# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION
### DOCKET NO. 1:23-CV-00041

----------------------------------------------------------------X

**JACOB DOE**

                **Plaintiff,**

      -against-

**THE UNIVERSITY OF NORTH CAROLINA
SYSTEM, THE UNIVERSITY OF NORTH
CAROLINA AT CHAPEL HILL, THE
UNIVERSITY OF NORTH CAROLINA BOARD
OF TRUSTEES, BOARD OF GOVERNORS OF
THE UNIVERSITY OF NORTH CAROLINA AT
CHAPEL HILL, KEVIN GUSKIEWICZ, in his
official capacity, ELIZABETH HALL, individually
and in her official capacity, JEREMY ENLOW,
individually and in his official capacity, BETH
FROEHLING, individually and in her official
capacity, REBECCA GIBSON, individually and in
her official capacity, JACLYN FEENEY,
individually and in her official capacity, DAVID
ELROD, individually and in his official capacity, and
DESIREE RIECKENBERG, individually and in her
official capacity,**

                **Defendants.**

----------------------------------------------------------------X

**VERIFIED COMPLAINT**

**JURY TRIAL
DEMANDED**

      Plaintiff Jacob Doe (hereinafter referred to as "Plaintiff" or "Doe")[1], by and through

his counsel, Nesenoff & Miltenberg, LLP, and Ekstrand and Ekstrand, LLP, as and for his

complaint against defendants the University of North Carolina System, the University of

---

[1] Plaintiff herewith files a motion to proceed pseudonymously.

1

North Carolina at Chapel Hill, the University of North Carolina Board of Trustees, the Board of Governors of the University of North Carolina at Chapel Hill, Kevin Guskiewicz, Elizabeth Hall, Jeremy Enlow, Beth Froehling, Rebecca Gibson, Jaclyn Feeney, David Elrod, and Desirée Rieckenberg (collectively, the "Individual Defendants") alleges upon knowledge with respect to himself, and upon knowledge, information and belief as to all other matters, as follows:

## THE NATURE OF THIS ACTION

1.      Plaintiff was a sophomore undergraduate student at the University of North Carolina at Chapel Hill ("UNC" or the "University") when he became the subject of a targeted campaign to destroy his reputation, his education, and his connections to the UNC community.

2.      In the spring of 2021, four undergraduate female students at UNC initiated false complaints of sexual misconduct against Plaintiff, arising out of alleged interactions spanning from March of 2020 through January 2021.

3.      Importantly, this was not an instance of four unconnected individuals who independently came forward to file reports with the University.  Instead, this was a premediated and coordinated campaign amongst the four women, spearheaded by UNC student Jane Roe 2, all of whom were part of a common friend group, regularly socialized with members of Plaintiff's fraternity, and two of whom were best friends.  Jane Roe 2 admitted that her actions in organizing the complaints against Plaintiff were intended to ostracize him from his friends, to have him excluded from his fraternity, and to have him lose his prestigious scholarship at UNC.

2

4.      This is precisely what the reporting parties accomplished.  Plaintiff has been shunned and cancelled by most, if not all, of his friends and peers at UNC, his reputation has been permanently destroyed, his scholarship was revoked, he was excluded from his fraternity and his apartment and, most critically, he has been permanently expelled from the entire University of North Carolina System.

5.      Though Plaintiff was ultimately found not responsible for any policy violations concerning two of the complainants and was found not responsible for most of the charges relating to the third complainant, the reporting parties succeeded in what they set out to do.  He has suffered immense, compounding, and irreparable harm since the University accepted the complaints, without question, in the spring of 2021.

6.      The University permitted the reporting parties to weaponize UNC's Title IX process against Plaintiff when the Investigators, Title IX Coordinator, the Equal Opportunity and Compliance Office, the Emergency Evaluation and Action Committee, the hearing panel chairs, and hearing panel members not only failed to ensure that the investigatory and adjudicatory processes were fair and objective, but rather contributed to the defective, prejudicial, and arbitrarily inequitable processes that were replete with gender bias against Plaintiff.

7.      As a result, Plaintiff was expelled from UNC and was barred from reapplying to UNC or applying to any constituent institution in the UNC System on a permanent basis in the spring of 2022, derailing his educational goals and career aspirations, and permanently tarnishing his name and reputation.

8.     Based on the foregoing, Plaintiff brings this action for violations of 42 U.S.C. § 1983 (Denial of Fourteenth Amendment Procedural Due Process), violations of Title IX of the Education Amendments of 1972, breach of contract, and other state law claims.

## **THE PARTIES**

9.     At all times relevant to this Complaint, Plaintiff was and is a natural person and citizen of the United States who currently resides in the State of North Carolina.

10.     At all times relevant to this Complaint, Defendant the University of North Carolina System (hereinafter the "UNC System") was and is a body politic and corporation capable of being sued pursuant to N.C.G.S. § 116-3 for the actions of its constituent institutions.   By statutory directive, the UNC System is "responsible for the general determination, control, supervision, management and governance of all affairs of the constituent institutions" (*Id*. § 116-11(2)) including, but not limited to, the University of North Carolina at Chapel Hill, East Carolina University, Elizabeth City State University, the University of North Carolina at Charlotte, the University of North Carolina at Asheville, the University of North Carolina at Wilmington, Western Carolina University and Appalachian State University.  N.C. Gen. Stat. § 116-2(4).

11.     At all times relevant to this Complaint, Defendant the University of North Carolina at Chapel Hill (the "University" or "UNC") was and is a public research university operated by the State of North Carolina and is a part of the UNC System and network of facilities of higher education with its principal place of business in Chapel Hill, Orange County, North Carolina.  As such, the University is a "constituent institution" of the UNC System.  N.C. Gen. Stat. § 116-2(4).

4

12.    At all relevant times, the Board of Governors of the University of North Carolina has been and is the corporate entity of the University "capable in law to sue and be sued" under N.C. Gen. Stat. § 116-3.

13.    At all relevant times, the University of North Carolina Board of Trustees, composed of eight individuals elected by the UNC Board of Governors, four individuals appointed by the North Carolina General Assembly, and the president of the student government, was and is tasked with serving as an advisor to the Board of Governors on matters pertaining to its institution and as advisor to the Chancellor concerning the management and development of the institution.

14.    Upon information and belief, at all times relevant to this Complaint, UNC and the UNC System receives and continues to receive federal funding and is therefore subject to liability under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a) (hereinafter "Title IX").

15.    At all relevant times, Defendant Kevin Guskiewicz ("Defendant Guskiewicz") was and is the Chancellor of the University of North Carolina at Chapel Hill.

16.    At all relevant times to the investigation, Defendant Elizabeth Hall ("Defendant Hall" or "Ms. Hall") was the Interim Head of the Equal Opportunity and Compliance Office (the "EOC").  Sometime in the fall of 2021, Defendant Hall was appointed the Associate Vice Chancellor of the EOC and the Title IX Coordinator for UNC, in the midst of the cases involving Plaintiff.

17.    At all relevant times, Defendant Jeremy Enlow ("Defendant Enlow" or "Mr. Enlow") was and is a Title IX investigator for the University, tasked with investigating

5

reports of sexual assault, interpersonal violence, stalking, complicity, retaliation, and protected class discrimination and harassment. Defendant Enlow was appointed as the lead investigator by Defendant Hall to investigate the allegations concerning Plaintiff.

18. At all relevant times, Defendant Beth Froehling ("Defendant Froehling" or "Ms. Froehling") was and is a Title IX investigator for the University, tasked with investigating reports of sexual assault, interpersonal violence, stalking, complicity, retaliation, and protected class discrimination and harassment.

19. At all relevant times, Defendant Rebecca Gibson ("Defendant Gibson" or "Ms. Gibson") was and is the University's Director of Report and Response in the Equal Opportunity and Compliance office. As such, Ms. Gibson worked with the Associate Vice Chancellor/Title IX Coordinator to oversee the University's efforts in responding to reports of harassment and discrimination, and also supervised the Report and Response Coordinators.

20. At all relevant times, Defendant Jaclyn Feeney ("Defendant Feeney" or "Ms. Feeney") was and is a Title IX investigator for the University, tasked with investigating reports of sexual assault, interpersonal violence, stalking, complicity, retaliation, and protected class discrimination and harassment. Upon information and belief, Ms. Feeney served for the first time as a Hearing Officer for the Roe 1, Roe 2, and Roe 3 hearings.

21. At all relevant times, Defendant David Elrod ("Defendant Elrod" or "Mr. Elrod") was and is the Associate Vice Provost, Equal Opportunity and Equity, of the Office for Institutional Equity and Diversity at North Carolina State University. Mr. Elrod was retained by UNC to serve as the Hearing Officer for the Roe 4 hearing.

6

22.     At all relevant times, Defendant Desirée Rieckenberg ("Defendant Rieckenberg" or "Ms. Rieckenberg") was the Dean of Students at UNC and served as the Hearing Chair for the EEAC in an August 19, 2021 hearing regarding Doe's request to attend classes during the fall semester of 2021.

## JURISDICTION AND VENUE

23.     This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 1331 and 1367.

24.     This Court has personal jurisdiction over the UNC System, the University, the University of North Carolina Board of Trustees, and the Board of Governors of the University of North Carolina at Chapel Hill on the ground that the UNC System is conducting business within the State of North Carolina, including in this judicial district.

25.     This Court has personal jurisdiction over the Individual Defendants as they all reside in the State of North Carolina and/or their wrongful and unlawful actions, individually and collectively, took place in the state of North Carolina.

26.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because the Defendant UNC System was and is a body politic and corporation capable of being sued pursuant to N.C. Gen. Stat. § 116-3 for the actions of its constituent institutions, including those which are located within this judicial district.[2]

---

[2] All constituents of the University of North Carolina System are implicated in Plaintiff's expulsion, as he was permanently removed from, and prohibited from applying to, any university within the University of North Carolina System.

7

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### I.    *Plaintiff's Matriculation at UNC*

27.    Plaintiff matriculated as a freshman student at the University in August of 2019, and enrolled in the Honors College.

28.    Prior to attending UNC, Plaintiff's high school guidance counselor described him as "a student who has the right moral compass to do the right thing regardless of personal cost", stating "I do not recall the last time I had a student who expressed such unbridled joy and emotion when he sees good things happening in the lives of his classmates."

29.    He chose to attend UNC in large part because he was awarded a prestigious Morehead-Cain Scholarship.

30.    During his first two years, Plaintiff met Morehead-Cain's rigorous GPA requirement while taking honors courses, majoring in philosophy and minoring in conflict resolution and history.

### II.    *Relevant Policies and Procedures*

31.    During the relevant timeframe, UNC employed different conduct policies depending upon the location of the alleged incident.

32.    The Policy on Prohibited Sexual Harassment Under Title IX ("Title IX Policy") applied to reports of Title IX Sexual Harassment that reportedly occurred on or after August 14, 2020, which was alleged to have taken place at "locations, events, or circumstances for which the University exercised substantial control over both the Responding Party and the context in which the Title IX Sexual Harassment occurred at the

time of the alleged incident.  This includes any building owned or controlled by a student organization that is officially recognized by the University.  This Policy applies to conduct that occurs in the United States."

33.     For alleged instances of sexual harassment or assault falling outside the definitions and/or jurisdictional requirements set forth by the Title IX Policy, the University would employ the Policy on Prohibited Discrimination, Harassment and Related Misconduct Including Sexual and Gender-Based Harassment, Sexual Violence, Interpersonal Violence, and Stalking ("PPDHRM") and the accompanying procedures.

34.     The PPDHRM applies to prohibited conduct that occurs on and off campus, including online or electronic conduct, if "the conduct occurred in the context of an employment or education program or activity of the University, had continuing adverse effects on campus, or had continuing adverse effects in an off-campus employment or education program or activity of the University."

35.     To determine whether the University has jurisdiction over conduct occurring off-campus that is not part of an educational program or activity of the University, the Director of the EOC or the Title IX Coordinator must assess whether the alleged conduct "has or is reasonably likely to have continuing adverse effects or to create a hostile environment for students, employees, or third parties while on campus or in any University employment or education program or activity."  Factors to be considered in making this assessment are "the seriousness of the alleged conduct, the risk of harm involved, whether both parties are members of the campus community, and whether the off-campus conduct is part of a series of actions that occurred both on and off campus."

9

36. Both the Title IX Policy and the PPDHRM assure that the University will "provide for the prompt and equitable" response to reports, however the specific procedures applicable to each policy differ in some respects, as described below.

**A.  <u>The Policy on Prohibited Sexual Harassment Under Title IX</u>**

37. Under the Title IX Policy, upon receipt of a report of Sexual Harassment, the Title IX Coordinator or designee must promptly contact the Reporting Party to discuss supportive measures, determine the party's wishes with respect to supportive measures, inform the reporting party of the availability of supportive measures regardless of whether a formal complaint is filed, and explain the process for filing a formal complaint.

38. The Title IX Coordinator or designee will also, where appropriate, refer the matter to the Emergency Evaluation and Action Committee ("EEAC") to assess whether the Responding Party poses a danger to themselves, or other members of the University community, or to University property.

39. Prior to any required notice to the responding party, if the EEAC determines that any of these conditions exist, they may impose a number of measures, alone or in combination, pending the conclusion of the resolution process.

40. Specifically, the EEAC "may impose on a student Responding Party an emergency removal, which may be referred to as a 'summary suspension,' if the EEAC finds an immediate threat to the physical health or safety of any individual arising from the allegations of Sexual Harassment that justifies removal."

41. The resolution process begins with the filing of a formal complaint with the Title IX Coordinator or designee.

42.     A formal complaint may be dismissed during the resolution process if the conduct reported in the formal complaint:  (i) would not constitute sexual harassment under Title IX; (ii) did not occur in a university educational program or activity; or (iii) was not directed against a person located in the United States.

43.     A Formal Complaint may also be dismissed, in whole or in part, in the Title IX Coordinator's discretion, if:  (i) a Reporting Party notifies the Title IX Coordinator or designee, in writing, that the Reporting Party would like to withdraw the Formal Complaint, in whole or in part; (ii) the Responding Party is no longer enrolled in or employed by the University; or (iii) specific circumstances prevent the University from gathering evidence sufficient to reach a determination about the Formal Complaint.

44.     After dismissing a formal complaint, the Title IX Coordinator or designee will send written notice of the dismissal and the reason(s) for dismissal simultaneously to the parties within five (5) business days.

45.     The Title IX Coordinator or designee also will review the reported conduct to determine whether investigation or other resolution of the complaint should proceed under the PPDHRM Policy.

46.     Either party may appeal the dismissal of a formal complaint within five (5) days on the following bases:  procedural irregularity; new evidence; or a conflict of interest or bias.

47.     Should the matter move forward, the University commits to conducting a prompt, thorough, and impartial resolution process.

48. Informal resolutions may be facilitated by the University to resolve a formal complaint at any time prior to reaching a determination on responsibility. Both parties must voluntarily consent to the informal resolution process in writing in order for it to proceed.

49. The Policy notes that in all phases of the formal resolution process, the parties will be provided an equal opportunity to present fact and expert witnesses, inculpatory and exculpatory evidence, and to have an advocate of their choice at any meeting.

50. Anyone invited to participate in any interview, hearing, or meeting must be provided written notice of the date, time, location, participants, and purpose of the meeting with sufficient advance time to prepare.

51. The Responding Party is to be presumed not responsible for the reported conduct at all times during the process, until a determination regarding responsibility is made at the conclusion of the formal process.

52. The Policy also specifies that the burden of proof and burden of gathering evidence sufficient to reach a determination of responsibility rest on the University and not on the parties.

53. The University is to provide written notice of the investigation to the parties within five (5) business days of receipt and review of a formal complaint, confirmation from the Reporting Party of the intent to proceed with an investigation and/or sufficient information for the University to determine whether the complaint meets the jurisdictional requirements.

54.     The written notice of investigation is to include the following information: (i) notice of the University's process for resolving reports of Title IX Sexual Harassment, including any available informal resolution processes; (ii) notice of the allegations of Sexual Harassment, including, if known, the identities of the parties involved in the incident, a summary of the conduct reportedly constituting Sexual Harassment; and the date and location of the reported incident; (iii) information about the range of potential sanctions under the Title IX Sexual Harassment Policy, including, where appropriate, notification that expulsion is a possible sanction for a student Responding Party and that expulsion precludes matriculation at any University of North Carolina constituent institution; and (iv) information about the parties' rights and responsibilities, including that the Responding Party is presumed not responsible for the reported conduct, the parties may have an Advocate of their choice, the parties may inspect and review evidence obtained as part of the investigation that is directly related to the allegations contained in the Formal Complaint, and that it is a violation of the University's PPDHRM Policy and Honor Code to knowingly make false statements or knowingly submit false information during the resolution process.

55.     The Title IX Coordinator will assign investigator(s) who have appropriate training and experience investigating allegations of sexual harassment. The investigator(s) are to gather information regarding the alleged conduct and will prepare an investigative report summarizing the evidence obtained as part of the investigation that is relevant to the allegations raised.

56.     Before the investigation report is completed, all parties have an equal opportunity to inspect and review any evidence obtained as part of the investigation that is directly related to the allegations, including evidence on which the University does not intend to rely in reaching a determination, as well as inculpatory and exculpatory evidence, so that each party may meaningfully respond to the evidence prior to conclusion of the investigation.

57.     After review of the evidence, the parties may submit a response in writing within ten (10) business days.

58.     Once the written responses are received, or the ten (10) business day response period lapses, the investigator(s) will consider any written responses and create a final investigation report summarizing all the evidence.

59.     After the investigation reports have been reviewed and responded to, the investigators will provide the report to a Hearing Panel.

60.     The final report must be sent to each party at least ten (10) business days prior to a hearing.

61.     The University designates a Hearing Panel selected from a pool of trained individuals.  Any individual designated to serve on a Hearing Panel must have sufficient training to serve in this capacity.

62.     Both parties have the ability to challenge a Hearing Panel member on the basis of an actual conflict of interest, bias, or lack of impartiality, and any Hearing Panel member may decline to participate on the basis of an actual conflict of interest, bias, or lack of impartiality.

63. Prior to the hearing, the Hearing Officer will meet separately with each party and their advocate to resolve pre-hearing concerns. At the pre-hearing meeting, the parties will have an opportunity to raise any challenges to the composition of the Hearing Panel and ask questions about the hearing process. Procedural challenges must be raised at least fifteen (15) business days prior to the hearing.

64. The hearing is conducted by the Hearing Coordinator or designee. The Hearing Coordinator is responsible for ensuring consistency in the process, informed understanding of Policy definitions and standards, and providing guidance as to available sanctions.

65. During the live hearing, both parties will have the opportunity to provide a statement of their account related to the alleged conduct, to present any evidence including witnesses, and, through their advocate, may pose cross-examination questions to any individual participating in the hearing.

66. Each party's advocate is permitted to ask the other party and any participating witnesses all relevant questions and follow up questions, including those challenging credibility.

67. The cross-examination is to be conducted directly, orally, and in real time by the party's advocate or advisor and never by a party themselves.

68. Before a participant answers any question, the Hearing Panel will first determine whether the question is relevant and will explain any decision to exclude a question as not relevant.

69.     Challenges to a relevance determination may not be raised during the hearing but may be raised on an appeal.

70.     While questions and evidence concerning a complainant's sexual predisposition or prior sexual behavior are generally deemed not relevant, such evidence can be offered when it concerns specific incidents of prior sexual behavior between the parties and is offered to prove consent.

71.     The Hearing Panel may not draw an adverse inference about responsibility based on a party or witnesses' absence from the hearing or refusal to answer cross-examination questions.

72.     After the hearing, the Hearing Panel will make a final determination regarding responsibility using the preponderance of the evidence standard.     The determination should be made based upon an objective evaluation of all relevant evidence, both inculpatory and exculpatory.

73.     The Hearing Panel will then issue a written determination that includes:  (i) identification of the reported conduct potentially constituting Sexual Harassment; (ii) a description of the procedural steps taken from receipt of the formal complaint through the determination, including any notices to the parties, interviews with the parties and witnesses, site visits, methods used to gather other evidence, and hearing(s) held; (iii) findings of fact supporting the determination; (iv) conclusions regarding the application of the University's Title IX Sexual Harassment Policy to the facts; (v) a statement of and rationale for the result as to each instance of reported conduct, including a determination regarding responsibility, any disciplinary sanctions imposed on the Responding Party; (vi)

16

whether remedies will be provided to the Reporting Party; and (vii) the University's procedures and permissible bases for the parties to appeal, including the time frame for submitting an appeal and the name of the Appeals Officer who will be assigned to review any appeal filed.

74. The decision is to be provided to both parties simultaneously.

75. Either party may submit an appeal based on: (i) procedural irregularity; (ii) new evidence; and/or (iii) conflict of interest or bias.

76. Appeals must be submitted in writing to the Report and Response Coordinator within five (5) business days of the determination.

77. Upon receipt of the appeal, the Title IX Coordinator will forward the appeal to the Appeals Officer, who is to be an impartial decision-maker selected from a pool of trained individuals.

78. If the appeal meets the required criteria, the other party is permitted an opportunity to review the written appeal and respond to it in writing.

79. Generally, the scope of the appeal is limited to a review of the written documentation or record of the original hearing and pertinent documentation regarding the grounds for appeal.

80. The Appeals Officer may affirm the outcome, return the matter to the Hearing Panel with instructions to reconvene to cure a procedural error or to assess the weight and impact of newly discovered evidence, or where the procedural error cannot be cured by returning the matter to the original Hearing Panel, convene a hearing before a newly constituted Hearing Panel.

81.     A written decision is to be issued within fifteen (15) business days from the date of submission of all appeal documents.

82.     Appeal decisions are final except in cases involving suspension or expulsion, which allow for further appeal based on specific grounds.

83.     Specifically, either party may further appeal to the Board of Trustees based upon a violation of due process, and material deviation from the Minimum Substantive and Procedural Standards for Student Disciplinary Procedures adopted by the Board of Governors, University of North Carolina Policy Manual §700.4.1.

84.     Where the Board of Trustees affirms the Hearing Outcome, the decision is final and not subject to further appeal.

85.     Sanctions are intended to address the effects of the misconduct on the Reporting Party and the University, hold the Responding Party accountable for the conduct, and eliminate sexual harassment, prevent its recurrence, and remedy its effects.

86.     The expulsion of a student must be approved by the Chancellor and means that a student is removed from the University and from the UNC System permanently, and may not be readmitted to any UNC System university unless and until the Chancellor concludes, based on the student's petition, that the individual should be given another opportunity to pursue an education within the UNC System.

87.     The Policy provides that the Title IX Coordinator, investigator(s), and any individuals designated by the University as a decision-maker in the formal resolution process, must not have a conflict of interest or bias for or against Reporting Parties or Responding Parties generally or an individual Reporting Party or Responding Party; must

18

not rely on sex stereotypes; and must promote impartial investigations and adjudications of Formal Complaints of Sexual Harassment.

88. Further, these individuals must receive training on: the definition of Sexual Harassment; the scope of the University's Educational Program or Activities; how to conduct an investigation and grievance process including hearings, appeals, and informal resolution processes as applicable; and how to serve impartially, including avoiding prejudgment of the facts at issue, conflicts of interest, and bias.

89. The Policy also specifies that hearing officers must receive training on issues of relevance of questions and evidence, including when questions and evidence about the Reporting Party's sexual predisposition or prior sexual behavior are not relevant, and investigators must receive training on issues of relevance to create an investigative report that fairly summarizes relevant evidence.

**B. Policy on Prohibited Discrimination, Harassment and Related Misconduct Including Sexual and Gender-Based Harassment, Sexual Violence, Interpersonal Violence, and Stalking**

90. Upon receipt of a report under the PPDHRM, a response team composed of a group of administrators – the Director of Equal Opportunity and Compliance, the Title IX Compliance Coordinator, a Report and Response Coordinator, and or staff in the Office of the Dean of Students – will offer resources to the Reporting Party and conduct an initial assessment.

91. The initial assessment considers the nature of the report, the safety of the parties and the campus community, the Reporting Party's preference for resolution, and the necessity for any supportive measures.

19

92.     As part of the initial assessment, a preliminary meeting will take place between the Reporting Party and the Report and Response Coordinator.

93.     If appropriate, an investigator may also meet with the Reporting Party to gather any necessary information.

94.     The Report and Response Coordinator will address any immediate concerns about the physical safety and emotional well-being of the parties, provide the Reporting Party with information about resources, advise on the procedural options available for resolution of the complaint, notify the party of the option to report to law enforcement, discuss the Reporting Party's preference for resolution, explaining the policy on retaliation, and explain the roles of those involved in the investigation process.

95.     The Report and Response Coordinator will also gather facts that will enable the Associate Vice Chancellor of Equal Opportunity and Compliance/Title IX Coordinator to assess the nature and circumstances of the allegation, refer the matter to EEAC for appropriate action, assess a potential pattern of evidence or similar conduct, determine whether a timely warning under federal law is required, and enter non-identifying information about the report into the University's daily crime log if the conduct is criminal in nature.

96.     When a Responding Party is notified of the allegations during the initial assessment, the Report and Response Coordinator will provide the party with information about resources, the available range of supportive measures, an explanation of procedural options, and the prohibition on retaliation.

97.     Following the initial assessment, the Director of Equal Opportunity and Compliance or the Title IX Compliance Coordinator may: (i) take no further action (ex: if the conduct alleged would not rise to the level of a violation); (ii) pursue voluntary resolution; or (iii) pursue investigation and adjudication to determine if disciplinary action is warranted.

98.     Upon receipt of a report, the Director of Equal Opportunity and Compliance or the Title IX Compliance Coordinator, in coordination with the Response Team, will make an immediate assessment of the risk of harm to the parties or to the broader campus community and will take steps necessary to address any risks.

99.     These steps include establishing interim measures, and may include referral to the EEAC to assess whether any individual poses a serious threat of disruption to the academic process or a danger to themselves, or other members of the University community or University property.

100.     If a Reporting Party does not want to move forward with a formal investigation, voluntary resolution may be available. However, the University retains discretion to determine when voluntary resolution is appropriate.

101.     Following the initial assessment, and in consultation with the Reporting Party, the University will initiate a prompt, thorough, and impartial investigation, designed to provide a fair and reliable gathering of the facts by a trained and impartial investigator.

102.     The Director of Equal Opportunity and Compliance or the Title IX Compliance Coordinator will oversee the investigation.

103.    All individuals, including both parties and any witnesses are to be treated with appropriate sensitivity and respect throughout the investigation.

104.    The Director of Equal Opportunity and Compliance or the Title IX Compliance Coordinator will assign investigator(s) who have training and experience in investigating allegations of prohibited conduct.  The investigator will gather information regarding the alleged conduct, and then determine if the information gathered establishes that the alleged conduct occurred by a preponderance of the evidence and if so, whether the conduct constitutes a violation of the Policy.

105.    The Equal Opportunity and Compliance Office will send the Reporting Party and the Responding Party a written notice of investigation, which constitutes the formal charge.  The notice is to be issued within five (5) business days of receipt of confirmation from the Reporting Party that he or she intends to proceed with an investigation and/or sufficient information for the University to determine that the report raises a potential policy violation.

106.    The Notice of Investigation should contain a summary of the allegations or conduct at issue, the range of potential violations under the Policy, the range of potential sanctions, and information about the prohibition on retaliation.

107.    The Notice of Investigation will also include, where appropriate, notification that expulsion is a potential sanction and that expulsion precludes matriculation at any UNC institution.

108.    The Director of Equal Opportunity and Compliance and the Title IX Compliance Coordinator will seek to resolve all reports within one academic semester and

will use best efforts to complete an investigation within sixty (60) business days from issuance of the Notice of Investigation.

109. During the investigation, the Reporting and Responding Parties will have an equal opportunity to be heard, to submit information, and to identify witnesses who may have relevant information.

110. The investigators will aim to speak separately with the parties, and any other individuals who have relevant information.

111. The investigators will gather any available physical or documentary evidence, including prior statements by the parties or witnesses, any communications, emails, social media, text messages, or other relevant materials, as well as information that is relevant to the determination of an appropriate sanction or remedy, including information regarding impact of the alleged incident on the parties.

112. All community members are expected to cooperate with the EOC office, to assure fairness and procedural due process.

113. The EOC will request the appearance of individuals from the University community who can provide relevant evidence.

114. The parties may decline to participate in proceedings, in which case the Director of Equal Opportunity and Compliance or the Title IX Compliance Coordinator will determine whether the investigation and hearing will proceed in the parties' absence.

115. If either party chooses not to appear, the investigators will determine whether the available evidence establishes a violation of the Policy.

116.    The investigators retain discretion to determine the relevance of any evidence and may exclude information in preparing the investigation report if the information is immaterial, irrelevant, or more prejudicial than informative.

117.    The investigators may also exclude statements of personal opinion by witnesses and statements as to general reputation or character.

118.    Generally, character information is deemed not relevant and will be excluded, as will prior sexual history or pattern evidence, except in limited circumstances including the following:

- Where there is evidence of a pattern of similar conduct, regardless of whether there has been a prior finding of a policy violation; where there is a prior finding of a violation for a similar act, there is a presumption of relevance and the finding may be considered in making a determination as to responsibility and assignment of a sanction.
- Where there was a prior or ongoing relationship between the parties and responding party asserts that consent was sought and given.
- A party's sexual history with an individual other than the reporting party may be relevant to prove intent, motive, absence of mistake, or to explain an injury.

119.    The University has discretion to consolidate multiple reports into one investigation, or one case before a Hearing Panel, if the information related to each incident would be relevant and probative in reaching a determination.

120.    Both parties have an opportunity to submit a written impact statement, the purpose of which is to provide relevant information about how the alleged conduct has affected their access to educational programs, activities, and opportunities.  It may also include any mitigating or aggravating factors to be considered in the sanctioning phase.

121. Impact statements will not be considered when determining responsibility, but will only be reviewed when deciding upon a sanction.

122. At the conclusion of the investigation, the investigators will prepare a written report summarizing the information gathered and noting the areas of agreement and disagreement between the parties.

123. Before the report is finalized, the parties will each have an opportunity to review the draft report and submit any final additional comments or information to the investigators within five (5) business days.

124. Subsequently, the investigators will consider the statements and address any new information, before finalizing the investigation report.

125. The final report includes an investigative finding, which determines whether the Responding Party violated a policy by the preponderance of the evidence standard.

126. In reaching the finding, the investigators will consult with the Director of Equal Opportunity and Compliance, the Title IX Compliance Coordinator, and any other designated administrator who has relevant information. The investigators may also consult with the Dean of Students regarding any prior disciplinary history of the Responding Party and the UNC Policy regarding any prior criminal history.

127. Once the investigation finding is issued, each party will meet separately with the Report and Response Coordinator for an outcome conference, at which point the parties will be permitted to review the final investigation report.

128. When there has been an investigation finding that a policy has been violated, the parties may: (i) accept the finding and recommended sanction; (ii) accept the finding

but request a hearing on the recommended sanction; or (iii) request a hearing on the finding and the recommended sanction.

129.    If either party requests a hearing, the matter will be referred to a Hearing Panel to determine whether a policy violation occurred and/or to determine an appropriate sanction.

130.    The Hearing Panel will send a Notice of Hearing to the parties and the investigators identifying the hearing date, location, and other details about the process and procedure.

131.    A pre-hearing meeting will take place with each party and the Hearing Chair to discuss the process, address any questions, and raise any new information not previously identified.

132.    The investigators are responsible for presenting the evidence supporting the investigative finding at the hearing.

133.    After the hearing, the Hearing Panel will make their own assessment of whether a policy violation occurred, based upon the relevant facts.

134.    The Hearing Panel will issue a Notice of Hearing Outcome within five (5) business days, which shall include the finding, the rationale for the result, a brief summary of evidence on which the finding is based, any sanctions, the date by which they must be satisfied, and information about the appeal process.

135.    The policy permits the Hearing Panel wide latitude in deciding upon appropriate sanctions and corrective measures to be imposed, guided by the understanding

that sanctions and/or corrective measures are intended to eliminate prohibited conduct, prevent its recurrence, and remedy its effects.

136.    Sanctions and corrective measures may include educational, restorative, rehabilitative, and punitive components.

137.    The Policy further notes that some behavior, however, "is so egregious in nature, harmful to the individuals involved, or so deleterious to the educational process that it requires severe sanctions, including suspension from the University or expulsion from the UNC System."

138.    In cases resolved through an investigation, the investigator in consultation with the Response Team is responsible for deciding upon an appropriate sanction.  In cases that are resolved through the Hearing Panel, the Hearing Panel is responsible for deciding upon appropriate sanctions.

139.    In reaching this determination, the investigator or Hearing Panel may solicit information from the Reporting Party, the Responding Party, and any other individual who can provide information relevant to the determination regarding potential sanctions.

140.    Some of the factors to be considered when deciding upon sanctions include: (i) the nature and violence of the conduct at issue; (ii) the effects of the conduct on the Reporting Party; (iii) the impact of the conduct on the community or the University; (iv) prior misconduct by the Responding Party and prior disciplinary history; (v) whether the Responding Party has accepted responsibility for the conduct; (vi) whether the Responding Party demonstrates an understanding of the requirements of the Policy; (vii) maintenance

27

of a safe and respectful environment; (viii) protection of the University community; and (ix) any other mitigating or aggravating factors.

141.    Either party may appeal to the Appeals Officer, an impartial decisionmaker designated by the Chancellor, within five (5) business days.

142.    The appeal must be based on one of the following grounds: (i) a violation of due process; (ii) material deviation from the Minimum Substantive and Procedural Standards for Student Disciplinary Procedures adopted by the Board of Governors, University of North Carolina Policy Manual §700.4.1; or (iii) newly discovered information has been obtained that was not previously available during the investigation or adjudication process and this new information would substantially affect the outcome.

143.    If the appeal is deemed timely and properly filed, each party will be given the opportunity to review the written appeal and respond to it in writing.

144.    The Appeals Officer may affirm the outcome, alter the outcome, return the matter to the Hearing Panel with instructions to reconvene to cure a procedural error or to assess the weight and impact of newly discovered information, or where the procedural error cannot be cured by returning the matter to the original Hearing Panel, convene a hearing before a newly constituted Hearing Panel.

145.    The Appeals Officer will render a written decision on the appeal to both parties within fifteen (15) business days from the date of submission of all documents.

146.    Appeal decisions are final except in cases involving suspension or expulsion, which allow for further appeal to the Board of Trustees based on specific grounds.

147.    Specifically, either party may further appeal to the Board of Trustees based upon a violation of due process, and material deviation from the Minimum Substantive and Procedural Standards for Student Disciplinary Procedures adopted by the Board of Governors, University of North Carolina Policy Manual §700.4.1.

148.    Where the Board of Trustees affirms the Hearing Outcome, the decision is final and not subject to further appeal.

149.    Sanctions of expulsion, permanent suspension, suspension for a definite or indefinite period, and probation are all noted on a student's transcript.

### III.    The Complainants- Jane Roe 1, Jane Roe 2, Jane Roe 3, Jane Roe 4.

#### A.  Jane Roe 4[3]- March through June, 2020

##### i.    Plaintiff's interactions and relationship with Roe 4

150.    Jane Roe 4 introduced herself to Plaintiff the first night he was on campus, in the fall of 2019.  The two became friends quickly and soon interacted with each other nearly every day thereafter during the school year.

151.    Their friendship became a very close one, as exhibited by Roe 4's offer for Plaintiff to sleep on a cot on the floor of her dormitory room when he had difficulty sleeping in his own room because of his roommate.  During his first semester at UNC, Plaintiff essentially lived in Roe 4's room.  They would often sleep in the same bed together, without any sexual contact occurring.  When Plaintiff was assigned to a single room the following

---

[3] Jane Roes 1-4 are numbered chronologically according to when their complaints were adjudicated by the University.

semester, Roe 4 would likewise sleep with Plaintiff in his bed often, again with no sexual contact occurring between them.

152.    Plaintiff viewed Roe 4 as a sister, in which each of them referred to the other as their "tiny twin," and with their relationship growing so close that Roe 4 confided in Doe about her various difficulties, whether related to physical abuse she had suffered in high school, a diagnosed eating disorder, other forms of abuse suffered, or suicidal ideation.

153.    Their relationship remained platonic at all times, and Plaintiff never attempted to engage in any sexual contact with her.

154.    During their freshman year, Roe 4 began dating John Coe[4], Plaintiff's best friend at that time.

### ii.    Spring break 2020-Gulf Shores, Alabama.

155.    Throughout their freshman year, Plaintiff and Roe 4 continued to regularly sleep in the same bed and hugged each other often.  In the spring semester of their freshman year, March of 2020, UNC announced that it would be forced to close its campus in response to the Covid-19 pandemic.  At the time this announcement was made, Plaintiff, John Coe, Roe 4 and their friends were in Gulf Shores, Alabama on Spring Break.  Consequently, they learned that rather than returning to campus after their trip, they would be required to return home instead.  Roe 4 was particularly concerned that by returning home early, John Coe would decide to break up with her, a concern that became apparent to others throughout the Gulf Shores trip.

---

[4] John Coe is a pseudonym.

30

156. As described by Witness James Moe[5]: "[Roe 4] was dating [John Coe] at the time but it was – it was becoming, like, I could tell, I could tell that they, like, were not necessarily on good terms from [John Coe's] side. I definitely think [Roe 4] still wanted to be dating [John Coe], but he was starting to, like, not want to date her."

157. Roe 4 and Plaintiff continued to regularly hug during the spring break trip, just as they always did. However, despite the hundreds of hugs that preceded that trip, Roe 4 claimed to take issue with one hug in particular with Plaintiff, which ultimately formed the basis for her sexual misconduct complaint against him.

158. That hug took place when Roe 4 was seated on a highbacked bar chair that was situated under the kitchen bar counter when Plaintiff approached her from behind, put his arms around her and inadvertently placed his hands in her lap.

159. After the trip concluded, Plaintiff and Roe 4 exchanged text messages, in which Plaintiff wrote: "Thank you gulf shores…I feel like we did it right." Roe 4 responded: "Oh absolutely." There was no indication at the time that Roe 4 took issue with anything that had occurred over spring break.

160. From March of 2020 through June of 2020, Plaintiff and Roe 4 continued to text frequently and hung out with each other on multiple occasions.

### iii.    *June 2020 – Charlotte, North Carolina.*

161. After UNC closed its campus due to the pandemic, Plaintiff spent time at his condominium in Charlotte, which was not far from where Roe 4 lived. She visited Plaintiff

---

[5] James Moe is a pseudonym.

there and spent much time discussing the fact that John Coe had broken up with her, a topic that became tiresome for Plaintiff as well as any friends visiting when Roe 4 was also present.

162.     On or about June 15, 2020, during one of Roe 4's visits with Plaintiff in Charlotte, they greeted each other with a hug as they always did, watched a movie, talked, and got food from a store nearby.  When it got late, Plaintiff walked her out, gave her a hug and said goodbye.

163.     The following day, John Coe told Plaintiff that Roe 4 had called him to tell him that Plaintiff made Roe 4 feel uncomfortable.  John Coe did not believe that Plaintiff would act in this manner given Plaintiff's relationship with Roe 4 which was like that of a sister.

164.     Further, Plaintiff later learned that Roe 4 also told John Coe that Plaintiff had "tricked" her into thinking that friends of Plaintiff's would also be present on the prior evening at the condominium.  However, the friends had told Roe 4 that Plaintiff did invite them over; but they declined the invitation as they did not want to hear more of Roe 4's incessant complaints about John Coe.

165.     In response to hearing this information from John Coe, Plaintiff wrote to Roe 4 by text message, stating "Hey [Roe 4] I just got off the phone with [John Coe] and he told me that I had made you uncomfortable.  If that's what happened I'm so sorry, you know I love you like an extra sister and I would never do something intentionally to make you feel that way."  Roe 4 responded "yes totally I just a little uncomfortable w some of the touchiness and I felt like it was a lot more than usual w adam and john."

32

166.    Alarmed by her claim, Plaintiff responded by stating "I think of you as my little sister, my entire family refers to as my twin, and I'm sorry I made you feel that way."

167.    Evidently, Roe 4's complaint regarding her interactions with Plaintiff in Charlotte in June of 2020 were manufactured in response to her disappointment over the deterioration of her relationship with John Coe, and with an intent to make John Coe jealous.

168.    Despite her later claims of alleged misconduct committed by Plaintiff, a few weeks later in July of 2020, Roe 4 invited Plaintiff to go to the beach with her and her friend Sara Poe.[6]  Plaintiff declined the invitation.

169.    Thereafter, Plaintiff did not initiate any communications with Roe 4 until the following year.

170.    However, Roe 4 continued to call Plaintiff, and sent him messages via Snapchat and iMessage.  On one occasion in September of 2020, Roe 4 asked him for a "tiny twin talk" – a phrase used by Roe 4 to refer to a private discussion with Plaintiff wherein she would discuss her current grievances towards other people.  Plaintiff responded that he was busy that day, but maybe "some other time."

171.    When classes resumed in the fall of 2020, Plaintiff did not engage in any communications or interactions with Roe 4, and John Coe began engaging in sexual interactions with other women, including Roe 2.

---

[6] Sara Poe is a pseudonym.

## B. <u>Jane Roe 2 – October 2020</u>

### i. *Plaintiff's interactions with Roe 2 on October 22-23, 2020.*

172. After Roe 2 matched with Plaintiff on a college hook-up app in October of 2020, Roe 2 and Plaintiff made plans for Roe 2 to come to Plaintiff's room in his fraternity house on the evening of October 22, 2020.

173. However, Roe 2 did not want to be seen entering the fraternity house, so she insisted on entering Plaintiff's room through a window on the back side of the fraternity house.

174. Upon arriving to the fraternity house that evening, Roe 2 climbed through Plaintiff's window into his bedroom. They watched a movie together and then became intimate.

175. Plaintiff asked Roe 2 if she wanted him to perform oral sex on her. She responded that she did, but she did not want John Coe or any of Plaintiff's and John Coe's fraternity brothers to find out.

176. Plaintiff told her that John Coe would not care if he and Roe 2 had a sexual interaction, a true statement based on a conversation Plaintiff had had with John Coe earlier that evening, upon being contacted by Roe 2 on the hook-up app. Specifically, Plaintiff asked John Coe whether he was interested in Roe 2 because Plaintiff had invited her over to his room. John Coe responded that he did not care.

177. After relaying the information that John Coe would not care if they had sex to Roe 2, she directly expressed consent to receiving oral sex. Plaintiff thereafter asked Roe 2 whether she wanted to engage in sexual intercourse, to which she responded

34

affirmatively. They climbed up onto his lofted bed and proceeded to engage in intercourse twice, before falling asleep together.

178. The following morning, Plaintiff walked to the store to purchase a Plan B-emergency contraception, as he had promised Roe 2 he would the night before. When Plaintiff returned, all the while Roe 2 remained in this room, Roe 2 took the Plan B and then consented to engaging in intercourse with Plaintiff once again.

179. Though Roe 2 had class that morning, she did not want to leave Plaintiff's room quite yet. Thus, Plaintiff brought Roe 2 breakfast, which she ate in his room, and Roe 2 then attended her remote class and took a quiz during the class from Plaintiff's room, by signing onto his computer.

### ii.    Jane Roe 2 and John Coe Begin a Dating Relationship.

180. It was clear to Plaintiff that Roe 2's primary concern regarding her four (4) sexual interactions with Plaintiff was that she did not want John Coe to find out about it. Roe 2 had been pursuing John Coe as a romantic interest, and Plaintiff was his best friend. She specifically stated to Plaintiff, "I don't want [John Coe] to think I'm a whore."

181. After his encounter with Roe 2, Plaintiff contacted John Coe to confirm that he was ok with Plaintiff having hooked up with Roe 2. John Coe responded that he "did not give a fuck."

182. Plaintiff and Roe 2 did not have any further sexual interactions, and they continued to be friendly thereafter. In fact, a few weeks later, on November 20, 2020, Roe 2 sent Plaintiff a video in which she told Plaintiff to "get your shit together" and join her and Roe 1 at a party at Roe 1's apartment.

183.    Roe 2 continued to pursue John Coe, and they eventually entered into a non-exclusive relationship, before it turned into an exclusive relationship around January 23, 2021.

184.    On or around January 23, 2021, Roe 2 told her best friend, Roe 1 (who had been in a nonexclusive but regular sexual relationship with Plaintiff), that she had engaged in sexual intercourse with Plaintiff in the fall of 2020.

185.    On or around January 27, 2021, Roe 2 told John Coe that she had engaged in sexual intercourse with Plaintiff in the fall of 2020.

186.    Thereafter, Roe 2 and Plaintiff engaged in a conversation via Snapchat messaging, in regard to their interactions, Roe 2's discussion with Roe 1, and Roe 2's relationship with John Coe.

187.    Roe 2 stated in part: "You have become a really good friend over these past months…I'll definitely be around a lot and I don't want things to be uncomfortable at all…I honestly do believe u don't have bad intentions it's just hard for me to know what to do bc I want to be a good friend to everyone…I can't act like I didn't learn all the information I did on Saturday and ignore it…"

188.    Plaintiff responded in part, saying:  "I don't know what all [Roe 4] or whoever said on Saturday, but I making a genuine promise to you that that's not me. What matters most to me is reassuring the people that I care most about that the version of me they know is really me…I'm listening and I want to talk about anything you need to say."

189.    Roe 2 then referenced the conversation held between herself, Roe 1, and Roe 4, stating in part: "the things that were said weren't anything along the lines of u like

36

holding down and forcing yourself onto girls it was more abt subtle emotionally manipulative tactics you use to get girls to have sex and pressure."

190. The conversation ended on pleasant terms, with Plaintiff and Roe 2 agreeing to remain cordial.

191. Later that evening, they both attended a Valentine's themed cocktail party, where they took part in a group photo together.

192. In December 2020, the Kappa Sigma fraternity was expelled from UNC's campus due to various violations of university rules. Accordingly, John Coe and Plaintiff moved into a small two-bedroom, one bathroom apartment near campus. Soon after, in January of 2021, Roe 2 for all intents and purposes moved in with the two of them, even though she had a designated single room in a dormitory on campus.

193. Roe 2 continued to stay overnight with Plaintiff and John Coe at least four to five times per week without issue, up until and continuing through, the time she filed a complaint against Plaintiff with the University.

### iii. *Plaintiff's Interactions with Roe 2 in March of 2021.*

194. On March 20, 2021, Roe 2 took her younger brother, a minor, out to parties with her and got him severely intoxicated. She then brought him back to Plaintiff's and John Coe's apartment, where he passed out on their couch while Roe 2 went to sleep in John Coe's room.

195. Upon waking up the following morning, Plaintiff discovered Roe 2's brother sleeping on the couch and obviously hungover, so he went out to get him some breakfast. Plaintiff then returned to the apartment and kept Roe 2's younger brother company by

playing video games with him, not wanting to leave him alone while Roe 2 remained in John Coe's room until around noon. When Roe 2 finally emerged from the bedroom, Plaintiff ignored her, given his shock at her treatment of her younger brother.

196. Later that same day, Roe 2 sent the following message via Snapchat to Plaintiff:

> Listen [Doe], I've been nothing but nice to you at every chance I get and you continuously refuse to acknowledge me or even my presence whatever I see u which is rlly often. idk [I don't] know what i said or did to make u act that way towards me all of the sudden but i don't appreciate it because it makes situations that don't need to be uncomfortable very uncomfortable. it's not cool for u to be all nice and cute w my brother then shut down the moment i walk out. i get we have had issues in the past but you were the one who wanted to make things amicable bc we see each other so often and i agree so idk why we can't do that. i'm not going to force u to act a certain way with me i just wanted to express that it makes me really uncomfortable when u don't j [just] talk to me like things are normal bc then im continuously reminded of what happened and i can't relax at my own boyfriends place. idk i just wanted to voice that.

197. Unfortunately, Plaintiff's upset and reaction to Roe 2's behavior with her little brother caused Roe 2 to turn on Plaintiff, initiating a chain of events that would lead to the commencement of multiple false complaints, and an eventual expulsion from the University.

## C. Jane Roe 1- November 2020 to February 2021

### i. *Plaintiff and Roe 1's Relationship.*

198. Plaintiff and fellow UNC student Roe 1 began a non-exclusive romantic relationship in the fall of 2020.

38

199. The first evening they spent time together was on November 1, 2020, in Plaintiff's room at his fraternity house. They watched a movie on the couch and then became intimate.

200. They climbed into his lofted bed and engaged in intercourse, during which Roe 1 placed Plaintiff's hand on her neck, stating that she liked it. Taking her direction, Plaintiff kept his hand there for a brief time. When Plaintiff asked where she wanted him to ejaculate, she stated "anywhere"; he specifically asked "inside you?" to which she stated "yes." The two fell asleep together in Plaintiff's bed.

201. Upon waking the following morning, Plaintiff went to McDonald's to get breakfast for Roe 1. They ate together and Roe 1's roommate, Kate Joe,[7] then came to pick her up for class. Roe 1 sent Plaintiff a message via Snapchat the same day, asking if he would Venmo $50 to Kate Joe for a Plan B-emergency contraception, and he did so.[8]

202. From November 1, 2020 through about January 25, 2021, Plaintiff and Roe 1 engaged in approximately forty similar consensual sexual interactions, including a weekend long stay from January 18-20, 2021 at the Carolina Inn.

203. During this time period, they continuously engaged in text message and Snapchat conversions, all of which appeared to be normal and friendly interactions.

_____

[7] Kate Joe is a pseudonym.

[8] Despite the request for a money for a Plan B, Roe 1 lied about this first sexual interaction with Plaintiff when she was interviewed by the EOC Investigators. In fact, during her interview, Roe 1 claimed that Plaintiff had attempted to force himself sexually on her but she had to fight him off. Roe 1 then continued her lies to the EOC Investigators, stating that Plaintiff threatened that he would tell everyone that she had had sex with him so that she should have sex with him anyway, which Roe 1 claimed to ignore as she left Plaintiff's room.

204. Plaintiff and Roe 1 were never in an "exclusive" dating relationship during this time period, and both engaged in sexual activity with others. While Plaintiff had intended to ask Roe 1 to become exclusive with him, she broke up with him before he was able to do so.

### ii. Roe 1 learns of Roe 4's accusations and breaks up with Plaintiff.

205. On January 23, 2021, while at a party, Roe 4 disclosed her accusations about Plaintiff to both Roe 2 and Roe 1, at which point Roe 1 learned that her best friend Roe 2 had also engaged in sexual intercourse with Plaintiff, less than two weeks before Roe 1 first became intimate with Doe.

206. Devastated and heartbroken by this revelation, two days later, on January 25, 2021, Roe 1 ended her relationship with Plaintiff. That same day, Roe 1 sent a text message to Plaintiff, explaining the reason she was upset, as follows:

> you need to listen to the exact accusations. you tend to pressure girls and become manipulative when trying to get a girl to have sex with you. you say all the right things to put a girl into the perfect emotional state to just give in. on a personal level you like to have sex very aggressively *which works* but there needs to be a balance.

207. Plaintiff responded, writing in part:

> What you've just said is devastating to me. That would never be my intention…I wish you had felt comfortable enough with me when we were actually being intimate to tell me that because this makes me feel terrible. Thank you for explaining to me now. I have to process all of that.

208. Roe 1 replied, writing:

40

just please take it into account because I know youre a good person and thats why it hurts for me to do this.[9]

209.   On the evening of January 27 into the early morning of January 28, 2021, Roe 1 slept in a lawn chair in the foyer of Plaintiff's apartment, where she waited the entire evening for him to return home from a party to which Roe 1 had not been invited.  She knew that he had attended a Valentine's themed cocktail party with a date, and intended to confront Plaintiff and his date when they came back to his apartment together that evening[10].  When Plaintiff did arrive home, alone, at around 9:00 a.m. he went to his bedroom and then sent Roe 1 a text message, asking if she wanted to come to his room and go back to sleep with him, in his bed.  The text message conversation began at 9:49 a.m. and went as follows:

| | |
|---|---|
| Plaintiff: | Want to crawl back in bed for a bit? |
| Roe 1: | 100% |
| Plaintiff: | Lmao then come here I've already got you a spot |

---

[9] Roe 1 lied about this text exchange when interviewed by the EOC Investigators.  Acting as if she were reading the texts from her phone, Roe 1 added and deleted certain key words from the exchanges to make the conversation appear less exculpatory as to Plaintiff.  Despite promises to the EOC Investigators that she would provide copies of the text exchange, Roe 1 failed to do so.  The Investigators did not follow up with Roe 1 after the first request for the texts and medical records.  Had they followed up, the Investigators would have discovered that Roe 1 was not being honest in her initial interview.  It was only after Plaintiff provided the texts that the Investigators had any idea how dishonest Roe 1 had been.  At the hearing, Roe 1 left the hearing at the suggestion of her lawyer – because it was her birthday – and before she could be cross-examined on these points by counsel for Plaintiff.

[10] Roe 1 fabricated the events of this evening entirely during the EOC's investigation.  Her story was disputed by the text message conversation described and set forth herein, as well as a photo from the Valentine's party on the evening of January 27, 2021, showing Plaintiff along with his date, John Coe, and Roe 2.  Notably and again, Roe 1 left the hearing before she could be cross-examined about the fabricated story she provided to the EOC Investigators.  The EOC investigators never followed up with Roe 1 to question her about her the obvious prevarications provided in her EOC interviews when compared to the three (3) lines of text set forth above.

41

210.    No sexual contact took place between the two; they only slept in the bed together for several hours that morning until Roe 2 took Roe 1 home.

211.    A few days later, on February 3, 2021, Roe 1 contacted Plaintiff, saying she wanted to talk with him about something important.  She indicated this conversation needed to be in person, so she went to meet him at his apartment.  When she arrived, she asked Plaintiff three questions she had written down ahead of time on her phone, to which he responded truthfully as follows:

| | | |
|---|---|---|
| Roe 1: | Did you really have sex with [Roe 2]? |
| Plaintiff: | Yes. |
| Roe 1: | Was our relationship all a lie? |
| Plaintiff: | No. |
| Roe 1: | Did you lie about how you felt about me? |
| Plaintiff: | No. |

212.    This was the last interaction Plaintiff and Roe 1 had.[11]

**D.  Jane Roe 3- January 2021**

213.    In January of 2021, Plaintiff invited Roe 3 to attend a ski trip with a group of friends from Plaintiff's hometown at Beech Mountain, to take place from January 11-14, 2021.

214.    Plaintiff and Roe 3 arranged to begin the drive the day before, and spend the night alone together at his family home in Morganton.  Upon arriving at the home, Plaintiff

---

[11] Again, Roe 1 denied, in her interviews with the EOC Investigators, that any further contact with Plaintiff occurred after the morning of January 28, 2021.  Roe 1 left the hearing before she could be cross-examined about this point.  Again and inexplicably, the EOC investigators never followed up in their interviews of Roe to question her about this obvious falsehood.

42

told Roe 3 that she could sleep in any of the bedrooms as the house was empty. She stated she wanted to sleep with him.

215. After they had dinner, Plaintiff and Roe 3 went to his bedroom, and changed, they began kissing and got into bed together. Plaintiff asked her if she wanted him to perform oral sex on her, she said "yes." He then asked if she wanted to have sexual intercourse, and she responded that she did, so they proceeded to do so.

216. Once they finished, Roe 3 told Plaintiff that she wanted to take a picture of them together, naked. Apparently, she had a large collection of nude photos, of both herself as well as herself with others. Plaintiff agreed, and she took a selfie photo of them using a large mirror in the bedroom.

217. They then slept together in Plaintiff's bed, and began kissing when they woke up in the morning. Plaintiff asked if she wanted to have sex again before they left. She initially stated yes, but shortly after beginning the act, she stated she was sore from the night before and so they stopped. They then got dressed, grabbed breakfast and continued their drive up to the mountain, picking up another friend along the way.

218. Months later, in March of 2021, Roe 3 would meet Roe 2 at a party and come to learn that they had both engaged in sexual intercourse with Plaintiff. At the urging of Roe 2, Roe 3 would thereafter join in the complaint against Plaintiff as an "anonymous" accuser, as part of Roe 2's campaign to ostracize Plaintiff and destroy his reputation. As in the case of Roe 2, Roe 3's allegations would commence an eight (8) months long university investigation process, culminating in a hearing before a panel that would find her allegations (as well as those of Roe 2) to be contradicted by the evidence and,

43

ultimately, concluding that Plaintiff was not responsible for the allegations as to either student.

### IV. *Collusion Amongst the Four Women to Initiate Complaints Against Plaintiff and Destroy his Reputation, Education, and Associations– January to March, 2021.*

219.    The campaign against Plaintiff began early in the spring semester of 2021, when Roe 2 began publicly accusing Plaintiff of misconduct to members of his fraternity.

220.    In March of 2021, Roe 2 spewed her false allegations of nonconsensual sex against Plaintiff to her boyfriend, John Coe, while Roe 4 shared her false allegations of nonconsensual sex against Plaintiff with her boyfriend, Joseph Boe[12], both of whom were on the Executive Committee of Plaintiff's fraternity.  This information was thereafter disseminated throughout the fraternity, tarnishing Plaintiff's name and reputation prior to any formal complaint being filed or investigated.

221.    The fraternity accepted the allegations without question, presumed Plaintiff responsible, and never posed any specific or detailed questions to him about the allegations, refusing to detail the allegations of Roe 2 and Roe 4 to Plaintiff in any event.

222.    Later in March of 2021, Roe 2 met Roe 3 at a party where they began talking and learned they had both been intimate with Plaintiff in the past.  Roe 2 thereafter reported this information back to Roe 1, who once again was devastated to learn about Plaintiff

---

[12] Joseph Boe is a pseudonym.

having been with another woman, with this encounter occurring during the timeframe when Doe and Roe 1 were seeing each other, albeit, not exclusively.

223. It was this discussion between Roe 2 and Roe 3, and the subsequent disclosure to Roe 1 that cemented the joint agreement to file formal reports against Plaintiff with the University. At the urging of Roe 2, Roe 3 agreed to join in the complaint against Plaintiff as an "anonymous" accuser.

224. On or about March 26, 2021, Roe 2 contacted two friends who were Morehead-Cain Scholars along with Plaintiff, to report that Plaintiff had sexually assaulted multiple women who "wish to remain anonymous."

225. Shortly thereafter, on or about not March 27, 2021, the two friends reported Roe 2's claims about Plaintiff to their advisors in the Morehead-Cain program, one of whom was Mallory Findlay ("Ms. Findlay"), who also served as Plaintiff's advisor. The complaints to the Morehead-Cain advisors were that Plaintiff had "committed sexual misconduct against several women."

226. On March 28, 2021, Roe 2, Roe 1, and Roe 3 then enlisted the help of Roe 1's roommate Kate Joe, who created a group chat for the four of them to discuss and align their allegations against Plaintiff. Kate Joe collected the accusations made by Roe 1, Roe 2, Roe 3, and Roe 4 and created one complaint containing all four sets of allegations, which was ultimately submitted to Ms. Findlay at the Morehead-Cain foundation. Significantly, not one of the text messages corresponding to the creation of this final complaint was ever disclosed during and as part of the investigation processes.

227. On March 29, 2021, Roe 2 reported to Ms. Findlay by telephone that Plaintiff had "committed sexual misconduct against UNC undergraduate women" and that he had "been kicked out of his fraternity for these actions, which will be effective on April 6." She also provided the report prepared by Kate Joe to Ms. Findlay, which was characterized as "anonymous statements from the undergraduate women."

228. Ms. Findlay thereafter reported this information to her fellow Morehead-Cain advisors, including Julie DeVoe, Montez Thomas, Sophia Figueroa, and executive director of the Morehead-Cain Foundation, Chuck Lovelace.

229. On April 1, 2021, Ms. Findlay, who was Plaintiff's advisor for the Morehead-Cain program, reported the allegations against him to the EOC. She took this drastic step without reaching out to her advisee, Plaintiff, or inquiring about the allegations and his response to them. Ms. Findlay's swift rush to judgment was emblematic of the University's, students', and Morehead-Cain's presumption from the outset that Plaintiff was responsible for the alleged misconduct.

230. Also on April 1, 2021, Kate Joe notified the EOC that she was submitting the joint and anonymous complaint prepared for Roe 1, Roe 2, Roe 3, and Roe 4.

231. As of April 11, 2021, Plaintiff had begun to feel the effects of the false accusations, despite no formal notices having been served, and no formal investigations having yet been commenced. He received a text message from a close friend he was dating, telling him: "yeah I'd rather not see you anymore but it's funny how u thought I wouldn't find out…I just don't hang out w sex offenders…how u treat one person doesn't erase how u treated the girls u assaulted." Remarkably, his friend acknowledged that the truth didn't

46

matter to her, as the mere accusations were sufficient to make her not want to remain friends with the Plaintiff. This sentiment was indicative of the larger effect these allegations would continue to have, regardless of the ultimate findings.

## V. *The University Imposes an Immediate Interim Suspension.*

232. On May 4, 2021, Plaintiff received an email from the Vice Chancellor for Student Affairs' office requesting that he schedule a 30-minute Zoom meeting with Jonathan Sauls ("Dean Sauls"), Senior Associate Vice Chancellor of Student Success and Administration.

233. During the meeting, Plaintiff was provided No Contact Orders with respect to three of the four complainants, and was informed that he was being immediately placed on an interim suspension.

234. The May 4, 2021 interim suspension notice provided as follows: "UNC Student Affairs has been advised that the University has received multiple complaints of sexual misconduct by you against different UNC students. The allegations include instances of non-consensual sexual activity accompanied by violent behavior."

235. The letter cited to Section II.B of the "Emergency Evaluation and Action Committee Policy and Procedures", stating the "EEAC has determined that your alleged behavior poses a serious threat of disruption of the academic process, or a continuing danger to the health or welfare of other members of the University community or University property and that the immediacy of that concern warrants immediate action."

47

236.    Accordingly, the EEAC imposed the following measures:   (i) campus restriction – Plaintiff was not permitted on campus other than "for the purpose of attending required in-personal classes or final exams."; (ii) suspension beginning with summer session I of 2021; and (iii) No Contact Orders as to Roe 1, Roe 2, and Roe 4.

237.    The Notice did not include any information about the specific allegations, the dates of alleged incidents, or the policy provisions alleged to have been violated.

238.    Significantly, at the time the No Contact Orders were issued, Roe 2 was still living in Plaintiff's apartment, effectively causing him to be evicted from his own living space.

239.    Finally, the notice indicated that Plaintiff was entitled to request a hearing before the EEAC to determine the appropriateness of the interim suspension decision, within seven (7) calendar days to Assistant Dean of Students Jessica Rehling.

240.    Prior to Plaintiff's submission of his request for a hearing on the interim suspension, Defendants Jeremy Enlow and Beth Froehling (the "Investigators" or the "EOC Investigators") began to interview the complainants.

241.    Roe 1 was interviewed on May 7 and May 14, 2021.

242.    On May 10, 2021, prior to being heard on the interim suspension and prior to appearing for an investigation interview, the Morehead-Cain Scholarship Program notified Plaintiff that his scholarship was indefinitely suspended, and that he was no longer eligible to receive funding or other benefits from the Foundation.

243.    On May 11, 2021, Plaintiff submitted his request for a hearing on the interim suspension.

244. On May 28, 2021, Plaintiff submitted his memorandum in support of his request to remove the interim measures, along with a request for an expedited review due to (i) his intended start date for summer employment in New Hampshire, and (ii) the fact that none of the complainants perceived him to be a danger to anyone.

245. As part of his request, and in direct conflict with the EEAC's conclusion that he posed a danger to members of the University community, he explained to the EEAC that Roe 2 chose to live in his apartment, rather than her own room on campus, beginning in January of 2021, throughout the spring semester—which was several months after her encounter with him in October of 2020.

246. Not only did Roe 2's actions refute the charges and any need for a No Contact Order ("NCO"), but they also caused Plaintiff to be evicted from his own apartment as the NCO prevented him from being near her.

247. Plaintiff further noted to the EEAC that Roe 2's main concern with him was that he ignored her when she failed to take care of her 14-year-old brother who visited and became intoxicated as an underage minor.

248. As for Roe 4, Plaintiff explained that he had never had any sexual relationship with her. He ended his friendship with Roe 4 because she was saying hurtful things about him and spreading false rumors. There was no evidence supporting any finding that he posed a threat to Roe 4, nor to any other member of the University community based upon her allegations, as they were evidently made up in an attempt to exact revenge on him for choosing not to continue their close friendship.

49

249.     In regard to the allegations made by Roe 1, Plaintiff explained that he and Roe 1 were in a relationship for several months.  The relationship came to an abrupt and unforeseen end in January 2021, in direct response, he believed, to Roe 4's disparaging comments about Plaintiff to Roe 1.  At the time, Plaintiff believed Roe 4's disparaging statements had the intended effect – Roe 1 ended her relationship with Plaintiff the following day.  Plaintiff was to discover later, during the course of the investigation, that comments and Roe 2's admission to Roe 1 that Roe 2 had sex with Plaintiff in the fall of 2020 was the true cause of Roe 1's decision to break up with him.

250.     As Plaintiff had not yet received copies of the formal complaints made against him, he was unaware of the exact allegations being made.  During his call with Dean Sauls, Dean Sauls admitted to being quite confused as to the nature and extent of the allegations—allegations that were delivered by Jeremy Enlow in a scattered and ill-defined way to Dean Sauls and to the EEAC panel.

251.     Rather than providing Plaintiff with full copies of the complaints, the night prior to the hearing, Dean Sauls sent to Plaintiff's attorney a few select excerpts from the complaints that the EOC had prepared without identifying the reporting parties.

252.     Plaintiff appeared for a hearing on his challenge to the interim suspension on June 3, 2021, before the EEAC.

253.     Dean Sauls acted as the Hearing Chair, on behalf of the EEAC, and conducted all the questioning of Plaintiff during the proceeding.

254.     By notice dated June 7, 2021, Plaintiff was informed that the EEAC denied his appeal.

255.	In support of its denial, the EEAC noted the "University has received complaints from four separate UNC students alleging unwelcome and non-consensual sexual activity or advances over a period of almost a year.  In some instances, these complaints include allegations that the encounters resulted in bruising and/or physical pain to the reporting party."

256.	As such, the EEAC determined "that the behavior at issue poses a continuing danger to other members of the University community and that immediacy of the danger is of sufficient import to warrant summary action."

257.	The same day his interim suspension appeal was denied, Roe 2 met with Defendant Enlow to discuss her allegations against Plaintiff.

## VI.	*Roe 1 and Roe 2 Formally Withdraw Their Complaints Against Plaintiff.*

258.	By email dated June 15, 2021 at 5:31 p.m., Roe 1 notified Defendant Hall, Defendant Gibson and Defendant Enlow that she was withdrawing her complaint against Plaintiff, stating:  "I've decided not to go forward in the process as I feel as though I have been able to move forward in my life and would like to be able to focus on my academics next semester as I will be on campus for the first time."

259.	Roe 1 admitted that she felt pressured by her parents into making the complaint against Plaintiff, and that she was "second guessing" whether to move forward.

260.	The very next day, on June 16, 2021 at 10:09 a.m., Roe 2 alerted Defendant Enlow, Defendant Froehling, and Defendant Gibson that she was withdrawing her complaint, stating:  "I think after hearing about how heavy, long, and intense this process will be through the title ix proceedings I knew I wasn't going to be able to continue in this

51

process, it just took me a few days to fully come to terms with that. I have no interest in continuing to give the responding party any more of my time or energy, nor can I allow it to distract me from my future and educational goals because those matter so much to me…I hope that this investigation continues smoothly for you and everyone else involved and that the appropriate action can be taken without my participation."

261. Thereafter, on June 28, 2021, Defendants Hall, Enlow, and Gibson prepared an "Assessment for Reporting Parties Requesting No Formal Action" related to the Roe 2 matter. In response to the item stating "[d]iscuss the risk you believe is posed to any individual or to the campus community by not proceeding, including the risk of additional violence," Defendants Hall, Enlow, and Gibson wrote "[t]he risk is high due to EOC receiving 5 total reports of sexual violence between March 2020 and January 2021. Reports indicate the a (sic) pattern of force." This statement was erroneous for two reasons. First, there were four reports made against Plaintiff, not five, and second, none of the reports made against Plaintiff involved any allegations of force, let alone a "pattern of force." This outrageous description of the allegations evidenced Defendants' (Hall, Enlow, and Gibson) belief in Plaintiff's guilt, regardless of the true facts and before any investigation had concluded.

262. Furthermore, the "Assessment for Reporting Parties Requesting No Formal Action" form falsely described the incidents reported by Roe 3 and Roe 4 as having "occurred within the context of fraternity-sponsored trips," notwithstanding that not only was this information false, but also neither Roe 3 nor Roe 4 ever claimed that the trips were fraternity sponsored.

52

263.    Instead, Defendants Hall, Enlow, and Gibson knowingly presented this false information in an effort to mislead and ensure that the University would be able to enforce its disciplinary policies and exercise its jurisdiction over Plaintiff, for events occurring off campus and during academic year breaks.

264.    Importantly, Plaintiff did not learn until *after* the hearings concluded in the spring semester of 2022 that Roe 2 had formally withdrawn her complaint with the EOC in June 2021.

265.    Even though Roe 2 withdrew her complaint in the same manner and at the same time Roe 1 did, the EOC withheld the fact of Roe 2's withdrawal from Plaintiff for seven months.

### VII.    EOC Issues the Notices of Investigation.

266.    On June 30, 2021, the EOC issued the notices for investigation for each of the four complaints.

267.    As to Roe 1, though she requested a dismissal of the entire complaint, the EOC only withdrew the following alleged violations:  (i) "From November 2020 to January 2021, you pressured the Reporting Party into having sexual intercourse that at times resulted in bruises on her collarbone and wrists"; and (ii) "from November 2020 to January 2021, you ignored the Reporting Party's verbal requests to stop during consensual sexual intercourse with her."

268.    As for the third allegation initially brought by Roe 1, the EOC signed the complaint on behalf of Roe 1.  The remaining allegation to be pursued against Plaintiff was

the following: "On or about November 19, 2020, in the Kappa Sigma house, you engaged in sexual intercourse with the Reporting Party without her consent."

269. Defendant Hall explained her decision to only partially dismiss the complaint, despite Roe 1's explicit request (which was then unknown to Plaintiff), stating: "[d]ismissal based on notification that the Reporting Party would like to withdraw their Formal Complaint is within the Title IX Coordinator's discretion. After reviewing the request and the reported conduct, I have determined that this portion of the Reporting Party's Formal Complaint will be dismissed because the Reporting Party's withdrawal prevents the University from gathering additional evidence sufficient to reach a determination about this portion of the Formal Complaint."

270. Though the same logic should have applied to the remaining claim of Roe 1 – *i.e.* her withdrawal would prevent the University from gathering sufficient evidence regarding the claim – Defendant Hall nonetheless decided to maintain the complaint on that charge against Plaintiff.

271. Roe 2 likewise previously withdrew her complaint against Plaintiff, however the EOC issued a notice of investigation on her complaint against Plaintiff, alleging as follows: "On or about October 22-23, 2020, in the Kappa Sigma house, you engaged in sexual intercourse with the Reporting Party multiple times throughout the evening and early morning without her consent." These allegations were maintained by the Interim Head of the EOC, Defendant Hall, even though they were contrary to the wishes of Roe 2 and despite the fact that the contemporaneous communications between Plaintiff and Roe

54

2 did not support such claims. These issues were well known to the EOC Investigators and remained undisclosed to the EEAC in any regard.

272. With respect to Roe 4, the notice of investigation indicated the following charges: "1. During spring break in March 2020, in Alabama, you grabbed the reporting party's vagina and attempted to penetrate her vagina with your finger(s) without her consent; 2. On or about June 2020, in your off-campus residence, you touched the reporting party's breasts, pressed your penis into her back, and attempted to engage in sexual intercourse with her without her consent." Again, such claims were unsupported by any contemporaneous written communications between the Plaintiff and Roe 4.

273. Finally, for Roe 3, the notice of investigation stated: "On or about December 13, 2020, in your western North Carolina residence, you engaged in sexual intercourse with the Reporting Party without her consent." Again, such allegations were accepted and acted on even though there were no contemporaneous written communications delivered by Roe 3 to the EOC Investigators.

274. The Roe 1 and Roe 2 complaints were to be investigated and adjudicated under the Policy on Prohibited Sexual Harassment Under Title IX, as the alleged incidents purportedly occurred on campus, while the Roe 3 and Roe 4 matters were to be investigated and adjudicated under the Policy on Prohibited Discrimination, Harassment, and Related Misconduct, as those alleged events took place off campus.

**VIII.  UNC Lacked Jurisdiction Over the Roe 1 and Roe 2 matters.**

55

275.    EOC proceeded to investigate the Roe 1 and Roe 2 matters despite its knowledge that the University lacked jurisdiction over these claims, both of which were withdrawn by the reporting parties.

276.    Here, the reporting parties withdrew their complaints shortly after they were submitted, and well before the EOC started their investigation.  Yet, the EOC disregarded each of the complainants' wishes and chose to investigate, adjudicate, and punish Plaintiff after a process rife with violations of due process and lacking in fundamental fairness.

277.    Defendants violated the requirements of Title IX when they chose to move forward with the Roe 1 and Roe 2 investigations, despite the knowledge that the reporting parties' withdrawal of their complaints would impact the University's ability to gather evidence sufficient to reach a determination as to their allegations, and notwithstanding the lack of evidence demonstrating that the alleged incidents had a substantial adverse effect on the University or on the community.

## IX.    UNC Lacked Jurisdiction Over the Roe 3 and Roe 4 matters.

278.    Similarly, despite their knowledge that the University lacked jurisdiction over the Roe 3 and Roe 4 matters, the EOC nonetheless moved forward with these investigations.

279.    Defendants were well aware that the PPDHRM only applied to prohibited conduct occurring off campus, if "the conduct occurred in the context of an employment or education program or activity of the University, had continuing adverse effects on campus, or had continuing adverse effects in an off-campus employment or education program or activity of the University."

56

280.    Moreover, to determine whether the University had jurisdiction over conduct occurring off-campus that was not part of an educational program or activity of the University, the Director of the EOC or the Title IX Coordinator were required to assess whether the alleged conduct "has or is reasonably likely to have continuing adverse effects or to create a hostile environment for students, employees, or third parties while on campus or in any University employment or education program or activity."

281.    Based upon the information provided by the reporting parties, and after conducting interviews with Roe 3, Roe 4 and Doe, Defendants Hall, Enlow, and Froehling were well aware that they had no basis for assuming jurisdiction over events that occurred off campus, during school breaks, and which did not result in any continuing adverse effects on campus.

282.    Specifically, neither the Roe 3 nor Roe 4 matters involved conduct that occurred in the context of any education program or activity of the University.  The Roe 3 matter arose from an encounter that occurred at Plaintiff's residence during the 2020-2021 winter break, while the Roe 4 matter concerned alleged conduct that occurred in Gulf Shores, Alabama during the 2020 spring break, and at Plaintiff's residence during the 2020 summer break.

283.    Further, there was no evidence, and the reporting parties were unable to articulate, how Plaintiff's interactions with either Roe 3 or Roe 4 resulted in any continuing adverse effects either on or off campus.

284.    To the contrary, subsequent to the Gulf Shores trip, from March of 2020 through June of 2020, Plaintiff and Roe 4 continued to text frequently and hung out on

57

multiple occasions. Subsequent to their interactions in June 2020, in July of 2020, Roe 4 invited Plaintiff to go to the beach with her and her friend Sara Poe, an invitation which Plaintiff declined.

285. Thereafter, Plaintiff did not initiate any communications with Roe 4, for many months. However, Roe 4 continued to call Plaintiff, and send him messages via Snapchat and iMessage, on one occasion in September of 2020 asking him for a "tiny twin talk" – a phrase used by Roe 4 to refer to a private discussion with Plaintiff wherein she would discuss her current grievances. Plaintiff responded that he was busy that day, but maybe "some other time."

286. Similarly, Roe 3 did not identify any continuing adverse effects or a hostile environment created by her interactions with Doe, nor did she provide any evidence to establish this.

287. Further demonstrating Defendants' intent to create jurisdiction over allegations where none existed, within the "Assessment for Reporting Parties Requesting No Formal Action" form described above, Defendants falsely described the incidents reported by Roe 3 and Roe 4 as having "occurred within the context of fraternity-sponsored trips," notwithstanding that not only was this information false, but neither Roe 3 nor Roe 4 ever claimed that the events were fraternity-sponsored trips.

288. Defendants Hall, Enlow, and Gibson knowingly presented this false information in an effort to ensure the University would be able to enforce its disciplinary policies and exercise its jurisdiction over Plaintiff, for private interactions occurring off campus and during academic year breaks.

58

289.     Evidently, the University pursued the charges on the Roe 3 and Roe 4 matters, despite the clear lack of authority to do so, in an effort to ensure they would be able to present multiple complaints against Plaintiff to the hearing panels, and in turn, assuring a finding of responsibility and a sanction of expulsion.

## X.     *Defendant Hall's Request to Consolidate the Four Cases.*

290.     By email dated July 12, 2021, Defendant Hall explained that the reports against Plaintiff would be addressed under two separate policies:   (i) the Policy on Prohibited Discrimination, Harassment, and Related Misconduct; and (ii) the Policy on Prohibited Sexual Harassment Under Title IX.

291.     She inquired whether Plaintiff would agree to consolidate the four matters, citing to the May 2020 Title IX regulations in support of the proposition that "the EOC may consolidate[e]… formal complaints when [the] allegations of sexual harassment *arise out of the same facts or circumstances*."   Citing to 36 CFR § 106.45(b)(4).

292.     While acknowledging that the four matters did not arise out of the same facts and circumstances, she nonetheless requested that Plaintiff consider agreeing to a consolidation, explaining that it would allow EOC to adjudicate the reports more quickly, and noting "we anticipate that each of the Reporting Parties will be relevant witnesses in some or all other reports.  Additionally, any relevant, permissible pattern evidence will be considered in the resolution of the individual reports."

293. Evidently, Defendant Hall presumed that a pattern of misconduct committed by Plaintiff would be revealed, before the investigations had even gotten fully under way.

294. She noted that absent an agreement to consolidate, the reports would involve two separate hearings under the Title IX Policy, as well as any hearing required under the Policy on Prohibited Discrimination and requested a response by July 26.

295. Significantly, at the time he received this request, Plaintiff had not yet been able to review the detailed complaints made by and filed on behalf of each complainant, despite his repeated requests to the EOC for copies of such complaints.

296. Given the only information provided to Plaintiff by the EOC up to this point was the information contained within the vague and undescriptive notices of the EOC drafted complaints, he was unable to ascertain the precise allegations on which he was being investigated.

297. Further, Ms. Hall provided no clarification as to how the conflicting procedures would be harmonized, if he did agree to consolidate all four complaints.

298. Plaintiff notified Ms. Hall that he declined to consolidate the matters, asserting his right under Title IX to have each complaint adjudicated separately and on its own merits.

299. Interim Head Defendant Hall accepted such a decision and reassured Plaintiff throughout the investigation that the evidence for each alleged violation would be kept separate and apart from the others, except for the sanctioning phase of the proceedings.

60

300.     However, this issue arose once again at the conclusion of the investigation in the Roe 1 matter, when the EOC produced the report of its investigation and transcripts of witness interviews, which were replete with references to the other cases against Plaintiff.

**XI.     *The Jan Barefoot Interview.***

301.     Upon notification of the various false complaints filed against him, Plaintiff's counsel engaged the services of a private investigator, Jan Barefoot ("Ms. Barefoot"), to assist in the collection of evidence and preparation of Plaintiff's defense.

302.     On July 21, 2021, Ms. Barefoot reached out to Roe 3 by phone to schedule a time to meet with her.

303.     As Roe 3 was not subject to a No Contact Order as of July 21, 2021 in relation to Plaintiff, there was nothing improper about Ms. Barefoot seeking an interview with her.

304.     Ms. Barefoot clearly introduced herself as a private investigator, and asked Roe 3 whether she would be willing to speak with Ms. Barefoot "about the incident with [Doe]."

305.     Roe 3 replied:  "Ok, I am on the way home, do you want to meet at my house or do you want me to meet you somewhere else?"  Ms. Barefoot responded that it was up to her where she wanted to meet, and would do whatever would make Roe 3 comfortable.

306.     Roe 3 initially suggested that they meet at McDonald's, but after they hung up, Roe 3 then called Ms. Barefoot back to state that she "just talked with her mom and it would actually be easier if we did meet at my house, is that too much trouble?"

307. Ms. Barefoot replied that it would be "no trouble at all" and they met at the Roe 3 home shortly thereafter. Roe 3 introduced Ms. Barefoot to her mother, and the three of them all sat together around the kitchen table and talked.

308. When Roe 3's mother asked "so y'all are getting information for [Doe's] attorney," Ms. Barefoot stated, "I work for [Doe's] attorney, yes" to which her mother responded "gotcha," "okay." The interview continued for an additional 36 minutes after this exchange, the entirety of which consisted of a professional and courteous discussion.

309. Roe 3's mother remained present the entire time, and neither Roe 3 nor her mother asked to terminate, pause, or otherwise curtail the conversation at any point.

310. Nonetheless, Roe 3 subsequently initiated a fabricated report to the EOC, claiming she was tricked into speaking with Ms. Barefoot, and alleging she was pressured and threatened throughout the course of their conversation, amounting to retaliation in violation of the University's policies.

## XII. The EOC Issued an Amended Notice of Investigation in the Roe 3 Matter to Include Allegations of Retaliation, Intimidation, Threats.

311. On July 22, 2021, Defendant Gibson informed Defendant Rieckenberg that Roe 3 had been contacted and interviewed by a private investigator the evening before. Defendant Gibson indicated that the EOC was assessing the option for an additional charge of retaliation against Plaintiff.

312. On July 23, 2021, the EOC issued a No Contact Order to Plaintiff with respect to Roe 3.

313. On July 29, 2021, Plaintiff requested a hearing to again request a modification to the interim suspension, solely asking that he be permitted to take the classes he was enrolled in for the fall 2021 semester, and that he be allowed to attend such classes in person, in the event that he could not do so remotely.

314. The EEAC hearing on the interim suspension took place on August 19, 2021, two days after the start of classes on August 17, 2021.

315. During the hearing, the EEAC Hearing Panel questioned Plaintiff about his interpretation of how Roe 3 "felt" when she was interviewed by Ms. Barefoot, notwithstanding that Plaintiff had no knowledge of or involvement in the decision to interview Roe 3, nor did he have any knowledge regarding what had transpired during the interview.

316. They further questioned him about the concerns he would "imagine" Roe 3 would have about her own safety, and "what concerns we as a committee may have or the concerns with safety at the institution."

317. Though Defendant Enlow was present for this hearing, he failed to inform Plaintiff of the false statements made by Roe 3 regarding Ms. Barefoot's alleged conduct during the interview.

318. Defendant Enlow further failed to inform Plaintiff prior to the EEAC hearing that Roe 2 had withdrawn her complaint in June of 2021. This was immensely prejudicial, as Plaintiff was unable to present this fact as information constituting "changed circumstances" that would justify granting his request to be permitted on campus solely to attend the classes he was registered to take in the fall 2021 semester.

63

319.    On August 25, 2021, the EEAC Panel voted to deny the limited modification to the interim suspension order that Plaintiff had requested, thereby foreclosing any opportunity to continue his education during the fall of 2021.

320.    In its findings, the EEAC stated: "the role of the EEAC is to consider the necessity and appropriateness of interim action to fulfill the University's obligation to provide a safe campus while separate disciplinary processes unfold.  Based on the presently available information, the EEAC did not find there was a material change in circumstances that mitigates the known facts and circumstances such that the original decision should be altered."

321.    Of course, the EOC was aware of the fact that both Roe 1 and Roe 2 had withdrawn their complaints against Plaintiff prior to the date of the interim suspension hearing, an indisputable "material change in circumstances."  Yet, this was not taken into consideration when denying Plaintiff's request to remove the suspension.

322.    The decision to maintain the interim suspension also was not warranted, as Plaintiff did not pose "a continuing danger to other members of the University community" nor was the "immediacy of the danger or threat . . . so great that emergency action should be taken."

323.    On the same day, after the interim suspension hearing, and after Plaintiff's request to modify the order was denied, the EOC issued to Plaintiff an Amended Notice of Investigation for Roe 3, which modified the June 30, 2021 Notice of investigation to include alleged violations of the retaliation policy based upon Roe 3's voluntary interview with Ms. Barefoot.  The Amended Notice stated:  "You (either on your own or through an

64

agent) authorized and/or instructed a third party acting on your behalf to engage in conduct that intimidated and/or threatened the Reporting Party on or about the evening of July 21, 2021."

324.    As of time of the Barefoot interview, Roe 3 had not requested a No Contact Order, and the decision to interview her was made by Plaintiff's attorney, not by Plaintiff. Yet, the University seized on the opportunity to reinforce its case against Plaintiff, demonstrating its presumption of guilt against him, and ensuring that he would, in turn, be removed from the school.

325.    Further, the timing of this notice was highly questionable, given the interview in question occurred over one month earlier, on July 21, 2021, the No Contact Order related to Roe 3 was sent to Plaintiff on July 23, 2021, and the EOC reported to the EEAC the details of the false allegations of retaliation on August 3, 2021.  Thus, the EOC and EEAC had access to Roe 3's false allegations regarding her interview with Ms. Barefoot for over one month, but only disclosed them to Plaintiff after the EEAC hearing, and on the same day Plaintiff's request to modify the interim suspension was denied.

326.    It is therefore highly likely that the EOC knowingly and intentionally concealed Roe 3's allegations related to the Barefoot interview from Plaintiff until after the EEAC rejected his petition to modify the interim suspension, to deprive him of the opportunity to respond to and refute the allegations.

327.    Importantly, in denying Plaintiff's request to modify the interim suspension, the EEAC relied upon Roe 3's false allegations of retaliation and witness intimidation as a basis for denying Plaintiff's request to continue his education and attend classes.

65

328. This was extremely problematic given Plaintiff had not received any notice regarding these new claims. Had he been provided proper notice and given an opportunity to respond, he would have easily refuted Roe 3's claims as Plaintiff could have offered Ms. Barefoot as a witness before the EEAC.

329. Further, in order to charge Plaintiff with "Retaliation" for the conduct of an investigator retained by his attorney, the EOC fabricated a new policy — adding words to the existing retaliation policy — in order to create a form of double vicarious liability, as the current policy only covered conduct of the accused, or of others acting at the direction of the accused.

330. Recognizing that that they would not be able to charge Plaintiff with retaliation under the applicable policy because he had no knowledge of, nor did he direct, the actions of the investigator, the EOC unilaterally created a new definition of retaliation, adding the phrase set forth in parens "either on your own or through an agent" to once again ensure that Plaintiff would be found responsible for a policy violation.

331. It is likewise concerning that UNC failed to observe the parallels between Roe 3's false allegations against Plaintiff and Roe 3's false allegations about her interactions with Ms. Barefoot.

332. With respect to Plaintiff, Roe 3: (i) consented to sexual intercourse and then denied that her consent was freely given; (ii) freely gave consent and later claimed that she stopped participating, thus withdrawing her consent; and (iii) created a false narrative about her interactions with Plaintiff, which was contrary to the documentary evidence (polygraph, text messages, and photographs).

66

333. With respect to Ms. Barefoot, Roe 3: (i) consented to the interview and then denied that she freely gave consent; (ii) freely gave consent to be interviewed and later claimed that she stopped participating, thus withdrawing her consent; and (iii) created a false narrative about her interaction with Ms. Barefoot, which was contrary to the documentary evidence (audio recording, sworn affidavit, and interview of Ms. Barefoot by EOC investigators).

334. There was no question that Roe 3 was willing to outright lie to the EOC, in an effort to ostracize Plaintiff.

### XIII. Additional False Complaint Made by Roe 2 and Roe 4, That Was Not Disclosed to Plaintiff.

335. In late July 2021, EOC Investigators were emailed by Roe 2 and Roe 4 with a new and false allegation that they were making against Plaintiff. Specifically, Roe 2 and Roe 4 claimed that Plaintiff was on campus, owned a gun, was breaking into his old room in the fraternity house and was making threats directed towards members of his fraternity.

336. Upon information and belief, Roe 2 and Roe 4 manufactured this false claim in response to being alerted by the EOC that Plaintiff had requested a hearing before the EEAC to challenge the interim suspension for the fall semester of 2021.

337. In fact, Plaintiff does not own a gun, has never owned a gun, and never possessed a gun. In addition, he could not possibly have been in Chapel Hill as claimed, as he was instead working at an overnight camp in New Hampshire during which he could not leave due to Covid restrictions during the relevant timeframe.

338.    As to the allegations of threats to his fraternity brothers, Roe 2 who was still involved in an exclusive relationship with John Coe used as a basis for such an allegation an email that Plaintiff sent to his supposed roommates in the coming fall semester of 2021.

339.    All of the foregoing could have been easily refuted had Plaintiff been presented with this information in a timely manner.  Yet incredibly, the EOC took the opportunity, instead of searching for the truth in its investigation and allowing Plaintiff to respond, to hide these allegations—which the EOC Investigators knew were either (1) demonstrably false and/or (2) unsupported—from the Plaintiff and then used them as a basis to prevent the EEAC from issuing an order allowing Plaintiff to continue his education.

340.    In short, the Interim Head of the EOC Defendant Hall allowed her charges to relay these preposterous claims to the EEAC shortly before it would hear Plaintiff's petition to attend classes in the fall, without first presenting the obviously false allegations to Plaintiff, to doom any chance Plaintiff may have had to attend fall classes – even to do so remotely in the second year of the pandemic.

341.    Thus, on August 3, 2021, EOC response coordinator Defendant Gibson presented this new information to the EEAC Chair, Defendant Rieckenberg. Unsurprisingly, the EEAC did deny Plaintiff's petition on August 25, 2021.

342.    Of equal concern, Plaintiff was not made aware until nine months later, on April 18, 2022, after the last of his four hearings concluded, that the EOC had provided this false report to the EEAC.  This was tremendously problematic in that the false report of Plaintiff owning a gun, breaking into an on-campus building, and threatening witnesses,

68

all of which was demonstrably false, was relied upon by the EEAC when it declined to remove the interim suspension.

343. Even further harm was created by this withholding of information because, had Plaintiff been made aware of the claim when first reported, he could have used the fact that Roe 2 and Roe 4 had fabricated information about him to dispute their credibility when Roe 2 testified at the Roe 1 hearing, and at the hearings on the Roe 2 and Roe 4 matters.

344. Finally, it was highly unlikely that the hearing panel in the Roe 1 and Roe 4 matters would find Plaintiff not responsible for any policy violation, as such a finding would be in direct conflict with the EEAC's prior determination that he was a danger to the university community, warranting continuation of the interim suspension.

## XIV.  *The Procedurally Defunct and Biased Investigation Processes.*

345. On September 13, 2021, Plaintiff's counsel submitted to EOC an affidavit prepared by Ms. Barefoot, in which she explained that her conversation with Roe 3 was entirely voluntary.

346. Plaintiff was interviewed by Investigators Enlow and Froehling on September 13 and 17, 2021, with respect to all four matters.

347. As part of the Roe 1 case, Roe 1 was interviewed on May 7 and May 14, 2021, along with nine (9) alleged witnesses.

348. As part of the Roe 2 case, Roe 2 was interviewed on May 12 and October 19, 2021, in addition to eight (8) alleged witnesses.

69

349.     Plaintiff submitted an extensive binder of contemporaneous communications and evidence related to each complaint, and voluntarily appeared for a polygraph examination for each matter, for which the reports were provided to the University.

350.     At the time that he sat for the polygraph examinations, Plaintiff still had not been informed by the EOC of the specific charges against him.  However, from the questions posed by the Investigators, counsel for Plaintiff was able to develop some general ideas of the specific allegations for each of the Complainants.

351.     The specific questions posed to Plaintiff during the polygraph examination conducted on September 23, 2021 related to the Roe 2 matter were as follows:

- Did you ever have sexual contact with Roe 2 without her affirmative, conscious, and freely given consent?  Answer:  No.
- Did you ever have sexual contact with Roe 2 while she was asleep, passed out, or otherwise unable to make a knowing or deliberate choice to engage in sexual contact?  Answer:  No.
- Did you ever continue to have sexual contact with Roe 2 after she withdrew her consent to the sexual contact?  Answer:  No.
- Before you had sexual contact with Roe 2, did [John Coe] tell you that he did not care if you invited Roe 2 to your room?  Answer:  Yes.

352.     The questions posed to Plaintiff during the polygraph examination conducted on September 24, 2021 related to the Roe 3 matter were as follows:

- At your home in [city], did you have sexual contact with Roe 3 without her affirmative, conscious, and freely given consent?  Answer:  No.
- At your home in [city], did you continue to engage in sexual contact with Roe 3 after she withdrew her consent? Answer:  No.
- At your home in [city], did Roe 3 take a photo of you and her naked in front of the mirror in your bedroom?  Answer:  Yes.
- At your home in [city], did you carry Roe 3 up the stairs forcibly or against her will?  Answer:  No.[13]

---

[13] This question arose from an allegation that Roe 3 made for the first time during her interview with Ms. Barefoot in July 2021- that Doe allegedly carried her up the stairs against her will, while

353. The specific questions posed to Plaintiff during the polygraph examination conducted on September 28, 2021 related to the Roe 1 matter were as follows:

- Did you ever have sexual contact with Roe 1 without her affirmative, conscious, and freely given consent?  Answer:  No.
- Did you ever have sexual contact with Roe 1 while she was asleep, passed out, or otherwise unable to make a knowing or deliberate choice to engage in sexual contact?  Answer:  No.
- Did you ever continue to engage in sexual contact with Roe 1 after she withdrew her consent to the sexual encounter?  Answer:  No.

354. Also on September 28, 2021, Plaintiff appeared for a polygraph examination related to the Roe 4 matter. The material questions posed were as follows:

- During Spring Break in March 2020 in Alabama, did you touch or penetrate Roe 4's vagina?  Answer:  No.
- During Roe 4's visit with you in Charlotte in June 2020, did you touch any part of Roe 4's body in a sexual manner?  Answer:  No.
- During Roe 4's visit with you in Charlotte in June 2020, did you attempt to engage in sexual intercourse with Roe 4 without her consent?  Answer:  No.
- Did [Doe's friends] tell you they did not want to spend time with Roe 4 when you told them she was coming to visit?  Answer:  Yes.

355. Each polygraph examination concluded that no deception was detected in Plaintiff's responses, and that the likelihood that his responses were produced by someone lying was less than 1%.

356. On October 7, 2021, Plaintiff's counsel sent a letter to Dean Sauls, objecting to the delayed notice to Plaintiff regarding Roe 3's accusations concerning the Barefoot

---

she kicked and screamed.  Roe 3 never reported this to the EOC Investigators in the course of their investigation.  As such, this false claim was one of the many inconsistencies in Roe 3's account that was cited by the Hearing Panel in their April 12, 2022 outcome letter, in which they found Roe 3 to be not credible.

71

interview, and presenting evidence that Roe 3 provided false information. Accordingly, Plaintiff's counsel requested that Plaintiff be permitted to register for the spring 2022 semester.

357. On October 10, 2021, the EOC interviewed Ms. Barefoot, concerning her July interview with Roe 3.

358. On October 29, 2021, the EOC issued the draft investigative report for the Roe 1 matter.

359. On November 10, 2021, Plaintiff submitted a written response to the Roe 1 draft investigation report. Roe 1 did not submit any response to the draft report.

360. On November 15, 2021, Plaintiff submitted an affidavit, detailing his interactions with John Coe, including their communications regarding Roe 2.

361. On December 1, 2021, Plaintiff submitted his responses to the draft investigation reports in the Roe 3 and Roe 4 matters.

362. On December 9, 2021, the EOC issued its Final Investigation Report in the Roe 3 matter. Plaintiff was found responsible for engaging in sexual assault or violence, and retaliation.

363. As the Roe 3 matter was investigated under the PPDHRM, as a part of the Final Investigation Report, the Investigators made a recommended sanction of expulsion. In reaching this recommended sanction, the Investigators considered that Plaintiff was found responsible on December 9, 2021 for two incidents of non-penetrative sexual assault in a separate matter (Roe 4), notwithstanding their actual knowledge that the matter was being further adjudicated through an appeal and hearing process.

364.    Also on December 9, 2021, the EOC issued its Final Investigation Report in the Roe 4 matter.  Plaintiff was found responsible for two counts of sexual assault (non-consensual sexual contact).  As the Roe 4 matter was investigated under the PPDHRM, as part of the Final Investigation Report, the Investigators again made a recommended sanction of expulsion.

365.    On December 22, 2021, the EOC provided a Notice of Hearing for the Roe 1 matter, scheduling the hearing for January 27, 2022.

366.    On December 23, 2021, Plaintiff submitted appeals for the findings and recommended sanctions in the Roe 3 and Roe 4 matters, pursuant to the PPDHRM procedures.

### XV.    *Failure to Redact Prejudicial Information from the Roe 1 Hearing Materials.*

367.    On December 26, 2021, Plaintiff's counsel, Defendant Hall, and Defendant Feeney participated in a phone call to discuss the report and upcoming hearing. Plaintiff's counsel asked Defendant Hall whether the EOC would agree to redact all references to other allegations of misconduct, to prevent this information from going to the Roe 1 Hearing Panel.

368.    Defendant Hall confirmed that such references would not be disclosed to the Hearing Panel, other than for the limited purpose of permitting the consideration of other findings of responsibility at the sanctioning phase, if Plaintiff was found responsible in the Roe 1 case.

73

369.    During this same phone call, Defendant Hall disclosed for the first time that Roe 1 had reviewed the investigation materials and submitted a response to them on November 10, 2021.

370.    Further, Defendant Hall advised that although Roe 1 may choose not appear at the hearing, her attorney would be permitted to appear in Roe 1's place and to speak on her behalf.

371.    Shocked by this revelation, Plaintiff's counsel questioned whether he would be allowed to cross-examine Roe 1's attorney, whose identity Defendant Hall refused to disclose, if he or she was in fact stepping into Roe 1's shoes.

372.    Defendant Hall admittedly did not have the answer to this particular question, seemingly because such an inherently prejudicial action had never been allowed previously during a Title IX hearing at the University.

373.    On January 12, 2022, Plaintiff was provided notice of opportunity to review the Final Investigation Report for the Roe 1 matter.

374.    In reviewing the Final Report, Plaintiff observed the following information presented by the witnesses, all of which supported his account:

- *Roe 4*:  Roe 4, a complainant against Plaintiff in a separate matter, had no direct information about Roe 1's allegations.  She admitted that she was "not super sure" what was said during conversation with Roe 1 because she "did not remember [the conversation with her] well."
- *Roe 2*:  Roe 2, a complainant against Plaintiff in a separate matter, had no independent knowledge about the alleged incident.  She first learned about Roe 1's claims in January 2021.
- *John Coe:*  Coe had no personal information about the allegations against Plaintiff, and did not even know what the allegations were.
- *James Moe:*  Moe had no personal information about the allegations against Plaintiff, and did not even know what the allegations were.

74

- *Kate Joe:*  The report misrepresented Kate Joe's speculation about the source of supposed "bruises" on Roe 1's neck.  Kate Joe testified that whenever she saw a bruise on Roe 1's neck, she thought they were "hickeys."  She further testified that she knew Roe 1 enjoyed engaging in breath play with sexual partners prior to Plaintiff, and she knew that Roe 1 had asked Plaintiff to engage in this practice as well.  She further reported that she could not locate any photos of Roe 1 at the Kappa Sigma house, taken on November 19, or on any other Thursday in November of 2020.

375.  Further, upon reviewing the Final Report, Plaintiff discovered that none of the redactions discussed during his conversation with Defendant Hall on December 26, 2021 had been made.

376.  Particularly concerning was the fact that the Final Report included numerous references to the other allegations made against Plaintiff, including for instance, the testimony of John Coe who stated "there [had] been multiple women who stepped forward who have accused [Mr. Doe] of multiple sexual violence allegations…" Similarly, the EOC included an incident description, noting "[Plaintiff], who is a sophomore at UNC, has committed sexual misconduct against [numeral redacted] UNC undergraduate women that they know of..." and "[w]e know of many other girls this has happened to by [Doe], but they are afraid to come forward…", "[Plaintiff] has been kicked out of his fraternity", and the "President of Morehead Cain…is taking action against him."

377.  The redaction of the precise number of accusers was futile in that the report still included reference to "multiple" allegations, and "multiple" women, as well as the actions taken by his fraternity and scholarship program in response.

378.  The EOC also failed to redact the numerous unsupported, extraneous, and inflammatory statements made by Roe 1 about Plaintiff during her interviews, improperly

75

included a transcript from Plaintiff's September 17, 2021 interview with the Investigators in which he was questioned about the other allegations, and inappropriately submitted to the Hearing Panel the unredacted interview transcripts of Roe 2, Roe 3, and Roe 4, among others, despite the fact that they had no knowledge of the sexual contact at issue in the other complaints.

379. On January 20, 2022, Plaintiff submitted a detailed 19-page letter in which he cited the various references that should have been redacted from the Final Report.

380. In addition, he questioned how the University would present Roe 1's case at the hearing, given that she withdrew her complaint in June 2021, refused to produce any evidence including evidence she promised to give to the Investigators, advised EOC to stop communicating with her, and presumably was not planning to testify at the hearing.

381. Plaintiff also reiterated his request for the removal or redaction of prejudicial and irrelevant materials from the hearing materials file, before the file was sent to the Hearing Panel members.

382. On January 21, 2022, Defendant Hall notified Plaintiff by email that, contrary to their agreement reached on December 26, 2021, all references to the false accusations included in the investigation file had in fact been submitted to the Hearing Panel, without the agreed to redactions. In this same correspondence, Defendant Hall notified Plaintiff for the first time that Roe 1 and/or her attorney would be permitted to speak freely during the hearing on any or all of the other accusations brought against

76

Plaintiff.[14]  In fact, Roe 1's counsel did just that in his opening statement, in which he sought to portray Plaintiff as a repeat offender and sexual predator that must be removed from campus.

383.   Indisputably, the various references to other allegations of sexual misconduct impacted the Hearing Panel's decision making in the Roe 1 case.  Even if there had been any semblance of neutrality initially (there was not), the bell could not be un-rung.

384.   Evidently, Defendant Hall and the EOC ensured the Hearing Panel would be prejudiced against Plaintiff, before he even appeared in front of them.

### XVI.   *The Roe 1 Hearing.*

385.   Plaintiff appeared for the Title IX hearing in the Roe 1 matter on January 27 and January 28, 2022.

386.   The Hearing Panel, chaired by Defendant Feeney, evidenced a bias against Plaintiff from the outset, deprived Plaintiff of proper notice concerning the charges he was facing when they revised the date of alleged incident during the hearing, and failed to afford Plaintiff a meaningful opportunity to be heard when they permitted Roe 1 to depart midway through the hearing and allowed her attorney to testify in her place.

### A.  <u>Failure to provide Plaintiff proper notice of the charges against him.</u>

387.   There is no question that at the core of procedural due process is the obligation to provide an accused with proper notice and a meaningful opportunity to be

---

[14] Plaintiff did not learn until after the Roe 1 hearing concluded that Roe 2 had withdrawn her complaint with the EOC back on June 16, 2021.

77

Case 1:23-cv-00041-MOC-WCM   Document 1   Filed 02/15/23   Page 77 of 192

heard. There also is no question that Title IX imposes strict notice requirements on universities when investigating and adjudicating allegations of sexual misconduct.

388. As part of these requirements, UNC was obligated to provide Plaintiff with written notice, including "sufficient details known at the time and with sufficient time to prepare a response before any initial interview." Sufficient details must include, at minimum, the date and location of the alleged incident.

389. Further, if, during the course of an investigation, the University determines that it will investigate additional or different allegations from those initially conveyed to the accused, it is required to notify the accused party of this new allegation. UNC failed immensely in regard to all of these mandates.

390. Plaintiff was notified at the initiation of the investigation that the date of alleged misconduct relating to the Roe 1 matter was November 19, 2020. This was the date that was confirmed by Roe 1 without hesitation, during her interview on May 7, 2021, after being questioned closely by the EOC Investigators and consulting her calendar. The EOC issued a notice of investigation confirming November 19, 2020 was the date in question, the EOC issued its own formal complaint on June 30, 2021 after Roe 1 withdrew her complaint, again noting the date of incident was November 19, 2020, and the Hearing Officer opened the matter by stating unequivocally that the hearing would concern the allegations of non-consensual sexual contact alleged to have occurred between Doe and Roe 1 on *November 19, 2020*.

391. At no time did UNC ever notify Plaintiff that any date other than November 19, 2020 was being investigated and adjudicated concerning Roe 1.

78

392. Accordingly, Plaintiff spent nearly ten months, up until the hearing date on January 27, 2022, providing all of the information he could recall concerning the events of November 19, 2020, gathering an abundance of evidence to dispute the allegations, and preparing his defense, part of which included the fact that no sexual contact of any kind had occurred between him and Roe 1 on November 19, 2020.

393. Incredibly, without any prior notice, he was then subjected to a hearing on January 27, 2022 where the date of alleged incident was astonishingly changed to November 12-13, 2020, after Roe 1 admitted that she had no sexual contact of any kind with Plaintiff on November 19, 2020.

394. At the beginning of the hearing, Roe 1's counsel, Attorney Andrew Fitzgerald ("Mr. Fitzgerald") admitted that no sexual contact occurred between Plaintiff and Roe 1 on November 19, 2020, and instead claimed that the incident at issue actually occurred in early November 2020.

395. When this dispute about the date arose, the Hearing Panel convened an *ex parte* meeting for approximately one hour, while Plaintiff sat by idly. He was never informed of the contents of the Hearing Panel's discussion, the conversation was not recorded, and he was not advised as to how the decision to proceed with the hearing in light of this new information was determined. Plaintiff only learned once the hearing resumed that the Hearing Panel would now determine whether non-consensual contact occurred on November 12-13, 2020.

396.    The matter should have been dismissed at that point, given the Reporting Party admitted that no sexual contact occurred on the relevant evening and, therefore, no possible finding of non-consensual contact could be reached.

397.    Yet remarkably, the Hearing Officer, the EOC and the Hearing Panel instead decided to proceed with the hearing, on the new charges against Plaintiff, despite the lack of any prior notice regarding the events of November 12-13, 2020, and in disregard of a ten months' long process that had already taken place.

398.    The EOC demonstrated a bias against Plaintiff when the Hearing Panel agreed to consider new allegations relating to a different date, without any notice to Plaintiff, evincing their clear objective to support the female complainant and ensure that Plaintiff would be found responsible.

399.    Plaintiff was left to collect what information he could on a brief lunch break during the hearing, which consisted of some text messages Plaintiff sent to his friends on November 13, 2020 at 2:34 and 5:23 a.m.

400.    As such, revising the date of the allegations in the middle of the hearing deprived Plaintiff of the requisite notice and sufficient opportunity to collect evidence concerning November 12-13, 2020, adversely impacting his ability to defend himself.

**B.    Deprivation of Plaintiff's right to cross-examine his accuser.**

401.    It is well established that cross-examination is "beyond any doubt the greatest legal engine ever invented for the discovery of truth." 3 Wigmore, Evidence §1367, p. 27 (2d ed. 1923). This is especially true in cases where credibility of the parties is at issue, as is often the case in matters revolving around sexual misconduct allegations.

80

402.  As has been recognized by various judicial circuits "[t]he basic elements of federal procedural fairness in a Title IX sexual-misconduct proceeding include a real, meaningful hearing and, when credibility determinations are at issue, the opportunity for cross-examination of witnesses." *Doe v. University of the Sciences,* 961 F.3d 203, 214-215 (3rd Cir. 2020). *See also Doe v. Purdue Univ.,* 928 F.3d 652 (7th Cir. 2019); *Doe v. Baum,* 903 F.3d 575 (6th Cir. 2018); *Haidak v. Univ. of Massachusetts-Amherst,* 933 F.3d 56 (1st Cir. 2019); *Walsh v. Hodge*, 975 F.3d 475 (5th Cir. 2020).

403.  Here, while UNC's policies expressly provide that each party is permitted to cross-examine the other party and witnesses at a hearing, Plaintiff was denied this right. When Roe 1 appeared for the hearing, she refused to answer questions posed by Plaintiff's attorney after she was confronted with questioning that demonstrated she had lied to the Investigators about her interactions with Plaintiff on November 1, 2020, when she falsely stated that they did not have intercourse that first evening.

404.  In the middle of this material line of questioning, the Hearing Chair interrupted Plaintiff's counsel to state that Roe 1 had requested a break.  When the hearing resumed, Plaintiff was informed that Roe 1 had departed from the hearing and as such, her counsel would be permitted to step in for Roe 1 and answer questions on her behalf, a procedure not expressly permitted by the University's policies.

405.  Allowing one's attorney to step into the role of the accusing party amounted to a significant and prejudicial error.  First, it was highly unlikely that any hearing panel member would deem an attorney answering questions on behalf of his client as being not credible or truthful, thereby imputing credibility to Roe 1's claims where none existed.

81

Second, allowing a party to question the other party's counsel does not equate to cross-examination of one's accuser, as the very intent of cross examination, *i.e.,* testing the facts and credibility of the witness, is no longer in play.

406.    Permitting Roe 1's counsel to answer questions on her behalf, transformed the hearing into even more of a farce.  This deprivation amounted to a substantial procedural irregularity and a clear violation of Plaintiff's procedural due process rights.

407.    Defendants engaged in further violations of Plaintiff's rights including, but not limited to, the following:  (i) Roe 1 was excused from the hearing because it took place on her birthday; (ii) Roe 1's counsel, when answering questions posed by Plaintiff's counsel and intended for Roe 1, intentionally misinterpreted the questions and read from parts of the investigation record about which he was not asked; (iii) Mr. Fitzgerald continually referred to the other allegations brought against Plaintiff, specifically those alleged by Roe 4, and expressed his belief that Plaintiff attempted to rape Roe 4; (iv) during his cross-examination of Plaintiff, Mr. Fitzgerald asked Plaintiff questions about the Roe 4 matter; (v) the Hearing Officer and Hearing Panel disallowed the testimony of a well-known local psychologist who would have spoken to the social dynamics of what Roe 1 experienced when interacting with Roe 2; (vi) Defendant Hall was present for the entirety of the hearing, implying that the outcome of this hearing was an important one for the EOC and for her career as the newly appointed head of the EOC; (vii) not only did she attend the hearing (as well as the three other hearings), but Defendant Hall actively engaged in directing the Hearing Officer, who was inexperienced with such matters, to make certain rulings, thus interfering with the required impartial adjudication process; (viii) Defendant

82

Hall directed the Hearing Panel in its decision making process; (ix) Defendant Hall took an active role in the Hearing Panel's writing of its decision letter; (x) the Hearing Panel permitted Roe 1 to leave midway through the hearing to avoid being cross-examined by Plaintiff's counsel.

### XVII. The Final Investigation Report in the Roe 2 Matter.

408.    On February 7, 2022, Plaintiff was provided notice of the opportunity to review the Final Investigation Report in the Roe 2 matter.

409.    Upon review of the Final Report, Plaintiff learned that all of the same witnesses that had been interviewed with respect to the Roe 1 matter were also interviewed for the Roe 2 matter.

410.    Several notable points were observed by Plaintiff in reviewing the Final Report for the Roe 2 matter; namely:

- Roe 4 was interviewed as a witness for Roe 2, even though she had no knowledge of the allegations and first met Roe 2 in January 2021, after the encounter at issue.
- Roe 4 admitted that she, Roe 2 and Roe 1 "got together a month after [Roe 2] shared her experiences with [Roe 4] to discuss their experiences regarding [Plaintiff] and "figure out [ …] if [they] actually [had] enough [information] and if any of [them] actually want[ed] to go through with […] reporting it" and "what [they] could do from that point."
- Roe 3 first met Roe 2 in March 2021 at a party, where they discussed their experiences with Plaintiff.  Subsequently, Roe 2 sent a message via Snapchat to Roe 3 saying "Hey, we're going to send in a statement to UNC [regarding Plaintiff] if you'd like to be a part of it."[15]
- Roe 3 had no personal knowledge of the allegations made by Roe 2.

---

[15] The Complainants never produced a copy of this message, in addition to other messages referenced during the investigation process.

411.    On February 9, 2022, Plaintiff appeared for the pre-hearing meeting in the Roe 2 matter.

### XVIII. The Erroneous Finding of Responsibility in the Roe 1 Matter.

412.    On February 16, 2022, Plaintiff received the Notice of Hearing Outcome in the Roe 1 case.  The Panel found him responsible for non-consensual sexual intercourse, while Roe 1 was incapacitated.

413.    The outcome letter indicated the:  "Hearing Panel determined that, on or about *November 19, 2020*, in the Kappa Sigma fraternity house, the Responding Party penetrated the Reporting Party's vagina with his penis without the Reporting Party's consent.  The Hearing Panel found a preponderance of the evidence demonstrated that the Reporting Party was incapacitated due to alcohol consumption, which rendered her physically helpless and substantially incapable of communicating Consent to sexual contact or communicating unwillingness to engage in sexual contact."

414.    Interestingly, the Hearing Panel found Roe 1's account to be more credible than Plaintiff, even though Roe 1 did not actually recall any sexual intercourse occurring on the date of the alleged incident.  Instead, she claimed that she believed it did happen because she woke up and felt pain the next morning which she initially attributed to menstrual cramps.  She also contended that she had internal pain and suffered bruising on her neck, which suggested to her that rough sexual intercourse had taken place.  The Panel concluded that the intercourse, which Roe 1 did not recall occurring, took place while she was unconscious, yet somehow still found her to be more credible, due to a lack of any

memory and despite the numerous falsehoods she relayed to the Investigators during the investigative phase of the case.

415. The Panel's decision was problematic in numerous additional ways, as discussed in detail below.

**A. The Panel improperly relied on "Facts" that were contradicted by the record.**

416. Initially, in concluding that the parties engaged in sexual intercourse on November 12, 2020 while Roe 1 was incapacitated, the Panel relied on certain purported "facts", which included the following: (i) Roe 1's "candor" in admitting she lied to the Panel and to the Investigators after being caught in the first of her lies during cross-examination, a fact which was deemed to support her credibility; (ii) Roe 1's witness Roe 2 was credible because she contradicted parts of Roe 1's account "when she could have been untruthful"; (iii) Roe 1 allegedly was "unconscious" for two hours, from approximately 1:00 to 3:00 a.m. due to having consumed peppermint Schnapps; (iv) during the two hour time period while she was unconscious, Plaintiff engaged in "rough sexual intercourse" with her; (v) at around 3:00 a.m. Roe 1 was awakened by "pain" that was "consistent with rough sexual intercourse"; (vi) she had bruising on her upper chest, neck, and wrists, which was consistent with being forcibly restrained while unconscious; (vii) video and photos provided by Roe 2 showed that Roe 1 was at the Kappa Sigma fraternity house at 9:48 a.m. on November 13, 2020; (viii) text messages Plaintiff sent to friends at 2:34 a.m. and 5:23 a.m. that allegedly confirmed Roe 1's timeline; and (ix) Roe 2 observed Roe 1 come into the hallway that leads to Plaintiff's room on November 13.

417.    Importantly, each of these purported "facts" which the Hearing Panel relied upon in finding Roe's allegations to be truthful were either contradicted by the evidence, not supported by the evidence, or both.

**B.  <u>The Panel's improper finding of credibility.</u>**

418.    First, the Hearing Panel found Roe 1 to be credible, in large part because she admitted during cross-examination at the hearing that she had sexual intercourse with Plaintiff on November 1, 2020, after initially denying this, and admitted that she had been dishonest when interviewed by the Investigators.

419.    Instead, she manufactured an event, telling the Investigators that Plaintiff attempted to have sex with her, attempted to blackmail her into sex, and that she fended off Plaintiff's efforts to have sex with her by pushing him away and running out of Plaintiff's room.

420.    It is inconceivable how the Hearing Panel used this intentional omission and the creation of an alternative story she relayed to the Investigators to somehow support their predetermined conclusion that Roe 1 was more credible than Plaintiff, despite the universe of facts suggesting otherwise.

421.    The Parties' interactions on November 1, 2020 were significant; it was their first date, and they engaged in multiple forms of sexual contact at multiple points that evening.  Yet, in failing to report the truth about the events that transpired on November 1, 2020, Roe 1 knowingly manufactured a wholly false and inflammatory account, intended to portray Plaintiff as a dangerous sexual predator.

86

422. This was not a one-time lie or omission; instead, her false story regarding November 1 persisted through an eight-month long investigation process and the truth only came to light upon cross-examination of Roe 1 during the hearing. What should have raised concerns to the Hearing Panel even more regarding Roe 1's credibility was the fact that she disappeared in the early stages of her cross-examination, afraid of the multitude of other lies that would finally be exposed. Yet again, her actions were somehow warped into a further justification for the Hearing Panel to find her credible.

423. Prior to Roe 1's departure from the hearing, additional questions arose that should have contributed to a finding against her. First, Roe 1 testified that one reason she believed Plaintiff had engaged in "rough sex" with her while she was unconscious on November 12-13 was that soon afterwards, she required medical attention to treat what her doctors allegedly referred to as "one of the most aggressive UTI's they had ever seen."

424. Roe 1 initially told the Investigators in May of 2021 that she would request and produce the medical records confirming this. She never did so, claiming at the hearing (which occurred eight months later in late January 2022) that she did not have time to request the records. Importantly, the hospital visit referred to actually occurred on November 10, 2020, two days prior to the alleged non-consensual activity.

425. Second, when discussing her allegations with the Investigators, Roe 1 intentionally misread the text messages[16] with Plaintiff when she either: (1) read words

---

[16] Two days after the January 23, 2021, party where Roe 2 disclosed to her best friend Roe 1 that she had sex with Plaintiff in October of 2020, Plaintiff and Roe 1 communicated by text regarding her upset over the conversations that occurred at the party. Those texts were never produced by Roe 1, but were later produced by Plaintiff, but only after she had been interviewed by the EOC

and phrases out of the texts she and Plaintiff exchanged to change their meaning, or (2) simply did not read texts that were relevant to a full understanding of the exchange. For example, in the part of her text to Plaintiff where she described them having "aggressive sex, *which works*" – meaning that Roe 1 enjoyed aggressive sex—Roe 1 omitted the phrase "which works" when reading the text messages out loud to the Investigators. Another example of Roe 1's complete lack of credibility during the investigation was when Roe 1 intentionally misread a part of Plaintiff's response to her. Instead of reading the sentence correctly, as: "I wish you had felt comfortable enough with me *when we were actually being intimate* to tell me that because this makes me feel terrible," Roe 2 omitted the italicized portion to make Plaintiff appear less empathetic and so as not to beg the obvious question from the Investigators to her – "Ms. Roe, did you ever complain of aggressive sex when you were being intimate with Plaintiff?"[17]

426. To further demonstrate her extreme lack of credibility, Roe 1 simply did not read a text to the EOC Investigators that was germane to the exchange. For example, after misreading Plaintiff's reply above, Roe 1 falsely declared to the Investigators that there were no more texts to the exchange with Plaintiff. When, in fact, there was another text Roe 1 sent to Plaintiff which she did not read at all. That text read: "just please take it into

---

Investigators.

[17] Of course, the EOC Investigators, in over 600 pages of interviews of the reporting parties and their friends, never challenged any statements made by the accusers or their witnesses, while the EOC Investigators grilled the Plaintiff about his contemporaneous statements, questioning what he meant when he sent texts to the reporting parties. There can be no serious argument that misreading texts during an interview conducted by Zoom requires a level of intentional deception in order to cast Plaintiff in the worst possible light.

account because I know youre a good person and that's why it hurts for me to do this." Roe 1 intentionally omitted this statement in reading her texts to the Investigators because to do so would show that she "knew" Plaintiff was a "good person" and not someone who months earlier allegedly had sex with her when she was incapacitated. Of course, because Roe 1 never delivered copies of the texts to the Investigators, and she abruptly and without warning left the hearing, this sort of depravity could not be explored and properly exposed by counsel for Plaintiff.[18]

427. Third, Roe 1 claimed the last time she interacted with Plaintiff was in the early morning hours of January 28, 2021, falsifying the circumstances regarding the reason she was at his apartment before he arrived home the following morning.

428. As discussed previously and according to the Plaintiff, Roe 1 was asleep in a lawn chair in the foyer of his apartment, when Plaintiff arrived home at around 9:00 a.m. and, much to his surprise, he saw her there. Roe 1 knew Plaintiff had attended a party with a date the prior evening and wanted to wait until he came home, to see if his date accompanied him. Once Plaintiff arrived home and went into his bedroom, he texted Roe 1 to ask if she wanted to go back to sleep in his bed. She responded, "100%" and they slept together in his bed for several hours that morning.

---

[18] Though Roe 1 promised during her interview in May of 2021 to deliver copies of the text messages, as well as her medical records to the EOC Investigators, she never did so. Perhaps more to the point, neither Defendant Enlow nor Defendant Froehling ever bothered to follow up with Roe 1 for this evidence. The EOC Investigators received copies of the texts from Plaintiff in September of 2021. There is no evidence that the EOC Investigators ever followed up on any of the obvious lies told to them by Roe 1 upon receipt of these records. Neither the Investigators nor Defendant Hall were interested in the truth.

429.    Instead of providing this truthful account, Roe 1 once again made up a harrowing story (as she had with their initial encounter), telling the EOC Investigators that she, Roe 2, and John Coe were asleep together on a large sofa in the common area of Plaintiff's apartment.  Roe 1 explained that according to Roe 2 and John Coe, Plaintiff had left town to visit his parents after the party and would not return to the apartment.  These statements by both Roe 2 and John Coe were intentionally false—they both knew that Plaintiff would return to his apartment after the party because they attended the party with Plaintiff.

430.    Nevertheless, Roe 1 insisted that when Plaintiff arrived at the apartment, she was sleeping on the couch, so he woke her up and asked her to go get in bed with him.  Roe 1 reported that she was "very nervous", felt as though she "was going to throw up almost immediately," and her "heart definitely quickened."  She further claimed that Doe then "stomped off into his room" and "slammed his door pretty loud."  While stating that Roe 2 and John Coe remained on the couch asleep during this interaction, Roe 1 also stated that she woke John Coe up and asked him to drive her home.

431.    The foregoing tale was invented by Roe 1 and was specifically disproved by the texts that Plaintiff provided voluntarily to the EOC Investigators.  Again, as with the other accounts provided by Roe 1 to the EOC Investigators, neither Defendant Enlow nor Defendant Froehling followed up with Roe 1 on her outrageous lies.  Nor did the then Interim Head of the OC, Defendant Hall, make any further inquiry which only served to further demonstrate that the UNC EOC had little interest—indeed, a complete lack of

90

interest—in determining the truth of the matter, and zero interest in determining the credibility of Roe 1.

432. Fourth, Roe 1 incorrectly stated that the interaction of January 28, 2021 was the last one between her and the Plaintiff. This statement was untrue as well. In fact, she had first attempted to visit Plaintiff in his apartment on February 1, 2021 under the auspices of returning certain clothes to him. But Plaintiff was not in his apartment during this visit. So, Roe 1 reached out to Plaintiff and met with him at his apartment on February 3, 2021. Accordingly, she knew this claim was false, as her text messages indisputably demonstrated that she requested to meet with Plaintiff on February 3, and they did. It is clear from the texts (produced only by Plaintiff) that Roe 1 was trying to rekindle a relationship with Plaintiff and she did not want the EOC Investigators to be aware of her efforts. Again, when the EOC Investigators received the texts demonstrating that Plaintiff was making up outrageous and untruthful stories about her interaction with Plaintiff, they did not conduct any follow-up investigation with the Roe 1.

433. Additionally, because she departed the hearing midway through, Plaintiff's advisor could not cross-examine her about these falsehoods and place squarely before the Panel the critical question of Roe 1's complete lack of credibility.

**C. Roe 1's allegation regarding her level of incapacity was directly disputed by the evidence.**

434. The Hearing Panel erroneously concluded that Roe 1 was "unconscious" due to alcohol consumption. In fact, this claim was expressly refuted by her own testimony.

435. Roe 1 described that she clearly recalled walking to Plaintiff's room after midnight, noting that she was able to walk on her own, without stumbling, falling, or running into anything, stating "I could still walk and everything. I wasn't like, out of my mind."

436. She elaborated on her cognitive state as well, explaining "I could still remember and understand things that were going on," and noting she clearly recalls communicating cogently to others, and being understood by them, stating: "I was speaking fine because I was getting straight responses to what I was saying [and] wasn't having to be asked to repeat myself."

437. She further acknowledged that she climbed up the ladder to Plaintiff's lofted bed on her own, which included a "very narrow turn that you also have to navigate." While alleging to have been unconscious during the precise time when Plaintiff supposedly engaged in rough sexual intercourse with her, she explained that any impairment she experienced was gone by 3:00 a.m. when she awoke to pre-menstrual pains and went to the bathroom.

438. While attempting to attribute this pain to rough sexual intercourse, Roe 1 confirmed during the hearing that the pain she experienced felt like the pelvic and abdominal pain that she would typically experience prior to the start of her menstrual cycle, due to her endometriosis.

439. As further confirmation, she noted that she went to the bathroom at that time, to check whether she had yet started her menstrual cycle, but she had not. Notwithstanding, the Hearing Panel concluded that the pain she allegedly experienced at 3:00 a.m. was due

to having been subjected to rough sexual intercourse while she was unconscious, rather than due to the precise reason Roe 1 herself described.  After going to the restroom, Roe 1 then returned to Plaintiff's room around 3:30 a.m., put on some of her clothing and went back to sleep on his couch until approximately 9:00 a.m.  Roe 1 insisted Plaintiff was still asleep in his bed, during the same time that Plaintiff was text messaging his fraternity brothers, in the early morning hours of November 13.  This obvious inconsistency in Roe 1's story was completely ignored by the Hearing Panel.

440.    All of the foregoing confirms that Roe 1 was not incapacitated, nor "unconscious", as the Hearing Panel concluded.

441.    The only objective evidence allegedly supporting Roe 1's level of impairment was purported typos in the text messages she sent that evening—none of which she ever produced to the Investigators.[19]

442.    Notably, this sole evidence of incapacitation was provided in response to a leading question from the Investigators, who asked during her interview "do you recall any issues with like manual dexterity, typos and texting, anything like that that night?" to which she expectedly responded with the information they sought to elicit, stating: "definitely typos and texting."

443.    Once again, Roe 1 failed to produce these text messages evidencing such typos and once again, the Investigators never asked her to provide them.  Somehow, all of

---

[19] Despite promises to the contrary, Roe 1 never produced a single email, text, snapchat, or other written or recorded communication with Plaintiff that supported her story.

this information was overlooked by the Hearing Panel when they arrived at the conclusion that Roe 1 was unconscious between 1:00 and 3:00 a.m., a claim that Roe 1 herself never even made.

444.    Ultimately, instead of reaching the more sensible conclusion – that Roe 1 was not incapacitated, and was not sexually assaulted – the Hearing Panel engaged in convoluted reasoning to conclude that Roe 1 was sexually assaulted while she was unconscious, because she could not remember that she was sexually assaulted, because she was unconscious when it happened.

### D. There was no evidence supporting Roe 1's claims of bruising.

445.    The Panel found that Roe 1 sustained bruising to her chest, neck, and wrists, all of which they found to be consistent with her claim that Plaintiff engaged in sexual intercourse with her while she was unconscious.

446.    Other than Roe 1's say-so, there was no evidence of any bruising on her chest, neck or wrists.  She did not produce photos of the bruising, text messages wherein the bruising was discussed, nor did she provide any medical records referencing the bruising.  Despite the Investigators' efforts to elicit testimony confirming that Roe 1 had bruising during the relevant timeframe, the closest they came was getting Kate Joe to state that Roe 1 had bruises at various times during their freshman year.

447.    Kate Joe also stated however (and these facts were not set forth in the Investigators' report) that Roe 1 liked engaging in sexual activity (breath play specifically)

that left her with hickeys, and that she did so with multiple sexual partners, both before and after Plaintiff. As for any bruising, Kate Joe noticed on Roe 1's neck around the time she was with Plaintiff, Kate Joe noted she and Roe 1 "thought they were hickeys" and stated that she and Roe 1 joked about that regularly in their morning discussions about the previous night's sexual activities.

448. To understand the lengths that the Hearing Panel went to in order to find Plaintiff responsible for the allegations made by Roe 1, one would have to believe that despite Roe 1 being physically restrained to the point of sustaining bruising on various parts of her body, any pain that would have resulted from such a horrendous assault was *not enough* to wake Roe 1 from her unconscious state, yet pre-menstrual pain was sufficient to rouse her.

449. Further, one would have to accept that despite being in such a deep state of unconsciousness as to not be aware of a sexual assault taking place, she nonetheless was easily awakened shortly thereafter, at which point she miraculously no longer observed any effects of impairment. Such testimony is simply not credible, yet it went completely ignored by the Hearing Panel.

### E. The text messages relied upon were not consistent with Roe 1's account.

450. The Panel also found that certain text messages sent by Plaintiff in the early morning of November 13, 2020, were consistent with Roe 1's account, when in actuality, they were consistent with Plaintiff's account, further demonstrating the preconceived decision the Hearing Panel sought to attain.

95

451. Plaintiff sent text messages at 2:34 a.m. and at 5:23 a.m. on November 13, 2020, objective evidence which indisputably refutes Roe 1's claims that he was in his bed from 1:00 a.m., was asleep in his bed when she awoke at 3:00 a.m., and that he remained sleeping through the time she woke up and left between 8:00 and 9:00 a.m.

452. Rather, Plaintiff was clearly not sleeping in his bed during this timeframe, as he texted a friend in regard to finding marijuana at 2:34 a.m. and then went to obtain it, smoke it, and then corresponded in a group chat at 5:23 a.m. to discuss going downstairs to clean the kitchen in the house before the house cook arrived that morning.

453. All of this directly contradicted Roe 1's narrative and unequivocally showed Roe 1's story to be untrue. Yet, the Hearing Panel improperly overlooked this when analyzing Roe 1's credibility and the truthfulness of her story.

454. Importantly, this also further highlights the prejudice caused to Plaintiff when the date of alleged incident was changed, from November 19, 2020 to November 12, 2020. As Plaintiff was not given proper notice regarding the date of the alleged incident at issue, and given he had spent approximately eight months obtaining evidence to dispute the claim of a non-consensual sexual interaction on November 19, 2020, Plaintiff was unable to collect all relevant evidence, identify material witnesses, and testify as to his actions from the revised date of alleged incident prior to the hearing.

455. He was therefore significantly and irreversibly harmed in his ability to meaningfully defend himself against Roe 1's false charges, an effect that the Title IX notice requirements are specifically intended to prevent.

## F. The video and photographic evidence provided by Roe 2 was likewise not supportive of Roe 1's claims.

456.    The video and photographic evidence submitted by Roe 2 in support of Roe 1's account lacked any probative value; however, the Hearing Panel inexplicably afforded it considerable weight in reaching its conclusions.

457.    Significantly, there was no video evidence that confirmed Roe 1's account; the video submitted did not even include Roe 1. As for the photographic evidence, Roe 2 provided one photo that was a selfie of Roe 1, in the common room of Kappa Sigma at 9:48 a.m. on November 13. As Roe 1 testified that she left Plaintiff's room between 8:00 and 9:00 a.m. that morning to be picked up by Kate Joe, this photo is of little value in establishing her claims, and rather, disputes her stated timeline of the events.

458.    Unfortunately, Plaintiff was not able to question her on this point during the hearing because she left before he could cross-examine her on it. Regardless, the Hearing Panel's reliance on this irrelevant piece of "evidence" was misplaced.

459.    The Hearing Panel's consideration of Roe 2's testimony regarding her observation of Roe 1 coming into the common room of the fraternity house from the hallway that goes to Plaintiff's room was inappropriate for similar reasons.

460.    Roe 1 testified that she left the house between 8:00 and 9:00 a.m. Thus, even if Roe 2 did see Roe 1 come into the common room around 9:45 a.m., for instance if she returned to the house shortly after leaving between 8:00 and 9:00 a.m., this says nothing about whether any sexual assault occurred and, again, only refutes Roe 1's stated timeline of the events that transpired.

97

461.    Moreover, Roe 2 was incorrect in representing that only Plaintiff's bedroom was accessed from that particular hallway.  As she well knew, there was also another bedroom as well as a computer room that would be accessible from that direction.

### G. The Panel found Roe 2 credible because she provided testimony inconsistent with Roe 1.

462.    Bewilderingly, the Hearing Panel deemed Roe 2 to be a credible witness, because she provided testimony that was inconsistent with Roe 1.

463.    Specifically, Roe 2 and Roe 1 offered different accounts concerning who picked Roe 1 up from the fraternity house on the morning of November 13, 2020 between 8:00 and 9:00 a.m. – Roe 1 stated that Kate Joe picked her up (which Kate Joe confirmed), while Roe 2 stated that she picked up Roe 1.

464.    While such a difference in testimony should have been viewed as a clear indication that one of them was lying, the Panel instead deemed Roe 2 to be credible, because she could have aligned her story with Roe 1 on this point, but did not do so.

465.    This should have spoken volumes about Roe 2's willingness to fabricate testimony, and evidences the Panel's blatant errors in its credibility analysis and decision-making.

466.    It is also remarkable to note that of the four hearing panels Plaintiff faced, the Hearing Panel in the Roe 1 matter was the *only one* to find Roe 2 credible.

98

## H. The Panel mischaracterized Plaintiff's testimony in order to find him less credible than Roe 1.

467.    The Hearing Panel further erred when it found Plaintiff to be less credible than Roe 1, based upon a supposed inconsistency in his testimony which was in fact, not an inconsistency at all.

468.    In its decision letter, the Hearing Panel inaccurately stated that "[Plaintiff] initially stated that he discovered breath play on YouTube, and that he tried it on [Roe 1], and she responded that she liked it.  Later in his testimony, [Plaintiff] said he did not try breath play with [Roe 1] until she asked him to."[20]  The foregoing testimony did not occur and is demonstrably not true.

469.    What Plaintiff actually stated was that the first time they had sex, Roe 1 placed his hand on her neck, he asked her "do you like this" and she replied "yes."  He further explained that he had first learned about it on YouTube, and was thus familiar with the concept, but did not do it until Roe 1 asked him to do it—not on November 13 as the EOC alleged but rather, on November 1— which was consistent with Kate Joe's report of Roe 1's enjoyment of breath-play with prior sexual partners.

---

[20] This was an issue that was incorrectly expressed in the Investigators' report—which was provided to the Hearing Panel—and to which Plaintiff objected by pointing out that the transcription was inaccurate when compared to a recording of same from the hearing.  The EOC refused to acknowledge the transcribing error and refused to correct it.  Specifically, Defendant Hall stated that she was not concerned with what the recording showed, that she accepted the inaccurate transcription and, on that basis, the EOC declined to make the correction—a clearly biased and remarkable assertion.

470.   Contrary to the Hearing Panel's misconception, none of this was inconsistent with any part of Plaintiff's testimony; yet it was used as a critical point in finding him to be not credible.

471.   Demonstrating the disparate treatment applied to Roe 1 as the female complainant in comparison to Plaintiff as the male respondent, the Hearing Panel found Roe 1 to be credible because she did not tell the Investigators that she had sex with Plaintiff on November 1, 2020 but then admitted at the hearing that she had not been truthful on this point.  It was hardly a meaningful concession by Roe 1 as her statement that she and Plaintiff did not have sex on November 1, 2020 was belied by her text message sent on November 2, 2020 to Plaintiff, wherein she asked Plaintiff to Venmo to her friend Kate Joe $50 for a Plan B-emergency contraception for Roe 1.

472.   In comparison, the Hearing Panel found Plaintiff not credible when he stated that he learned about "breath play" on YouTube and tried it on Roe 1 when she asked him to in their very first sexual encounter on November 1—not November 13—a point that was not even remotely inconsistent.  Yet, the Hearing Panel mischaracterized his statements as somehow being not consistent and thus, harmful to his credibility.

473.   The Hearing Panel held their decision on sanctioning in abeyance until the responsibility phase of the other matters pertaining to Plaintiff had concluded, noting that an updated Notice of Hearing Outcome would be issued at that time.

## XIX.   The Roe 2 Hearing.

474.   Plaintiff appeared for the Title IX hearing in the Roe 2 matter on February 21 and 22, 2022.

475. Though Plaintiff was ultimately found not responsible for the allegations brought by Roe 2, the University again deprived him of an equitable investigation and adjudication process and repeatedly exhibited gender bias against Plaintiff as the male accused.

476. By way of example and not limitation: (i) the EOC failed to redact from the record the allegations as to the other three complainants, despite its prior agreement to do so; (ii) the Investigators included in the report all written allegations of the three other reporting parties and reference was made by Roe 2 to all such instances; (iii) the EOC listed some seven (7) witnesses including Roe 2—and called none of them except Roe 2; (iv) references and testimony by others—who were not witnesses at all, but rather story tellers of hearsay and unsupported statements—were included in the Investigators' report; (v) the Investigators let stand John Coe's statement to the Investigators that Plaintiff used John Coe's name to have sex with Roe 2 which was directly contradicted by the affidavit of Plaintiff which expressed to the contrary; and (vi) the Investigators did not set forth in their report that Roe 2, in a January 27 Snapchat exchange, told Plaintiff: "the things that were said at the party [by Roe 4 and me to [Roe 1] (Plaintiff's soon to be exclusive girlfriend)] weren't along the lines of u like holding down and forcing yourself onto girls, it was more abt subtle emotionally manipulative tactics you use to get girls to have sex and pressure, I'm not saying u rlly did that w me . .".

477. Additionally, the EOC withheld communications from Plaintiff that it received from Roe 2 and Roe 4 in July of 2021. By email dated July 22, 2021, Roe 4 falsely claimed that Plaintiff owned a gun, had broken into his room at the fraternity house,

and had been making threats to members of his fraternity. By email dated July 30, 2021, one day after Plaintiff had filed his request for authorization to attend his classes, Roe 2 sent an email to the EOC, falsely claiming that Plaintiff had broken into his old room, bragged about having a gun, and was sending frightening messages to members of his fraternity in a group chat.

478.    The foregoing was demonstrably false because Plaintiff has never owned a gun, he was working at a camp in New Hampshire over the summer where he could not leave the camp because of Covid restrictions, and he had copies of the messages he sent to his, then, fall semester roommates and others that were anything but threatening. Once again, the Investigators never requested copies of these supposedly threatening messages, and the fraternity brothers never provided them to the EOC. Had they done so, it would have been apparent that the messages referenced did not include any language that could be considered remotely threatening.

479.    Upon information and belief, Roe 2's email was prompted by news from the EOC to Roe 2 and Roe 4—both of whom sent the same untruthful communications—that Plaintiff was seeking to have his temporary suspension lifted as he was not a danger to the community. Roe 2 and Roe 4, in order to falsely support the notion that Plaintiff was in fact a danger to the community conspired to make these outlandish statements, allegedly on behalf of certain fraternity brothers.

480.    The allegations were used surreptitiously by Defendant Enlow and co-investigator Defendant Froehling to eliminate Plaintiff's chance of obtaining a removal of his interim suspension from the EEAC.

481.  The EOC never provided this information about the false complaint made in July 2021 to Plaintiff until nearly nine months later, after the four hearings had all concluded, thus preventing him from defending against this false and defamatory claim and utilizing the false claims to refute the testimony and credibility of Roe 2 and Roe 4.

482.  On March 18, 2022, Plaintiff received the Notice of Hearing Outcome which indicated the Hearing Panel found him not responsible for any policy violation.

483.  The Panel concluded that there was "[i]nsufficient evidence to determine by a preponderance of the evidence that the Reporting Party did not consent to the first three instances of sexual contact on or about October 22, 2020. Regarding the fourth instance of sexual contact on or about October 23, 2020, the Hearing Panel determined by a unanimous vote that there was insufficient evidence to determine by a preponderance of the evidence that the Reporting Party did not consent to sexual intercourse."

## XX.  The Roe 3 Hearing and Outcome.

484.  Plaintiff appeared before the Hearing Panel in the Roe 3 matter on March 21, March 22, and March 29, 2022.

485.  Roe 3 refused to attend the hearing to offer her version of events.

486.  On April 12, 2022, Plaintiff received the Notice of Hearing Outcome which indicated he had been found not responsible.

487.  The Hearing Panel concluded that Plaintiff did not violate the Policy by engaging in sexual assault or violence and did not violate the Policy on Retaliation.

488. Significantly, the Hearing Panel for this matter found Roe 3 to be less credible than Plaintiff, pointed out the various inconsistencies in her statements, and noted that she did not provide much detail in response to the Investigators' questions and was not present for the hearing to answer questions.

489. They further found Plaintiff's account of the intimate details to be "persuasive" and candid.

490. Importantly, the Hearing Panel found many questions asked by the Investigators to Roe 3, the same Investigators assigned to the other three matters, to be leading and "thus lent less weight to the Reporting Party's responses."

## XXI. *The Roe 4 Hearing and Outcome.*

491. Finally, on April 7, 2022, Plaintiff appeared before a Hearing Panel for the Roe 4 matter.

492. David Elrod, an administrator at North Carolina State University, was retained to serve as Hearing Officer for the Roe 4 matter.

493. No explanation was provided to Plaintiff as to why an administrator from a different university was being brought in to hear the case instead of using Ms. Feeney, the Hearing Officer in the prior three hearings.

494. Defendant Elrod, who was the Associate Vice Provost, Equal Opportunity and Equity, of the Office for Institutional Equity and Diversity at North Carolina State University, admitted during the proceeding that he was not familiar with the UNC Policies and Procedures governing PPDHRM proceedings.

495. However, that lack of knowledge did not prevent Defendant Elrod from issuing a verbal ruling precluding Plaintiff from introducing evidence that impugned the complainant's credibility.

496. Specifically, prior to the hearing, Defendant Elrod issued a ruling that barred Plaintiff from presenting factual and documentary evidence that was relevant to Roe 4's credibility including, but not limited to, evidence that Roe 4 lied to the EOC in order to continue the hearing.

497. Roe 4 had posted to her social media accounts about a black eye and bruised knees that she sustained during a drunken fight with a rival fraternity brother, which she improperly characterized as a "medical emergency" when requesting a new hearing date. Though the hearing was continued at her request, Roe 4 still did not appear.

498. Despite Plaintiff's objections, and notwithstanding that there was no UNC Policy that authorized a hearing officer to bar all evidence relevant to the complaining witness's credibility, Defendant Elrod precluded Plaintiff from offering such evidence.

499. In Defendant Elrod's written decision concerning the exclusion of the credibility evidence submitted after the hearing concluded, he incorrectly cited to "Section 7 of the Procedures" as the basis for his determination. In fact, there was no Section 7 of the Procedures.

500. Seemingly, Defendant Elrod was referring to subsection IV(c)(7)(a) of the Procedures, which falls under the section describing the investigation process. As such, Elrod's reliance on this section was likewise misplaced as that subsection governed "investigations" and the investigators' discretion in determining the relevance of any

105

evidence when preparing the investigative report, not the adjudication of alleged policy violations by a Hearing Panel.

501. Further, during the Roe 4 hearing the Investigators improperly presented their findings reached in the Roe 3 matter, noting that Plaintiff had been found responsible for sexual assault and retaliation in a separate matter. The presentation of this information was specious, as the findings reached by the Investigators in December of 2021 related to the Roe 3 matter was not the final decision. Instead, contrary to the findings of the investigators, Plaintiff was ultimately found not responsible by the Panel after the hearing in that case.

502. When Plaintiff's counsel requested that the Hearing Panel in Roe 4 be informed as to the actual and final findings in the Roe 3 and Roe 2 matters, Defendant Elrod refused to do so. The allowance of this inaccurate and inflammatory information by Defendant Elrod further contributed to the defective hearing process.

503. Elrod's actions in depriving a respondent, here the Plaintiff, of a fair and meaningful hearing were regrettably, not a first-time occurrence. In fact, UNC was clearly aware of Elrod's propensity to disregard the due process rights of accused students, as he has done so previously.

504. In the matter of *Gulyas v. Appalachian State University*, (2017 WL 3710083 (W.D.N.C. Aug. 28, 2017)), the Plaintiff overcame the defendants' motion to dismiss on his claim that Elrod's conduct violated the plaintiff's due process rights, arguing Elrod's conduct was "sufficiently egregious objectively to deny Plaintiff a fair hearing and a meaningful opportunity to be heard such that no reasonable government official in Elrod's

place could have concluded that the investigation and the University Conduct Board hearing satisfied due process." *Id.* at *6.

505. Finally, the EOC withheld communications from Plaintiff that it received from Roe 2 and Roe 4 in July of 2021, falsely claiming that Plaintiff owned a gun, stating that they believed Plaintiff had broken into his room at the fraternity house, and that he was threatening some of his fraternity brothers with emails.

506. As the EOC did not provide this information to Plaintiff until after the four hearings had concluded, he was deprived of the opportunity to cross-examine Roe 4 on these false allegations, which would have immensely damaged her credibility even further.

507. During the hearing, Plaintiff was the only person to provide testimony to the Hearing Panel. He testified that he did not touch Roe 4's vagina, nor did he reach "down towards [Roe 4's] vagina."

508. Roe 4 did not testify before the Hearing Panel, no witness reported seeing Plaintiff's hand touch her vagina, and no witness reported seeing his hand even touching near her vagina. Yet, somehow the Hearing Panel still concluded that Plaintiff did touch Roe 4's vagina.

509. Plaintiff received the Notice of Hearing Outcome on April 14, 2022, in which he was found responsible for engaging in sexual assault or sexual violence.

510. As part of the evidence relied upon to reach this conclusion, the Hearing Panel noted that Sara Poe noticed Roe 4's "eyes and facial expression change", disregarding any of the other innumerable reasons that someone's eyes or facial expression may change in any given moment. It took quite the leap by the Hearing Panel to construe

107

a change in one's facial expression or eyes as proof that a sexual assault had been committed.

511.    The Hearing Panel's determination that Roe 4's consistent telling of her account lent support to her credibility, likewise strains credulity.

512.    At no point was Roe 4 consistent in the telling and retelling of her account; to wit:  (i) while in the Gulf Shores in March of 2020, Roe 4 claimed to have told John Coe exactly what Plaintiff had done to her, however, John Coe had no recollection of Roe 4 telling him that Plaintiff had done anything inappropriate; (ii) Roe 4 claimed Sara Poe witnessed the incident, which Sara Poe refuted as she had no line of sight as to the alleged touching; (iii) on January 23, 2021, Roe 4 reported her allegations about Plaintiff to Roe 2 and Roe 1, which did not include any allegation of grabbing her vagina; (iv) in March of 2021, Roe 4 told Kate Joe "everything that had happened," which did not include any reference to spring break at the Gulf Shores or to Plaintiff "grabbing her vagina"; (v) on April 1, 2021, Roe 4 claimed that Plaintiff grabbed her vagina, alleging two individuals witnessed this action, despite knowing this to be untrue; (vi) on May 10, 2021, Roe 4 told the EOC Investigators that Plaintiff attempted to finger her, which was stopped when James Moe ran over, grabbed Plaintiff and pulled him off of Roe 4—neither act occurred, this was the first mention of Plaintiff allegedly fingering her and James Moe denied pulling Plaintiff off of anyone including Roe 4; (vii) sometime after April 1, 2021, Roe 4 told Joseph Boe that Plaintiff put his hand on her crotch and attempted to lift her bathing suit; (viii) on October 20, 2021, Roe 4 alleged Plaintiff sexually assaulted her; and finally, (ix) Roe 4 told Defendant Enlow, in a follow up interview that she ran out of the condominium

108

when "[Doe] tried to rape me." Astonishingly, Defendant Enlow, on cross-examination, denied that Roe 4 alleged Plaintiff had tried to rape her, knowing this was inconsistent with her complaint. It is without question that the Hearing Panel erred in finding that Roe 4 remained consistent in her allegations.

513. The Hearing Panel also improperly relied upon a supposed contemporaneous disclosure made by Roe 4 to Sara Poe, directly following the alleged incident in June of 2020.

514. As neither Roe 4 nor Sara Poe testified at the hearing, Plaintiff was deprived of his right to question them on this dubious evidence. Nor did Roe 4 or Sara Poe provide any contemporaneous writings regarding the alleged communications between them.

515. Notably, the Hearing Panel did not specify what the precise contemporaneous disclosure was, neither Roe 4 nor Sara Poe ever provided a copy of it, nor did they provide copies of their phone records to indicate that a text message was even sent at the time they claimed.

516. Thus, the reasonable conclusion is that no such contemporaneous disclosure existed. However, the Hearing Panel relied on this non-existent and manufactured evidence to support its finding of responsibility against Plaintiff.

517. Moreover, the arbitrary prohibition on Plaintiff's ability to present evidence refuting Roe 4's credibility was a significant error that contributed to the erroneous outcome.

518. In this particular case, there was voluminous evidence of the accuser's propensity to lie. One of her own witnesses described her as "the most unreliable narrator

109

that I've ever met," "a very big gaslighter," and "genuinely, physically, not being able to . . . accept responsibility for anything that she does," statements the witness backed up with several detailed illustrative examples of Roe 4's habit of evading responsibility for her own wrongdoing, "twisting the truth towards her favor," and fabricating false claims about the individuals who are harmed by her conduct.

519.    Additionally, posts that she published to social media prior to the continued date for her hearing demonstrated that she had lied to the EOC, when she told them she had suffered a medical condition, in order to avoid appearing for and testifying at the hearing.

520.    Based on the foregoing, Plaintiff's inability to cross-examine Roe 4, in combination with the exclusion of any evidence related to her credibility that Plaintiff sought to introduce, placed him at a substantial disadvantage in the hearing proceeding, and ensured that he would be found responsible for at least one violation.

521.    Plaintiff received an Amended Notice of Hearing Outcome on May 11, 2022, in which the sanction to be imposed was addressed.

522.    The Hearing Panel concluded that Plaintiff "did not accept responsibility for the conduct, nor did he demonstrate an understanding of the impact of his behavior to others," which it determined warranted a sanction of a permanent expulsion from the UNC System.

## XXII. The Amended Notice of Hearing Outcome for the Roe 1 Matter.

523.    On May 16, 2022, Plaintiff received an Amended Notice of Hearing Outcome for the Roe 1 matter, as the final hearing and outcome had been reached.

110

524. The Amended Notice indicated the "Hearing Panel found that the Responding Party took advantage of the Reporting Party when she was unconscious and was not deterred by her lack of consent or intoxication…Responding Party did not accept responsibility for the conduct at any time before, during, or after the hearing. Instead, he attempted to cast blame on the Reporting Party during the hearing."

525. Oddly, the Panel went on to explain that "this conduct took place in a fraternity house and that the Responding Party was not deterred from engaging in sexual activity despite the Reporting Party's lack of consent. Moreover, multiple people in the fraternity knew about the Responding Party's conduct and their statements to Investigators indicated that they found the conduct problematic." It is unclear why the knowledge of Plaintiff's fraternity brothers was mentioned, or why it had any relevance to the Hearing Panel's sanctioning decision.

526. Ultimately, the Hearing Panel issued the following sanctions with respect to the Roe 1 matter: (i) suspension for one academic year; (ii) probation for two years after return or until Plaintiff completes his academic credits, whichever is longer; (iii) Plaintiff must report regularly to designated administrators; (iv) Plaintiff is barred from holding office or participating in sports or any other activity where students represent the University; (v) educational requirements—including completion of programs related to consent and intoxication, which are designed to help manage behavior and understand why it was inappropriate; (vi) the no contact orders are to remain in effect; and (vii) exclusion from university housing during the probation period.

527. It is particularly significant to note that Plaintiff was ultimately found *not responsible* on the accusations of non-consensual sexual intercourse and attempted non-consensual sexual intercourse made by Roe 2, Roe 3, and Roe 4. However, these determinations were each made after the Roe 1 hearing took place.[21] Accordingly, the Hearing Panel in the Roe 1 matter relied upon a purported pattern of sexual misconduct when forming its conclusions regarding Roe 1's claims, even though each of those other allegations of misconduct were subsequently found to be false. This reality further highlights the severity of the errors committed by the EOC in failing to redact all references to the other allegations from the investigation files.

### XXIII. Appeals of the Roe 1 and Roe 4 Matters.

528. Plaintiff submitted his appeal of the Roe 1 case on June 6, 2022, based upon the following grounds: (i) a procedural irregularity affected the outcome of the matter; (ii) there is new evidence that could affect the outcome of the matter and was not reasonably available at the time of the determination of responsibility or sanctions; and (iii) the investigator's bias in favor of the reporting party or reporting parties generally, or against the responding party or responding parties generally affected the outcome of the matter.

529. In addition to seeking a reversal of the outcome, Plaintiff submitted that any further proceedings would be futile due to the severe and pervasive defects that permeated the process. Instead, he requested that the matter be dismissed as the only appropriate

---

[21] It is worth noting that while the Roe 1 outcome was delivered prior to the hearings on the other three matters, the Roe 1 sanction letter was issued after the fourth and final hearing concluded.

remedy, given the implausibility that any re-investigation or re-hearing could rectify the significant errors made, and in light of the unequivocal evidence demonstrating Roe 1's allegations were false.

530.    Plaintiff submitted his appeal in the Roe 4 case on June 6, 2022, noting that a student found responsible and sanctioned for a violation of the PPDHRM is entitled to reversal of that finding and sanction when the students can show:  (i) a violation of due process; (ii) material deviation from the Minimum Substantive and Procedural Standards for Student Disciplinary Procedures; or (iii) there is new information that was not available during the investigation or adjudication that would substantially affect the outcome. Plaintiff's appeal submitted that he was entitled to relief on all three of these available grounds.

531.    On June 20, 2022, Defendant Gibson notified Plaintiff that the EOC had reviewed his appeal in the Roe 4 matter and determined that it was based on permissible grounds set forth in the procedures, thus allowing the appeal to move forward.  Vice Chancellor for Institutional Integrity and Risk Management George Battle ("Mr. Battle") was designated as the appeals officer.

532.    On June 29, 2022, Defendant Hall notified Plaintiff that the Appeals Officer reviewed the appeal in the Roe 1 matter and determined that it was timely filed and was based on permissible grounds, thus allowing the appeal to move forward to consideration.

533.    On August 3, 2022, after several self-granted extensions, UNC issued the appeal decision on the Roe 4 matter.

534. Disregarding many of the points raised by Doe as part of his appeal, Mr. Battle responded to a select few and ultimately concluded that Doe did not meet his burden of proof "to overcome the presumption that the Hearing Outcome was decided reasonably and appropriately." Mr. Battle further stated that he did "not find any clear and material error on the part of the Hearing Panel" and thus affirmed the Hearing Outcome in the Roe 4 matter.

535. On August 17, 2022, after several self-granted extensions, UNC issued the appeal decision in the Roe 1 matter.

536. Incredibly, Appeal Officer Rachelle Feldman, Vice Provost for Enrollment, admitted in the appeal outcome letter that her decision was based on *ex parte* "interview[s] of the Hearing Panel Chair [Jackie Feeney] and the primary investigator [Jeremy Enlow]." As demonstrated herein, Ms. Feeney and Mr. Enlow participated in many of the due process violations documented by Plaintiff in his appeal. Yet, neither Ms. Feldman, Ms. Feeney, nor Mr. Enlow notified Plaintiff or his counsel of these *ex parte* interviews, which Plaintiff did not learn about until the appeal decision was issued, and the appeal outcome letter failed to disclose the contents of the *ex parte* statements made by Ms. Feeney and Mr. Enlow upon which Ms. Feldman made her decision.

537. Further, despite Plaintiff's detailed analysis of the errors committed by the Hearing Panel in the Roe 1 matter, which spanned over fifteen pages in his appeal submission, the Appeal Officer purported to summarize his grievances in one sentence, noting Plaintiff "states that the Hearing Panel's decision was arbitrary and capricious." The Appeal Officer's failure to address the specific points raised by Plaintiff in his appeal

114

was only made worse by her perfunctory response, finding the Hearing Panel's decision was valid because it referenced testimony and documentary evidence, thus overlooking Plaintiff's illustration demonstrating why the Panel's findings were in fact not supported by the evidence cited.

538.    Moreover, in concluding that the Panel's decision to change the date of the alleged incident during the hearing itself was not an error, the Appeals Officer ignored that Roe 1 unequivocally asserted in her EOC interview that the sexual intercourse at issue took place on November 19.  This change in date was a direct violation of Title IX which requires that a responding party be provided with notice containing sufficient details regarding the allegation, and "with sufficient time to prepare a response before any initial interview."  The Appeal Officer disregards this mandate entirely, inexplicably concluding that changing the date of the alleged violation during the hearing, after Plaintiff had spent the prior eight months gathering evidence to defend himself against the charges somehow satisfied the notice requirements explicitly provided for by the Title IX regulations.  *See* 34 CFR § 106.45(b).

539.    As for Plaintiff's discussion regarding the deprivation of his right to cross-examine Roe 1 at the hearing, while conceding that Roe 1 did leave the hearing in the middle of questioning, the Appeal Officer responded that there was no violation because Plaintiff's counsel was able to conduct some cross-examination before Roe 1 departed, and pointed out that Plaintiff's counsel "did not object" when the Hearing Chair announced that Roe 1 had left the hearing.  Yet, the Appeal Officer fails to identify any authority in either the Title IX regulations or University policies that require one's advisor to object in

115

order to preserve an issue for appeal. Even more remarkably, the Appeal Officer was evidently not informed — in her *ex-parte* communications with Ms. Feeney or otherwise – that during the pre-hearing meeting, Ms. Feeney instructed Plaintiff and his counsel that they were not permitted to object to decisions made by the Hearing Panel or Chair, and that such objections must be raised on appeal.

540. The Appeal Officer likewise misunderstood or misconstrued Plaintiff's position regarding the EOC's failure to produce exculpatory evidence in its possession to Plaintiff until after the hearings had concluded. Failing to recognize the significance of this intentional act of withholding critical information from a responding party, the Appeal Officer simply noted that she did not see a reference to the false allegations in the Hearing Outcome and thus, the false allegations did not impact the decision.

541. In both appeal decisions, the Appeal Officers disregarded numerous additional points raised by Plaintiff in his appeals, and arbitrarily explained away clear procedural errors and biases committed during the investigation processes, resulting in a mere rubber-stamping of the Hearing Panels' findings rather than a thoughtful and objective decision.

542. Doe thereafter appealed both the Roe 1 and Roe 4 outcomes to the Board of Trustees on September 14, 2022.

543. On September 21, 2022, Associate Vice Chancellor and Senior University Counsel Kara Simmons ("Simmons"), on behalf of the Chair of the Board of Trustees, notified Plaintiff that the Chair of the Board had determined that the appeal petition in the

Roe 1 matter stated valid grounds for appeal and appointed three trustees to serve as the Board of Trustees Panel for the review of Plaintiff's appeal.

544.    Simmons further noted that Roe 1 would have fourteen (14) calendar days within which to submit a written response to the appeal, as would Vice Provost Feldman and Defendant Hall.

545.    Also on September 21, 2022, Simmons on behalf of the Chair of the Board of Trustees, notified Plaintiff that the Chair of the Board had determined that the appeal petition in the Roe 4 matter stated valid grounds for appeal and appointed three trustees to serve as the Board of Trustees Panel for the review of Plaintiff's appeal.

546.    Simmons further noted that Roe 4 would have fourteen (14) calendar days within which to submit a written response to the appeal, as would Vice Chancellor Battle and Defendant Hall.

547.    On October 3, 2022, Simmons notified Plaintiff that the Chair of the Board of Trustees granted requests submitted by Feldman and Hall (pertaining to the Roe 1 matter), as well as by Battle and Hall (pertaining to the Roe 4 matter), for an extension of the deadline to submit their responses to Plaintiff's appeals. The deadline was extended until October 14, 2022.

548.    On October 14, 2022, Simmons submitted to the Board of Trustees Appeals Board, on behalf of Elizabeth Hall and Rachelle Feldman (for the Roe 1 matter), as well as Elizabeth Hall along with George Battle (for the Roe 4 matter), the EOC's responses to Plaintiff's appeals.   In each case, the EOC attempted to defend its own actions and

117

challenged the arguments raised by Plaintiff in his appeals, requesting that the original findings of responsibility reached by the Hearing Panels be upheld.

549. On February 14, 2023, Plaintiff received the decisions from the Board of Trustees on both the Roe 1 and Roe 4 matters.

550. The Board of Trustees Panel rejected every argument advanced by Plaintiff in each appeal, finding there was no clear and material error, and recommending to the full Board of Trustees that they uphold the findings and sanctions.

551. Consequently, the Board of Trustees unanimously affirmed the recommendations of the Board of Trustees Panels, denied Plaintiff's appeals, and upheld the decisions and sanctions issued in the Roe 1 and Roe 4 matters.

552. Plaintiff has now exhausted all of his administrative remedies.


## DAMAGES TO PLAINTIFF

553. As a result of the Defendants' unlawful, unfair, gender-biased, and improper conduct, Plaintiff was subjected to disciplinary processes that failed to comport with the University's promises to Plaintiff as an enrolled student, the tenets of Title IX, and principles of good faith and fundamental fairness.

554. As a result of Defendants' unlawful, unfair, gender-biased, and improper conduct, Plaintiff was improperly expelled from the entire University of North Carolina system, depriving him of the benefits of years of hard work and tuition, and his constitutional right to a public education.

118

555.    As a result of Defendants' unlawful, unfair, gender-biased, and improper conduct, Plaintiff has been falsely labeled as a perpetrator of sexual assault and his records from UNC will permanently bear a notation stating that he was expelled for a violating school policies.

556.    As a result of Defendants' unlawful, unfair, gender-biased, and improper conduct, Plaintiff's academic/disciplinary file and transcript are now marred by false and baseless findings of sexual assault and a permanent expulsion.

557.    As a result of Defendants' unlawful, unfair, gender-biased, and improper conduct, Plaintiff will have to disclose to any future educational institution or job that he applies to that he was found responsible for committing sexual assault, effectively destroying any chance for Plaintiff to achieve success academically or professionally in the future.

558.    As a result of Defendants' unlawful, unfair, gender-biased, and improper conduct, Plaintiff's education and career paths have been derailed, resulting in considerable economic and consequential harm.

559.    As a result of Defendants' unlawful, unfair, gender-biased, and improper conduct, Plaintiff has suffered and will continue to suffer reputational harm, ridicule, persecution, pecuniary harm, deprivation of his education, and damage to his education and career prospects.

560.    As a result of Defendants' unlawful, unfair, gender-biased, and improper conduct, Plaintiff has been shunned and cancelled by most, if not all, of his friends and peers at UNC, his reputation has been permanently destroyed, his scholarship was revoked,

he was excluded from his fraternity and his apartment and, most critically, he has been permanently expelled from the entire University of North Carolina System.

561.   Plaintiff will face further irreparable harm should UNC disclose Plaintiff's disciplinary records to the press, pursuant to the North Carolina Supreme Court's decision in *DTH Media Corp. v Folt*, 841 S.E.2d 251 (N.C. 2020), *cert denied*, 141 S. Ct 1126 (2021).

## COUNT I
## Violation of 42 U.S.C. § 1983-Denial of Fourteenth Amendment Due Process and Conspiracy
## (Against All Defendants)

562.   Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

563.   The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law."

564.   Defendant UNC is a public entity that receives large amounts of state and federal funding and is therefore subject to the Fourteenth Amendment.  UNC, the UNC System, the Board of Trustees, the Board of Governors, and the Individual Defendants, as state actors, are therefore bound by the requirements of the United States Constitution.

565.   UNC, the UNC System, the Board of Trustees, and the Board of Governors as public institutions established by the State of North Carolina as well as the Individual Defendants, as agents of the University and individually, have a duty to provide students equal protection and due process of law by and through any and all policies and procedures set forth by the University and the Constitution of the State of North Carolina.

566.     Fourteenth Amendment due process protections are required in higher educational disciplinary proceedings.  At a minimum, the Supreme Court has made clear that there are two basic due process requirements:  (1) notice; and (2) an opportunity to be heard.  *Papin v. Univ. of Miss. Med. Ctr.*, 347 F.Supp.3d 274, 279 (S.D. Miss. Sept. 28, 2018), citing *Flaim v. Med. Coll. Of Ohio*, 418 F.3d 629, 634 (6th Cir. 2005).

567.     Where a student at a public university faces suspension or expulsion through a disciplinary proceeding, a serious property interest is at stake; a suspension or expulsion will have a lasting negative impact on the student's life, so heightened due process protections including a hearing, with the right to present evidence, cross-examine adversarial witnesses and to call witnesses may be required.  *Doe v. Univ. of Mississippi*, 361 F. Supp. 3d 597, 611 (S.D. Miss. 2019); *Doe v. Baum*, 2018 WL 4265634, at **3-5 (6th Cir. Sept. 7, 2018); *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 402-04 (6th Cir. 2017).

568.     Plaintiff, as a student at UNC, faced disciplinary action that included the possibility of suspension or expulsion.  Accordingly, the Due Process provisions of the Fourteenth Amendment applied to the disciplinary processes utilized in Plaintiff's case, and Plaintiff was entitled to a process commensurate with the seriousness of the allegations and potential discipline, sanctions, and repercussions he was facing.

569.     It is well established that a person has a protected liberty interest in his good name, reputation, honor, and integrity, of which he cannot be deprived without due process.

570.     It is also well established that a person has a protected property interest in pursuing and continuing his education, as well as in future educational and employment

opportunities and occupational liberty, of which he cannot be deprived without due process.

571. As the Supreme Court has eluded the ultimate question of whether there is a protected interest in continued education at the public university level, the critical inquiry undertaken by the Fourth Circuit in such cases focuses on whether the procedural processes adopted by the university conformed to due process standards.

572. Here, there is no question that the University failed to afford Plaintiff the minimum procedural safeguards required by due process, before imposing a permanent expulsion.

573. There also is no question that Plaintiff possessed both a constitutionally protected property and liberty interest.

574. Plaintiff's constitutionally protected property interest in his continued enrollment at UNC, and his right to be free from an arbitrary dismissal, derives from the policies, courses of conduct, practices and understandings established by UNC, as well as the express and implied contractual relationship between UNC and Plaintiff.

575. By their very nature, the applicable University conduct policies and procedures create a student right to continued enrollment and the right to be free from arbitrary and capricious decision making and sanctions, by providing as follows: (i) the "University does not unlawfully discriminate in offering equal access to its educational programs and activities"; and (ii) "The University recognizes the rights of all members of the University community to learn and work in an environment that is free from Discrimination and Harassment."

576. Furthermore, the UNC System has adopted a Policy on Minimum Substantive and Procedural Standards for Student Disciplinary Proceedings ("Policy on Minimum Substantive and Procedural Standards"), which is incorporated into the UNC Policy Manual.

577. The Policy on Minimum Substantive and Procedural Standards describes its purpose as being "to establish legally supportable, fair, effective and efficient procedures for student disciplinary proceedings," which it seeks to accomplish by imposing minimum standards for such proceedings that purportedly "exceed the requirements of due process and therefore complying with these requirements will also result in providing due process."

578. The Policy on Minimum Substantive and Procedural Standards goes on to describe the following procedural and substantive standards that must be afforded in any student disciplinary proceeding, as follows:

- *Procedural:* requires notice and an opportunity for a hearing.

- *Substantive:* requires that the decision reached be neither arbitrary nor capricious.

579. Furthermore, the Code of Conduct, Section 502(D)(3) assures that "[i]n the discharge of the chancellor's duty with respect to matters of student discipline, it shall be the duty of the chancellor to secure to every student the right to due process."

580. In consideration of the foregoing assurances, UNC's policies created a property right in Plaintiff's continued enrollment with the University, and a contractual right to protection against an arbitrary dismissal.

123

581. Plaintiff further has a constitutionally protected liberty interest because the allegations brought against Plaintiff ultimately resulted in an expulsion from the UNC system, a sanction that will have significant and lifelong ramifications with respect to his education, employment, and reputation.

582. Plaintiff was wrongly held responsible for sexual misconduct, a charge that by its nature implies "the existence of serious character defects such as dishonesty or immorality." *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 308 (4th Cir. 2006).

583. Thus, unless overturned, Plaintiff's expulsion for sexual misconduct will remain a part of Plaintiff's permanent educational records and the stigmatizing label associated with the finding will impair his ability to seek further education or employment. Absent the relief sought through this matter, other individuals will inevitably come to learn of Plaintiff's expulsion due to a finding of sexual misconduct.

584. Throughout the investigation and adjudication of the charges against Plaintiff, Defendants, individually and in concert, conspired to violate Plaintiff's clearly established rights under the Due Process Clause of the Fourteenth Amendment when they deprived him of the minimal requirements of procedural fairness, proper notice and a meaningful opportunity to be heard.

### a. Due Process Violations – Jane Roe 1 Case.

585. First, with respect to the Roe 1 matter, Plaintiff was deprived of both adequate notice and a meaningful opportunity to be heard, before he was suspended from the University for one full academic year.

124

586.    In furtherance of the conspiracy, Plaintiff was not given sufficient notice of the charges against him in the Roe 1 matter when the date was of the alleged incident was changed during the hearing itself, after an eight-month long investigation process had already taken place.

587.    Plaintiff was notified from the initiation of the investigation that the date of alleged misconduct involving Roe 1 was November 19, 2020:  (i) Roe 1 confirmed this date during her interview on May 7, 2021, when she consulted her calendar; (ii) the EOC issued a notice of investigation confirming November 19, 2020 as the date in question; (iii) the EOC issued its own formal complaint on June 30, 2021 after Roe 1 withdrew her complaint, again noting the date of incident as November 19, 2020; and (iv) the Hearing Officer opened the hearing on January 27, 2022 by stating unequivocally that the hearing would concern the allegations of non-consensual sexual contact that were alleged to have occurred on November 19, 2020.

588.    At no time did UNC ever notify Plaintiff that any date other than November 19, 2020 was being investigated and adjudicated.  Accordingly, Plaintiff spent several months, up until the hearing date on January 27, 2022, providing all of the information he could recall concerning the events of November 19, 2020, gathering an abundance of evidence to dispute the allegations, and preparing his defense, a significant part of which included the fact that no sexual contact of any kind had occurred between himself and Roe 1 on November 19, 2020.

589.    Yet, without any prior notice, he was then subjected to a hearing on January 27, 2022 where the date of alleged incident was changed from November 19 to November

125

12-13, 2020. Roe 1 admitted, and there was no question, that Plaintiff and Roe 1 did not have sexual contact of any kind on November 19, 2020. Yet, instead of dismissing the charges entirely, the Hearing Panel decided that it would instead determine whether non-consensual contact occurred on November 12-13, 2020.

590. This unilateral decision to change the date of alleged incident, during the hearing itself, was a substantial and direct violation of Plaintiff's right to adequate and prior notice of the charges against him, in violation of due process.

591. Plaintiff was also deprived of a meaningful opportunity to be heard in the Roe 1 matter when he was unable to cross-examine his accuser.

592. While UNC's policies afford the accused student a right to cross-examine his accuser at a hearing, Plaintiff was denied this right when Roe 1 refused to answer questions posed by Plaintiff's attorney, after she was confronted with a line of questioning which established that she had lied to the Investigators about her interactions with Plaintiff on November 1, 2020. In the middle of this material line of questioning, the Hearing Chair interrupted Plaintiff's counsel to state that Roe 1 had requested a break. When the hearing resumed, Plaintiff was informed that Roe 1 had departed from the hearing and as such, her counsel would be permitted to step in for Roe 1 and answer questions on her behalf.

593. Not only was this unique action not permitted by the applicable policies, but allowing one's attorney to step into the role of the accusing party also amounted to a significant and prejudicial error.

594. First, it was highly unlikely that the Hearing Panel would deem an attorney responding to cross-examination questions on behalf of their client as being not credible or

126

truthful, thus imputing unwarranted credibility to Roe 1 by virtue of the individual testifying on her behalf.

595.    Second, allowing Roe 1's counsel to step into the shoes of his client for purposes of responding to cross-examination questions deprived Plaintiff of his right to be heard.  Posing questions to an experienced attorney, in lieu of the party directly, sidesteps the very purpose of cross-examination, *i.e.*, testing the credibility and reliability of the witness herself.  This deprivation amounted to a substantial procedural irregularity and a clear violation of Plaintiff's procedural due process rights.

### b. Due Process Violations- Jane Roe 4 Case.

596.    Second, with respect to the Roe 4 matter, Plaintiff was similarly deprived of a meaningful opportunity to be heard, before he was permanently expelled from the University.

597.    Plaintiff was not afforded an opportunity to cross-examine Roe 4, as she did not testify before the Hearing Panel.

598.    Additionally, his right to be heard was further adversely impacted by the Hearing Chair's pre-hearing decision to exclude evidence relating to Roe 4's credibility.  Minutes before the hearing began, the Hearing Chair held a private conference with Plaintiff and his counsel to notify them that they would be barred from presenting evidence relevant to Roe 4's credibility.  When questioned on the authority relied upon for such a ruling, the Hearing Chair declined to identify a specific policy provision, indicating that he would do so at the conclusion of the hearing.

599.    After the hearing, the Chair wrote to Plaintiff's counsel, explaining that his

ruling regarding the exclusion of credibility evidence was based upon "Section 7 of the Procedures" notwithstanding that there was no Section 7 of the Procedures related to the hearing proceeding. Instead, the Chair quoted from Section IV (7) of the Procedures, which governs the EOC investigations and reports but does not speak to the hearing process.

600. Based on the foregoing, Plaintiff was deprived of his right to adequate notice in the Roe 1 matter, and a meaningful opportunity to be heard in both the Roe 1 and Roe 4 matters, before he was ultimately suspended and then expelled from the University.

601. Defendants' actions had the purpose and effect of failing to provide Plaintiff with reasonable notice of the charges and a fair opportunity to present a defense, which was in violation of Plaintiffs' due process rights and caused him to suffer irreparable harm to his education, livelihood and reputation.

### c. Liability of the Individual Defendants.

602. Section 1983 of Title 42 of the U.S. Code provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

603. The Individual Defendants, as well as other agents, representatives, and employees of UNC acted under color of state law when they showed intentional, outrageous, and reckless disregard for Plaintiff's constitutional rights.

604. Plaintiff seeks to hold the Individual Defendants liable in their individual capacities because they knowingly violated Plaintiff's clearly established constitutional

rights, as well as UNC policies, when they took actions that led to his expulsion from the University, without affording Plaintiff proper notice and an opportunity to be heard.

605.    Defendant Hall knowingly violated Plaintiff's clearly established rights to notice, a meaningful opportunity to be heard, and the right to cross-examine witnesses, when she:  (i) failed to notify Plaintiff that Roe 1 and Roe 2 withdrew their complaints against Plaintiff in June of 2021; and (ii) during the December 26, 2021 phone call, Defendant Hall advised Plaintiff that Roe 1 could choose not to appear for the hearing, in which case Roe 1's attorney would be permitted to appear in her place and respond to cross-examination questions on her behalf.

606.    As Title IX Coordinator for the University, Defendant Hall engaged in further violations of Plaintiff's clearly established rights, through her ratification and/or approval of the actions committed by those under her supervision, including the Investigators.

607.    In furtherance of the conspiracy, Defendants Enlow and Froehling knowingly violated Plaintiff's clearly established right to notice and a meaningful opportunity to be heard when they engaged in the following actions:  (i) failed to notify Plaintiff that Roe 1 and Roe 2 withdrew their complaints against Plaintiff in June of 2021; (ii) failed to notify Plaintiff of the false allegations brought by Roe 2 and Roe 4 in July of 2021, thus depriving him of an opportunity to respond to and refute such claims, and yet surreptitiously utilized such information to eliminate Plaintiff's chance of having his interim suspension removed by the EEAC; (iii) failed to provide this information regarding the false complaint to Plaintiff during the investigation process, thus preventing him from

presenting a defense to this false and defamatory claim and utilizing the false claims to refute the testimony of two of his accusers; (iv) deprived Plaintiff of a meaningful opportunity to be heard when they conducted biased investigations, designed to lead to the predetermined conclusion that Plaintiff was responsible for each claim; (v) failed to pursue material evidence referenced by Roe 1 and her witnesses, such as photographs, text messages, and medical records, attributing this failure to his practice of allowing the reporting party and their witnesses to share whatever they are comfortable with; (vi) included in the investigation reports multiple references to the other allegations brought against Plaintiff; as such, the Hearing Panels were provided an investigation file that included references to the false accusations brought by the other accusers, despite a prior agreement between Plaintiff and Defendant Hall that all such references would be redacted; and (vii) engaged in other violations of Plaintiff's rights to be established at a trial of this matter.

608.    In furtherance of the conspiracy, Defendant Gibson knowingly violated Plaintiff's clearly established rights to notice when she informed Defendant Rieckenberg on July 22, 2021 that Roe 3 had been contacted and interviewed by a private investigator the evening before.  Defendant Gibson indicated that the EOC was assessing whether to add an additional charge of retaliation against Plaintiff, which they did.  Defendant Gibson did not inform Plaintiff of this new charge of retaliation until August 25, 2021, after the interim suspension hearing took place, and after Plaintiff's request to modify the order was denied.

609.    Defendant Gibson further violated Plaintiff's clearly established right when,

on August 3, 2021, she notified EEAC Chair Defendant Rieckenberg about the false allegations brought forth by Roe 2 and Roe 4 in July of 2021.  Unsurprisingly, the EEAC thereafter denied Plaintiff's petition to remove the interim suspension.  Plaintiff was not informed of this false allegation until the spring of 2022, after he had participated in all four hearings, depriving him of the opportunity to challenge the claim and refute the accusers' credibility.

610.  In furtherance of the conspiracy, Defendant Feeney knowingly violated Plaintiff's clearly established rights to notice, an opportunity to be heard, and the right to cross-examine witnesses.  As hearing Chair, Defendant Feeney deprived Plaintiff of proper notice concerning the charges he was facing in the Roe 1 matter when she permitted the Hearing Panel to revise the date of alleged incident during the hearing, and failed to afford Plaintiff a meaningful opportunity to be heard when they permitted Roe 1 to depart midway through the hearing and allowed her attorney to testify in her place.

611.  In furtherance of the conspiracy, Defendant Elrod knowingly violated Plaintiff's clearly established right to have an opportunity to be heard when he arbitrarily precluded Plaintiff from introducing evidence that impugned Roe 4's credibility, despite the absence of any University policy providing for the exclusion of such information.  Plaintiff's inability to present information clearly demonstrating Roe 4's disposition for being untruthful prevented him from being able to present a full and meaningful defense.

612.  Defendant Elrod, in issuing this evidentiary ruling without knowledge of relevant University policy, cited to the incorrect policy and did not submit his written decision until the hearing had concluded.  In collaboration with Defendant Hall, Elrod acted

131

with intentional or reckless disregard of the effect his decision would have on Plaintiff, causing Plaintiff to lose the opportunity to present evidence that would have contributed to a full and meaningful defense.[22]

613.    Without regard for Plaintiff's due process rights, the Defendants individually and collectively engaged in investigatory and adjudicatory processes that resulted in the improper suspension and expulsion of Plaintiff from the University and the UNC System.

614.    As fully detailed above, the unlawful actions taken by the Individual Defendants, acting in their individual capacities, were motivated by a malicious motive or intent or, at the very least, reckless or callous indifference to Plaintiff's right to due process, warranting an award of punitive damages to Plaintiff.

615.    In addition, as part of this action, Plaintiff seeks prospective injunctive relief against Defendant Guskiewicz in his official capacity, in the form of reinstatement to the University and the UNC System as of the Fall 2022 semester.

616.    For a federal court injunction ordering prospective relief in a case involving a sexual misconduct proceeding at UNC, joinder of Defendant Guskiewicz in his official

---

[22] Such actions were in line with Elrod's biased and procedurally defective decision-making in a prior matter in which he likewise deprived another respondent of a fair and meaningful hearing. In *Gulyas v. Appalachian State University*, (2017 WL 3710083 (W.D.N.C. Aug. 28, 2017)), the Plaintiff overcame the defendants' motion to dismiss on his claim that Elrod's conduct violated the plaintiff's due process rights, arguing Elrod's conduct was "sufficiently egregious objectively to deny Plaintiff a fair hearing and a meaningful opportunity to be heard such that no reasonable government official in Elrod's place could have concluded that the investigation and the University Conduct Board hearing satisfied due process." *Gulyas v. Appalachian State Univ.*, 2017 WL 3710083 at *6.

capacity is necessary for purposes of implementation of the requested prospective relief.

617. The Supreme Court's *Ex parte Young* decision instructs that Eleventh Amendment immunity does not bar a plaintiff's request for prospective injunctive relief or declaratory judgment against a state actor named in their official capacity. *See generally Ex parte Young*, 209 U.S. 123, 150-156 (1908). *See also Green v. Mansour*, 474 U.S. 64 (1985) (determining declaratory relief is within *Ex parte Young*'s purview when violations of federal law are threatened or ongoing).

618. As a result of these due process violations, Plaintiff continues to suffer substantial injury, damage, and loss, including, but not limited to, loss of future educational and career opportunities, reputational damage, economic injuries and other direct and consequential damages.

619. As a result of the foregoing, Plaintiff has standing to seek, and is entitled to, an injunction vacating the disciplinary findings and decisions reached in the Roe 1 and Roe 4 matters, granting an expungement of Plaintiff's academic record, and permitting Plaintiff's readmission to UNC as a student in good standing for the Fall 2022 semester.

620. As a result of the foregoing, Plaintiff is entitled to prospective relief against Defendants, and compensatory and punitive damages against the Individual Defendants acting in their individual capacities in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## COUNT II
## Violation of 20 U.S.C. § 1681 *et seq.*-Title IX-Erroneous Outcome and Conspiracy (Against UNC)

621.    Plaintiff repeats and realleges each and every allegation above as though fully set forth herein.

### a. The Effect of the "April 2011 Dear Colleague Letter" on University Sexual Misconduct Policies.

622.    On April 4, 2011, the Department of Education's Office for Civil Rights ("OCR") issued a guidance letter to colleges and universities in receipt of federal funding, which became widely known as the "April 2011 Dear Colleague Letter" (the "DCL"). U.S. Department of Education, *Dear Colleague* (Apr. 4, 2011), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf (hereinafter "Dear Colleague Letter" or "DCL").

623.    The DCL advised recipients that sexual violence constitutes sexual harassment within the meaning of Title IX of the Education Amendments of 1972 and its regulations, and directed schools to "take immediate action to eliminate the harassment, prevent its recurrence and address its effects." DCL at 4.

624.    The DCL responded, in part, to a special investigative report published by National Public Radio and the Center for Public Integrity, which proclaimed a campus rape epidemic and criticized the OCR for its lax response to what the report characterized as a social problem of critical importance. *See* Joseph Shapiro, *Campus Rape Victims: A Struggle for Justice*, NATIONAL PUBLIC RADIO (Feb. 24, 2010), http://www.npr.org/templates/story/story.php?storyId=124001493. The report described

134

in detail the obstacles faced by sexual assault victims in obtaining redress though college disciplinary proceedings, and how victims who did engage in the college disciplinary process suffered additional trauma as a result. Much of the report focused on underreporting, re-traumatization of victims, rape myth adherence on college campuses (e.g., that women invite rape, that rapes are just drunk hook-ups, and that women routinely lie), and young men's cultural adherence to the sexual aggressor role.

625. The OCR further relied on faulty statistics in sounding its "call to action" for campuses nationwide—that "about 1 in 5 women are victims of completed or attempted sexual assault while in college." DCL at 2. The researchers behind this study subsequently invalidated that statistic as a misrepresentation of the conclusions of the study and warned that it was "inappropriate to use the 1-in-5 number as a baseline . . . when discussing our country's problem with rape and sexual assault on campus." *See* Christopher Krebs and Christine Lindquist*, Setting the Record Straight on "1 in 5"*, TIME MAGAZINE (Dec. 14, 2015), http://time.com/3633903/campus-rape-1-in-5-sexual-assault-setting-record-straight/.

626. Relying on the faulty one-in-five statistic, the OCR, through the DCL, minimized due process protections for the accused by, among other things, mandating the adoption of a relatively low burden of proof— "more likely than not"—in cases involving sexual misconduct, expressly prohibiting colleges from applying a higher standard of proof. (DCL at 10-11)

627. The DCL (at 12) also strongly discouraged allowing cross-examination because it "may be traumatic or intimidating" to the alleged victim.

135

628. Despite its supposed purpose as a mere guidance letter, the Department of Education ("DOE") treated the DCL as a binding regulation and pressured colleges and universities to aggressively pursue investigations of sexual assault on campus.

629. Before the DCL, colleges and universities generally did not use their disciplinary procedures to adjudicate sexual misconduct cases and certainly not in the manner and frequency that they have since the issuance of the DCL.

630. After the DCL was published, schools changed their sexual assault and sexual harassment policies and procedures.

631. On April 29, 2014, OCR issued additional directives to colleges and universities in the form of a guidance document titled *Questions and Answers on Title IX and Sexual Violence* ("OCR's April 2014 Q&A") which was aimed at addressing campus sexual misconduct policies, including the procedures colleges and universities "must" employ "to prevent sexual violence and resolve complaints" and the elements that "should be included in a school's procedures for responding to complaints of sexual violence." OCR's April 2014 Q&A at 9, 12; http://www2.ed/gov./about/offices/list/ocr/docs/qa-201404-title-ix.pdf.

632. The OCR's April 2014 Q&A advised schools to adopt a trauma informed approach, advising, for example, that hearings should be "conducted in a manner that does not inflict additional trauma on the complainant." *Id.* at 31.

633. In the same month that the OCR issued its April 2014 Q&A on Title IX, the White House issued a report titled *Not Alone*, which included a warning that if the OCR finds a school in violation of Title IX, the "school risks losing federal funds." *See* White

136

House Task Force to Protect Students from Sexual Assault, *Not Alone* (Apr. 2014), *available at* https://obamawhitehouse.archives.gov/sites/default/files/docs/report_0.pdf. The report further advised that the Department of Justice ("DOJ") shared authority with OCR for enforcing Title IX, and could therefore initiate investigation, compliance review, and/or litigation against schools suspected of violating Title IX.

634.    In June 2014, then-Assistant Secretary of Education Catherine Lhamon testified before the United States Senate, warning that if the OCR could not secure voluntary compliance with the DCL from a college or university, it could elect to initiate an administrative action to terminate federal funds or refer the case to the Department of Justice. *See* Testimony of Catherine E. Lhamon, Assistant Secretary Office for Civil Rights, U.S. Department of Education (June 26, 2014), https://www2.ed.gov/about/offices/list/ocr/correspondence/testimony/20140626-sexual-violence.pdf.

635.    To support its enforcement of the DCL, the OCR hired hundreds of additional investigators. To date, OCR has conducted over five hundred investigations of colleges for the potential mishandling of complaints of sexual misconduct. *See Title IX: Tracking Sexual Assault Investigations*, CHRONICLE OF HIGHER EDUCATION, https://projects.chronicle.com/titleix/ (last visited August 11, 2022).

636.    The threat of revocation of federal funds—the ultimate penalty—was a powerful tool in motivating colleges to aggressively pursue and punish male students accused of sexual misconduct.

637.    Colleges and universities including UNC, were fearful of and concerned

about being investigated or sanctioned by the Department of Education and/or of potential Title IX lawsuits by the U.S. Department of Justice ("DOJ"). In response to pressure from OCR, DOJ, and the Obama White House, educational institutions, like UNC, limited procedural protections afforded to males, like Plaintiff, in sexual misconduct cases.

638. On September 7, 2017, Department of Education Secretary Betsy DeVos vowed to replace the "failed system" of campus sexual assault enforcement to ensure fairness for both accusers and the accused, proclaiming that "one person denied due process is one too many." Press Release, *Secretary DeVos Prepared Remarks on Title IX Enforcement* (Sept. 7, 2017), *available at* https://www.ed.gov/news/speeches/secretary-devos-prepared-remarks-title-ix-enforcement.

639. On September 22, 2017, the OCR formally rescinded the DCL and the April 2014 Q&A and put in place interim guidance (the "2017 Q&A"), while the current administration reviewed and revised its practices regarding the adjudication of complaints of sexual misconduct on college campuses. *See* Dep't of Educ., Dear Colleague Letter (Sept. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf; *see also* Dep't of Educ., *Q&A on Campus Sexual Misconduct* (Sept. 2017), https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.

640. In rescinding the 2011 DCL, the OCR noted that it had placed "improper pressure upon universities to adopt procedures that do not afford fundamental fairness," and "lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and *are in no way required by Title IX law or regulation*." Dep't of Educ., Dear Colleague Letter (Sept. 22, 2017),

https ://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf

(citations omitted) (emphasis added).

641.    On November 16, 2018, the Department of Education released proposed Title IX regulations, subject to "notice-and-comment rulemaking." *Secretary DeVos: Proposed Title IX Rule Provides Clarity for Schools, Support for Survivors, and Due Process Rights for All* (Nov. 16, 2018, 9:41 a.m.) https://content.govdelivery.com/accounts/USED/bulletins/21bcf5b.

642.    Despite a different direction announced by the Trump Administration, colleges universities, and educational programs including UNC mostly continued with victim-centered practices and policies in place during the Obama Administration, holding on, as a matter of ideological commitment, to what is a gender biased enforcement of Title IX.

643.    In January 2020, NASPA, the national organization of Student Affairs Administrators in Higher Education, which has 15,000 members representing more than 1500 institutions, issued a study, *"Expanding the Frame: Institutional Responses to Students Accused of Sexual Misconduct."* (available at https://www.naspa.org/report/expanding-the-frame-institutional-responses-to-students-accused-of-sexual-misconduct).  The study, intended to refute "the common narrative that institutions are not concerned with responding parties' rights in sexual misconduct cases," essentially evidenced to the contrary that widespread institutional bias against the accused starts at the very inception of a complaint, prior to any investigation or adjudication.

139

644. In a process governed by the enforcement of Title IX gender equality, and in which overwhelming the majority of accused students are male, the survey reported that only 5% of schools have even one full-time employee to assist accused students; 85% have no budget dedicated specifically to providing services for accused students; and for accused students "no established best practices currently exist, and most institutions are only just developing these programs, identifying what specific services are needed, and exploring what is equitable or equal." While alleged victims have entire departments of advocates funded by the institution dedicated to their needs, only 13% of colleges and universities have a staff member reach out "directly to responding parties about support services available." The study suggests that accused students are left to defend themselves by administrators "due to perceived pushback from members of the campus community who disagree with providing respondent services."

645. On May 6, 2020, the United States Department of Education released new Title IX regulations, which carried the force and effect of law as of August 14, 2020. ("US Department of Education Releases Final Title IX Rule," available at https://www2.ed.gov/about/offices/list/ocr/newsroom.html)

646. The new Title IX regulations provided respondents certain procedural rights, including without limitation: (i) a presumption of innocence until a finding of responsibility is made at the conclusion of the process; (ii) the right to review evidence directly related to the allegations with at least ten (10) days to review and respond; (iii) the right to review an investigative report that fairly summarizes relevant evidence and a minimum of ten (10) days in which to respond to the investigative report; (iv) an assurance

that Title IX personnel are free from conflicts of interest or bias; and (v) the right to a live hearing in which each party's advisor may ask the other party and any witnesses all relevant questions, including those challenging credibility, with such cross-examination to be conducted directly, orally, and in real time. (*See* "Summary of Major Provisions of the Department of Education's Title IX Final Rule," available at https://www2.ed.gov/about/offices/list/ocr/docs/titleix-summary.pdf)

647. The May 2020 regulations took effect on August 14, 2020.

648. On June 23, 2022, the Biden Administration issued a Notice of Proposed Rulemaking regarding proposed changes to the regulations once again, proclaiming that the amendments will "restore crucial protections for students who are victims of sexual harassment, assault, and sex-based discrimination- a critical safety net for survivors that was weakened under previous regulations."

649. As these most recent proposed regulations remain in the notice and comment period, they are not applicable to the disciplinary cases involving Plaintiff.

### b. UNC Has Faced Public Pressure Regarding Sexual Misconduct Complaints.

650. In addition to the foregoing events, the University's actions and decision-making in its handling of the complaints against Plaintiff were informed by ongoing external and internal pressures on UNC to aggressively pursue complaints of sexual misconduct against male students, in response to events dating back to 2013.

### i. Former and Current UNC Students Speak Out Against the University's Handling of Sexual Misconduct Complaints and Resulting Investigations.

651. Beginning in 2013, UNC became the subject of particular scrutiny after several current and former students, including Andrea Pino and Annie Clark, spoke out publicly about the University's improper and inadequate handling of their complaints of sexual misconduct, leading to considerable negative publicity surrounding the University.

652. The students went on to file complaints with the Department of Education's Office for Civil Rights regarding UNC's mishandling of sexual assault and harassment complaints. Caitlin McCabe, *5 submit complaint against UNC over sexual assault,* THE DAILY TAR HEEL (Jan. 16, 2013, 11:52 pm) https://www.dailytarheel.com/article/2013/01/5-submit-complaint-against-unc-over-sexual-assault; *UNC Comes Under Fire in Sexual Assault Case*, CAROLINA ALUMNI REVIEW (Mar. 4, 2013), https://alumni.unc.edu/news/unc-comes-under-fire-in-sexual-assault-case/; *Federal complaint accused UNC of 'indifference' toward sexual assault*, WRAL.COM https://www.wral.com/federal-complaint-accuses-unc-of-indifference-toward-sexual-assault/12006671/ (last updated Jan. 21, 2013, 7:48 pm); *UNC student who says she was raped facing honor code violation,* WRAL.COM, https://www.wral.com/unc-student-who-says-she-was-raped-facing-honor-code-violation/12150684/ (last updated Feb. 26, 2013, 11:34 pm); Nina Strochlic, *Expelled for Speaking Out About Rape?,* THE DAILY BEAST, https://www.thedailybeast.com/expelled-for-speaking-out-about-rape (published Feb. 28, 2013, 4:45 am; last updated July 12, 2017, 1:04 am); Shelley Ng, *College student could be expelled for reporting her rape and creating an 'intimidating environment' for her alleged rapist*, NEW YORK DAILY NEWS (Feb. 27, 2013, 6:19 pm)

142

https://www.nydailynews.com/news/national/unc-woman-faces-expulsion-reporting-rape-article-1.1274035.

653.    Among the complaints was that of female UNC student Landen Gambill, who faced an honor code violation in retaliation for submitting a sexual misconduct complaint to UNC.  Associated Press, *Rally planned at UNC-CH on sexual assault issues*, WINSTON-SALEM JOURNAL, https://journalnow.com/rally-planned-at-unc-ch-on-sexual-assault-issues/ article_04a40f5c-8226-11e2-ab00-001a4bcf6878.html (published Feb. 28, 2013, updated Apr. 16, 2021); see also *UNC student who says she was raped facing honor code violation,* WRAL.COM, https://www.wral.com/unc-student-who-says-she-was-raped-facing-honor-code-violation/12150684/ (last updated Feb. 26, 2013, 11:34 pm); Strochlic, *supra ¶* 2.

654.    As a result, the hashtag "#IStandWithLanden" took off on social media, demonstrating the public's support of the complainant, and its outrage over the University's actions in response to Gambill's sexual misconduct complaint.  Associated Press, *Rally planned at UNC-CH on sexual assault issues*, WINSTON-SALEM JOURNAL, https://journalnow.com/rally-planned-at-unc-ch-on-sexual-assault-issues/article_04a40f5c-8226-11e2-ab00-001a4bcf6878.html (published Feb. 28, 2013, updated Apr. 16, 2021); *see also* @coronerkid, Twitter (Feb. 25, 2013, 9:03 pm) https://twitter.com/coronerkid/status/306222814309003266 (stating "You CANNOT violate an honor code for GETTING RAPED.  That's straight up VICTIM-BLAMING, which is straight up NOT OKAY. #istandwithlanden"); @sarahnev, Twitter (Feb. 28, 2013, 7:03 pm) https://twitter.com/saranev/status/307279930218131457 (noting that she

143

was "[g]rateful for women like Landen who speak out [and d]isgusted by those who think she is wrong. #IStandWithLanden"); @EMMulligan13, Twitter (Feb. 25, 2013) https://twitter.com/EMMulligan13/status/306138029209309184 (noting that she "[j]ust read about what's going on at UNC and #IstandwithLanden[] [t]he university is completely in the wrong."); @TheOnlyBlythe, Twitter (Feb. 26, 2013) https://twitter.com/TheOnlyBlythe/status/306551463629447168 (stating "WTF, colleges? Rape happens everyday on campus- FIX IT. Don't blame those who take a stand. #istandwithlanden").

655. These events also prompted students of the University to launch a group called SAFER Carolina, comprised of "Survivors and Allies for Empowerment and Reform", which describes itself as "a movement dedicated to raising awareness about gender-based violence and pushing for change at UNC-Chapel Hill." SAFER Carolina, FACEBOOK.COM, https://www.facebook.com/SAFER-Carolina-141455316013512.

656. In response to the growing concerns and outcry regarding the University's culture of sexual violence and hostility, students launched an online petition (the "Petition"), urging UNC's Chancellor and the Board of Trustees to take action to change policies and trainings regarding sexual misconduct complaints and the resulting process. SAFER Carolina, *Chancellor Thorp and The UNC Board of Trustees: Take Action Against the Culture of Sexual Violence and Hostility at UNC*, CHANGE.ORG, https://www.change.org/p/chancellor-thorp-and-the-unc-board-of-trustees-take-action-against-the-culture-of-sexual-violence-and-hostility-at-unc?utm_source=share_petition&utm_medium=url_share&utm_campaign=url_share_bef

144

ore_sign#share.  The Petition stated that survivors had "been re-victimized by a system that strives for surface compliance, but that in practice, contributes to their trauma and the tolerance of sexual violence." *Id.*

657.    The Petition called for the University to, among other things:  (a) address the "victimization and severe injustice" of Gambill; (b) implement training in compliance with "federal law and the expectations of Title IX, The Dear Colleague Letters of 2010 and 2011 and the Clery Act"; (c) investigate the University's compliance with Title IX, Title VII, Title VI, and Title II, as well as reporting and procedures related to sexual misconduct; (d) expedite reviews of UNC officials including Dean Sauls; (e) implement "stronger disciplinary punishment for perpetrators found guilty of sexual misconduct and sexual harassment"; and (f) improve the University alert system. *Id.*

658.    Ultimately, the Petition garnered over 4,400 signatures. *Id.*

659.    Students at UNC also held a rally in February of 2013 to demand prompt action and change in the University's handling of sexual misconduct complaints and in support of Gambill.  *UNC-CH students rally against sexual assaults*, WRAL.COM, https://www.wral.com/rally-planned-at-unc-ch-on-sexual-assault-issues/12166672/ (published Feb. 28, 2013, 8:24 pm; last updated Mar. 1, 2013, 6:20 pm).

> ii.    **After Public Scrutiny and the Filing of Formal Complaints, the DOE's OCR Launches an Investigation into UNC's Handling of Sexual Assault and Harassment Complaints.**

660.    As a result of the student complaints, the DOE's OCR launched an investigation into such practices in March of 2013 that attracted widespread publicity and attention.  Richard Pérez-Peña, *Students Initiate Inquiry Into Harassment Reports*, THE

145

NEW YORK TIMES (Mar. 7, 2013), https://www.nytimes.com/2013/03/08/education/students-initiate-inquiry-into-harassment- reports.html?hpw; *Feds Will Probe Handling of Sexual Misconduct Case,* CAROLINA ALUMNI REVIEW (Mar. 7, 2013), https://alumni.unc.edu/news/feds-will-probe-handling-of-sexual-misconduct-case/; *Dept. of Ed Opens Investigation Into UNC's Handling of Sexual Assaults*, HOSPITAL/SCHOOL/UNIVERSITY CAMPUS SAFETY (Mar. 14, 2013), https://www.campussafetymagazine.com/news/dept-of-ed-opens-investigation-into-unc-s-handling-of-sexual-assaults/; *Feds to investigate UNC's handling of sex assault cases*, WRAL.com, https://www.wral.com/feds-to-investigate-unc-s-handling-of-sex-assault-cases/12191041/ (published Mar. 6, 2013, 5:55 pm, last updated 11:28 pm).

661.   UNC's then-chancellor Holden Thorp promised full cooperation with the federal investigation and highlighted the "commitment" of UNC to "help survivors of sexual assault get the information and resources they need."   *Dept. of Ed Opens Investigation Into UNC's Handling of Sexual Assaults*, HOSPITAL/SCHOOL/UNIVERSITY CAMPUS SAFETY (Mar. 14, 2013), https://www.campussafetymagazine.com/news/dept-of-ed-opens-investigation-into-unc-s-handling-of-sexual-assaults/.

### iii.    *UNC Faces Even More Scrutiny, Including Becoming the Subject of a Documentary, While the OCR's Investigation Continues.*

662.   While the Office for Civil Rights' investigation of UNC remained underway, some UNC complainants connected with complainants at other universities across the country, including Occidental College, Amherst College, and Yale University, in an effort to start a nation-wide movement.  Richard Pérez-Peña, *College Groups Connect to Fight*

146

*Sexual Assault*, THE NEW YORK TIMES (Mar. 19, 2013), https://www.nytimes.com/2013/03/20/education/activists-at-colleges-network-to-fight-sexual-assault.html.

663. Two of the UNC complainants, Annie Clark and Andrea Pino, continued to attract national attention by speaking out against the mishandlings of their complaints both at UNC and at other institutions around the country. Rebecca Johnson, *Campus Sexual Assault: Annie E. Clark and Andrea Pino Are Fighting Back—And Shaping the National Debate*, VOGUE (Oct. 9, 2014), https://www.vogue.com/article/college-sexual-assault-harassment-annie-e-clark-andrea-pino.

664. The stories of the various complainants "galvanized a community of UNC sexual-assault survivors who contend that the university isn't taking its students' allegations of sexual abuse seriously" highlighting that it's "about [them] collectively as survivors." Strochlic, *supra* ¶ 2.

665. In 2015, film directors Kirby Dick and Amy Ziering released a documentary titled *The Hunting Ground*, described as "an expose of rape crimes on U.S. college campuses, their institutional cover-ups, and the devastating toll they take on students and their families." *The Hunting Ground*, INTERNET MOVIE DATA BASE, https://www.imdb.com/title/tt4185572/ (last visited Aug. 30, 2022).

666. *The Hunting Ground* focused on the stories of two of the UNC complainants, Andrea Pino and Annie Clark, calling into focus once again UNC's mishandlings of sexual misconduct complaints and further highlighting what some referred to as a "national epidemic." Leora Yashari, *The Stars of the Documentary* The Hunting Ground *Are Still*

*Telling Sexual Assault Survivors, "We Believe You",* VANITY FAIR (Jan. 8, 2016) https://www.vanityfair.com/hollywood/2016/01/the-hunting-ground-annie-clark-andrea-pino.

667.  *The Hunting Ground* received critical acclaim despite several sources, including Harvard University Law School professors, calling into question the veracity of the statistics supporting the documentary.  Ashe Schow, *19 Harvard Law professors pen letter denouncing 'The Hunting Ground'*, THE WASHINGTON EXAMINER (Nov. 11, 2015, 2:47 pm)  https://www.washingtonexaminer.com/tag/cnn?source=%2F19-harvard-law-professors-pen-letter-denouncing-the-hunting-ground%2Farticle%2F2576140;  Emily Yoffe, *How* The Hunting Ground *Blurs the Truth*, SLATE (June 1, 2015, 11:07 am), https://slate.com/news-and-politics/2015/06/the-hunting-ground-a-closer-look-at-the-influential-dcumentary-reveals-the-filmmakers-put-advocacy-ahead-of-accuracy.html; *The Hunting Ground* Film, https://www.thehuntinggroundfilm.com/ (last visited Aug. 30, 2022).

668.  In 2016, yet another student spoke out publicly against UNC regarding the improper handling of her sexual misconduct complaint.  UNC student Delaney Robinson held a press conference in September of 2016, during which she told reporters that she was assaulted in February of 2016 and when she reported the matter to the University, she was "met with inaction and indifference."  Tony Marco and Chandrika Narayan, *UNC student says she was raped by football player*, CNN (Sept. 14, 2016, 7:00 am) https://www.cnn.com/2016/09/13/us/unc-rape-allegations; *Student's Sexual Assault Claim*

148

*Turns Attention to UNC Policy,* CAROLINA ALUMNI REVIEW (Sept. 14, 2016), https://alumni.unc.edu/news/students-sexual-assault-claim-turns-attention-to-unc-policy/.

669.    Robinson stated that the University's policies promised "a rigorous process conducted by well-trained investigators" but that such a process did not occur in her case. *Id.*

670.    Later, on the very same day as Delaney's press conference, UNC indefinitely suspended the respondent from the UNC football team. *Id.*

671.    In April 2017, UNC found that the respondent did not violate the school's sexual misconduct policy and dismissed an appeal from Robinson challenging the outcome.  Olivia Messer, *Sexual Assault Case Against UNC Football Player Dismissed*, THE DAILY BEAST (June 29, 2017), https://www.thedailybeast.com/sexual-assault-case-against-unc-football-player-dismissed.

### iv.    The DOE finds UNC Violated Federal Statutes.

672.    On February 7, 2017, the Department of Education issued a Program Review Report regarding the University of North Carolina at Chapel Hill's failure to comply with the requirements of the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act ("Clery Act"), the higher Education Act fire safety requirements, and the Department's regulations.

673.    The DOE issued its findings in response to the Program Review on August 23, 2019, concluding that UNC had violated the Clery Act for several years, in nine (9) major areas, which included:  (a) "lack of administrative capability"; (b) "failure to

149

property define the campus/Clery geography"; (c) "failure to issue timely warnings"; (d) "failure to properly compile and disclose crime statistics"; (e) "discrepancies between the crime statistics included in the ASR and the data submitted to the campus safety and security data analysis cutting tool"; (f) failure to collect campus crime information from all required sources; (g) failure to follow institutional policy in a case of an alleged sex offense; (h) failure to disclose accurate and complete disciplinary referral statistics – failure to retain records needed to substantiate Clery Act compliance; and (i) failure to include required information I the annual fire safety reports."  Letter from Julian Schmoke, Director, Clery Act, Compliance Division, DOE, to Kevin M. Guskiewicz, Interim Chancellor UNC (Aug. 23, 2019) https://police.unc.edu/wp-content/uploads/sites/255/2019/11/U.S.-Department-of-Education-Final-Program-Review-August-2019.pdf.

674. In making its findings, the DOE reviewed relevant materials dating back to 2009.  Schomke, *supra* ¶ 31; Charlie McGee, 'Blistering': *UNC faces fines after federal safety, crime reporting violations,* THE DAILY TAR HEEL (Nov. 19, 2019) https://www.dailytarheel.com/article/2019/11/unc-clery-act-violation-findings-reveal-report-omissions-and-retaliations-from-the-university.

675. The "blistering" 2019 Determination provoked further media attention and publicity.  Emily Tulloch and Amy Dickerson, *Title IX Lessons from DOE Report Finding Clery Act Violations at UNC,* FRANCZEK, P.C. (Dec. 5, 2019), https://www.titleixinsights.com/2019/12/title-ix-lessons-from-doe-report-finding-clery-act-violations-at-unc/; McGee, *supra* ¶ 32.

150

***v.*** ***The DOE's OCR Finds That UNC Violated Title IX Due to Its Mishandling of Sexual Misconduct Complaints, Resulting in a Resolution Agreement.***

676.    On June 25, 2018, the DOE issued a letter (the "Letter of Findings") in response to the complaints filed by students of UNC in 2013.  Letter from Letisha Morgan, Office for Civil Rights Team Leader, District of Colombia Office, to Dr. Carol L. Folt, Chancellor, UNC Chapel Hill (June 25, 2018), https://www.unc.edu/wp-content/uploads/2018/06/FINAL-R-LOF-UNC-Chapel-Hill-11132051-PDF-1.pdf.

677.    After an extensive investigation spanning several years, the DOE found that UNC had violated Title IX due to its mishandling of the complainant's sexual misconduct complaints. *Id.* at 1.

678.    The issuance of the findings, after a five-year long investigation, drew widespread attention and media coverage.  Associated Press, *Federal Civil Rights Investigation Finds UNC Chapel Hill Mishandled Sexual Assault Claims,* WFAE 90.7, CHARLOTTE'S NPR NEWS SOURCE (June 26, 2018), https://www.wfae.org/local-news/2018-06-26/federal-civil-rights-investigation-finds-unc-chapel-hill-mishandled-sexual-assault-claims (highlighting that "of the 285 cases" reviewed by the DOE, "only 18 were formally investigation by UNC and only five were done so within the proper timeframe."); Jeremy Bauer-Wolf, *The 'Confusing' Case of UNC's Title IX Violations*, INSIDE            HIGHER            ED            (June            27,            2018), https://www.insidehighered.com/news/2018/06/27/unc-found-have-violated-title-ix-multiyear-investigation; *Office of Civil Rights Cites UNC Failures in Handling Sexual Assault*, CAROLINA ALUMNI REVIEW (June 27, 2018), https://alumni.unc.edu/news/office-

151

of-civil-rights-cites-unc-failures-in-handling-sexual-assault/ (noting that "UNC was one of the starting points of what became a network of assault victims across the country who called out their schools on what they saw as often poorly focused, overworked and poorly trained counselors, investigators, health care providers, police and adjudicators in uncoordinated patchworks of offices and agencies"); *Federal investigation finds UNC violated Title IX in handling of sexual violence complaints,* ABC, INC., WTVD-TV RALEIGH DURHAM (June 26, 2018), https://abc11.com/unc-university-of-north-carolina-chapel-hill-sexual-harassment/3656640/.

679. In its Letter of Findings, the DOE identified UNC's violations, including but not limited to, a failure to adopt prompt and equitable grievance procedures, lack of timely resolution of complaints, and a failure to provide a non-hostile environment. *Id.* at 7-13.

680. UNC agreed to resolve the open investigation on June 21, 2018, "[w]ithout admitting to any violation of law", through a Resolution Agreement with the DOE (the "Resolution Agreement"). *Id.* at 13, 16-20.

681. The Resolution Agreement required UNC, among other things, to review and revise its Title IX policies and grievance procedures, revise and implement training procedures, and provide periodic reports to the OCR.

### vi. *UNC Faces Scrutiny Yet Again When the Rowing Coach is Accused of Sexual Harassment.*

682. In December 2019, UNC faced scrutiny yet again when students brought forth allegations of Title IX violations, including emotional abuse and sexual harassment, against the women's rowing coach Sarah Hanley. Chapel Fowler and Brian Keyes, *UNC*

*rowing head coach resigns amid Title IX investigation*, THE DAILY TAR HEEL (Dec. 2, 2019), https://www.dailytarheel.com/article/2019/12/unc-rowing-head-coach-sarah-haney-resigns-title-ix-investigation.

683. The allegations included "inappropriate touching and comments about athletes' appearance and sexuality." *Id.*

684. Ultimately, Hanley resigned from her position. Fowler, *supra* ¶ 40; *see also* Dakota Moyer, *Former UNC Rowing Coach Denies Role in Reported Title IX Investigation*, CHAPELBORO.COM (Dec. 3, 2019), https://chapelboro.com/news/unc/former-unc-rowing-coach-denies-role-in-reported-title-ix-investigation.

### vii. UNC Agrees to Pay the DOE $1,500,000 and Engage in a Complete Overhaul of Its Existing Organizational Structure and Applicable Policies to Settle Violations.

685. In resolution of the Letter of Findings, UNC entered into a settlement agreement (the "Settlement Agreement") with the DOE on June 24, 2020. Settlement Agreement, UNC at Chapel Hill, United States DOE, June 24, 2020, https://police.unc.edu/wp-content/uploads/sites/255/2020/06/Settlement-Agreement-UNC-and-U.S.-Department-of-Education-Executed-06262020.pdf.

686. UNC's Chancellor, Defendant Guskiewicz announced the Settlement Agreement on June 30, 2020, highlighting that "[t]he University has made improvements and changes since the review began, but the shortcomings do not meet Carolina's standards for excellence." Message from Chancellor Guskiewicz on a settlement agreement with the Department of Education, Chancellor of the Univ. of N. Carolina at Chapel Hill (June 30,

153

2020), https://www.unc.edu/posts/2020/06/30/clery-settlement/? utm_campaign=063020 +Message+from+Chancellor+Guskiewicz+on+a+settlement+agreement+with+the+Depar tment+of+Education&utm_medium=bitly&utm_source=Twitter-KG; *see also* Kevin Guskiewicz (@KevinGuskiewicz), TWITTER (June 30, 2020, 2:20 PM) https://twitter.com/KevinGuskiewicz/status/1278030582988132353?ref_src=twsrc%5Etf w%7Ctwcamp%5Etweetembed%7Ctwterm%5E1278030582988132353%7Ctwgr%5E% 7Ctwcon%5Es1_&ref_url=https%3A%2F%2Fchapelboro.com%2Fnews%2Func%2Func -pays-1-5-million-to-settle-over-past-campus-safety-violations.

687.    The Settlement Agreement was widely publicized. Brighton McConnell, *UNC Pays $1.5 Million to Settle Over Past Campus Safety Violations,* CHABELBORO.COM, (June 30, 2020), https://chapelboro.com/news/unc/unc-pays-1-5-million-to-settle-over-past-campus-safety-violations.

688.    The Settlement Agreement highlighted that the DOE "issued a Final Program Review Determination…stating that UNC had failed to comply with the requirements of…the Clery Act..." Settlement Agreement, UNC at Chapel Hill, United States DOE, June 24, 2020, https://police.unc.edu/wp-content/uploads/sites/255/2020/06/Settlement-Agreement-UNC-and-U.S.-Department-of-Education-Executed-06262020.pdf at 1.

689.    As part of the Settlement Agreement, UNC and the DOE agreed to "address additional appropriate enhancements…to identify further steps that UNC will undertake to ensure continued compliance in the future." *Id.*

690.    Importantly, UNC agreed to pay a fine of $1,500,000 to the Department of Education and implement a series of corrective actions, outlined at length in the Appendix

154

to the Settlement Agreement. *Id.* at 2-8. There were several notable "corrective actions" included in the Agreement. *Id.* at 4-8. Specifically, UNC retained a consultant that "designed a Clery Act Program Support Plan" (the "Clery Consultant") for UNC. *Id.* at 4. The Clery Consultant's role was to: (a) "provide training to executives and practitioners"; (b) "coordinate the conduct of a self-study"; (c) "conduct a data audit to assess the accuracy and completeness of the institution's crime statistics and compliance with the timely warning and emergency notification provisions"; (d) assess the adequacy of existing campus safety and crime prevention policies, procedures, and programs"; and (e) "assist the institution to identify and notice Campus Security Authorities (CSAs) and identify and classify its Clery Geography." Settlement Agreement, UNC at Chapel Hill, United States DOE, June 24, 2020, https://police.unc.edu/wp-content/uploads/sites/255/2020/06/Settlement-Agreement-UNC-and-U.S.-Department-of-Education-Executed-06262020.pdf at 4.

691. Additionally, mere months prior to the initiation of the complaints against Plaintiff, UNC agreed to undertake a complete overhaul of its existing policies and structure, to change its "organizational structure and existing campus safety and crime practices, policies, procedures, training programs, and systems" and, "in consultation with" the DOE, "implement new policies, procedures, training programs, and systems, as needed, to address deficiencies and other areas of concern identified by the [DOE]." *Id.* (emphasis added).

692. The Settlement Agreement also set forth what UNC and the DOE referred to as "Post-Review Monitoring" to "ensure that adequate remedial measures are developed,

fully implemented and sustained." *Id.* The DOE anticipated, but did not guarantee, that "all Post-Review Monitoring activities" would be complete in approximately three years, or by 2023, thus bringing the cases against Plaintiff within this monitoring period. *Id.*

693. The Post-Review Monitoring included, but is not limited to: (a) the formation of a new Clery Compliance Committee ("CCC"); (b) assessment of "existing crisis intervention and/or behavioral threat assessment teams"; (c) implementation of training, reviewed by the DOE, including "specialized training for investigators and hearing officials" that "must include training on understanding the trauma typically experienced by victims of violent crime, especially sexual violence"; (d) continued communication regarding misconduct and reporting; (e) "a complete reassessment of procedures and protocols" for campus safety, required programs by the Violence Against Women Reauthorization Act of 2013, and other areas; (f) self-assessments to identify potential additional violations; and (g) on-site assessments by the DOE. Settlement Agreement, UNC at Chapel Hill, United States DOE, June 24, 2020, https://police.unc.edu/wp-content/uploads/sites/255/2020/06/Settlement-Agreement-UNC-and-U.S.-Department-of-Education-Executed-06262020.pdf at 5-8.

        ***viii.  Under Pressure from the Settlement Agreement, UNC Continues to Make Changes in an Attempt to Win Good Favor with the DOE.***

694. The University continued to hire additional staff and resources in response to the DOE's investigation. UNC Vice Chancellor for Human Resources and Equal Opportunity and Compliance Becci Menghini wrote: "[w]e recognize the lasting impact sexual misconduct has both on individual members of our campus and on our community

as a whole. . . [a]fter reviewing the results of the 2019 AAU Campus Climate Survey on Sexual Assault and Sexual Misconduct, Chancellor Guskiewicz announced his intention to further invest in prevention and to hire a Chief Prevention Strategy Officer to oversee University prevention efforts.'"  Brighton McConnell, *UNC Updates Its Title IX Policy, Reflects New Federal Guidelines,* CHAPELBORO.COM, (Aug. 20, 2020), https://chapelboro.com/news/unc/unc-updates-its-title-ix-policy-reflects-new-federal-guidelines.

695.    Additionally, UNC, along with schools across the entirety of the United States, updated their policies to align with the new 2020 Federal Regulations, effective August 2020.  Brighton McConnell, *UNC Updates Its Title IX Policy, Reflects New Federal Guidelines,* CHAPELBORO.COM, (Aug. 20, 2020), https://chapelboro.com/news/unc/unc-updates-its-title-ix-policy-reflects-new-federal-guidelines; Becci Menghini, *University adopts new Title IX Policy in compliance with new federal regulations*, UNC HUMAN RESOURCES AND EQUAL OPPORTUNITY AND COMPLIANCE, (Aug. 14, 2020), https://eoc.unc.edu/university-adopts-new-title-ix-policy-in-compliance-with-new-federal-regulations/.

696.    The 2013 complaints that incited staunch activism and demand for changes to UNC's handling of sexual assault allegations drew renewed national attention during the 50th anniversary of Title IX.  The New York Times published an article on April 27, 2022 which addressed the Title IX complaints filed by Pino and Clark in 2013, and the national survivor advocacy organization End Rape on Campus, that Pino co-founded.  Alina Tugend, *Title IX at 50: How it Changed Congress, Campuses and Sports*, THE NEW YORK

157

TIMES (Apr. 27, 2022) https://www.nytimes.com/2022/04/27/arts/design/new-york-historical-society-title-ix-50.html.

### c. The Title IX Pleading Standard.

697.    Title IX of the Education Amendments of 1972 provides, in relevant part, that:  "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

698.    Title IX may be violated by a school's failure to remedy sexual harassment, and by a school's imposition of discipline where gender is a motivating factor in the decision.  In either case, the statute is enforceable through an implied private right of action. *See Cannon v. Univ. of Chicago*, 441 U.S. 677 (1979); *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994).

699.    Title IX of the Education Amendments of 1972 applies to all public and private educational institutions that receive federal funding, including Defendant UNC and the UNC System.

700.    Upon information and belief, UNC and the UNC System, at all times relevant to this Complaint, received and continues to receive federal funding and is therefore subject to liability under Title IX of the Education Acts of 1972, 20 U.S.C. § 1681(a).

701.    The Second Circuit in *Yusuf v. Vassar College* articulated two theories under which a plaintiff could plead a Title IX violation – erroneous outcome and selective enforcement.

158

702.     Under an "erroneous outcome" case, the claim is that the plaintiff was innocent and wrongly found to have committed an offense and gender bias was a motivating factor behind the erroneous findings.  "Plaintiffs who claim that an erroneous outcome was reached must allege particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding" and "particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding."  *Yusuf v. Vassar Coll.*, 35 F.3d at 715.

703.     Under the "selective enforcement" theory, the claim asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or decision to initiate the proceeding was affected by the student's gender.

704.     While some circuits continue to analyze Title IX claims under the erroneous outcome and selective enforcement theories, the Fourth Circuit has adopted the Seventh Circuit's view that there is "no need to superimpose doctrinal tests on the [Title IX statute.] *Doe v. Purdue Univ.*, 928 F.3d 652, 667 (7th Cir. 2019).  More simply, "the standard for Title IX claims in this context" asks:  "do 'the alleged facts, if true, raise a plausible inference that the university discriminated [against John Doe] 'on the basis of sex'?"  *Doe v. Columbia Coll. Chi.*, 933 F.3d 849, 854–55 (7th Cir. 2019) (quoting *Purdue Univ.*, 928 F.3d at 667–68); *Schwake v. Arizona Bd. Of Regents*, 967 F.3d at 947.

705.     In so doing, the Fourth Circuit has noted however that it "find[s] no inherent problems with the erroneous outcome and selective enforcement theories identified in *Yusuf*.  In fact, either theory, with sufficient facts, may suffice to state a plausible claim.  We merely emphasize that the text of Title IX prohibits all discrimination on the basis of

159

sex.  *See* 20 U.S.C. § 1681(a)." *Sheppard v. Visitors of Virginia State Univ.,* 993 F.3d 230, 236 (4th Cir. 2021)

### d. Gender Bias Exhibited Throughout the Investigations and Adjudications.

706.    UNC violated Title IX in the instant case because the University reached two erroneous findings that Plaintiff was responsible for sexual misconduct, and gender bias was a motivating factor in the wrongful findings.

707.    Further, there was a particularized causal connection between the erroneous outcomes in Plaintiff's disciplinary proceedings and his sex, as described in detail throughout this complaint.

708.    Upon information and belief, UNC's mishandling of Plaintiff's Title IX cases was informed by institutional, systemic gender bias, as well as external pressure from the student body and the United States Department of Education, under a threat of rescission of federal funds.

709.    UNC applied its policies and procedures in a manner that discriminated against Plaintiff on the basis of his sex and led to erroneous outcomes.

710.    UNC and the UNC System also imposed unwarranted and unjustly severe sanctions on Plaintiff, in both suspending and expelling him, and gender bias was a motivating factor.

711.    Several of the University administrators involved in the disciplinary matters against Plaintiff acted in a discriminatory manner against him, as further described below.

### i. *The EOC and EEAC.*

712.    From the initiation of the charges against Plaintiff, the EOC and EEAC conspired to perform the investigations against Plaintiff in a manner calculated to find Plaintiff responsible for some policy violation.

713.    UNC, before investigating the source of the complaints or the veracity of the allegations, immediately suspended Plaintiff, based simply on the fact that four female students had filed complaints, notwithstanding that this was not an instance of four unconnected and random individuals, but rather a coordinated campaign of female students who were part of a common friend group.  In fact, one of the women admitted that her actions in organizing the complaints against Plaintiff were intended to ostracize him from his friends and to have him excluded from his fraternity.

### ii. *The Investigators.*

714.    Investigator Jeremy Enlow exhibited bias against Plaintiff throughout the investigation process, which contributed to the resultant erroneous findings reached by the Hearing Panels in the Roe 1 and Roe 4 matters.

715.    First, concerning the Roe 1 matter, Defendant Enlow asked the complainant and witnesses leading questions, in an effort to elicit certain testimony and information, while he repeatedly asked Plaintiff the same question in different ways, in an effort to catch him in inconsistencies.  These interview tactics were employed with the intent of obtaining evidence that would support his preconceived determinations regarding Plaintiff and Roe 1, and the veracity of each of their accounts.

161

716. Second, Defendant Enlow failed to pursue material evidence referenced by Roe 1 and her witnesses, such as photographs, text messages, and medical records, attributing this failure to his practice of allowing the reporting party and their witnesses to share whatever they are comfortable with. In contrast, Defendant Enlow pressed Plaintiff and his attorney to produce all evidence they had prior to conducting Plaintiff's first interview, made repeated demands for certain pieces of evidence, and included in the investigation report certain statements to suggest that Plaintiff was deliberately hiding evidence despite Plaintiff's clear statement that such evidence did not exist.

717. This difference in treatment with respect to the collection of evidence from the parties further highlights Defendant Enlow's bias against Plaintiff as the male accused, and his efforts to seek out evidence that supported his predetermined conclusions while ignoring evidence that would refute it.

718. Third, Defendant Enlow included in his report multiple references to the other allegations brought against Plaintiff. As such, the Hearing Panels were provided an investigation file that included references to the false accusations brought by the other accusers, despite a prior agreement between Plaintiff and Defendant Hall that all such references would be redacted.

719. Fourth, after Jane Roes 1 and 2 withdrew their complaints, on June 28, 2021, Defendants Hall, Enlow, and Gibson prepared an "Assessment for Reporting Parties Requesting No Formal Action" related to the Roe 2 matter. In response to the item stating "[d]iscuss the risk you believe is posed to any individual or to the campus community by not proceeding, including the risk of additional violence", Defendants wrote "[t]he risk is

162

high due to EOC receiving 5 total reports of sexual violence between March 2020 and January 2021. Reports indicate the a (sic) pattern of force." This statement was erroneous for two reasons: there were four reports made, not five, and importantly, none of the reports made against Plaintiff involved any allegations of force, let alone a "pattern of force." This outrageous description of the allegations evidenced Defendants' belief in Plaintiff's guilt, before any investigation had taken place, further demonstrating a bias against him.

720. Additionally, Defendants Enlow and Froehling conspired to withhold from Plaintiff communications UNC received from two of the female accusers in July of 2021, falsely claiming that Plaintiff bragged about having a gun, stating that they believed Plaintiff had broken into his room at the fraternity house, and that he was threatening some of his fraternity brothers.

721. The foregoing was demonstrably false because Plaintiff has never owned a gun, he was working at a camp in New Hampshire over the summer where he could not leave the camp because of Covid-19 restrictions, and he had copies of the emails he sent to his, then, fall semester roommates and others that were anything but threatening.

722. Yet, these allegations were used surreptitiously by Defendants Enlow and Froehling, by providing same to the EEAC without notice to Plaintiff, to eliminate Plaintiff's chance of obtaining a removal of his interim suspension from the EEAC and continuing his education at UNC for the fall semester of 2021.

723. In furtherance of the conspiracy, the Investigators never provided this information regarding the false complaint to Plaintiff during the investigation processes, thus preventing Plaintiff from presenting a defense to this false and defamatory claim and

utilizing the false claims to refute the testimony of two of the accusers and to attack their credibility.

724.    All of the foregoing indicia of bias, when committed by the individuals who were tasked as EOC Investigators with collecting the available evidence, and fairly, objectively, and neutrally summarizing the factual information gathered, irrefutably adversely affected the Hearing Panel's decision-making process.

725.    Consequently, Defendant Enlow's and Froehling's bias permeated every aspect of the investigation, through the investigation, hearing panel, and decision-making, influencing every administrator involved in any capacity in the cases against Plaintiff.

### iii. _The Hearing Panels._

726.    The Hearing Panels in the Roe 1 and Roe 4 matters evidenced a bias against Plaintiff through their conduct and decision-making related to the proceedings, as well as in their ultimate findings.

727.    Importantly, the text messages and documentary evidence, along with witness testimony, unquestionably refuted the allegations that Plaintiff's sexual relations with three of the female accusers was non-consensual, and disproved that any sexual contact ever occurred with the fourth female accuser.  Moreover, Plaintiff's polygraph test results concerning each matter further corroborated his account of the events.  Yet, UNC utterly and completely ignored Plaintiff's evidence and continuously skewed the investigations and hearings to assist the female accusers.

164

728.    With respect to the Roe 1 matter, the Hearing Panel engaged in gender biased actions throughout the proceeding, in an effort to ensure a finding of responsibility was reached.

729.    First, the Hearing Panel allowed the female accuser's lawyer in his opening statement to declare that he would show that Plaintiff was a serial sexual abuser, and that he would prove a pattern of same against Plaintiff.

730.    Second, they allowed the female accuser's attorney to respond to cross-examination questions on her behalf when she inexplicably walked out of the hearing early, during her cross-examination, thereby depriving Plaintiff of the ability to confront her with documentary evidence that unequivocally showed the falsity of her statements and prior descriptions of her claims against Plaintiff.

731.    Also at the hearing, and without any prior notice to Plaintiff, the Hearing Panel permitted a change in the date of alleged incident from November 19, 2020 to November 12-13, 2020, after the complainant admitted that no sexual contact occurred with Plaintiff on November 19, 2020, and while her attorney proclaimed that the alleged conduct by Plaintiff occurred on November 5, 2020.

732.    Rather than dismissing the complaint, the University chose to proceed with the hearing on the new charges against Plaintiff, despite the lack of notice and in disregard of the fact that he had spent the prior ten months obtaining evidence and establishing a defense to refute the complainant's claims regarding the events of November 19.

733.    The Hearing Panel indisputably demonstrated a bias against Plaintiff when they agreed to consider new allegations relating to a different date, without any notice to

165

Plaintiff, evincing their clear objective to support the female complainant and ensure that she would prevail.

734. Specifically, Roe 1 knew that Plaintiff was able to disprove her allegations as to what transpired on November 19, as she had seen all evidence he provided to the Investigators. As such, revising the date of the allegations in the middle of the hearing deprived him of any notice or opportunity to collect evidence concerning November 12-13, 2020.

735. Furthermore, the Hearing Panel chose to find Plaintiff responsible despite the accuser's disappearance and conflicting evidence from her witness. The Hearing Panel inexplicably opined in its decision that it relied on the conflict in testimony because it made the evidence "more credible." The Hearing Panel failed to consider Plaintiff's evidence refuting the accusations.

736. Finally, the Hearing Panel chose to find Plaintiff responsible when it was apparent that the accuser lied about the very first sexual interaction between Plaintiff and Roe 1. Inexplicably, when Roe 1 was presented with contemporaneous texts requesting money from Plaintiff a Plan B-emergency contraception, to refute her description of their encounter which included Plaintiff allegedly attempting to force himself on her for his sexual gratification and then, according to Roe 1, Plaintiff attempting to blackmail her into having sex with her, the Hearing Panel gave credit to the accuser for admitting she lied to the EOC Investigations.

737. The Hearing Panel, despite the credibility issues attendant to Roe 1's claims of no sexual interaction when there was sexual interaction with the Plaintiff, demonstrated

166

the Hearing Panel's determination to find Plaintiff responsible no matter what Roe 1 claimed to the EOC Investigators.

738.    The Hearing Panels further exhibited bias against Plaintiff as the male accused when they issued findings in the Roe 1 and Roe 4 matters that were inconsistent with, and directly contradicted by, the evidence.  *See Doe v. Columbia* (831 F.3d 46, 57 (2d Cir. 2016) ("[w]hen the evidence substantially favors one party's version of a disputed matter, but an evaluator forms a conclusion in favor of the other side (without an apparent reason based in the evidence), it is plausible to infer (although by no means necessarily correct) that the evaluator has been influenced by bias.")

739.    In the Roe 4 matter, there was voluminous evidence of the accuser's propensity to lie.  One of her own witnesses described her as "the most unreliable narrator that I've ever met," "a very big gaslighter," and "genuinely, physically, not being able to . . . accept responsibility for anything that she does," statements he backed up with several detailed illustrative examples of the accuser's habit of evading responsibility for her own wrongdoing, "twisting the truth towards her favor," and fabricating false claims about the individuals who were harmed by her deceitful and gaslighting conduct.

740.    Additionally, posts that Roe 4 published to social media prior to the continued date for her hearing demonstrated that she had lied to the EOC, by claiming she had a medical condition, to avoid appearing for and testifying at the hearing.

741.    With further respect to the Roe 4 matter, the Hearing Panel improperly relied upon a supposed contemporaneous disclosure made by Roe 4 to witness Sara Poe, directly following the alleged incident in June of 2020.

167

742.   As neither Roe 4 nor witness Sara Poe testified at the hearing, Plaintiff was deprived of his right to question them on this dubious evidence.

743.   Notably, the Hearing Panel did not specify what the precise contemporaneous disclosure was, neither Roe 4 nor Sara Poe ever provided a copy of it, nor did they provide copies of their phone records to indicate that a text message was even sent at the time they claimed.

744.   Thus, the reasonable conclusion is that no such contemporaneous disclosure existed.   However, the Hearing Panel arbitrarily relied on this non-existent and manufactured evidence to support its finding of responsibility against Plaintiff.

745.   Further, as discussed above, the public pressure on UNC to vindicate female survivors alleging sexual misconduct caused the University to subject Plaintiff to four biased and unfair processes, all of which were tilted in favor of the female complainants and against him, the male.

746.   It is well established that a university that is motivated to take adverse action against an accused male in order to respond to or protect itself from negative publicity about sexual harassment is motivated by gender bias and engages in unlawful sex discrimination under Title IX. *Doe v. Columbia Univ.*, 831 F.3d at 58 (stating that "fear of negative publicity or of Title IX liability[] are not necessarily . . . lawful motivations distinct from sex bias," and that an institution "that adopts, even temporarily, a policy of bias favoring one sex over the other in a disciplinary dispute . . . in order to avoid . . . bad publicity[] has practiced sex discrimination, notwithstanding that the motive for the discrimination did not come from ingrained or permanent bias against that particular sex").

168

747. Upon information and belief, UNC has engaged in a pattern of unfair investigations and adjudications resulting in serious sanctions being imposed upon male students, while not making comparable efforts with respect to allegations of sexual violence and abusive conduct made against female/non-male students.

748. Based on the foregoing, and in furtherance of the conspiracy, Plaintiff was subjected to several biased, prejudiced, and unfair processes in violation of Title IX designed to find him, the male, responsible.

749. This unlawful discrimination in violation of Title IX has proximately caused Plaintiff to sustain substantial and ongoing injury, damage, and loss, including, but not limited to: emotional distress; psychological damages; loss of education; loss of future educational and career opportunities; reputational damages; economic injuries; and other direct and consequential damages.

750. As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial but in excess of $75,000, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing UNC to: (i) permit Plaintiff to enroll as a student in good standing for the Fall 2023 semester at UNC; (ii) reverse the outcome, findings, and sanctions regarding the Roe 1 and Roe 4 complaints; (iii) expunge Plaintiff's disciplinary record with respect to all of the complaints made against him; (iv) remove any record of the findings and/or Plaintiff's suspension and expulsion from his educational file/disciplinary records/transcript; (v) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed; and (vi) any and all further actions required to return Plaintiff to the status

quo ante.

## COUNT III
## Breach of Contract
## (Against UNC)

751.    Plaintiff repeats and realleges each and every allegation above as though fully set forth herein.

752.    At all times relevant hereto, a contractual relationship existed between UNC and Plaintiff by virtue of Plaintiff's enrollment at UNC and as defined by and through UNC's policies and procedures governing the student disciplinary system, including but not limited to the Policy on Prohibited Sexual Harassment Under Title IX, the Policy on Prohibited Discrimination, Harassment and Related Misconduct Including Sexual and Gender-Based Harassment, Sexual Violence, Interpersonal Violence, and Stalking, and the Minimum Substantive and Procedural Standards for Student Disciplinary Procedures.

753.    Through these policies, UNC provided specific, enforceable provisions outlining certain procedures that were to be followed by the institution before Plaintiff could be suspended or expelled for violation of a university policy.

754.    Any failure to follow promised procedures in the disciplinary process would therefore constitute a violation of the University's contract with its student.

755.    Additionally, Plaintiff entered into a signed written contract with the Morehead-Cain Foundation on March 13, 2019, establishing a contractual relationship between Plaintiff and the Foundation, which was dependent upon his continued enrollment at the University.

756. In fact, the contract with Morehead-Cain expressly stated and required as follows: "I agree to withdraw my applications for admission from all other colleges and universities except the University of North Carolina at Chapel Hill."

757. Accordingly, through the documents it publishes and provides to students, UNC makes express and implied contractual commitments to students involved in the disciplinary process and/or the investigation of potential violations of the policies.

758. Under North Carolina law, the elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract.

759. Based on the aforementioned facts and circumstances, UNC created express and implied contracts when it offered, and Plaintiff accepted, admission to UNC, and when Plaintiff paid the required tuition and fees.

760. UNC committed several breaches of its agreements with Plaintiff during the investigation and adjudication processes.

   *a.* ***Failure to conduct a thorough and impartial investigation and adjudication process.***

761. Through the applicable policies, UNC agreed to: (i) conduct "a prompt, thorough, and impartial investigation, designed to provide a fair and reliable gathering of the facts by a trained and impartial investigator"; (ii) the University committed to conducting a prompt, thorough, and impartial resolution process; (iii) both the Title IX Policy and the PPDHRM assure that the University will "provide for the prompt and equitable" response to reports; and (iv) the University affirmed that the Title IX Coordinator, investigator(s), and any individuals designated by the University as a

decision-maker in the formal resolution process, must not have a conflict of interest or bias for or against Reporting Parties or Responding Parties generally or an individual Reporting Party or Responding Party; must not rely on sex stereotypes; and must promote impartial investigations and adjudications of Formal Complaints of Sexual Harassment.

762.    Each of the foregoing assurances were violated at every step of the process. By way of example and not limitation:

- UNC immediately suspended Plaintiff, without so much as an investigation into the source of the complaints or the veracity of the allegations, based simply on the fact that four female students had filed complaints, notwithstanding that this was not an instance of four unconnected and random individuals, but rather an obvious and coordinated campaign of female students who were part of a common friend group;
- UNC repeatedly refused to provide Plaintiff with material information at the time when he could have used such information in support of his defense, finally disclosing certain critical information only after the four hearings were concluded;
- UNC withheld from Plaintiff communications from one of the accusers in July of 2021 reporting that the private investigator hired by Plaintiff's attorney interviewed her at her home and alleging that the investigator engaged in harsh investigative tactics, a claim that was refuted by the investigator's affidavit and interview with the EOC Investigators.
- In order to charge Plaintiff with "Retaliation" for the alleged conduct of his lawyer's investigator, the EOC fabricated a new policy—adding words to the existing retaliation policy in order to create a form of double vicarious liability, because the actual policy would only cover retaliatory conduct of the accused, or of others acting at the direction of the accused;
- UNC withheld from Plaintiff the fact that two accusers wrote to the EOC falsely claiming that Plaintiff bragged about having a gun, stating that they believed Plaintiff had broken into his room at the fraternity house over the summer, and that he was threatening some of his fraternity brothers. Though this inflammatory claim was demonstrably false, the University did not notify Plaintiff of this information until after the four hearings were concluded, thus preventing him from presenting a defense to this false and defamatory claim in both the EEAC and EOC proceedings; preventing him from utilizing the false claims to refute the testimony of two of the accusers; and hindering his ability to attack the credibility of the two accusers in their respective proceedings;

- UNC also did not advise Plaintiff that the lead accuser and her co-accuser and best friend had requested a withdrawal of their complaints shortly after the initial interim suspension was imposed, until months after the hearings were concluded and the spring 2022 courses already started. Instead, UNC only permitted a partial withdrawal, such that UNC could continue their flawed investigations, designed to reach the predetermined conclusion that Plaintiff was responsible for a policy violation;

- UNC utterly ignored Plaintiff's evidence, refused to produce exculpatory materials in its possession or collect contemporaneous communications from the accusers that would belie their claims, and continuously skewed the investigations and hearings to impair Plaintiff's defense and assist the female accusers;

- At the first hearing with Roe 1, which resulted in a finding of responsibility against Plaintiff, the Hearing Panel allowed the female accuser's attorney to respond to cross-examination questions on her behalf after she inexplicably walked out early in the hearing, after providing testimony on direct-examination, depriving Plaintiff of the ability to cross-examine her with documentary evidence that unequivocally showed the falsity of her statements;

- Also at the Roe 1 hearing, and without any prior notice to Plaintiff, the Hearing Panel permitted a change in the date of alleged incident from November 19, 2020 to November 12-13, 2020, after the complainant admitted (contrary to her statement to the Investigators) that no sexual contact occurred with Plaintiff on November 19, 2020. Rather than dismissing the complaint and the underlying Notice of Investigation, the University chose to proceed with the hearing on the new charges against Plaintiff, despite the lack of any pre-hearing notice and in disregard of the fact that he had spent the prior eight months obtaining evidence and establishing a defense to refute the complainant's claims regarding the events of November 19;

- The EOC provided the Hearing Panel an investigation file that included scores of references to the false accusations brought by the other accusers and unknown others, despite a prior agreement with Defendant Hall that all such references would be redacted;

- The Hearing Officer in the Roe 4 hearing issued an initial ruling that barred Plaintiff from presenting any evidence that was relevant to the female accuser's credibility, a significant error that contributed to the erroneous outcome; and

- Defendant Hall also actively engaged in directing the Hearing Officer, who was inexperienced with such matters, to make certain rulings, thus interfering with the required impartial adjudication process.

173

### b. *Failure to presume Plaintiff not responsible.*

763.    Defendants also violated their conduct policies when they failed to presume Plaintiff not responsible for the reported conduct at all times during the process, until a determination regarding responsibility was made at the conclusion of the formal process.

764.    On March 29, 2021, Roe 2 reported to Ms. Findlay that Plaintiff had "committed sexual misconduct against UNC undergraduate women" and that he had "been kicked out of his fraternity for these actions, which will be effective on April 6."

765.    Ms. Findlay thereafter reported this information to her fellow Morehead-Cain advisors, including Julie DeVoe, Montez Thomas, Sophia Figueroa, and executive director of the Morehead-Cain Foundation, Chuck Lovelace.

766.    On April 1, 2021, Ms. Findlay, who was Plaintiff's advisor for the Morehead-Cain program, reported the allegations against him to the EOC.  She took this drastic step without reaching out to her advisee, the Plaintiff, or inquiring about the allegations and his response to them.  Her swift rush to judgment was emblematic of the University's presumption from the outset that Plaintiff was responsible for the alleged misconduct.

767.    Defendant Hall likewise engaged in actions that revealed her predetermined conclusion that Plaintiff was responsible for the alleged misconduct, before the investigation process even began.

768.    By email dated July 12, 2021, Defendant Hall explained that the reports against Plaintiff would be addressed under two separate policies:  (i) the Policy on Prohibited Discrimination, Harassment, and Related Misconduct; and (ii) the Policy on Prohibited Sexual Harassment Under Title IX.

769.    She inquired whether Plaintiff would agree to consolidate the four matters, citing to the May 2020 Title IX regulations in support of the proposition that "the EOC may consolidate[e]… formal complaints when [the] allegations of sexual harassment *arise out of the same facts or circumstances.*" Citing to 36 CFR § 106.45(b)(4)

770.    While acknowledging that the four matters did not arise out of the same facts and circumstances, she nonetheless requested that Plaintiff consider agreeing to a consolidation, explaining that it would allow EOC to adjudicate the reports more quickly, and noting "we anticipate that each of the Reporting Parties will be relevant witnesses in some or all other reports.  Additionally, any relevant, permissible pattern evidence will be considered in the resolution of the individual reports."

771.    Evidently, Ms. Hall presumed that a pattern of misconduct committed by Plaintiff would be revealed, before the investigations had even gotten fully under way.

772.    Indeed, Defendant Hall in conjunction with Defendant Enlow decided early on, before any investigation had been undertaken by the EOC, that the off-campus events were sponsored fraternity and sorority events and utilized this incorrect presumption as a predicate for conjuring an artificial basis for jurisdiction under the umbrella policies of UNC and the UNC System.

773.    After the interim suspension hearing, and after Plaintiff's request to modify the order was denied, on August 25, 2021 the EOC issued to Plaintiff an Amended Notice of Investigation for Roe 3, which modified the June 30, 2021 Notice of investigation to include alleged violations of the retaliation policy and No Contact Order, stating:  "You (either on your own or through an agent) authorized and/or instructed a third party acting

175

on your behalf to engage in conduct that intimidated and/or threatened the Reporting Party on or about the evening of July 21, 2021."

774.    At the time of Barefoot's interview of Roe 3, Roe 3 had not requested a No Contact Order, and the decision to interview her was made by his attorney, not by Plaintiff.

775.    Recognizing that that they would not be able to charge Plaintiff with retaliation under the applicable policy, the EOC unilaterally created a new definition of retaliation, to reinforce its case against Plaintiff.  These actions further demonstrated the University's presumption of guilt against Plaintiff, and the steps taken to ensure he would ultimately be removed from the school.

### c.  *Deprivation of Plaintiff's right to cross-examine his accusers.*

776.    The University's Title IX Policy provided that each party's advocate was permitted to ask the other party and any participating witnesses all relevant questions and follow up questions, including those challenging credibility.  It did not permit one's advocate to respond to questions on behalf of the party.

777.    Notwithstanding, during the Roe 1 hearing, while Plaintiff's attorney was in the middle of a material line of questioning, the Hearing Chair interrupted Plaintiff's counsel to state that Roe 1 had requested a break.  When the hearing resumed, Plaintiff was informed that Roe 1 had departed from the hearing and that her counsel would be permitted to step in for Roe 1 to answer questions on her behalf.

778.    Plaintiff was thus deprived of his right to question the other party, in direct violation of the applicable policy.

176

779.    Similarly, Jane Roe 4 failed to appear for her hearing at all, even after it was rescheduled to accommodate her unexpected "medical emergency," an event that she lied about to the Hearing Panel.  As such, Plaintiff was also denied an opportunity to question this accuser, in the second matter for which he was ultimately found responsible.

780.    In addition to the violations delineated above, UNC violated the covenant of good faith and fair dealing by failing to afford Plaintiff the fair, thorough, and impartial investigation processes to which he was entitled, resulting in two erroneous outcomes and the final severe sanction of expulsion.

781.    North Carolina courts recognize an implied covenant of good faith and fair dealing in every contract, which mandates that neither party will do anything which injures the right of the other to receive the benefits of the agreement.

782.    Each of the foregoing breaches contributed to a process that deprived Plaintiff of his fundamental and contractually guaranteed rights, ultimately leading to two adverse and erroneous findings against Plaintiff.

783.    As a proximate and foreseeable consequence of the foregoing breaches, Plaintiff sustained damages, including, but not limited to, emotional distress, psychological damages, loss of education, loss of future educational and career opportunities, reputational damage, economic injuries and other direct and consequential damages.

784.    As a result of the foregoing, Plaintiff is entitled to damages in excess of $75,000 in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## COUNT IV
## Negligent Hiring, Supervision and Retention
## (Against UNC and Defendant Hall)

785.   Plaintiff repeats and realleges each and every allegation above as though fully set forth herein.

786.   At the time of the relevant events, UNC owed Plaintiff a duty to use care in the hiring, training, supervision, and retention of its personnel, including those employed by the EOC who were involved in the disciplinary investigations and adjudications of the cases against Plaintiff.

787.   In investigating the four matters against Plaintiff, Defendant Enlow acted negligently when he conducted a procedurally defective and biased investigation process, designed to support his predetermined conclusion that Plaintiff was responsible for the alleged misconduct.

788.   Such negligence was exhibited by, for example:  (i) Enlow posing leading questions to the complainants and witnesses in an effort to elicit certain testimony and information, while repeatedly asking Plaintiff the same question in different ways, in an effort to catch him in inconsistencies; (ii) his failure to pursue material evidence referenced by Roe 1 and her witnesses, such as photographs, text messages, and medical records, attributing this failure to his practice of allowing the reporting party and their witnesses to share whatever they are comfortable with; (iii) his multiple references within the investigation reports to other allegations brought against Plaintiff in the individual actions; (iv) his withholding of exculpatory evidence from Plaintiff, which he knowingly and intentionally excluded from the Final Investigation Report in the Roe 1 matter; (v) his

provision of information either directly or indirectly to the EEAC in a manner that was anything but neutral in order to prejudice the EEAC in its view of Plaintiff and to obtain an interim suspension that was largely based on incorrect and invalid "facts" that were not investigated beforehand; (vi) incorrectly citing to authorities for propositions that were not correct or supported by those cites; (vii) mischaracterizing the "evidence" to the hearing panels and to the EEAC; and (viii) ignoring exculpatory evidence for Plaintiff and hiding such evidence from Plaintiff and his counsel until after the hearings were concluded and in some cases, not producing the exculpatory evidence until after Plaintiff submitted his appeals.

789.    Each of the foregoing demonstrated that Defendant Enlow was incompetent in his duties and should not have been serving as a Title IX investigator for the University.

790.    Defendant Hall, as Defendant Enlow's supervisor, had actual or constructive notice of Defendant Enlow's actions described above, as she oversaw and was heavily involved in the investigation processes.

791.    Further, Defendant Hall negligently supervised Defendant Enlow by failing to properly train him on how to conduct a fair and impartial investigation in compliance with the applicable University policies, failing to retrain him, and/or failing to terminate his employment despite her knowledge of the repeated demonstrations of bias committed by through the investigation of all four cases.

792.    Defendant Enlow's ineptitude in conducting the four investigations proximately caused the harm Plaintiff suffered, namely an expulsion, as the Hearing Panel

members relied upon the Investigators' findings in reaching their final determinations of fact and in issuing sanctions commensurate with the findings.

793.    UNC exhibited further negligence in retaining Defendant Elrod to serve as the hearing officer in the Roe 4 matter, given previous challenges to his fairness and impartiality in the *Gulyas v. Appalachian State University* matter.

794.    As described by the plaintiff in *Gulyas,* Defendant Elrod's conduct violated the plaintiff's due process rights, and was "sufficiently egregious objectively to deny Plaintiff a fair hearing and a meaningful opportunity to be heard such that no reasonable government official in Elrod's place could have concluded that the investigation and the University Conduct Board hearing satisfied due process."  *Gulyas v. Appalachian State Univ.*, 2017 WL at *6.

795.    UNC's decision to retain a hearing officer with a track record of depriving accused students of a fair proceeding, was both negligent and reckless.

796.    Further, it was foreseeable that a negligently conducted disciplinary investigation would ultimately lead to incorrect findings, causing immense harm to the student found responsible and consequently sanctioned.

797.    In committing the aforementioned acts or omissions, Defendant Hall and/or UNC negligently breached their duty to use due care, which directly and proximately resulted in the injuries and damages to Plaintiff as alleged herein.

798.    As a direct and foreseeable consequence of Defendants' conduct, Plaintiff has suffered irreparable injury to his reputation, loss of educational opportunities, loss of future earning capacity, and other economic and non-economic losses.

180

## COUNT V
## Negligent Infliction of Emotional Distress
## (Against the Individual Defendants)

799.   Plaintiff repeats and realleges each and every allegation above as though fully set forth herein.

800.   Defendants Hall, Enlow, Froehling, Gibson, Feeney, Elrod, and Rieckenberg each carried out their duties with respect to the cases against Plaintiff in a negligent manner when, either acting individually or in concert, they permitted the reporting parties to weaponize UNC's Title IX process against Plaintiff, engaged in decision-making calculated to lead to the predetermined conclusion that Plaintiff was responsible and must be punished severely, failed to ensure that the investigatory and adjudicatory processes were fair and objective, and instead contributed to the defective, prejudicial, and arbitrarily inequitable processes that were replete with gender bias against Plaintiff.

801.   By way of example but not limitation, Defendants:  (i) presumed Plaintiff responsible; (ii) deprived him of proper notice of the allegations; (iii) imposed an interim suspension based upon a false allegation that was not disclosed to Plaintiff until ten months later and after the hearings had all concluded; (iv) failed to disclose critical and exculpatory information at various junctures, until after the close of the proceedings in which Plaintiff could have used such information in his defense; (v) permitted the inclusion of information concerning other allegations within each investigation report to ensure at least one finding of responsibility against Plaintiff was reached; (vi) utilized the same two EOC Investigators for all four matters further contributing to the biased nature of the proceedings; (vii) utilized the same hearing officer for three of the four hearings to again ensure there was no impartial

and objective review; (viii) conducted investigations skewed in favor of the complainants and designed to reach predetermined findings of responsibility; and (ix) deprived Plaintiff of the opportunity to cross-examine his accusers.

802.     In combination with conduct described above, the Defendants' actions evinced a malicious and corrupt intent and a pattern of extreme and outrageous behavior pursued with the intent to cause Plaintiff to suffer severe emotional distress.

803.     Plaintiff has in fact suffered severe emotional distress as a proximate result of Defendants' actions.

804.     It was reasonably foreseeable that such negligent acts would result in severe emotional distress to Plaintiff, given the nearly year-long process that forced him to continuously defend himself, attempt to prove his innocence, face administrators that were not unbiased but instead presumed him to be responsible from the beginning and, despite all of his efforts, ultimately resulted in him being permanently removed from school, ostracized from his friends and peers, removed from his prestigious scholarship, and suffering from irreparable harm to his reputation.

805.     Defendants' conduct will continue to cause harm to Plaintiff given the irreparable harm to his reputation, the interruption in his education, and the lifelong consequences that flow therefrom.

806.     It was reasonably foreseeable that Plaintiff would suffer emotional and psychological harm as a result of Defendants' conduct.

807.     As a direct and foreseeable consequence of the foregoing conduct, Plaintiff has suffered, and will continue to suffer considerable emotional and psychological harm.

## COUNT VI
## <u>Intentional Infliction of Emotional Distress and Conspiracy</u>
## <u>(Against the Individual Defendants)</u>

808.    Plaintiff repeats and realleges each and every allegation above as though fully set forth herein.

809.    Defendants Hall, Enlow, Froehling, Gibson, Feeney, Elrod, and Rieckenberg engaged in extreme and outrageous conduct when, either acting individually or in concert, they permitted the reporting parties to weaponize UNC's Title IX process against Plaintiff, engaged in decision-making calculated to lead to the predetermined conclusion that Plaintiff was responsible and must be punished severely, failed to ensure that the investigatory and adjudicatory processes were fair and objective, and instead contributed to the defective, prejudicial, and arbitrarily inequitable processes that were replete with gender bias against Plaintiff.

810.    By way of example but not limitation, Defendants:  (i) presumed Plaintiff responsible; (ii) deprived him of proper notice of the allegations; (iii) imposed an interim suspension based upon a false allegation that was not disclosed to Plaintiff until ten months later and after the hearings had all concluded; (iv) failed to disclose critical and exculpatory information at various junctures, until after the close of the proceedings in which Plaintiff could have used such information in his defense; (v) permitted the inclusion of information concerning other allegations within each investigation report to ensure at least one finding of responsibility against Plaintiff was reached; (vi) utilized the same two EOC Investigators for all four matters further contributing to the biased nature of the proceedings; (vii) utilized the same hearing officer for three of the four hearings to again ensure there was no impartial

and objective review; (viii) conducted investigations skewed in favor of the complainants and designed to reach predetermined findings of responsibility; and (ix) deprived Plaintiff of the opportunity to cross-examine his accusers.

811.   The foregoing actions committed by the Individual Defendants as employees of the University, were so outrageous, so extreme in degree, and went beyond all bounds of decency, such that they were utterly intolerable.

812.   The actions of the Individual Defendants in their handling of the cases involving Plaintiff indicate either an intention to cause emotional distress to Plaintiff, or a reckless indifference to the high likelihood that such actions would cause severe emotional distress to Plaintiff, and such actions did directly cause severe emotional distress.

813.   Defendants' conduct will continue to cause harm to Plaintiff given the irreparable harm to his reputation, the interruption in his education, and the lifelong consequences that flow therefrom.

814.   As a direct and foreseeable consequence of the foregoing conduct, Plaintiff has suffered, and will continue to suffer considerable emotional and psychological harm.

**COUNT VII**
**Tortious Interference with Contract**
**(Against UNC and the Individual Defendants)**

815.   Plaintiff repeats and realleges each and every allegation above as though fully set forth herein.

816.   The elements of tortious interference with contract under North Carolina law are:  (1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) defendant knows of the contract; (3)

184

the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to the plaintiff.

817.    As described above, Plaintiff entered into a valid contract with the Morehead-Cain Foundation, a third-party entity that is distinct and separate from the University itself.

818.    Defendant UNC was indisputably aware of the contract between Plaintiff and the Morehead-Cain Foundation; his status as a Morehead Scholar was discussed amongst the members of the EOC and EEAC throughout the disciplinary proceedings, the Investigators referenced this fact in the investigation reports, and Director of Scholar Advising for the Foundation, Julie Devoe, corresponded with the EOC to inquire about the status of the cases against Plaintiff.

819.    UNC intentionally induced the Morehead-Cain Foundation to cease carrying out the contract with Plaintiff, when they notified the Morehead-Cain Foundation of the alleged misconduct complaints filed against Plaintiff.

820.    As a direct and proximate result, on May 10, 2021, prior to being heard on the interim suspension and prior to appearing for an investigation interview, the Morehead-Cain Scholarship Program notified Plaintiff that his scholarship was indefinitely suspended, and that he was no longer eligible to receive funding or other benefits from the Foundation.

821.    UNC and the Individual Defendants from the EOC, including Defendant Hall, intentionally, maliciously, and without justification, induced the Foundation to cease performance of their contract with Plaintiff and revoke his scholarship.

185

822.     Specifically, rather than advise the Foundation that an investigation had just been initiated and that no finding of responsibility had been reached against Plaintiff, they instead relayed information affirming EOC's presumption that Plaintiff was responsible for the allegations.  In turn, the Foundation "suspended [Plaintiff] from our scholarship based on the information [the EOC] provided."

823.     UNC and Defendant Hall's action resulted in actual damage to Plaintiff; namely, the revocation of his prestigious scholarship, as well as all future opportunities that would arise from his connections to the Foundation.

**COUNT VIII**
**Violation of State Constitution**
**(Against UNC)**

824.     Plaintiff repeats and realleges each and every allegation above as though fully set forth herein.

825.     UNC is an agency of the State of North Carolina and at all times relevant to this cause of action, UNC and its employees, agents, officers and directors were acting within the course and scope of the authority, employment or agency conferred on them by UNC.  As such, all of the conduct alleged herein is attributable to UNC and the State of North Carolina.

826.     The foregoing acts, omissions, agreements, and concerted conduct of Defendants directly and foreseeably caused the deprivations of the rights guaranteed to the Plaintiff by the North Carolina Constitution, including, but not limited to the following:

   a.   Defendants' conduct deprived Plaintiff of the right to the fruits of his own labor in violation of Article I, Section 1;

186

b. Defendants' conduct deprived Plaintiff of his constitutional right to education in violation of Article I, Section 15;

c. Defendants' conduct violated "the duty of the State to guard and maintain" Plaintiff's constitutional right to education in violation of Article I, Section 15;

d. Defendants' conduct denied Plaintiff the equal protection of the laws in violation of Article I, Section 19; and

e. Defendants' conduct violated Plaintiff's constitutional right not to be deprived of his liberties, privileges or property but by the law of the land, in violation of Article I, Section 19.

827. As a direct and foreseeable result of the foregoing violations of Plaintiff's constitutional rights, Plaintiff has suffered the harms and damages alleged above in an amount to be determined by a jury and the imminent irreparable harms necessitating the injunctive relief Plaintiff seeks in this action.

828. Plaintiff pleads this direct cause of action under the North Carolina Constitution in the alternative to Plaintiff's state-law claims should those causes of action be barred in whole or part or otherwise fail to provide a complete and adequate state law remedy for the wrongs committed by the Defendants and their agents and employees.

**<u>PRAYER FOR RELIEF</u>**

**WHEREFORE,** for the foregoing reasons, Plaintiff demands judgment against

Defendants as follows:

> (i)      On the first cause of action for violation of Title IX of the Education Amendments of 1972, a judgment awarding Plaintiff damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing UNC to: (i) reverse the outcome, findings, and sanction regarding the Roe 1 and Roe 4 complaints; (ii) expunge Plaintiff's disciplinary record in its entirety; (iii) remove any record of the Roe 1 and Roe 4 findings or Plaintiff's suspension and expulsion from his educational file/disciplinary records/transcript; (iv) any and all further actions required to return Plaintiff to the status quo ante;

> (ii)      On the second cause of action for a violation of 42 U.S.C. § 1983 procedural due process, a judgment awarding Plaintiff damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing UNC to: (i) reverse the outcome, findings, and sanction regarding the Roe 1 and Roe 4 complaints; (ii) expunge Plaintiff's disciplinary record in its entirety; (iii) remove any record of the Roe 1 and Roe 4 findings or Plaintiff's suspension and expulsion from his educational file/disciplinary records/transcript; (iv) any and all further actions required to return Plaintiff to the status quo ante;

> (iii)      On the third cause of action for breach of contract, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements;

> (iv)      On the fourth cause of action for negligent hiring and retention, a judgment awarding Plaintiff damages in an

amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements;

(v) On the fifth cause of action for negligent infliction of emotional distress, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements;

(vi) On the sixth cause of action for intentional infliction of emotional distress, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements;

(vii) On the seventh cause of action for tortious interference with contract, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements; and

(viii) On the eighth cause of action for violations of the North Carolina State constitution, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages

189

to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements; and

(ix)    Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff herein demands a trial by jury of all triable issues in the present matter.

**Respectfully submitted this 15th day of February, 2023, by:**

**NESENOFF & MILTENBERG, LLP**
*Attorneys for Plaintiff*

**By:**  /s/ *Andrew Miltenberg*
Andrew T. Miltenberg, Esq.
Stuart Bernstein, Esq.
Tara J. Davis, Esq.
363 Seventh Avenue, Fifth Floor
New York, New York 10001
(212) 736-4500
amiltenberg@nmllplaw.com
sbernstein@nmllplaw.com
tdavis@nmllplaw.com
*Pro Hac Vice applications forthcoming*

-and-

**EKSTRAND AND EKSTRAND, LLP**

**By:** /s/  *Robert Ekstrand*
Robert C. Ekstrand, Esq.
N.C. Bar No. 26673
110 Swift Avenue, 2nd Floor
Durham, North Carolina 27705
(919) 416-4590
rce@ninthstreetlaw.com

190

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## ASHEVILLE DIVISION

-------------------------------------------------------------X

**JACOB DOE**

                        **Plaintiff,**

       **-against-**                               **No. 1:23-CV-00041**

**THE UNIVERSITY OF NORTH CAROLINA SYSTEM,** *et al.*

                        **Defendants.**

-------------------------------------------------------------X

## VERIFICATION OF PLAINTIFF

**JACOB DOE**, being duly sworn, deposes and says:

      I am the Plaintiff named in this matter. I have read the annexed complaint, know the contents thereof, and affirm that the factual allegations contained in paragraphs 1-22, 25, 27-828 are true to my knowledge, except as to matters alleged upon information and belief and as to those matters, I believe them to be true.

      Signed under the pains and penalties of perjury, on this 14th day of February 2023.

_____

**JACOB DOE**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION

-------------------------------------------------------------X
JACOB DOE

               **Plaintiff,**

    -against-                           No. 1:23-CV-00041

THE UNIVERSITY OF NORTH CAROLINA
SYSTEM, *et al.*

               **Defendants.**
-------------------------------------------------------------X

## <u>VERIFICATION OF ROBERT C. EKSTRAND</u>

**ROBERT C. EKSTRAND, ESQ.**, being duly sworn, deposes and says:

    I am co-counsel to Plaintiff in this matter and served as Plaintiff's attorney and advisor from the commencement of the administrative procedures through and including the investigations, hearings, and final appeals. As such, I have personal knowledge of the entirety of the University's administrative proceedings against Plaintiff. I have read the annexed complaint, know the contents thereof, and affirm that the information contained the Complaint are true to my knowledge, except as to matters alleged upon information and belief and as to those matters, I believe them to be true.

    Signed under the penalties of perjury, on this 15th day of February 2023.

                                 _____
                                   **ROBERT C. EKSTRAND**