# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION
### CIVIL ACTION NO: 1:23-CV-00041

-------------------------------------------------------------X

JACOB DOE,

                 *Plaintiff*,

      -against-

THE UNIVERSITY OF NORTH CAROLINA
SYSTEM, et al.,

                 *Defendants*.

-------------------------------------------------------------X


## MEMORANDUM OF LAW
## IN SUPPORT OF PLAINTIFF'S MOTION FOR
## A TEMPORARY RESTRAINING ORDER AND
## <u>PRELIMINARY INJUNCTION</u>

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................1

STATEMENT OF THE FACTS ................................................................2

QUESTION PRESENTED........................................................................12

ARGUMENT ............................................................................................13

   I.   Plaintiff is Likely to Succeed on the Merits of his Claims. ...........................14

   II.   Plaintiff will suffer Irreparable Harm if the University is Permitted to Treat its Decisions Below as Final and the Results of the Disciplinary Proceeding are Prematurely Disclosed. ...........................................................................21

   III.   The Balance of Hardships Tips Decidedly In Plaintiff's Favor.................22

   IV.   It is in the Public Interest to Grant the Injunction.....................................23

   V.   A Bond is Not Required. ...........................................................................24

CONCLUSION.........................................................................................25

**Cases**

*AT by HT v. Univ. of N. Carolina,*
 No. 1:16-CV-489, 2016 WL 10586289 n.5 (M.D.N.C. July 7, 2016).........14

*Brzonkala v. Va. Polytechnic Inst. and State Univ.*,
 132 F.3d 949 (4th Cir. 1997)..................................................................................16

*Cantley v. W. Va. Reg'l Jail & Corr. Facility Auth.,*
 771 F.3d 201 (4th Cir. 2014)..................................................................................14

*Centro Tepeyac v. Montgomery County*,
 722 F.3d 184 (4th Cir. 2013)..................................................................................25

*Di Biase v. SPX Corp.*,
 872 F.3d 224 (4th Cir. 2017)..................................................................................15

*Direx Israel, Ltd. v. Breakthrough Med. Corp.*,
 952 F.2d 802 (4th Cir. 1991)..................................................................................14

*Doe v. Baum*,
 903 F.3d 575 (6th Cir. 2018)..................................................................................17

*Doe v. George Washington Univ.,*
 366 F. Supp. 3d 1 (D.D.C. 2018)...........................................................................21

*Doe v. Marymount Univ.*,
 297 F. Supp. 3d 573 (E.D. Va. 2018)............................................................ 17, 18

*Doe v. Washington & Lee University*,
 No. 6:19-cv-00023, 2021 WL 1520001 (W.D. Va. Apr. 17, 2021)....................20

*Doe v. Wood County Bd. of Educ.*,
 888 F. Supp.2d 771 (S.D.W.V. 2012) ...................................................................25

*DTH Media Corp. v Folt,*
 841 S.E.2d 251 (N.C. 2020) .......................................................................... passim

*Frankenmuth Mut. Ins. Co. v. Cadet Constr. Co.*,
 No. 1:19-CV-1125, 2020 WL 2322726 (M.D.N.C. May 11, 2020)....................24

*G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*,
 822 F.3d 709 (4th Cir. 2016)..................................................................................15

*Hughes Network Systems, Inc. v. InterDigital Communication Corp.*,
 17 F.3d 691 (4th Cir. 1994).....................................................................................23

*Kevin M. GUSKIEWICZ, in his official capacity as Chancellor of The University of*
 *North Carolina at Chapel Hill, et al., Petitioners, v. DTH MEDIA*
 *CORPORATION, et al., Respondents.*,
 2020 WL 6162030 (U.S.) 21 ..................................................................................24

*Kowalski v. Chicago Tribune Co.*,
 854 F.2d 168 (7th Cir.1988)...................................................................................14

*Lab'y Corp. of Am. Holdings v. Kearns*,
    84 F. Supp. 3d 447 (M.D.N.C. 2015) ..................................................................23
*Legend Night Club v. Miller*,
    637 F.3d 291 (4th Cir. 2011) ..............................................................................25
*Menaker v. Hofstra Univ.*,
    935 F.3d 20 (2d Cir. 2019) ...................................................................................21
*Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*,
    22 F. 3d 546 (4th Cir. 1994) ................................................................................23
*Norris v. Univ. of Colo.*,
    362 F. Supp. 3d 1001 (D. Colo. 2019) ........................................................ 17, 18
*NovaQuest Cap. Mgmt., L.L.C. v. Bullard*,
    498 F. Supp. 3d 820 (E.D.N.C. 2020) ................................................................24
*Pashby v. Delia*,
    709 F.3d 307 (4th Cir. 2013) ..............................................................................14
*Pashby v. Delia*,
    709 F.3d at 332 ....................................................................................................26
*Roberts v. U.S. Jaycees*,
    468 U.S. 609 (1984) ............................................................................................25
*Roe v. Dep't of Def.*,
    947 F.3d 207 (4th Cir. 2020) ..............................................................................24
*Sheppard v. Visitors of Virginia State University*,
    993 F.3d 230 (4th Cir. 2021) ...................................................................... 16, 22
*The Real Truth About Obama, Inc. v. FEC*,
    575 F.3d 342 (4th Cir. 2010) ..............................................................................14
*Univ. of Tex. v. Camenisch*,
    451 U.S. 390 (1981) ............................................................................................16
*Winter v. Natural Resources Defense Council, Inc.*,
    555 U.S. 7 (2008) ................................................................................................14
*Yusuf v. Vassar College*,
    35 F.3d 709 (2d Cir. 1994) ........................................................................ 16, 17, 22

**Rules**

Fed. R. Civ. P. 65(c) ...................................................................................................26

**INTRODUCTION**

Recently, the Supreme Court of North Carolina determined that under the state public records law, North Carolina's public universities must disclose to the press some disciplinary records relating to students found to have violated sexual assault policies. *DTH Media Corp. v Folt*, 841 S.E.2d 251 (N.C. 2020), *cert denied*, 141 S. Ct 1126 (2021). There is no guidance in this decision, or any subsequent holdings, discussing the timing of the disclosure, whether such disclosure should be withheld pending a federal litigation that challenges the outcome of a disciplinary administrative proceeding, or whether a judicial order setting aside the disciplinary findings as unlawful negates a disclosure obligation. As such, the limited issue of the timing of disclosure is a matter of first impression.

Plaintiff, a male Sophomore student, was the subject of a targeted campaign by four female students, to harm him through vicious false accusations, mainly concerning claims of sexual misconduct and assault. The University of North Carolina at Chapel Hill ("UNC" or the "University"), instead of investigating the source of the complaints or the veracity of the allegations, immediately suspended Plaintiff, and subjected him to faulty, biased and unfair investigations, hearings and appeals processes, in violation of federal and state law and the guidelines set by UNC's Policies on Title IX and on prohibited discrimination, harassment and related misconduct. The erroneous outcomes

1

that stemmed therefrom resulted in Plaintiff's permanent expulsion from the entire UNC System.

Plaintiff has filed a Verified Complaint seeking a reversal of UNC's findings and sanctions based in part on gender discrimination, in violation of Title IX. (ECF No. 1) As Plaintiff is likely to succeed on the merits of the case and his reputation, future education and employment will be irreparably harmed if disclosure of the outcome of UNC's flawed process comes to light, Plaintiff is seeking a temporary restraining order and injunction, to stay the disclosure of his name and disciplinary records to the press and the public, until a final determination is made in this federal lawsuit. Respectfully, if the disclosure is permitted now, even if this Court later reverses UNC's findings and sanctions, such a decision will not be able to undo the harm caused to Plaintiff by the disclosure. Conversely, a delay in the disclosure of the disciplinary findings causes no harm to UNC, its students, the media or the public at large.

## STATEMENT OF THE FACTS

The merits of this case and the irreparable harm that would result from a premature disclosure of Plaintiff's disciplinary records are supported by the Declaration of Robert C. Ekstrand, Esq. in Support of Plaintiff's Pseudonym Motion (ECF No. 3-1) ("Ekstrand Decl."), and Plaintiff's Verified Complaint (ECF No. 1). Mr. Ekstrand has personal knowledge of the facts summarized below as he represented Plaintiff and acted as Plaintiff's Advisor from the commencement of administrative procedures through and

including the investigations, hearings and final appeals. Ekstrand Decl., ¶ 2. The Ekstrand Declaration and the Verified Complaint establish that throughout the investigations, adjudications and appeals of the complaints against Plaintiff, Defendants failed to abide by the guidelines set by UNC's Policy and acted in violation of federal and state law.

The administrative proceedings arise out of a joint complaint filed by four female UNC students, who collectively asserted that Plaintiff engaged in non-consensual sexual acts with them. Ekstrand Decl., ¶ 6. The egregious tactics employed by UNC in its investigation and adjudication of Plaintiff are too numerous to include in a succinct summary. The facts provided herein are examples of the most egregious and glaring violations, biases, and flaws that are known to the Plaintiff, and in and of themselves support the relief sought in Plaintiff's Verified Complaint and through the within motion.

Without any investigation into the source of the complaints or the veracity of the allegations, UNC immediately suspended Plaintiff.[1] Ekstrand Decl., ¶ 7. The complaints were a coordinated campaign by four female students who were part of a common friend group. *Id*. One of the female students who led the effort to file a "joint complaint" admitted that she organized the complaints to ostracize Plaintiff from his friends, have him excluded from his fraternity, and have his prestigious scholarship revoked. *Id.*

---

[1] While the decision to suspend Plaintiff was ostensibly for the protection of the university community against the "danger" he posed, the university made the suspension effective after Plaintiff completed his spring 2021 final exams.

3

After the suspension, which was issued without process, UNC unlawfully refused to provide Plaintiff critical information when he could have used such information in support of his defense. Ekstrand Decl., ¶ 8.

By way of example, UNC withheld from Plaintiff communications from one of the accusers in July of 2021 reporting that the private investigator hired by Plaintiff's attorney interviewed her at her home and allegedly engaged in harsh investigative tactics. The investigator's interview with the UNC Investigators contradicted the accuser's claims. But UNC did not advise Plaintiff or his attorney of the accuser's claims. Instead, the Equal Opportunity and Compliance Office (the "EOC") reported these claims to the Emergency Evaluation and Action Committee ("EEAC")[2] in *ex parte* communications, and even withheld issuing the Notice of Investigation of these allegations to Plaintiff until after the EEAC denied Plaintiff's petition seeking permission to participate in the courses he was registered to take in the fall of 2021. Cmplt., ¶¶ 311-323.

In fact, the first time Plaintiff was notified of the possibility of any alleged impropriety on the part of his lawyer's investigator was during the EEAC hearing on that

---

[2] Prior to notice being issued to a responding party, the EEAC determines whether a responding party poses a danger to themselves, or other members of the University community, or to University property. If any of these conditions exist, they may impose a number of measures pending the conclusion of the resolution process, including but not limited to, an emergency removal referred to as a "summary suspension," if the EEAC finds "an immediate threat to the physical health or safety of any individual arising from the allegations of Sexual Harassment that justifies removal."

4

very petition.  Cmplt., ¶ 315.  Members of the EEAC were fully briefed on the allegations and questioned Plaintiff about them. Cmplt., ¶¶ 311, 315-317.  After the EEAC refused Plaintiff's petition to participate (even remotely) in his fall 2021 courses, the EOC issued its Notice of Investigation disclosing the accuser's false claims about the interview with Mr. Ekstrand's investigator.  Cmplt. ¶ 323.  Worse still, in order to charge Plaintiff with "Retaliation" for the alleged conduct of his lawyer's investigator, the EOC fabricated a new policy, adding words to the existing retaliation policy in order to create a form of double vicarious liability, because the actual policy would only cover retaliatory conduct of the accused, or of others acting at the direction of the accused.  Cmplt., ¶¶ 329-330.

After the hearings concluded and Plaintiff's appeals were submitted, the University disclosed another illustrative body of *ex parte* communications that prejudiced the panel which decided whether to continue the interim suspension against Plaintiff. Specifically, in the weeks leading up to the hearing on Plaintiff's petition to take courses in the fall of 2021, the EOC alerted the accusers that Plaintiff had filed a petition to resume classes.  Cmplt., ¶¶ 335-336.  In response, the lead accuser and one other collaborated to fabricate a fantastic lie about Plaintiff's conduct during the summer, while the EEOC's suspension was in effect.  *Id.* In July of 2021, the two accusers wrote to the EOC falsely claiming that Plaintiff bragged about having a gun, stating that they believed Plaintiff had broken into his room at the fraternity house over the summer, and that he was threatening

some of his fraternity brothers in emails to the point that some of the members were afraid Plaintiff would come after them. Cmplt., ¶ 335; Ekstrand Decl., ¶ 9.

The foregoing was all demonstrably false because Plaintiff has never owned a gun, he was working at a camp in New Hampshire over the summer where he could not leave the camp because of Covid-19 restrictions, and he had copies of the emails he sent to his, then, fall semester roommates and others that were anything but threatening. Cmplt., ¶¶ 337, 478; Ekstrand Decl., ¶ 10. Yet, unbeknownst to Plaintiff, the EOC, in *ex parte* communications with the EEAC, reported these outrageous allegations to the EEAC Chairwoman prior to the EEAC's hearing on Plaintiff's petition to modify his interim suspension and permit him to take fall courses. Cmplt. ¶¶ 340-341.

Mr. Ekstrand requested all evidence regarding Plaintiff's interim suspension before the interim suspension hearing in August 2021, before the hearings on the merits began in January 2022, throughout the merits hearings, and after the hearings concluded in May 2022. Ekstrand Decl., ¶ 12. However, the University did not produce the emails revealing all of this information until after Plaintiff's appeals were submitted, in June 2022. Ekstrand Decl., ¶ 13. Plaintiff never had an opportunity to refute this outlandish claim in any of his hearings because the EOC never disclosed it – or produced any of the emails communicating it – to the Plaintiff until after all four hearings were concluded nine months later. Cmplt., ¶ 342; Ekstrand Decl., ¶ 13.

UNC also failed to advise Plaintiff that the lead accuser, along with her co-accuser, had requested a withdrawal of their complaints shortly after the initial interim suspension was imposed, until months after the hearings were concluded and the spring 2022 courses had already started. Cmplt., ¶ 762; Ekstrand Decl., ¶ 14. Despite their requests to withdraw their complaints in June 2021, UNC only allowed a partial withdrawal, permitting UNC to continue their flawed investigations, designed to reach the predetermined conclusion that Plaintiff was responsible. *Id.* It was clear throughout the administrative process that UNC was acting solely on behalf of the four female accusers, even as evidence of their fraud mounted, rather than as a neutral arbiter. *Id.*

The text messages and documentary evidence, along with witness testimony, refuted the allegations that Plaintiff's sexual relations with three of the female accusers was non-consensual, and disproved that any sexual contact ever occurred with the fourth female accuser. Ekstrand Decl., ¶ 15. Moreover, Plaintiff's polygraph test results concerning each matter further corroborated his account of the events. *Id.* UNC utterly ignored Plaintiff's evidence, refused to produce exculpatory materials in its possession or collect contemporaneous communications from the accusers that would belie their claims, and continuously skewed the investigations and hearings to impair Plaintiff's defense and assist the female accusers. *Id.*

At the first hearing which resulted in a finding of responsibility against Plaintiff (the Jane Roe 1 hearing), the Hearing Panel allowed the female accuser's attorney to

respond to cross-examination questions on her behalf when she inexplicably walked out early on in the hearing, after providing testimony on direct-examination, depriving Plaintiff of the ability to fully cross-examine her with documentary evidence that unequivocally showed the falsity of her statements. Cmplt., ¶ 762; Ekstrand Decl., ¶ 16.

Also at the hearing, and without any prior notice to Plaintiff, the Hearing Panel permitted a change in the date of alleged incident from November 19, 2020 to November 12-13, 2020, after the complainant admitted that no sexual contact occurred with Plaintiff on November 19, 2020. Cmplt., ¶ 762; Ekstrand Decl., ¶ 17. Rather than dismissing the complaint and the underlying Notice of Investigation, the University chose to proceed with the hearing on the new charges against Plaintiff, despite the lack of any pre-hearing notice and in disregard of the fact that he had spent the prior ten months obtaining evidence and establishing a defense to refute the complainant's claims regarding the events of November 19. Cmplt., ¶ 762; Ekstrand Decl., ¶ 18.

The EOC provided the Hearing Panel an investigation file that included scores of references to the false accusations brought by the other accusers and unknown others, despite a prior agreement with Defendant Hall that all such references would be redacted. Ekstrand Decl., ¶ 19.

The Hearing Panel chose to find Plaintiff responsible despite the accuser's disappearance from the "Zoom" hearing, a litany of documented lies she told the Investigators about Plaintiff, and conflicting evidence from her witness. Ekstrand Decl.,

¶ 20.   The Panel inexplicably opined in its decision that it *relied on* the accuser's admission that she lied to the Investigators because it made her "more credible."  Cmplt., ¶¶ 416, 735; Ekstrand Decl., ¶ 20.  The Panel failed to consider that the accuser quit the hearing in lieu of being confronted with Plaintiff's evidence showing she lied to the Investigators about Plaintiff in many other instances or Plaintiff's evidence refuting her new accusation.  Ekstrand Decl., ¶ 20.

As to the second hearing in which Plaintiff was ultimately found responsible (the Jane Roe 4 hearing), Plaintiff denied any sexual contact with the accuser and there was no evidence presented throughout the investigation or hearing establishing any sexual contact between Plaintiff and this accuser ever occurred, other than the accuser's constantly changing story.  Cmplt., ¶¶ 507-508; Ekstrand Decl., ¶ 21.  In fact, the accuser never showed up for the "Zoom" hearing[3] and the only witness who testified, the Plaintiff, denied ever touching her or attempting sexual relations.  *Id.*

Prior to the hearing, the Hearing Officer, who was brought in to serve from another institution, and himself admitted that he was not familiar with UNC's policies, issued an initial ruling that barred Plaintiff from presenting any evidence that was relevant to the female accuser's credibility, a significant error that contributed to the erroneous outcome.

---

[3] This was after the accuser caused the hearing to be postponed by falsely claiming she had a "medical emergency" that prevented her from participating in the hearing. There was no medical emergency; rather, the accuser's own posts to her social media accounts revealed that the, during the weekend before her hearing, she sustained a black eye and bruised knees in a drunken fight at a fraternity party.

9

Cmplt., ¶ 496; Ekstrand Decl., ¶ 22. In this particular case, there was voluminous evidence of the accuser's propensity to lie. One of her own witnesses described her as "the most unreliable narrator that I've ever met" and "a very big gaslighter", a claim he backed up with several detailed illustrative examples of the accuser's habit of evading responsibility for her own wrongdoing, "twisting the truth towards her favor," and fabricating false claims about the individuals who are harmed by her conduct including her roommates and sorority sisters. Cmplt., ¶ 518; Ekstrand Decl., ¶ 23.

In reaching its determination, the Panel improperly relied upon what they claimed was a contemporaneous disclosure, made by the accuser to a friend following the alleged incident in June of 2020. However, a copy of the supposed disclosure was never provided to the Investigators, and neither the accuser nor her friend appeared at the hearing to testify as to the existence of such a disclosure. Cmplt., ¶¶ 513-516; Ekstrand Decl., ¶ 24. Notably, the Panel did not specify what the precise contemporaneous disclosure was, nor was there any evidence admitted or presented corroborating a contemporaneous disclosure. *Id*. Thus, the Panel improperly relied on non-existent and manufactured evidence in finding the Plaintiff responsible for sexual misconduct. *Id*. Moreover, UNC ignored the results of Plaintiff's polygraph test, which corroborated his consistent denials of the false accusations. Ekstrand Decl., ¶ 24.

Despite there being no evidence of wrongdoing on the part of the Plaintiff, and notwithstanding the failure of the accusers to participate in the process or present reliable

10

evidence supporting their allegations, Plaintiff was ultimately found responsible in two hearings for violating Title IX and UNC's policy on prohibited discrimination, harassment and related misconduct. Consequently, he was permanently expelled from the entire University of North Carolina System. Cmplt., ¶ 7; Ekstrand Decl., ¶ 25.

Plaintiff appealed the findings of the two Hearings from which he was found "responsible," and his appeals were denied on August 3 and August 17, 2022. Cmplt., ¶¶ 533, 535; Ekstrand Decl., ¶ 26. Plaintiff thereafter appealed both matters to the Board of Trustees, on September 14, 2022. Cmplt., ¶ 542; Ekstrand Decl., ¶ 26. Those appeals were denied on February 14, 2023. Cmplt., ¶ 549; Ekstrand Decl., ¶ 26. Plaintiff has now exhausted the administrative process and is seeking relief through this federal litigation. Cmplt., ¶ 549; Ekstrand Decl., ¶ 27.

It is alleged in the Verified Complaint and in the Ekstrand Declaration that throughout the investigation, adjudication and appeal of the allegations against Plaintiff, Defendants failed to abide by the guidelines set by UNC's Policy and acted in violation of federal and state law. A comprehensive factual summary supporting Plaintiff's request for relief is provided in the Verified Complaint. The Verified Complaint seeks relief for violations of Title IX of the Education Amendments of 1972, violation of Fourteenth Amendment Procedural Due Process, breach of contract, and other state law claims.

Plaintiff has been severely damaged by the Defendants' actions as his education and future have been severely compromised due to the biased, flawed and unjust

11

procedures that resulted in Plaintiff's expulsion. Cmplt., ¶¶ 553-561; Ekstrand Decl., ¶ 29. Plaintiff has also suffered severe physical, psychological and emotional distress and irreversible harm to his reputation. *Id.* This motion seeks to prevent further irreparable harm to the Plaintiff through the premature disclosure of the flawed disciplinary findings and sanction.

## QUESTION PRESENTED

Question:    Should this Court issue a temporary restraining order and preliminary injunction to prevent the disclosure of the findings of Plaintiff's disciplinary hearings, or any other information related thereto, until such time as a final determination is made in this litigation?

Answer:    Yes. It is likely that the findings of responsibility and sanction against Plaintiff, which derive from biased, flawed, and unjust processes conducted by the Defendants, will be reversed. The premature disclosure of Plaintiff's name and the outcome of the biased and flawed hearings will cause irreparable harm and cannot be undone or remedied if this Court finds UNC to have violated Plaintiff's rights and reverses the administrative findings and sanction. Conversely, a delay in the disclosure of such damning information until Plaintiff has had an opportunity to fairly litigate the findings and sanction poses no harm to the Defendants. Notably, UNC opposed the disclosure of information from its disciplinary proceedings in the matter of *DTH Media Corp.*, 841 S.E.2d 251, 263, on the basis that such disclosure would, among other things,

"jeopardize the safety of students found responsible during the Title IX process by placing them at risk for retribution."

## ARGUMENT

Plaintiff's motion for a temporary restraining order and preliminary injunction, which seeks to maintain the status quo and prevent irreparable harm during the pendency of this lawsuit, should be granted because the facts, as discussed herein, satisfy the requirements for such relief under the standard set forth in *Winter v. Natural Resources Defense Council, Inc.,* 555 U.S. 7, 20 (2008), and as recognized by the Fourth Circuit in *Pashby v. Delia,* 709 F.3d 307, 320 (4th Cir. 2013).

Parties seeking a temporary restraining order and preliminary injunction must make a "clear showing" of four prerequisites: "(1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm, (3) the balance of hardships tips in their favor, and (4) the injunction is in the public interest." *Pashby v. Delia,* 709 F.3d at 320 (*citing Winter,* 555 U.S. at 20).[4] The court must "separately consider each *Winter* factor to determine whether each factor has been "satisfied as articulated." *Id.* at 320-321, (*citing The Real Truth About Obama, Inc. v. FEC*, 575 F.3d

---

[4] "A request for a preliminary injunction is evaluated in accordance with a 'sliding scale' approach: the more the balance of irreparable harm inclines in the plaintiff's favor, the smaller the likelihood of prevailing on the merits he need show in order to get the injunction." *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 813 (4th Cir. 1991), citing *Kowalski v. Chicago Tribune Co.,* 854 F.2d 168, 170 (7th Cir.1988).

13

342, 347 (4th Cir. 2010), *reversed on other grounds*). *See also Cantley v. W. Va. Reg'l Jail & Corr. Facility Auth.,* 771 F.3d 201, 207 (4th Cir. 2014); *AT by HT v. Univ. of N. Carolina,* No. 1:16-CV-489, 2016 WL 10586289, at *3 n.5 (M.D.N.C. July 7, 2016).

The North Carolina Supreme Court, in *DTH Media Corp.*, 841 S.E.2d 251, does not provide any guidance as to the timing by which disclosure of the final results of a disciplinary proceeding should occur. While the burden to the movant seeking a TRO and Preliminary Injunction is high, given the silence in the law as to the timing of disclosure, the minimal effect that it would have on the public if the disclosure is delayed in comparison to the significant harm that will result to Plaintiff from premature disclosure, it is respectfully submitted that a stay of disclosure should be granted pending the outcome of this case. Plaintiff is simply seeking to maintain the status quo by preventing the disclosure of his identity and the results of the disciplinary administrative proceedings until such time as this matter is decided before this Court because the irreparable harm from premature disclosure cannot be undone.

## I. **Plaintiff is Likely to Succeed on the Merits of his Claims.**

To demonstrate a likelihood of success on the merits, "[a] plaintiff need not establish a certainty of success, but must make a clear showing that he is likely to succeed at trial." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (internal quotations omitted). Motions for preliminary injunction are "governed by less strict rules of evidence." *G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709, 725 (4th Cir. 2016). Because

"the purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held" and "given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Id.* (*quoting Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)).

Here it is claimed, in part, that UNC's decision to discipline Plaintiff was an erroneous outcome and was motivated by gender bias. "Title IX unquestionably prohibits federally supported educational institutions from practicing 'discrimination' on the basis of sex." *Brzonkala v. Va. Polytechnic Inst. and State Univ.*, 132 F.3d 949, 957 (4th Cir. 1997), *rev'd en banc on other grounds*, 169 F.3d 820 (4th Cir. 1999). The Fourth Circuit addressed the standard necessary to claim relief under Title IX in the context of a motion to dismiss in *Sheppard v. Visitors of Virginia State University*, 993 F.3d 230 (4th Cir. 2021), wherein it held that to state a claim for relief under Title IX, a plaintiff must allege facts that "raise a plausible inference that the university discriminated against [the student] on the basis of sex." The existence of substantial and particularized "procedural flaws" in proceedings "affecting the proof" demonstrates a genuine issue of material fact as to whether there was discrimination on the basis of sex. *Id.* at 236 (discussing the "erroneous outcome" theory identified in *Yusuf v. Vassar*

*College*, 35 F.3d 709, 715 (2d Cir. 1994) and holding that such theory may suffice to state a claim with sufficient facts).

Pleading sufficient facts which cast some articulable doubt on the accuracy of the outcome of a Title IX disciplinary proceeding is "not a significant barrier to cross" and can be established in a number of ways including: pointing to procedural flaws in the investigatory and adjudicative processes; noting inconsistencies or errors in the adjudicator's oral or written findings; or challenging the overall sufficiency and reliability of the evidence. *Doe v. Marymount Univ.*, 297 F. Supp. 3d 573, 584 (E.D. Va. 2018); *Norris v. Univ. of Colo.*, 362 F. Supp. 3d 1001, 1011 (D. Colo. 2019); *Yusuf*, 35 F. 3d at 715. Allegations that a plaintiff was not provided a right of cross-examination when credibility was at stake is also sufficient to cast some articulable doubt on the accuracy of a disciplinary proceeding's outcome. *Doe v. Baum*, 903 F.3d 575 (6th Cir. 2018) (where the outcome of a university disciplinary proceeding depends on credibility, an accused has a constitutional due process right to "some form of cross-examination" of the accuser at an in-person hearing). As are "particular evidentiary weaknesses behind the finding of an offense such as motive to lie on the part of a complainant or witnesses." *Norris*, 362 F. Supp. 3d at 1011.

Gender bias can be inferred from the manner in which university officials treat a male Title IX respondent as compared to the female complainant(s), including allegations that exculpatory evidence was overlooked in favor of finding the male responsible for

Title IX violations.  *Marymount U.*, 297 F. Supp. 3d at 586-587. *See Norris*, 362 F. Supp. 3d at 1012-1013.

In this case, the facts provided in the Verified Complaint and the Ekstrand Declaration, sufficiently raise a plausible inference that UNC discriminated against Plaintiff when it found him responsible for violating UNC's Policy on Prohibited Sexual Harassment Under Title IX and UNC's Policy on Prohibited Discrimination, Harassment and Related Misconduct, resulting in a sanction of expulsion.  UNC accepted the female students' accusations as true and operated under a presumption of guilt against Plaintiff, a male student, from the moment the complaints were filed, when it issued an interim suspension without any investigation into the veracity of the accusations.  Examples of UNC's disparity in treatment throughout the proceedings include, but are not limited to:

- The withholding of information and evidence from Plaintiff throughout the proceedings, including access to complaints and evidence;

- The withholding of information concerning the formal withdrawal of complaints by two complainants for more than six months, and not until after conclusion of the hearings on the formally withdrawn complaints;

- Reliance on demonstrably false allegations that Plaintiff threatened individuals with a gun even though he did not own a gun and was not even in the State at the time (Plaintiff was not informed of this allegation until all four hearings concluded, despite UNC using it as a basis to continue the interim suspension);

- Plaintiff was not given a proper opportunity to cross-examine his accusers for the matters in which he was found responsible, despite clear credibility concerns;

17

- The Hearing Panel's reliance on non-existent documentary evidence, that was never provided nor disclosed by one of the accusers, to support its finding that Plaintiff was responsible for a policy violation;

- UNC allowed a change in the date of the alleged incident concerning one of the complaints during the course of the hearing, after a ten-month long investigation, and did not allow Plaintiff time to investigate or present evidence concerning the newly alleged date;

- UNC failed to consider and overlooked evidence presented by Plaintiff, including his testimony, favorable polygraph testing results, text messages, and character evidence, even when such evidence was the only evidence available to the Hearing Panel;

- In one of the two hearing wherein Plaintiff was found responsible, UNC improperly allowed an attorney to testify in place of the accuser after she inexplicably left the hearing early, before Plaintiff had an opportunity to cross-examine her on critical evidence. UNC denied Plaintiff the right to question the accuser's character and gave no weight to Plaintiff's evidence, including a favorable polygraph test;

- In the other Hearing that resulted in an adverse finding, Plaintiff was found responsible despite no adverse witness testimony or presentation of evidence. Once again, the Panel ignored Plaintiff's evidence and a favorable polygraph test.

These only scratch the surface of the violations committed by UNC which resulted in the erroneous findings and sanction.

A recent case, relying on the Fourth Circuit holding in *Sheppard*, opined that a university hearing panel's determination of responsibility based on biased assumptions and findings that a female's testimony is "more credible" than a male's testimony, raises an inference of gender bias. *Doe v. Washington & Lee University*, No. 6:19-cv-00023, 2021 WL 1520001, at *13 (W.D. Va. Apr. 17, 2021). In the instant case, it is clear that

18

UNC gave no credit to Plaintiff's testimony or evidence because he is a male and instead found against him despite a lack of evidence of any sexual or wrongful misconduct on his part. UNC instead unfairly determined responsibility based on unfounded accusations in the complaints, even after two were formally withdrawn and despite the existence of evidence establishing the falsity of the female students' accusations.

Moreover, the University's actions and decision-making in its handling of the complaints against Plaintiff were informed by ongoing external and internal pressures on UNC to aggressively pursue complaints of sexual misconduct against male students, further establishing a likelihood of success on his gender bias claim. In the Verified Complaint, Plaintiff details a series of events beginning in 2013, during which UNC became the subject of scrutiny and criticism. These events include the public discussions initiated by current and former students regarding the University's improper handling of their sexual assault complaints, investigations conducted by the Office for Civil Rights into whether UNC mishandled student sexual assault and harassment complaints, the release of a documentary which exposed the University's mishandling of assault claims, and the Department of Education's findings letter in response to OCR's investigation which concluded that UNC violated Title IX due its mishandling of sexual assault complaints. Cmplt., ¶¶ 640-670.

Each of the foregoing contributed to increased activism and negative media attention surrounding the University, which in turn, has created additional pressure on

the University to aggressively pursue and punish male students accused of misconduct. *See Menaker v. Hofstra Univ.,* 935 F.3d 20, 33 (2d Cir. 2019) ("[W]hen combined with clear procedural irregularities in a university's response to allegations of sexual misconduct, even minimal evidence of pressure on the university to act based on invidious stereotypes will permit a plausible inference of sex discrimination. . . . [W]here a university (1) takes an adverse action against a student or employee, (2) in response to allegations of sexual misconduct, (3) following a clearly irregular investigative or adjudicative process, (4) amid criticism for reacting inadequately to allegations of sexual misconduct by members of one sex, these circumstances provide the requisite support for a prima facie case of sex discrimination."); *see also Doe v. George Washington Univ.,* 366 F. Supp. 3d 1 (D.D.C. 2018) (Male university student sufficiently alleged causal connection between allegedly erroneous outcome in disciplinary proceedings against him for sexual assault and gender bias on part of university where university faced public pressure regarding its handling of female students' sexual assault claims from federal investigations, public protests, and female students, including plaintiff's accuser, and that in response, university issued a statement as proof of its commitment to combatting sexual assault.)

Plaintiff has clearly alleged facts sufficient to establish gender bias under the standard set forth in *Sheppard*, 993 F.3d 230 and the "erroneous outcome" framework articulated in *Yusuf*, 35 F.3d 709. Accordingly, such facts surely demonstrate a

likelihood of success on the merits sufficient to warrant the entry of a TRO and preliminary injunction against the disclosure of information concerning the disciplinary findings and sanction against Plaintiff to the public or the media pending the outcome of this case.

## II.    Plaintiff will suffer Irreparable Harm if the University is Permitted to Treat its Decisions Below as Final and the Results of the Disciplinary Proceeding are Prematurely Disclosed.

The substantial harm suffered by Plaintiff as a result of the biased proceedings, resulting in findings of sexual misconduct and a sanction of expulsion is devastating, and without immediate intervention, the publication of any information concerning the findings and sanction of the biased and flawed proceedings will unquestionably cause extreme irreparable harm to Plaintiff's reputation, education and employment opportunities.

It is well established that a showing of irreparable harm requires a Plaintiff to demonstrate that he is subject to a continuing harm that cannot be adequately addressed by final relief on the merits and for which "monetary damages are difficult to ascertain or are inadequate." *Lab'y Corp. of Am. Holdings v. Kearns*, 84 F. Supp. 3d 447, 463 (M.D.N.C. 2015) (citing *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F. 3d 546, 551–52 (4th Cir. 1994)).

It is well understood that harm is irreparable when it cannot be cured by a monetary award. *See, Hughes Network Systems, Inc. v. InterDigital Communication*

*Corp.*, 17 F.3d 691 (4th Cir. 1994). The premature disclosure of the disciplinary information against Plaintiff, associating him with violations of sexual misconduct or abuse, will be devastating and incurable. Assuming that this Court reverses the University's finding and Plaintiff is able to return to UNC, his safety at the school will be in jeopardy, he will be at risk for retribution, and his future career prospects will be severely limited by the falsely publicized misinformation. UNC itself acknowledged the very fact of irreparable harm that students would face with such disclosure in *DTH Media Corp.*, (841 S.E.2d 251, 263), recognizing that "[r]esponsible students who are named publicly may be subject to severe harassment and retribution . . . [s]ome of these students may face threats to their immediate physical safety. . . [o]thers may suffer lifelong stigma despite never having been found guilty in a formal court proceeding. *Kevin M. GUSKIEWICZ, in his official capacity as Chancellor of The University of North Carolina at Chapel Hill, et al., Petitioners, v. DTH MEDIA CORPORATION, et al., Respondents*., 2020 WL 6162030 (U.S.) 21. Therefore, any information relating to the disciplinary proceedings, finding and sanction against Plaintiff must be withheld pending the outcome of this litigation, because the alternative is devastating and irreparable to Plaintiff.

### III.     The Balance of Hardships Tips Decidedly In Plaintiff's Favor.

In assessing this factor, a court must consider the burdens that would be imposed on the moving party and the non-moving party if the injunction were granted. *See Roe v. Dep't of Def.*, 947 F.3d 207, 231 (4th Cir. 2020). Where granting an injunction would

have little impact on the non-moving party, but denying the relief sought would cause great harm to the moving party, this factor weighs in favor of granting the injunction. *See NovaQuest Cap. Mgmt., L.L.C. v. Bullard*, 498 F. Supp. 3d 820 (E.D.N.C. 2020); *Frankenmuth Mut. Ins. Co. v. Cadet Constr. Co.*, No. 1:19-CV-1125, 2020 WL 2322726, at *5 (M.D.N.C. May 11, 2020).

The balance of hardships in this case weighs decidedly in Plaintiff's favor. UNC has never taken the position in prior cases that a stay of disclosure of disciplinary findings and sanctions against a student places a burden on UNC. In fact, UNC has been a supporter of confidentiality of these proceedings for the safety of its students and the integrity of the administrative process. Therefore, UNC cannot argue now that it would be impacted by a delay of disclosure pending the outcome of this litigation.

Conversely, as discussed in section II, the burden to Plaintiff if the TRO and preliminary injunction is denied is significant and will negatively harm him throughout his life, even if the findings and sanction are ultimately reversed. The requested injunction sought by the Plaintiff will temporarily restrict the disclosure of information until such time as this case is decided, after which disclosure will be determined by the outcome of this case.

## IV. It is in the Public Interest to Grant the Injunction.

It is always in the public interest to enforce and uphold constitutional rights. *Centro Tepeyac v. Montgomery County*, 722 F.3d 184, 191(4th Cir. 2013); *Legend Night*

*Club v. Miller*, 637 F.3d 291, 303 (4th Cir. 2011). The "public interest is certainly served by promoting compliance with Title IX." *Doe v. Wood County Bd. of Educ.*, 888 F. Supp.2d 771 (S.D.W.V. 2012). Antidiscrimination laws prohibiting sex discrimination serve "compelling state interests of the highest order." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 624 (1984). Therefore, the public, as well as Plaintiff, have a shared interest in ensuring that Title IX rights are properly protected. Moreover, there is a public interest in ensuring the accuracy of the disclosures permitted by the holding in *DTH Media Corp. v Folt.*

In furtherance of protecting Plaintiff's constitutional rights against gender bias, it is crucial that the information concerning the biased and flawed disciplinary proceedings be enjoined from disclosure until such time as a final determination is made in this lawsuit.

## V.   **A Bond is Not Required.**

Federal Rule of Civil Procedure 65(c) provides that a "court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." However, "the district court retains the discretion to set the bond amount as it sees fit or waive the security requirement." *Pashby v. Delia*, 709 F.3d at 332. Plaintiff submits that no bond is required here as Defendants will not suffer any material damage, nor be exposed to the likelihood

of any harm, if the requested preliminary injunction is granted. Therefore, Plaintiff submits that he should not be required to post any bond/security as part of this motion.

## **CONCLUSION**

For the reasons stated above, the Court should grant a temporary restraining order and preliminary injunction (i) enjoining Defendants from releasing or disclosing any information concerning the disciplinary proceedings that are the subject of this lawsuit; (ii) requiring Defendants to direct all individuals, including but not limited to employees and students, over whom they exercise control to refrain from publishing or disclosing any information concerning Plaintiff, the disciplinary proceedings, or the outcomes of such proceedings; and (iii) requiring UNC to inform any media outlet, or any other third party, that receives information concerning Plaintiff's disciplinary outcome about the filing of this motion for a temporary restraining order and preliminary injunction, and notifying such media outlets or other third party, that they are prohibited from publishing any information concerning Plaintiff, the disciplinary proceedings, or the outcomes of such proceedings.

**[signature page to follow]**

25

DATED: New York, New York
      October 6, 2023

                    Respectfully submitted,

                    **NESENOFF & MILTENBERG, LLP**
                    ***Attorneys for Plaintiff***

                    **By:**  */s/ Andrew Miltenberg*
                        Andrew T. Miltenberg, Esq.
                        Stuart Bernstein, Esq.
                        Tara J. Davis, Esq.
                        363 Seventh Avenue, Fifth Floor
                        New York, New York 10001
                        (212) 736-4500
                        amiltenberg@nmlllaw.com
                        sbernstein@nmlllaw.com
                        tdavis@nmlllaw.com

                        -and-

                    **EKSTRAND AND EKSTRAND, LLP**

                    **By:** */s/  Robert Ekstrand*
                        Robert C. Ekstrand, Esq.
                        110 Swift Avenue, 2nd Floor
                        Durham, North Carolina 27705
                        (919) 416-4590
                        rce@ninthstreetlaw.com