**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 24-1301**

———————

JACOB DOE

        Plaintiff - Appellee

v.

THE UNIVERSITY OF NORTH CAROLINA SYSTEM; UNIVERSITY OF
NORTH CAROLINA AT CHAPEL HILL; UNIVERSITY OF NORTH
CAROLINA AT CHAPEL HILL BOARD OF TRUSTEES, f/k/a University of
North Carolina Board of Trustees; BOARD OF GOVERNORS OF THE
UNIVERSITY OF NORTH CAROLINA; LEE H. ROBERTS, f/k/a Kevin
Guskiewicz, in his official capacity; ELIZABETH HALL, individually and in her
official capacity; JEREMY ENLOW, individually and in his official capacity; BETH
FROEHLING, individually and in her official capacity; REBECCA GIBSON,
individually and in her official capacity; JACLYN FEENEY, individually and in her
official capacity; DAVID ELROD, individually and in his official capacity;
DESIREE RIECKENBERG, individually and in her official capacity

        Defendants - Appellants.

———————

Appeal from the United States District Court for the Western District of North Carolina, at
Asheville.  Martin K. Reidinger, Chief District Judge.  (1:23−cv−00041−MR)

———————

Argued:  January 28, 2025                Decided:  April 4, 2025

———————

Before WILKINSON and AGEE, Circuit Judges, and FLOYD, Senior Circuit Judge.

———————

Affirmed in part, reversed in part, and dismissed in part by published opinion. Judge
Wilkinson wrote the opinion, in which Judge Agee and Senior Judge Floyd joined.

————————

**ARGUED:** Lindsay Vance Smith, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellants.  Andrew T. Miltenberg, Tara Jill Davis, NESENOFF & MILTENBERG, LLP, New York, New York, for Appellee.  **ON BRIEF:** Joshua H. Stein, Attorney General, Nicholas S. Brod, Deputy Solicitor General, Sripriya Narasimhan, Deputy General Counsel, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellants.  Marla S. Bowman, Litigation Counsel, Office of University Counsel, UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL, Chapel Hill, North Carolina, for Appellant University of North Carolina at Chapel Hill.  Stuart Bernstein, NESENOFF & MILTENBERG, LLP, New York, New York; Robert C. Ekstrand, EKSTRAND & EKSTRAND, LLP, Durham, North Carolina, for Appellee.

————————

2

WILKINSON, Circuit Judge:

Jacob Doe, a student at the University of North Carolina at Chapel Hill, was found responsible for two allegations of sexual misconduct against female classmates. As a result, Doe lost his scholarship and was permanently expelled from the entire University of North Carolina system. Doe sued the university and several employees for deprivations of Fourteenth Amendment due process, violations of his rights under Title IX, and a handful of state law claims. The district court largely denied the defendants' motions to dismiss, allowing Doe's federal claims and most of his state law claims to advance.

We reverse in part, affirm in part, and dismiss in part. Because we hold that the district court erred in rejecting the defendants' assertions of sovereign and qualified immunity, we reverse the judgment below to the extent it permitted Doe to pursue money damages. But we think the district court properly allowed Doe to seek prospective injunctive relief for the due process violations he alleges. We decline to exercise pendent appellate jurisdiction over Doe's Title IX claim and dismiss the appeal as to that issue.

## I.

Because the defendants moved to dismiss under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, we take as true the facts alleged in Doe's complaint and draw all reasonable inferences in his favor.[1] *Evans v. United States*, 105 F.4th 606, 615–16 (4th Cir. 2024) ("[W]here the defendant contends that the allegations in the complaint are

---

[1] The defendants also moved to dismiss for improper venue under Rule 12(b)(3). J.A. 216, 219. Because they do not raise the issue of venue on appeal, we do not address it.

insufficient to confer subject-matter jurisdiction, the district court assesses the motion under the same standard as one brought under Rule 12(b)(6).").

A.

Jacob Doe was an undergraduate student at the University of North Carolina at Chapel Hill (UNC-CH). In the spring of Doe's sophomore year, four female students— Jane Roes 1 through 4—submitted a joint complaint to UNC-CH's Equal Opportunity and Compliance (EOC) Office accusing Doe of sexual misconduct. The complaint alleged nonconsensual sexual interactions between Doe and the women occurring between March 2020 and January 2021.

Doe was notified of the complaint in May 2021. He was immediately placed on an interim suspension and subjected to no-contact orders. Shortly thereafter, Doe was informed that his Morehead-Cain scholarship had been indefinitely suspended. Doe appealed the interim measures to the university's Emergency Evaluation and Action Committee. After a hearing, the Committee denied Doe's appeal.

In June 2021, Roes 1 and 2 contacted the EOC Office to formally withdraw their complaints. After considering the "risk . . . posed to any individual or to the campus community by not proceeding," the EOC Office declined to dismiss the disciplinary charges in those matters. J.A. 75.

The university proceeded to investigate all four sets of allegations. The Roe 1 and Roe 2 matters were investigated under the school's Title IX policy because the alleged events occurred on campus. The Roe 3 and Roe 4 matters were investigated under the school's general sexual harassment policy because the alleged events occurred off campus.

4

Both policies called for an investigation by trained personnel, the preparation of a written investigation report, and an opportunity for the parties to review and respond to the evidence before the written report became final. Under the Title IX policy, no finding of responsibility would issue until "after a live hearing." J.A. 236. Under the general sexual harassment policy, final investigation reports included "investigative finding[s]." J.A. 297. If the report found that a policy violation had occurred, any party could request that the matter be adjudicated by a hearing panel.

Over the next five months, university investigators interviewed Doe, all four Roes, and at least seventeen other witnesses. Doe underwent a voluntary polygraph examination, submitted text messages and other evidence, and exercised his policy right to review and respond to the draft investigation reports. Although Doe was "reassured . . . throughout the investigation that the evidence for each alleged violation would be kept separate," the individual reports contained numerous references to the other investigations. J.A. 83–84. Pursuant to the general sexual harassment policy, the final reports for the Roe 3 and Roe 4 matters contained investigative findings. Doe was found responsible "for engaging in sexual assault or violence" in the Roe 3 matter and "for two counts of sexual assault" in the Roe 4 matter. J.A. 95–96. Both reports recommended expulsion.

After the final investigation reports were completed, Doe received separate hearings on each of the four matters. Each hearing was conducted by a three-person panel and presided over by a nonvoting hearing chair. The hearing panels found Doe responsible for the allegations in the Roe 1 and Roe 4 matters. Doe was found not responsible in the Roe 2 and Roe 3 matters.

The hearing for the Roe 1 matter was held in January 2022. At the beginning of the investigation, Doe was notified that the alleged nonconsensual sexual contact had occurred "[o]n or about November 19, 2020." J.A. 77. Doe then "spent nearly ten months . . . gathering an abundance of evidence to dispute the allegations" that he had had sexual contact with Roe 1 on November 19. But at the hearing, Roe 1's counsel "admitted that no sexual contact occurred between [Doe] and Roe 1 on November 19, and instead claimed that the incident at issue actually occurred in early November 2020." J.A. 102. After the hearing panel met privately for an hour, they informed Doe that the panel would consider whether nonconsensual sexual contact had occurred on November 12 or 13.

Roe 1 initially submitted to cross-examination by Doe's attorney. Partway through questioning, she requested a break. When the hearing resumed, the panel informed Doe that Roe 1 had left and that "her counsel would be permitted to step in for Roe 1 and answer questions on her behalf." J.A. 104. The hearing panel ultimately found Doe "responsible for non-consensual sexual intercourse, while Roe 1 was incapacitated" and suspended him for one academic year. J.A. 107, 147.

The hearing in the Roe 4 matter was held in April 2022. Roe 4 did not appear, nor did any of the witnesses named in her complaint. Citing university policies, the hearing chair prohibited Doe from presenting evidence to impeach Roe 4's credibility. Doe asserts that this prevented him from sharing the "voluminous evidence" he had collected "of [Roe 4's] propensity to lie." J.A. 190. The panel found Doe "responsible for engaging in sexual assault or sexual violence" against Roe 4 and permanently expelled Doe from the UNC system. J.A. 130, 133.

Doe appealed the decisions and sanctions from the Roe 1 and Roe 4 hearings. Each appeal was assigned to a different university appeal officer. In August 2022, the appeal officers affirmed the panel findings and sanctions in the Roe 1 and Roe 4 matters. Doe appealed both decisions to the UNC Board of Trustees. In February 2023, the Board affirmed.

B.

Having exhausted his university remedies, Doe filed a lawsuit in U.S. District Court for the Western District of North Carolina. He sued UNC-CH, the UNC system, the UNC-CH Board of Trustees, the UNC Board of Governors, and eight university employees: UNC Chancellor Lee H. Roberts (substituted for former chancellor Kevin Guskiewicz); interim EOC head Elizabeth Hall; Title IX investigators Jeremy Enlow, Beth Froehling, and Jaclyn Feeney; EOC Director of Report and Response Rebecca Gibson; David Elrod, the hearing chair for the Roe 4 hearing; and UNC-CH Dean of Students Desiree Rieckenberg. The district court found that except for the UNC Chancellor, who was "sued in his official capacity only," the employee defendants were "sued in their respective official and individual capacities." J.A. 376.

The upshot of Doe's complaint is that the university and its employees denied him fair and adequate disciplinary proceedings, leading to erroneous outcomes in the Roe 1 and Roe 4 matters and causing serious damage to his education, reputation, and career prospects. Doe asserted claims under 42 U.S.C. § 1983 for deprivations of Fourteenth Amendment due process, a claim under Title IX of the Education Amendments Act of 1972 for an erroneous disciplinary outcome, and a series of claims under North Carolina law. He

7

sought compensatory and punitive damages and an injunction vacating the disciplinary findings in the Roe 1 and Roe 4 matters, expunging his disciplinary record, and readmitting him to UNC-CH.

The defendants moved to dismiss for lack of subject matter jurisdiction and for failure to state claims upon which relief could be granted. The district court denied the motions in large part. With respect to Doe's federal claims, the court rejected the defendants' arguments that they were entitled to sovereign or qualified immunity and determined that Doe had plausibly alleged his due process and Title IX claims. The district court dismissed Doe's state law claims for intentional infliction of emotional distress and negligent hiring, supervision, and retention but allowed his claims for breach of contract, negligent infliction of emotional distress, tortious interference, and state constitutional violations to proceed.

The defendants appealed.

## II.

We begin by addressing the district court's denial of the defendants' motions to dismiss Doe's due process and state law claims on sovereign and qualified immunity grounds. While orders denying motions to dismiss are ordinarily not immediately appealable, we have long recognized that the collateral order doctrine "provide[s] a basis for appellate jurisdiction over orders refusing to dismiss § 1983 claims against officials claiming sovereign or qualified immunity from suit." *Adams v. Ferguson*, 884 F.3d 219, 224 (4th Cir. 2018). The same is true for orders refusing to dismiss state law claims on the basis of sovereign immunity. *Stewart v. North Carolina*, 393 F.3d 484, 487 n.1 (4th Cir.

8

2005). Having established our jurisdiction over these portions of the appeal, we consider each issue in turn.

## A.

We first consider whether Doe's claims against UNC-CH, the UNC system, the UNC-CH Board of Trustees, and the UNC Board of Governors are precluded by state sovereign immunity. The UNC institutions argued below that Doe's due process and state law claims against them were "barred by the Eleventh Amendment."[2] J.A. 220. As we have explained, "Eleventh Amendment immunity" is "a common (though somewhat inaccurate) shorthand for the federal-law doctrine that protects non-consenting States from suit in federal court." *Global Innovative Concepts, LLC v. Florida*, 105 F.4th 139, 144 (4th Cir. 2024). This immunity "also extends to state agencies and other governmental entities that can be viewed as arms of the state." *Singleton v. Md. Tech. & Dev. Corp.*, 103 F.4th 1042, 1047 (4th Cir. 2024) (quoting *Md. Stadium Auth. v. Ellerbe Becket Inc.*, 407 F.3d 255, 260–61 n.8 (4th Cir. 2005)).

Here the district court acknowledged that "the UNC Entity Defendants are state agencies." J.A. 398. The court also observed that the North Carolina statute creating the UNC system characterized the defendant entities as "bod[ies] politic and corporate." *Id.* (quoting N.C. Gen. Stat. § 116-3). Because the parties' filings did not address the distinction between state agencies, which "generally receive the protections of Eleventh

---

[2] Doe's Title IX claim was asserted against UNC-CH only. The defendants accept that "UNC-CH has waived sovereign immunity" with respect to this claim "by accepting Title IX funds." Opening Br. at 25 n.9.

Amendment immunity," and "bod[ies] politic and corporate," which do not, the district court determined that the institutions had "not met their burden of establishing that the Eleventh Amendment bars [Doe]'s claims against them from being brought in federal court."[3] J.A. 398.

Having found that the UNC institutions failed to establish an entitlement to sovereign immunity, the district court next analyzed whether Doe's three state law claims against UNC-CH nonetheless merited dismissal under North Carolina law. The court dismissed the negligent hiring, supervision, and retention claim but allowed the breach of contract and state constitutional claims to proceed.

On appeal, the UNC institutions argue that the district court's rejection of their entitlement to sovereign immunity is squarely precluded by precedent. They point to our decision in *Huang v. Board of Governors of University of North Carolina*, 902 F.2d 1134 (4th Cir. 1990), where we held that a North Carolina State University (NCSU) professor could not sue NCSU or the UNC Board of Governors in federal court. In *Huang*, we expressly considered the language of N.C. Gen. Stat. § 116-3. We explained that "§ 116-3 does not waive North Carolina's sovereign immunity in its own courts, let alone its Eleventh Amendment immunity in federal court." *Id.* at 1139. Accordingly, we upheld the district court's dismissal of the professor's § 1983 and state law claims against the UNC institutions he sued. *Id.* at 1138–39.

---

[3] The district court noted the UNC institutions' alternative argument that they "are not properly considered 'persons' subject to suit under § 1983." J.A. 399. The court did not resolve this argument and the defendants do not renew it on appeal.

10

*Huang* would seemingly establish the entitlement of the UNC institutions to sovereign immunity here. Rather than defend the district court's reliance on § 116-3, Doe offers two new arguments for why the UNC institutions are not immune from suit in federal court. First, he argues that notwithstanding *Huang*, the UNC institutions failed to demonstrate that they are in fact arms of the state. Second, he argues that the UNC institutions waived any immunity from suit in federal court when they moved to transfer venue to the Middle District of North Carolina.

We think the district court erred in denying the UNC institutions' motion to dismiss Doe's claims against them on sovereign immunity grounds, and neither of Doe's arguments persuades us to the contrary.

In *Maryland Stadium Authority v. Ellerbe Becket Inc.*, we recognized that it is not enough for a defendant university to rely on our treatment of other public universities as arms of their respective states. 407 F.3d at 263. Instead, we explained that "each state university must be evaluated in light of its unique characteristics" and "conduct[ed] our own inquiry into whether" the University of Maryland was "an alter ego" of the state. *Id.* (quoting *Univ. of R.I. v. A.W. Chesterton*, 2 F.3d 1200, 1204 (1st Cir. 1993)).

Here we have already considered the status of the university system that claims to be an arm of the state. The entity defendants in this case, like the institutions that we held were entitled to sovereign immunity in *Huang*, are divisions of UNC. As the district court recognized, the North Carolina "General Assembly created the UNC System as a single agency" comprised of different "constituent institutions." J.A. 384 (citing *Bd. of Governors of Univ. of N.C. v. U.S. Dep't of Labor*, 917 F.2d 812, 815 (4th Cir. 1990)). Having

11

previously determined that UNC's constituent institutions, including NCSU and the UNC Board of Governors, may claim immunity from suit in federal court, we think the defendants were entitled to rely on our precedent. This is especially true given that Doe has pointed us to no facts suggesting a different result under the factors we use when assessing whether an entity is an arm of the state in the first instance. *See Hutto v. S.C. Ret. Sys.*, 773 F.3d 536, 543 (4th Cir. 2014).

As to Doe's second rejoinder, it is true that in limited circumstances a state waives its immunity by removing an action to federal court. *See Biggs v. N.C. Dep't of Pub. Safety*, 953 F.3d 236, 241 (4th Cir. 2020) ("In this circuit, a state's removal of a suit to federal court waives sovereign immunity only if the state has consented to suit in its own courts."). It does not follow, however, that a motion to transfer venue has the same consequence as the removal of an action. Where, as here, a state that has already been hauled into federal court asks only that its case be heard in a different federal forum, we will not hold the defensive maneuver against it. The motion to transfer venue here simply does not indicate a voluntary degree of involvement with the merits of the action that would justify the serious consequence of abrogating sovereign immunity from suit in a federal forum.

## B.

We next consider the district court's refusal to dismiss Doe's § 1983 due process claim against the university employees.[4] The employee defendants sued in their personal

---

[4] The district court also declined to dismiss Doe's state law claims against the employee defendants for breach of contract, negligent infliction of emotional distress, tortious interference, and violations of the North Carolina constitution. The defendants assert that the negligent infliction of emotional distress and tortious interference claims "are not

capacities contend that Doe's due process claim against them for damages is barred by qualified immunity. Qualified immunity "is an affirmative defense" which "may be invoked by a government official sued in his personal, or individual, capacity." *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 305–06 (4th Cir. 2006). This defense "shields government officials performing discretionary functions from personal-capacity liability for civil damages under § 1983, 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id.* at 306 (quoting *Wilson v. Layne*, 526 U.S. 603, 609 (1999)).

The doctrine of qualified immunity recognizes that public officials must sometimes make decisions "in gray areas, where the law is unsettled or murky." *Rogers v. Pendleton*, 249 F.3d 279, 286 (4th Cir. 2001). In such situations, the fear of liability should not hamstring officials in the discharge of their duties. Thus immunity attaches unless a right is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mays v. Sprinkle*, 992 F.3d 295, 301 (4th Cir. 2021) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). The bar for notice is high. To defeat qualified immunity, a right's existence must have been "beyond debate . . . *at the time* of the conduct in question." *Id.* (quoting *Reichle*, 566 U.S. at 664).

The two-part qualified immunity inquiry is well-settled. To determine whether the employee defendants are entitled to qualified immunity, "we must consider whether (1) the

---

directly implicated by this appeal." Opening Br. at 24 n.8. Because the defendants press no argument as to the remaining breach of contract and state constitutional claims against the employee defendants, we do not address those claims, either. *See* Response Br. at 13 n.4 (stating that Doe's state law claims are "not directly addressed in this appeal").

facts 'make out a violation of a constitutional right' and (2) whether that right was 'clearly established' at the time of the defendant[s'] alleged misconduct." *Sheppard v. Visitors of Va. State Univ.*, 993 F.3d 230, 238 (4th Cir. 2021) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). We have discretion to address the prongs in either order. *See Pearson*, 555 U.S. at 236.

Doe points to several aspects of his disciplinary hearings that he believes violated his right to procedural due process, including a lack of adequate notice, the inability to introduce certain evidence, and biased hearing panels. But these pale in comparison to the foremost deficiency Doe identifies: the denial of his right to cross-examine his accusers. With respect to the Roe 1 hearing, Doe contends that he was denied an adequate opportunity for cross-examination because the hearing panel allowed Roe 1 to leave partway through questioning and permitted her attorney to answer questions on her behalf. With respect to the Roe 4 hearing, Doe says that he was denied the opportunity to cross-examine Roe 4—and any of her witnesses—altogether. The district court agreed that Doe alleged "serious procedural flaws" with his disciplinary hearings, calling out the substitution of Roe 1's attorney during questioning as "a particularly stark example." J.A. 402.

The concerns Doe raises are serious ones. But we cannot say that our prior cases clearly establish a due process right to cross-examination in the particular context of university disciplinary proceedings. We recently recognized as much in another case involving a due process challenge to a university's adjudication of a sexual misconduct complaint. In *Doe v. Virginia Polytechnic Institute and State University*, 77 F.4th 231 (4th

14

Cir. 2023) ("*Virginia Tech*"), we noted that our sister circuits "are divided on whether due process requires cross-examination in university disciplinary proceedings" and acknowledged that we have "never held that cross-examination is required" in this setting. *Id.* at 239 (citing *Walsh v. Hodge*, 975 F.3d 475, 487 & n.54 (5th Cir. 2020)). We had no opportunity in *Virginia Tech* to rule on whether an opportunity for cross-examination nevertheless ought to be required because there the plaintiff failed to allege that he had actually been denied the chance to cross-examine the complainant. *Id.*

In light of our statements in *Virginia Tech*, we are hard-pressed to find that there was a clearly established right to cross-examination at the time of Doe's disciplinary proceedings.

All that said, we cannot ignore the weighty interests implicated by cross-examination in adjudications of sexual misconduct allegations in higher education settings. We acknowledge that it can take real courage for victims of sexual misconduct to come forward and report their abuse. *See* Deborah Tuerkheimer, *Beyond #MeToo*, 94 N.Y.U. L. Rev. 1146, 1159–63 (2019) (observing the reluctance of student victims to report sexual assaults to campus authorities). Reliving the trauma of a sexual assault is an experience that no victim could possibly welcome. The thought of having a private violation of one's bodily integrity aired in public cannot help but be unsettling. The prospect of facing cross-examination may operate as an additional discouragement to undergoing what is already a forbidding ordeal.

On the other side of the matter is the idea, embedded in the foundations of our adversarial system of justice, that cross-examination is "the greatest legal engine ever

15

invented for the discovery of truth." *Watkins v. Sowders*, 449 U.S. 341, 349 & n.4 (1981) (quoting 5 John Henry Wigmore, Evidence in Trials at Common Law § 1367 (Chadbourn rev. 1974)). Often at the heart of sexual misconduct disputes is the matter of consent. Witness credibility and recollection are crucial in such proceedings, and this renders tools for reaching the truth all the more important.

We agree with the employee defendants that a right to cross-examination in this context has not, up to this point, been clearly enough established to deny them the protection of qualified immunity. But we underscore that, as a matter of procedural due process, an accused student must be "afforded the *meaningful* hearing to which they [are] entitled." *Tigrett v. Rector & Visitors of Univ. of Va.*, 290 F.3d 620, 630 (4th Cir. 2002) (emphasis added) (discussing *Mathews v. Eldridge*, 424 U.S. 319 (1999)). Going forward, cross-examination will materially assist in ensuring a meaningful hearing in higher-education disciplinary proceedings. This is particularly true where, as here, (1) the resolution of a disciplinary charge turns on credibility determinations, and (2) the potential sanctions are severe.

By holding the cross-examination opportunity Doe received here constitutionally deficient, we note that the sanctions Doe faced were serious. He was permanently expelled not only from UNC-CH, but "from every state-funded public university that is a constituent of the UNC System." J.A. 26, 400. Moreover, Doe asserts that his academic record will permanently note the disciplinary "findings of sexual assault" and his resulting expulsion. J.A. 142. This is a far cry from a ten-day secondary school suspension, *see Goss v. Lopez*,

16

419 U.S. 565, 584 (1975), or a dismissal for academic underperformance, *see Bhattacharya v. Murray*, 93 F.4th 675, 700–01 (4th Cir. 2024).

None of the foregoing is to say that university adjudicators lack discretion in imposing reasonable limits on cross-examination under the circumstances of a particular case. Although addressing the Sixth Amendment right to cross-examination in the criminal context, *Delaware v. Van Arsdall*, 475 U.S. 673 (1986), is instructive. A university disciplinary panel or hearing officer may certainly impose limits to guard against "concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Id.* at 679. Courts have no warrant to displace the discretion accorded those university adjudicators whose familiarity with the pertinent circumstances is shown to be matched by their fairmindedness.

For example, we agree with several of our sister circuits that, while "due process in the university disciplinary setting requires 'some opportunity for real-time cross-examination, even if only through a hearing panel,'" "we have no reason to believe that questioning of a complaining witness by a neutral party is so fundamentally flawed as to create a categorically unacceptable risk of erroneous deprivation." *Haidak v. Univ. of Mass.-Amherst*, 933 F.3d 56, 69 (1st Cir. 2019); *see also Walsh*, 975 F.3d at 485; *Overdam v. Tex. A&M Univ.*, 43 F.4th 522, 529–30 (5th Cir. 2022) (per curiam); *Doe v. Univ. of Ark.-Fayetteville*, 974 F.3d 858, 867–68 (8th Cir. 2020). The underlying question, of course, is whether the hearing as a whole was meaningful in substance and not just in form.

17

As for the other procedural defects Doe alleged, we are not persuaded that they rose to the level of constitutional violations. To the notice issue, we agree that a more precise statement of the date of the alleged misconduct in the Roe 1 matter would have been salutary, particularly given that Doe and Roe 1 assertedly had a "non-exclusive romantic relationship" during the relevant timeframe. J.A. 61–62. But the notice Doe received included the nature of the charge, the location of the alleged misconduct, and the caveat that the incident occurred "on or about" the stated date. J.A. 77. We are not persuaded that the notice, though not ideal, deprived Doe of an adequate opportunity to prepare his defense.

In sum, the due process claims for damages against the individual university employees must be dismissed inasmuch as those individuals are entitled to qualified immunity.

## C.

Because the UNC institutions are entitled to state sovereign immunity, the employee defendants sued in their official capacities are "protected from a damages action by the same immunity." *Ballenger v. Owens*, 352 F.3d 842, 845 (4th Cir. 2003). But Doe seeks more than just money damages for the due process deprivations he alleges. He also requests three forms of injunctive relief: "(i) a vacating of the disciplinary findings and decisions; (ii) expungement of his academic record; and (iii) reinstatement as a student in good standing." Response Br. at 60; *see* J.A. 192.

Doe asks to pursue these additional forms of relief under the *Ex parte Young* exception to state sovereign immunity. The *Ex parte Young* exception "allows suits against

18

state officers for prospective equitable relief from ongoing violations of federal law." *Lytle v. Griffith*, 240 F.3d 404, 408 (4th Cir. 2001). To determine whether a suit may proceed under *Ex parte Young*, "a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (internal quotation marks omitted) (quoting *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 296 (1997) (O'Connor, J., concurring)). Because the district court found that the UNC institutions could not invoke state sovereign immunity, it did not consider whether the exception applied.

The first part of the "straightforward inquiry" requires us to assess whether Doe has "identif[ied] a cognizable property or liberty interest and a deprivation without due process." *Sheppard*, 993 F.3d at 239. Doe's complaint alleged both a property and a liberty interest. He claimed a property interest in his continued enrollment created by his "express and implied contractual relationship" with UNC and a liberty interest in his "good name, reputation, honor, and integrity." J.A. 144. The district court evidently accepted both asserted interests, finding in general terms that Doe had alleged a "grievous loss sufficient to trigger due process protections." J.A. 400–01.

We have followed the Supreme Court's "watchful approach" and only "assumed, without actually deciding, that university students possess a 'constitutionally protectible property right' in their continued enrollment in a university.'" *Sheppard*, 993 F.3d at 239 (quoting *Tigrett*, 290 F.3d at 627). Nor have we expressly found that a student possessed a liberty interest implicated by a university disciplinary action. *See, e.g.*, *Tigrett*, 290 F.3d at

19

628–29; *see also Doe v. Va. Polytechnic Inst. & State Univ.*, 2024 WL 1417977, at *6 (W.D. Va. Apr. 2, 2024) (indicating that this court has continued to take a cautious approach towards both property and liberty interests).

We hold that Doe has alleged a liberty interest sufficient to trigger procedural due process protections. A plaintiff asserting a liberty interest in his reputation must show (1) a stigmatizing statement, (2) some type of dissemination, and (3) some other government action that "alters or extinguishes one of his legal rights." *Elhady v. Kable*, 993 F.3d 208, 225 (4th Cir. 2021) (alterations omitted) (quoting *Paul v. Davis*, 424 U.S. 693, 711 (1976)).

Taking the facts in his complaint as true, Doe has satisfied this standard. Doe alleged that his "expulsion for sexual misconduct will remain a part of [his] permanent educational records" and "will impair his ability to seek further education or employment." J.A. 147. There is no question that a notation of expulsion, contained in a student's educational record, implies a "serious character defect[] such as dishonesty or immorality." *Ridpath*, 447 F.3d at 308 (quoting *Robertson v. Rogers*, 679 F.2d 1090, 1092 (4th Cir. 1982)). This is all the more true when that expulsion is based on a finding of sexual misconduct. And Doe has certainly experienced a change in status given his permanent expulsion from the entire North Carolina public university system.[5] Given the pejorative nature of the alleged

---

[5] UNC-CH's general sexual harassment policy defines "expulsion" to mean

that a student is removed from the University permanently and may not be admitted to any UNC System university unless and until the Chancellor who imposed or approved the sanction (or the Chancellor's successor) concludes on the basis of the former student's petition and any supportive documentation that the individual should be given a new opportunity to pursue higher education within the UNC System.

20

misconduct and the severity of the actual sanction imposed, we hold that a sufficient liberty interest has been alleged.

Because Doe has adequately alleged a protected liberty interest, we must consider whether the injunctive relief he seeks is properly characterized as prospective. While we do not exclude the possibility that some inflictions of reputational damage may be fleeting and evanescent, others may evince a deep-seated and ongoing harm. Several of our sister circuits have held that an erroneous disciplinary record is an ongoing injury. *See, e.g.*, *Doe v. Purdue Univ.*, 928 F.3d 652, 666 (7th Cir. 2019) (Barrett, J.) (explaining that university student's "marred record is a continuing harm for which he can seek redress"); *Flint v. Dennison*, 488 F.3d 816, 825 (9th Cir. 2007) (stating that correction of university records "serve[s] the purpose of preventing present and future harm"). We think as well that an erroneous university record of a student's permanent expulsion for sexual misconduct inflicts an ongoing injury for which the student can seek equitable relief.

In light of the foregoing, we find that the district court did not err in permitting Doe's claims for injunctive relief against the university employees to survive the defendants' motion to dismiss.

### III.

Finally, we briefly address the district court's decision not to dismiss Doe's Title IX claim against UNC-CH. Unlike the claims we have discussed in Part II, UNC-CH acknowledges that acceptance of federal funds does operate as a waiver of sovereign

---

J.A. 300. The Title IX policy contains a near-identical definition. *See* J.A. 241.

immunity in a Title IX action. Opening Br. at 25 n.9.; *see also Litman v. George Mason Univ.*, 186 F.3d 544, 555 (4th Cir. 1999). The defendants acknowledge that, unlike the district court's decisions as to immunity, the denial of the motion to dismiss the Title IX claim under Rule 12(b)(6) would "ordinarily not [be] immediately appealable." Opening Br. at 54. Nevertheless, the defendants ask us to exercise pendent appellate jurisdiction and address the merits of the motion.

Pendent appellate jurisdiction is "a judicially-created, discretionary exception to the final judgment requirement." *Rux v. Republic of Sudan*, 461 F.3d 461, 475 (4th Cir. 2006). Under the exception, we may review issues "not otherwise subject to immediate appeal when such issues are so interconnected with immediately appealable issues that they warrant concurrent review." *Id.* Here, the defendants argue that Doe's Title IX claim is so interconnected with the individual defendants' qualified immunity defense that pendent appellate jurisdiction is appropriate.

We disagree. Although Doe's Title IX claim is factually related to the question of qualified immunity, the two issues are not "inextricably intertwined." *Elegant Massage, LLC v. State Farm Mut. Auto. Ins. Co.*, 95 F.4th 181, 188 (4th Cir. 2024) (quoting *Scott v. Fam. Dollar Stores, Inc.*, 733 F.3d 105, 111 (4th Cir. 2013)). Whether the individual defendants can avail themselves of qualified immunity does not "necessarily resolve" whether Doe has plausibly stated a claim against UNC-CH for discrimination on the basis of sex under Title IX, nor do we think review of the elements of Doe's Title IX claim is otherwise necessary to resolve the "immediately appealable" immunity issues. *Id.*

22

We note that "[p]endent appellate jurisdiction is an exception of limited and narrow application," which we exercise only "sparingly." *Rux*, 461 F.3d at 475; *Elegant Massage,* 95 F.4th at 188. Because we decline to apply this rare exception to the district court's denial of the motion to dismiss Doe's Title IX claim, we dismiss that portion of the appeal for lack of appellate jurisdiction.

IV.

For the reasons stated above, we reverse the district court's denial of the defendants' motions to dismiss the claims against the UNC institutions and the § 1983 due process claim against the employee defendants sued in their personal capacities. But we affirm the district court's judgment to the extent it allowed Doe's due process claim for prospective injunctive relief to proceed against the employee defendants sued in their official capacities. We decline to exercise appellate jurisdiction over the denial of the defendants' motion to dismiss Doe's Title IX claim against UNC-CH and dismiss the appeal as to that issue.

*AFFIRMED IN PART, REVERSED IN PART, AND DISMISSED IN PART*