# EXHIBIT 5

# DOE'S EXPERT REPORT

## Jacob Doe v. The University of North Carolina System, *et al.*
## Civil Case No. 1:23-cv-00041-MR

**April 14, 2025**

**Prepared By:**

Jackie Gharapour Wernz

Civil Rights Attorney & Consultant

ECR Solutions PLLC

jackie@educationcivilrights.com



### Expert Report of Jacqueline Farideh (née Gharapour) Wernz
*Jacob Doe v. The University of North Carolina System, et al.*
*Civil Case No. 1:23-cv-00041-MR*

My opinions in this case relate to the evaluation, investigation, and adjudication of allegations of sexual misconduct by four female students against Jacob Doe, a student at the University of North Carolina Chapel Hill (UNC), for alleged sexual assault. My opinions are based on my two decades of relevant education and experience and my review of the facts of the case, which are detailed below.

In my opinion, the actions of UNC and its individual administrators regarding the allegations against Jacob Doe did not meet the standard of care for institutional sex-based misconduct cases.

### INTRODUCTION

I prepared this report at the request of Doe Jacob Doe in the matter of *Jacob Doe v. The University of North Carolina System, et al.*, Civil Case No. 1:23-cv-00041-MR. The report includes my opinions on UNC's actions and practices in the administrative proceedings underlying the litigation.

Part I of this report summarizes the training and experience that qualify me as an expert. Part II describes the materials I reviewed in this case. Part III provides background for understanding the standards of care at issue in this case. Part IV contains a summary of the facts based on my review of the record. Finally, Part V contains my opinions, provided to a reasonable degree of professional certainty based on the information reviewed, that UNC's actions in this case did not comport with the applicable standard of care.

This is a preliminary report. As additional relevant facts are uncovered or facts are clarified through subsequent discovery, I will supplement this report and my opinions.

### I.     Training and Experience

I have nearly two decades of experience as an administrator, federal regulator, legal consultant and educator, and attorney and counselor on Title IX, sexual misconduct, related student affairs/student conduct, and other education law issues impacting colleges, universities, community colleges, and K-12 schools nationwide.

This section briefly summarizes the experience, training, and publications that establish my unique expertise in those areas as they relate to higher education.[1]

After graduating *summa cum laude* with a triple major on a full scholarship plus stipend from the Donaghey Scholars Honors Program at the University of Arkansas at Little Rock, I attended the University of Virginia School of Law on a Hardy Cross Dillard (now, Karsh-Dillard) Scholarship, the law school's premier merit scholarship program, which provides full tuition and a stipend for all three years of law school. I served on the editorial board for the *Virginia Law Review* and graduated in the top quarter of my class. My interest in education law began early during law school. I worked for a renowned education law scholar, current UVA President James E. Ryan, as a research assistant in education law and obtained a summer associate position with national education law powerhouse Hogan & Hartson (now Hogan Lovells) in Washington, D.C., where I worked almost exclusively with the education law group.

After leaving law school, I served educational institutions in the private sector at some of the top law firms in the country, including Hogan, Winston & Strawn in Chicago, Illinois, and two premier education law boutiques, Franczek P.C. in Chicago, Illinois, and Thompson & Horton LLP in Dallas, Texas. In those positions, including as a Partner at Franczek and T&H, I counseled and represented hundreds of educational institutions on a wide variety of issues, including student conduct/student affairs, threat assessment, behavioral intervention, negligence and breach of contract in the education context, First and Fourth Amendment concerns, and compliance with laws and regulations such as Title IX, Title VI, Title VII, Section 504, the ADA, VAWA, and related state laws.

My work in private practice has always focused primarily on supporting clients through every step of their compliance journey regarding sexual misconduct, including coordination of compliance efforts, avoiding bias and conflicts of interest, staff training, initial responses to reports and complaints, investigations, hearings, appeals, disciplinary sanctions, remedies, and record maintenance. It has included counseling, consulting, training, policy writing and revision, and grievance support

---

[1] Although I have one of the strongest records in the country relating to Title IX, sexual misconduct, and related student affairs/student conduct issues for primary and secondary schools, the standard of care for those issues is markedly different in K 12. For that reason, this section primarily focuses on my significant experience with postsecondary schools. My full curriculum vitae is attached to this report and contains a more detailed description of my experience, training, and publications, including those involving K-12 institutions.

to help institutions comply with Title IX and other sexual misconduct laws, regulations, and policies.

In private practice, I also advise on and serve in the roles of investigator, decision-maker/hearing officer, advisor, appellate decision-maker, and informal resolution facilitator in hundreds of Title IX and non-Title IX sexual harassment, civil rights, and student conduct matters, including high-profile, sensitive complaints of sexual harassment and sexual assault. I conduct and advise on sexual harassment audits and reviews, ensuring policies, procedures, and practices align with standards of care and best practices for sexual harassment responses. I develop and implement engaging, practical training programs for administrators, attorneys, and others in the field. I have personally trained thousands of educational administrators and employees through hundreds of workshops and seminars, both in-person and online. I also oversaw the training of innumerable others by attorneys under my supervision and using my training curricula at Franczek and T&H. Training sessions cover compliance with Title IX, prevention efforts, responding to and investigating reports of sexual harassment, supportive and interim measures, coordinating with law enforcement, credibility, and implementing appropriate disciplinary sanctions and remedies.

In addition to this significant private practice work, my passion for civil rights prompted me in early 2016 to pursue a position as a civil rights attorney for the U.S. Department of Education's Office for Civil Rights. OCR enforces several federal civil rights laws that prohibit discrimination, including Title IX. At OCR, I managed a large, diverse caseload of complaints. I evaluated, investigated, negotiated resolutions of, prepared letters of findings for, and monitored agreements resolving complaints. I interviewed witnesses, gathered, reviewed, and analyzed data in investigations, and wrote letters of findings and resolution agreements. My experience in Title IX matters at OCR was particularly unique. I handled a relatively large caseload of Title IX cases as compared to peers, including cases involving sexual harassment, assault, and violence. Working under both the Obama and Trump administrations provided me with a unique understanding of the OCR regulatory landscape in the two administrative regimes that have governed educational institutions since 2008 and will continue to do so for at least the next four years.

I continue to build my unique and robust perspective of Title IX and related work today in my role as Acting Director of Civil Rights and Investigations, Title IX Coordinator, and ADA Coordinator for the University of Idaho and its approximately 12,000 students and 2,300 employees. I began that role in June 2023 as Interim

Director through a contract with T&H. Because of my successes in the role, even from a remote location, the University asked me to join as a full-time employee, which I did in March 2024. As Acting Director of OCRI, I coordinate compliance with Title IX, other federal and state civil rights laws, and University policies prohibiting sexual misconduct. I have primary responsibility for, among other things, training and supervising both external and internal investigators, decision-makers, appellate decision-makers, and informal resolution facilitators in cases involving civil rights, including sexual misconduct, discrimination, and harassment. I also monitor and advise University leadership on civil rights laws, regulations, standards of care, and best practices, including those involving Title IX and sexual harassment. I serve as the primary liaison with OCR regarding complaints against the University of noncompliance with Title IX and other Federal civil rights regulations. I also work closely with the University's Office of General Counsel regarding legal concerns and complaints involving civil rights issues, including those involving sexual misconduct. I am a key partner with the Dean of Students office on student conduct matters that intersect with civil rights, including Title IX and sexual misconduct issues. I also continue to support other schools, colleges, and universities with the work I undertook in private practice part-time through my consulting firm, ECR Solutions PLLC.

In addition to my work experience, I am a nationally recognized thought leader regarding Title IX and sexual misconduct processes in educational institutions. In July 2024, the Title IX Coordinator at Boise State University and I produced and served as the main presenters at an innovative two-day conference for higher education and K-12 institutions on Title IX (https://www.boisestate.edu/tixie/title-ix-conference-higher-ed-and-k-12-training/). We will revamp that conference again this fall. I also frequently present training sessions at other national and statewide conferences, including for organizations like the National Association of College and University Attorneys (NACUA), the Association of Title IX Administrators (ATIXA), AASA (the School Superintendents Association), the American Association of School Personnel Administrators, the University of Texas's Annual School Law Conference, and school administrator, personnel, and attorney associations in many states. I have presented innumerable complimentary webinars on Title IX and sexual harassment to the field through my consulting business, my work at law firms, and other organizations and companies.

I am an innovator regarding practical tools for compliance with sexual harassment laws, regulations, industry standards, and best practices. I created a Title IX "Toolkit" through Franczek P.C. for colleges and universities to use to comply

with the 2020 Title IX regulation. ATIXA requested access to that "Toolkit" when preparing its own "TIX-KIT" for clients. I also released a Higher Education Title IX Guidebook for clients in early 2022 through Thompson & Horton LLP. That included over 50 checklists, evaluation tools, forms, and templates to allow administrators to work more quickly and effectively through the cumbersome Title IX process in the 2020 Title IX rules.

I write extensively on Title IX and civil rights. The Illinois Bar Journal[2] and the American School Board Journal published articles I wrote on Title IX and equity. From its inception until July 2021, I was the primary author and editor of the Title IX Insights blog (www.titleIXinsights.com). Upon joining Thompson & Horton in August 2021, I launched a new blog, Title IX Tips (www.titleIXtips.com), for which I was the primary author and editor for three years. I now have an Education Civil Rights blog through my consulting firm (www.educationcivilrights.com/blog). I am a repeat presenter on the Title IX and Civil Rights Podcast, produced by Dan Schorr LLC. Journalists regularly call upon me to provide background and comments on Title IX, other civil rights, and other education law matters. In 2025, I have been quoted by *The Atlantic Monthly*, *The Wall Street Journal*, *The Chronicle of Higher Education*, *Education Week*, *K-12* and *Higher Ed Dive*, and *The 74*, among other news outlets.

I am licensed to practice law in Texas and Illinois and have been admitted in Idaho, awaiting swearing-in. I am a founding and current Board member of the National School Attorneys Association (NSAA), the Chair of AASA's School District Attorney Committee (SDAC), a former Board member of the National Schools Boards Association's Council of School Attorneys (COSA), and a member of many organizations, including NACUA. I am being compensated for my services in this matter at the rate of $400 per hour ($250/hour for travel time) plus reimbursement for reasonable expenses.

## II.    Materials Reviewed

In preparing this report, I reviewed the following documents:

- Doe's Verified Complaint (Feb. 15, 2023)
- Fourth Circuit Brief for Doe-Appellee (Sep. 27, 2024)
- Memorandum of Decision and Order (Mar. 4, 2024)

---

[2]    Jackie Gharapour Wernz, "t's Time for Title IX: New Rule, New Regime What Should Illinois Attorneys Know About the Controversial New Title IX Rule?", 108 Ill. B.J. 28 (2020).

- Fourth Circuit Opinion (Apr. 4, 2025)
- Doe's Mediation Statement (Nov. 21, 2024)
- Documents in UNC's document production
- Additional documents relating to the potential bias of hearing panelists

### III.    Background Considerations Regarding Standard of Care

In the context of student discipline proceedings for alleged sex-based misconduct at colleges and universities, the standard of care refers to the established norms and procedures that have gained widespread acceptance in the field and are grounded in legal authority, including binding court decisions and regulatory requirements. The standard of care is distinct from best practices, which are aspirational and may vary widely across institutions.

The distinction is most straightforward with respect to Title IX because of the significant decisional and regulatory authority under that federal law. The Title IX statute is short. It provides, in pertinent part: "No person . . . shall, based on sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."[3]

The express statutory means of enforcement for Title IX is administrative. The statute directs the U.S. Department of Education to establish requirements to effectuate the nondiscrimination mandate. It permits the Department's Office for Civil Rights (OCR) to enforce those requirements through any means authorized by law, including ultimately the termination of federal funding.[4] OCR has exercised that authority in recent history by issuing a significant number of regulations and informal guidance on sex-based misconduct, much of it conflicting from administration to administration.[5]

---

[3]    20 U.S.C. § 1681(a).

[4]    *Id*. at § 1682.

[5]    Early on, the guidance issued by OCR on sexual harassment went through the notice and comment process of formal rulemaking. *See* U.S. Dep't. of Education ("ED"), OCR, Sexual Harassment Guidance: Harassment of Students By School Employees, Other Students, or Third Parties, 62 FR 12034 (Mar. 13, 1997), https://www.govinfo.gov/app/details/FR-1997-03-13/97-6373 and ED, OCR, Revised Guidance on Sexual Harassment: Harassment of Students by School Employees, Other Students, or Third Parties (Jan. 19, 2001) (hereinafter, "2001 Guidance"), https://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf. During the Presidential administration of Barack Obama, however, OCR issued informal guidance

Given the evolving nature of regulatory enforcement over the past several decades, it is my professional opinion that the standard of care applicable to university disciplinary proceedings involving allegations of Title IX sexual misconduct is grounded primarily in federal courts' interpretations of institutional obligations under Title IX. While federal regulations issued by the U.S. Department of Education's Office for Civil Rights (OCR) also inform professional expectations, their role in shaping the standard of care depends not merely on their existence but rather on whether the principles they reflect are fundamental, widely accepted, and consistently applied in the field.

With respect to non-Title IX sexual misconduct cases, the standard of care is not identical to the standard for Title IX cases, in large part because the case law,

---

addressing sexual harassment and other federal civil rights laws without going through the rulemaking process. *See, e.g.,* ED, OCR, Dear Colleague Letter ("DCL") Sexual Violence (April 4, 2011) (hereinafter, "2011 DCL"), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf, withdrawn by, ED, OCR, DCL (Sept. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf; and ED, OCR, Questions and Answers on Title IX and Sexual Violence (April 29, 2014) (hereinafter "2014 Q&A"), https://www2.ed.gov/about/offices/list/ocr/docs/qa201404-title-ix.pdf, withdrawn by, ED, OCR, DCL (Sept. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf. During Donald Trump's Presidential administration, OCR issued its own informal guidance on sexual harassment while at the same time withdrawing the 2011 DCL and the 2014 Q&A. ED, OCR, Q&A on Campus Sexual Misconduct (Sept. 22, 2017) (hereinafter, "2017 Q&A"), https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix201709.pdf. On August 14, 2020, under the Donald Trump administration, amendments to the Title IX regulations, at 34 C.F.R. Part 106, addressing sexual harassment complaint processing under Title IX went into effect. Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30,026 (May 19, 2020), https://www.govinfo.gov/content/pkg/FR-2020-05-19/pdf/2020-10512.pdf. The amendments begin on page 30,572. The Federal Register notice also includes a preamble, at pages 30,026-30,570, that clarifies OCR's interpretation of Title IX and the Title IX regulations. Joseph Biden's Presidential administration has issued informal guidance. *See* ED, OCR, Questions and Answers on the Title IX Regulations on Sexual Harassment (July 2021) (hereinafter "2021 Q&A"). On April 29, 2024, the Biden administration released its own final rule to amend the Title IX regulations. Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 89 Fed. Reg. 33,896, https://www.federalregister.gov/documents/2024/04/29/2024-07915/nondiscrimination-on-the-basis-of-sex-in-education-programs-or-activities-receiving-federal. The rule went into effect on August 1, 2024, in several states, including North Carolina, but was vacated nationwide in January 2025 action for declaratory, *Tennessee v. Cardona*, No. CV 2:24-072-DCR, 2025 WL 63795 (E.D. Ky. Jan. 9, 2025), *as amended* (Jan. 10, 2025), and was abandoned by the White House under both the Biden and second Trump administrations. Only the 2020 Title IX rule is at issue in this case.

regulations, and guidance that contribute to the Title IX standard of care do not apply to non-Title IX cases. Following the issuance of the 2020 Title IX regulations, many universities implemented a dual-process approach to handling sexual misconduct allegations. That approach involved two distinct procedures: one that complied with the regulatory requirements for cases falling within Title IX's jurisdictional scope, and another for addressing all other sexual misconduct allegations that fell outside that scope. Under that dual system, identical allegations of sexual assault can be adjudicated under different procedural frameworks—despite involving the same underlying conduct and potentially resulting in the same disciplinary outcome— solely based on whether the incident meets the jurisdictional criteria of the Title IX regulations.

Nonetheless, even in non-Title IX cases, federal case law and constitutional due process principles continue to influence the standard of care, particularly where public institutions are concerned. Federal courts have provided a significant body of information of which a reasonable postsecondary administrator is aware. Such cases, which include a strong focus on compliance with institutional policies, providing adequate notice and opportunity to respond to allegations, and the fundamental accuracy of decisionmaking, impact the standard of care in both Title IX and non-Title IX cases.

Generally speaking, the concept of due process is a flexible one, that "calls for such procedural protections as the particular situation demands." *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976). Though a university disciplinary proceeding need not include the full trappings of a criminal trial, at a minimum, due process requires fair notice and a meaningful opportunity to be heard. *Mathews*, 424 U.S. at 348; *Todman v. Mayor & City Council of Baltimore*, 104 F.4th 479 (4th Cir. 2024).

My understanding of the way those sources come together is grounded in two decades of direct engagement with educational institutions nationwide, including in-depth policy and practice reviews, compliance assessments, and legal analysis. This includes two years serving as Acting Director of Civil Rights and Investigations and Title IX Coordinator at a public land grant university, where I was responsible for overseeing all aspects of Title IX and civil rights compliance in a complex operational environment. In that role, I directly observe how policies and procedures are operationalized and evaluated within an institutional context.

In addition to this practical experience, my understanding is shaped by the synthesis of legal authority, regulatory guidance, and observable institutional norms. I routinely analyze federal case law and OCR enforcement actions to identify patterns

in how courts and regulators define institutional responsibilities. I also draw on structured professional activities, including developing policies aligned with federal regulations, providing compliance training to institutional actors, and consulting with administrators responsible for implementing Title IX and related mandates. This combination of legal analysis and empirical observation allows me to identify standards that are not only taught in theory but widely implemented and sustained in practice.

Based on the following factual summary, my opinions incorporate the above considerations when discussing the standards of care applicable to this case and my opinion that UNC repeatedly failed to comply with them.

## IV.    Factual Summary

Between 2013 and 2020, UNC was the subject of sustained public, media, and federal scrutiny regarding its alleged lack of support for female complainants in sexual misconduct investigations. This was not a typical situation for any educational institution—it went viral. Students criticized the university for failing to take their reports seriously, leading to widespread coverage in traditional and social media, the formation of campus advocacy groups, petitions calling for reform, and public demonstrations. Five complainants filed complaints against UNC under Title IX and the Clery Act in 2013,[6] and at least one other OCR complaint followed in 2020.[7] A 2015 documentary amplified concerns by focusing on two of the five students who alleged in 2013 that UNC mishandled their reports. One news report explained that the two female students became "national heroes for sexual assault survivors and supports, with their story launching waves of Title IX complaints across the country. The women eventually founded an advocacy group, End Rape on Campus, and co-wrote a book."[8] OCR concluded its 2013 case by finding that UNC mishandled complaints of sexual assaults in a way that harmed alleged victims,[9] and the 2020

---

[6]    *See* OCR Letter of Findings UNC-Chapel Hill (Jun. 28, 2018), *available at* https://ocrcas.ed.gov/sites/default/files/ocr-letters-and-agreements/11132051-a.pdf.

[7]    *See* OCR Letter of Findings UNC-Chapel Hill (Dec. 8, 2023), *available at* https://ocrcas.ed.gov/sites/default/files/ocr-letters-and-agreements/11202094-a.pdf.

[8]    Jeremy Bauer-Wolf, "The 'Confusing' Case of UNC's Title IX Violations," Inside Higher Ed (Jun. 26, 2018).

[9]    *See* OCR Letter of Findings UNC-Chapel Hill (Jun. 28, 2018), *available at* https://ocrcas.ed.gov/sites/default/files/ocr-letters-and-agreements/11132051-a.pdf.

was under investigation through December 2023.[10] In 2020, the Department of Education's Clery Act Compliance Division concluded that UNC had violated Title IX and the Clery Act, resulting in a $1.5 million fine, required policy changes, and a multi-year period of federal monitoring.[11] OCR continued monitoring UNC's response to Title IX reports until September 21, 2020.[12]

Against the backdrop of this intense public and regulatory scrutiny, in April 2021, four female students—Jane Roes 1 through 4—submitted allegations against Doe to UNC's Equal Opportunity and Compliance (EOC) office. Doe, a Morehead-Cain Scholar and Honors College member, was accused of separate incidents of sexual misconduct involving each of the Roes, all of which allegedly occurred between March 2020 and January 2021. In a communication to Doe in January 2021, Roe 2 acknowledged that the group had considered submitting complaints to isolate Doe, get him kicked out of his fraternity, and make him lose his scholarship—all of which occurred shortly after the complaints were submitted.

Prior to formal complaints being filed, Doe had informally heard from Roes 1, 2, and 4 about some concerns with his behavior, but the nature of the allegations had changed dramatically by the time they reached EOC. For example, although Roe 4 initially told Doe on January 25, 2020, that he had allegedly made her "uncomfortable" because of some unspecified "touchiness," with no reference of a sexual nature, her complaint to EOC involved an elaborate scheme by Doe to get her alone in his apartment so he could attack her and fondle her breasts on one occasion and an attempt to digitally penetrate her vagina at a beach house in front of Roe 4's boyfriend/Doe's best friend and 14 other students.[13] Similarly, on January 25, 2021, Roe 1 told the Respondent that the "exact accusations" being raised against him were

---

[10] *See* OCR Letter of Findings UNC-Chapel Hill (Dec. 8, 2023), *available at* https://ocrcas.ed.gov/sites/default/files/ocr-letters-and-agreements/11202094-a.pdf.

[11] *See* Jackie Wernz and Emily Tulloch, "Title IX Lessons from DOE Report Finding Clery Act Violations at UNC," Title IX Insights Blog (Dec. 5, 2019), *at* https://www.franczek.com/blog/title-ix-lessons-from-doe-report-finding-clery-act-violations-at-unc/ (note that upon my departure from the firm, the firm removed my name from publications); *see also* Jackie Wernz and Emily Tulloch, "Title IX Lessons from DOE Report Finding Clery Act Violations at UNC," JD Supra (Dec. 10, 2019), *at* https://www.jdsupra.com/legalnews/title-ix-lessons-from-doe-report-11782/ (same note).

[12] *See* OCR Letter of Findings UNC-Chapel Hill (Dec. 8, 2023) at n.1, *available at* https://ocrcas.ed.gov/sites/default/files/ocr-letters-and-agreements/11202094-a.pdf.

[13] Although not raised in the initial complaint, Roe 4's complaint continued to grow throughout the process. By the time of her interview, she was alleging Doe of having attempted to rape her.

that he "tend[s] to pressure girls and become manipulative when trying to get a girl to have sex with you, you say all the right things to put a girl into the perfect emotional state to just give in" and that he "like[s] to have sex very aggressively" and that although that "works" for Roe 1, "there needs to be a balance." By the time the report was made to EOC months later, it Doe had forcibly restrained Roe 1 by the neck and raped her on several occasions, including once when she was purportedly unconscious. Roe 2 also told the Respondent, on January 27, 2021, through text message what the accusations were against him, including those from both herself and Roe 1: "[T]he things that were said weren't anything along the lines of [yo]u like holding down and forcing yourself onto girls it was more ab[ou]t subtle emotionally manipulative tactics you use to get girls to have sex and pressure." Yet by the time she reported her concerns to EOC, Roe 2 alleged not only that Doe had held down and raped Roe 1, but also that Roe allegedly did the same thing to Roe 2.

A few things changed between the initial concerns raised with Doe and the Roe's report, none having to do with any alleged sexual misconduct itself. On January 21, 2021, Doe and his best friend, Roe 4's boyfriend, moved into a new apartment near campus. Roe 4 essentially moved in too, spending most days and nights there with her boyfriend/Doe's best friend. Two days later, Roe 4 saw Roes 1 and 2 at a party and told them that she had concerns with Doe—presumably, that he had been "touchy" and made her "uncomfortable," including pressuring her for sex. Within days, both Roes 1 and 2 wrote to Doe about what Roes 1, 2, and 4 had discussed and disclosed to each other. As noted above, it was nothing like what would be said in late March when they reported to EOC.

On January 25, 2021, Roe 1 ended her relationship with Doe. As noted earlier, she expressed concerns in a message to him about his behavior toward women, stating that he tended to "pressur[e] girls" and could become "manipulative when trying to get a girl to have sex with [him]." She also commented that although rough sex between them had "worked," there needed to be a better balance. However, at no point did she mention that Doe had sexually assaulted her or anyone else.

Roe 1 was also concerned that Doe might have been sexually involved with others during the early stages of their relationship, including her best friend, Roe 2. On the night of January 27–28, 2021, she slept on a lawn chair in the foyer of Doe's apartment, which Doe believed was an effort to see if he would bring home a date after attending an event. When Doe returned home alone and texted Roe 1 asking if she wanted to join him in bed to rest a bit more, she replied "100%." Despite this interaction, her concerns lingered. On February 3, 2021, she visited Doe's apartment

to ask whether he had slept with Roe 2. Doe admitted that he had, though he insisted that their relationship had not been a lie and that he had not misrepresented his feelings for her. After this conversation, Roe 1 left and never spoke to him again.

Although Roe 1 appeared upset about Doe's sexual behavior, no reports were made to the Equal Opportunity and Compliance (EOC) Office at that time. It was not until March 20, 2021—following an unrelated incident involving Roe 2—that coordinated efforts to file a complaint against Doe began. That night, Roe 2 brought her younger brother, a minor, to Doe's apartment while he was severely impaired. She then went to sleep with her boyfriend, who was also Doe's roommate and best friend, leaving her brother passed out on the couch. When Doe awoke, he found the boy still in that condition, got him breakfast, and stayed with him while they played video games until Roe 2 woke up around noon. He did not hide his frustration with her and ignored her presence.

The following day, March 21, 2021, Roe 2 messaged Doe expressing anger that he "continuously refused to acknowledge [her] or even [her] presence whatever [sic] I see you which is really often." She did not attribute her frustration to any alleged sexual misconduct. Instead, she stated that she was confused about his behavior, writing, "I don't know what I said or did to make you act that way toward me all of a sudden." She referenced their previous conversation—where he had been accused of "pressuring" girls for sex—and said his recent behavior "continuously reminds" her of what had happened, making it difficult for her to "relax at my own boyfriend's place."

Within days, Roe 2 contacted two fellow Morehead Scholars to report that Doe had "sexually assaulted" multiple women who, according to her, wished to remain anonymous. These friends then relayed the report to Mallory Findlay, Doe's advisor in the Morehead-Cain program, on March 27, 2021. Findlay indicated the report stated Doe "had committed sexual misconduct against several women," prompting her to notify the EOC.

Meanwhile, on March 23, 2021, Roe 2 met Roe 3 at a party. Roe 2 was reportedly discussing the allegations against Doe at the event, which led Roe 3 to disclose for the first time that Doe had sexually assaulted her. On March 28, 2021, the Roes started a group chat to align their narratives. Another classmate gathered their statements and compiled them into a written complaint. However, UNC was unable to verify what was said in those conversations because the EOC never requested the messages and the individuals involved never submitted them.

On March 29, 2021, Findlay spoke with Roe 2 by phone. Roe 2 claimed that Doe "has committed sexual misconduct against UNC undergraduate women" and that he was being expelled from his fraternity due to those actions, effective April 6. This claim was demonstrably inaccurate: Doe's fraternity had already been disbanded in January 2021 due to conduct by other members unrelated to him.
████████████████████████████████████████████ Instead, a few members had decided not to include Doe's name among those seeking to reinstate the chapter—a fact Doe did not learn until April 14, 2021.

There is also no indication that the fraternity members made any meaningful effort to assess whether there was a good-faith basis for the vague sexual misconduct claims being circulated by the Roes. There appears to be no dispute that Roe 2 had no intention of doing more than "ostracizing" Doe from their shared friend group and causing him to lose his scholarship. But Findlay's report to EOC took the matter out of Roe 2's hands. Elizabeth Hall, who was the newly appointed Interim Head of the EOC office by that time, and her office received the complaint. Interestingly, a biography of Hall on the UNC website states that had only been an investigator with EOC for around *two years* prior to being promoted to *lead the office*. Before that, the bio says she had never worked at a University, let alone in (or leading in) the education civil rights space.[14] She assigned the case to lead investigator Jeremy Enlow, who was no stranger to pro-complainant pressures. He had left the University of Denver mere months before, in July 2020, taking the equivalent of a significant demotion to join UNC[15] just months after students set up an anonymous Instagram account to criticize DU's response, under Enlow's leadership, to sexual misconduct complainant's reports.[16]

---

[14] "Elizabeth Hall," Conflict management Initiative, *at* https://cmi.unc.edu/people/elizabeth-hall/. *See also* Elizabeth Hall, Leadership Team, Our Team at https://eoc.unc.edu/whoweare/our-team/ ("Elizabeth previously worked in the EOC as an investigator, the Assistant Director, and the ADA Coordinator. Prior to joining the team, Elizabeth was a litigator in Raleigh, North Carolina and handled appeals in state and federal courts.")

[15] *See* University of Denver, "Update to the Office of Equal Opportunity & Title IX" (Jul. 16, 2020), *at* https://www.du.edu/news/update-office-equal-opportunity-title-ix.

[16] Elizabeth Hernandez, "Students use anonymous Istagram account to call on University of Denver to better respond to gender violence," The Denver Post (Jan. 22, 2020),

By April 15, 2021, gossip stemming from the Roes' complaints had such a negative impact on Doe that his attorneys sent a cease-and-desist letter to the (defunct) fraternity's executive board, directing them to stop making allegedly defamatory statements about Doe and to preserve any communications concerning him. Despite being aware of the comments and the effect they were having on Doe, EOC took no action to address what might have constituted peer retaliation in violation of Title IX.

On May 4, 2021, EOC issued no-contact orders to Doe and the Roes. The orders were unusually broad, prohibiting contact in any location, at any time, and for any reason. Although Roe 2 was informally living in Doe's off-campus apartment, the order barred Doe from contacting her there, which meant that Doe could no longer remain in his apartment due to the presence of someone who did not have a legal claim to the residence. While EOC was aware of those circumstances, the record does not reflect any efforts by EOC to address the impact of the no-contact order on Doe.

On May 10, 2021, Doe received a letter from the Morehead-Cain Foundation stating that his scholarship was being suspended indefinitely, effective immediately. As a result, Doe could only continue his studies at UNC if he and his family paid the full cost. At the time, there had been no adjudication of the complaints against him, and Doe had not been given notice of, or an opportunity to respond to, the Foundation's decision.

No further activity is documented in the EOC file between May 4 and early June 2021.



The apparent purpose of the meeting was to receive a new report from Roe 4, in which she alleged that Doe was on campus, owned a gun, and had broken into his old room in the fraternity house. These claims contradicted other available information. There is no transcript or set of notes from the meeting, nor is there evidence that any materials from the meeting were shared

---

*available at* https://www.denverpost.com/2020/01/22/university-of-denver-we-can-du-better-sexual-assault/.

with Doe before his hearings. EOC did not disclose the meeting or Roe 4's allegations until after all four disciplinary hearings were complete.

[REDACTED] EOC official Hall signed formal complaints on behalf of the institution. In doing so, she cited "violence" and a "pattern" of behavior. EOC did not inform Doe that the complainants had withdrawn. This fact was not disclosed to him until after all four disciplinary hearings had concluded.

The notice of allegations for Roe 1's case listed November 19, 2020, as the date of the alleged incident, which Roe 1 had also stated during her initial interview. [REDACTED]

[REDACTED]

[REDACTED]

On July 23, 2021, EOC issued a no-contact order between Roe 3 and Doe. In the accompanying letter, Enlow did not indicate that Roe 3 had reported any concerns about the interview, and the order itself did not reference any alleged impropriety. In response, Doe's attorney clarified:

> I read the no-contact order [Enlow's] covering email as a form letter and email, rather than a suggestion that the actions by [Barefoot] were

improper in any way. Prior to this NCO, there has been no restriction on our right to contact [Roe 3]. Our investigator first contacted [Roe 3] by phone to ask if she would consent to an interview. [Roe 3] agreed and the two arranged to meet. [Roe 3] spoke freely with [Barefoot] with her mother present.

The attorney added that the clarification was offered "in the event [Roe 3] has construed these events differently." Although EOC had received Roe 3's claims and reported them to the EEAC in advance of its hearing on Doe's request to attend fall courses remotely, it did not share this information with Doe.

On July 29, 2021, Doe petitioned the EEAC to modify his interim suspension so he could take fall classes remotely. EOC had already been in communication with the Roes regarding the possibility that Doe might file such a petition. On July 22, 2021, Roe 4 sent an email to EOC alleging that Doe owned a gun, had broken into the fraternity house, and was making threats toward fraternity members. On July 30, 2021—one day after Doe filed his petition—Roe 2 sent the following email to EOC [all sic]:



The allegations in Roe 2's email were inconsistent with information available to EOC at the time. Doe was working at an overnight camp in New Hampshire that required him to remain on site, and he would not return to Chapel Hill until August. He had never owned or possessed a gun and had not claimed otherwise. Doe's attorney had informed EOC of those facts multiple times prior to the EEAC hearing.

On August 3, 2021, EOC response coordinator Rebecca Gibson briefed EEAC Chair Desiree Rieckenberg on those allegations in advance of Doe's hearing. She later summarized that call in an email to EOC investigators Enlow and Froehling:



The EEAC hearing on Doe's petition occurred on August 19, 2021. EOC did not disclose Gibson's email or the substance of its communication with the EEAC Chair to Doe. These communications were not provided to Doe until April 18, 2022—twelve days after his final hearing had concluded. As a result, Doe was unable to respond to the allegations referenced in the hearing. He was also denied the opportunity to use this information as potential evidence of the credibility of certain complainants or of the investigators' approach to evaluating such claims.

At the hearing, Doe presented evidence that contradicted the complainants' accounts in support of his request to take his fall courses remotely. However, because the allegations communicated by EOC to EEAC were not shared with him, he had no ability to respond to them during the hearing.

On August 25, 2021, EEAC denied Doe's petition. EOC subsequently informed Doe that it was adding retaliation charges based on Barefoot's July 21 interview of Roe 3. There is no dispute that EOC was aware of the interview when Roe 3 reported

it that same day. EOC issued a no-contact order on July 23 based on Roe 3's account, and reported those same allegations to the EEAC on August 3.

The Roe 1 and Roe 2 cases were investigated under UNC's Title IX policy; the Roe 3 and Roe 4 cases were investigated under UNC's general harassment policy due to the off-campus nature of the alleged conduct. In July 2021, Hall proposed consolidating the cases to permit consideration of "pattern evidence." Doe declined, and was assured that each matter would be handled separately. ████████████ ████████████████████████████████████████████████████████████████.

### A. Roe 4's Complaint

Doe was never provided a copy of Roe 4's written complaint or a detailed summary of her allegations. As a result, he did not begin to understand the scope of his claims until investigators interviewed him. Portions of the allegations became apparent only through the questions posed during the interview.

Following those intervi████████████████████████████████████ ████████████████████ agreed. In total, four polygraph examinations were conducted—one for each complainant's set of allegations—by retired FBI Special Agent James Randy Walker, who previously led the FBI's polygraph program in North Carolina. The first exam, addressing Roe 4's allegations, was completed on September 28, 2021, and both Special Agent Walker's credentials and his report were submitted to EOC shortly thereafter.

Doe consistently denied having any sexual contact with anyone without clear and affirmative consent. According to the polygraph results addressing Roe 4's allegations, Special Agent Walker concluded that Doe did not show signs of deception in response to the tested questions. These questions addressed alleged incidents in Alabama during Spring Break in March 2020 and in Charlotte in June 2020. The questions also covered Doe's statements about friends allegedly expressing discomfort with Roe 4 visiting. Walker reported that the physiological data collected indicated a statistical probability of deception of less than 1%.

### i. Investigation – Roe 4

EOC Investigator Jeremy Enlow employed different interview techniques for complainants and respondents. Interviews with Roe 4 and other complainants involved leading questions and uncritical acceptance of statements. ██████████

███████████████████████████████ By contrast, Doe's interview included repeated questions, probing for inconsistencies, and unsupported implications in the report that Doe withheld evidence.

█████████████████████████████████████████████████████████████████████████████████████████ Enlow did not request key materials, such as photographs and messages that were referenced during the investigation. There is also no evidence that Enlow ever notified the complainant or supporting witnesses of the importance of such evidence if they hoped there would be a finding against Doe.

Meanwhile, Enlow made multiple targeted evidence requests of Doe and treated the absence from Doe of evidence as a sign of noncooperation. I████████████████████████████████████████████████████████████████

The investigation report also emphasized evidence supporting Roe 1's account while minimizing or excluding contradictory information. Potentially exculpatory details about interpersonal dynamics, motivations to fabricate, or prior false reports by Roe 4 were ignored or minimized. The report also included references to other unrelated allegations, based on a letter from Doe's attorney in an unrelated matter, despite prior assurances that such information would be excluded.

Drafts of the investigation reports also show efforts to shape a narrative that would be harmful to Doe. ████████████████████████████████████████████████████████████████ Similar comments are also elsewhere in the report drafts.

After all hearings had concluded, the EOC disclosed materials suggesting that potentially exculpatory evidence had not been included in the investigation file. That evidence, which may have supported Doe's defense, was not made available during the adjudication process.

The investigative record submitted to the Hearing Panel included multiple references to allegations made by other Roes—neither of which had been adjudicated at the time and two of which were later found not supported by the evidence. The

references were not part of the formal notice issued to Doe, nor were they consolidated with his consent.

Throughout the process, Doe requested that the four cases be handled separately to ensure that each would be adjudicated on its own merits. Early in the investigation, the Title IX Coordinator acknowledged that under Title IX, the university could not consolidate the cases without Doe's consent. Doe declined, and his legal counsel consistently emphasized this position in communications with EOC.

This separation was maintained procedurally until the EOC released its investigative reports and accompanying witness interview transcripts. Although some redactions were made, many references to the other complaints remained. For example, one witness—Roe 2's boyfriend and Doe's former roommate—who had no direct knowledge of the incident at issue, was quoted as saying he had heard that "multiple women… accused [Doe] of multiple sexual violence allegations." Other materials included anonymous third-party statements that Doe "has committed sexual misconduct against several women" and had been "kicked out of his fraternity" as a result. One unredacted document referred to supposed "written statements" from other complainants and alleged that "many other girls" had experienced similar conduct but were afraid to come forward.

These included internal findings from other EOC matters and summaries of prior allegations. For example, the investigation report included a discussion of the investigator's recommended sanction—expulsion—which it stated was based on the investigator's finding Doe was responsible for nonconsensual vaginal intercourse with Roe 3. At the time of the hearing in Roe 4's case, however, there was not a panel decision in Roe 3's case. When the Roe 3 decision was issued, moreover, Doe was unanimously acquitted of all of Roe 3's allegations. Nevertheless, the statement was in the investigation report transmitted to the hearing panel before the Roe 4 hearing began.

The EEOC process had consolidated the complainants, whereas the Title IX process did not, pursuant to both policy and Doe's lack of consent.

In light of the number and nature of the references in the report, Doe's attorney requested a meeting with the Title IX Coordinator, which occurred on December 26, 2021. During that meeting, the Coordinator stated that the hearing panel would not be presented with references to allegations outside the specific case being heard. She indicated that if a finding of responsibility were made in one case, that outcome could be considered during sanctioning after all four hearings had concluded. Based on that understanding, Doe's attorney submitted a 19-page letter identifying references in the investigation file that they believed should be redacted.

Shortly before the hearings, however, the Title IX Coordinator informed Doe's attorney that the full, unredacted investigation file had been submitted to the hearing panel. In a January 21, 2022 email—the day after the final pre-hearing conference—she also notified the parties that the complainants and their legal counsel would be permitted to reference any of the other allegations during the hearings, despite the parties' earlier understanding to the contrary.

After all of Doe's hearings concluded, the EOC allegedly disclosed materials suggesting that exculpatory evidence had not been included in the original investigative report or shared with the parties. The nature of this evidence, as described, could have been relevant to Doe's defense, and its omission raises questions regarding the completeness and fairness of the investigative file.

### ii.     Hearing – Roe 4

Shortly before the hearing began, the Hearing Chair held a private conference with Doe and his legal counsel to inform them of a ruling that would limit the scope of evidence permitted during the proceeding. Specifically, the Chair stated that Doe would not be allowed to present evidence relating to the complainant Roe 4's credibility. That included evidence such as prior instances in which Roe 4 had allegedly made false or misleading statements, as well as information regarding a recent claim she made to the EOC about a "medical emergency" that prevented her from appearing at a previously scheduled hearing. According to information submitted by Doe's counsel, Roe 4 had posted videos on social media during that same time period, showing a black eye and bruised knees that were allegedly sustained during a physical altercation at a fraternity house.

During the pre-hearing conference, the Chair did not cite a specific policy provision as the basis for the ruling. He indicated that he would provide a policy reference after the hearing concluded. Doe's counsel raised concern at that time, noting that they were not aware of any policy language authorizing a Hearing Chair

to categorically exclude credibility-related evidence from a hearing involving allegations made by that individual. The Chair did not alter the ruling, and the hearing proceeded under those limitations.

Following the hearing, the Chair wrote to Doe's attorney to explain the rationale behind his decision. In that correspondence, the Chair cited "Section 7 of the Procedures" as the authority for the ruling. There is no Section 7 in the Procedures. The Chair's explanation appeared to refer to Section IV(C)(7) of the Procedures, which pertains to the EOC's investigatory process, including investigator responsibilities and report preparation. That section does not apply to the Hearing Panel or to the conduct of the hearing itself.

Following the ruling that barred the presentation of certain credibility evidence, Chairman Elrod later stated that Doe was permitted to present evidence regarding Roe 4's credibility at the hearing. During the hearing, however, Chairman Elrod closely monitored the scope of questioning and interrupted Doe and his counsel on multiple occasions when they began to raise matters relating to Roe 4's credibility.

As a result of those limitations, Doe was not permitted to introduce several categories of evidence relevant to credibility. That included witness statements, documentary evidence, and Roe 4's own statements concerning specific events in which she was alleged to have made materially false or misleading representations. According to Doe's counsel, these restrictions precluded him from presenting entire sections of his planned cross-examination of the investigator, segments of Doe's direct examination, and portions of both the opening statement and closing argument.

In this non-Title IX matter, the investigator, Enlow, was allowed to present his "case" directly to the hearing panel and to respond to objections as though he was a prosecutor.



The hearing that led to Doe's expulsion also did not include an opportunity for cross-examination of his accuser. Instead, Roe 4 first reported a "medical emergency" to cause the hearing scheduled for her to be postponed and when it was finally rescheduled, she didn't show up. As a result, Doe's attorney was not given the chance

to question Roe 4 about the evolution of her allegations (from feeling uncomfortable to Doe tried to rape me), her demonstrable lies to the EOC, or all of the evidence that contradicts her claims. The EOC believed it had an alternative approach that met the cross-examination that due process demands, citing policy that allows an advisor/attorney to answer any questions for the reporting party as though the reporting party is testifying. However, neither Roe 4 or her advisor showed up. In an adjudication that resulted in Doe's expulsion from every institution in the North Carolina University System, neither Doe nor the hearing board was able to question Roe 4 or any of the witnesses against Doe.

The Hearing Panel's written explanation for its finding that Doe "touched [Roe 4]'s vagina" cited four points it described as supporting that conclusion:



Regarding the first ("[Doe's] hand reached down towards [Roe 4]'s vagina while in the presence of witnesses"), Doe testified at the hearing and denied touching Roe 4's vagina or reaching toward that area. Roe 4 did not testify, and no witness reported seeing Doe touch Roe 4's vagina or approach that area during the interaction. The only witness who reported seeing the interaction was Sara Poe, Roe 4's lifelong friend, who, according to Roe 4's own statement, said she ███████████████ Sara Poe confirmed in her EOC interview that she could not see anything below Roe 4's torso, which was blocked by the counter.

The other individual who observed the interaction was James Moe who told investigators he had an unobstructed view and watched the entire hug from start to finish. 

The observation that "███████████████████████████ ███████████ was referring to a statement by Sara Poe, who did not testify at the hearing. Although changes in facial expression can be a reaction to distress, they may also occur in response to a wide range of stimuli. James Moe who was present at the time, described Roe 4's facial expression as ███████████

" adding that this was typical behavior for her when she drank. When asked by investigators whether he observed any signs of distress in Roe 4's demeanor during or after the hug, <sup>James Moe</sup> responded ████████████."



Finally, regarding the assertion that Roe 4 was ████████████ ████████████████████████████ the record shows significant variances in her telling over time.

During Spring Break, Roe 4 claimed to have disclosed the incident to her then-boyfriend, John Coe , who Roe 4 was terrified was about to break up with her. At the time, <sup>John Coe</sup> was also Doe's best friend and roommate; he later broke up with Roe 4 and became Roe 2's boyfriend. Despite Roe 4's claim, <sup>John Coe</sup> told investigators he had no recollection of her reporting any inappropriate conduct during that trip.

Roe 4 also told investigators that Sara Poe witnessed the incident. However, <sup>Sara Poe</sup> stated unequivocally that she "████████████████ such event.

On January 23, 2021, Roe 4 disclosed allegations about Doe to Roe 2 and Roe 1. Both documented their conversations with Roe 4 shortly thereafter. Notably, neither of their written accounts included any mention of Doe grabbing Roe 4's vagina.

In March 2021, when Roe 4 discussed the possibility of filing a complaint with Kate Joe , she referenced an incident in Charlotte that made her feel uncomfortable. She did not mention the Spring Break trip, Gulf Shores, or any act of Doe touching her vagina.

Roe 4's written statement dated ████████████████████



During her May 10, 2021 interview with EOC investigators,

Later, Roe 4 told her boyfriend, Joseph Boe, that the incident occurred while she, Doe, and [James Moe] were by the beach during Spring Break. She said Doe "put his hand on her crotch and was starting to, like, lift her bathing suit," and again claimed that [James Moe] stopped him. This version differed from both the April 1 written account and the May 10 interview.

Finally, on October 20, 2021, when shown a photograph of herself sitting on Doe's lap at the Gulf Shores house, Roe 4 described the interaction as "sexual assault"—introducing yet another framing of the alleged conduct.

### iii.        Appeal – Roe 4

When Doe appealed, the EOC office was allowed to submit documentation in support of the hearing panel's finding. This documentation read much like a defense brief, arguing directly and zealously against the arguments raised by Doe on appeal.

The appeal was denied, despite references to the procedural and bias concerns identified above, the fact that other allegations against Doe were repeatedly referred to in the process despite later findings of insufficient evidence to support them, and despite the claim that new evidence that had been withheld by EOC could have impacted the outcome of the hearing.

### B.     Roe 1's Complaint

As with Roe 4's complaint, Doe was never provided a copy of Roe 4's written complaint or a detailed summary of her allegations. As a result, he did not begin to understand the scope of her claims until investigators interviewed him. Portions of the allegations became apparent only through the questions posed during the interview.

As discussed above, following those interviews, Doe asked his attorney what additional steps he could take to support his account and, at his attorney's suggestion, took a polygraph examination. The polygraph—by retired FBI Special Agent James

Randy Walker, who previously led the FBI's polygraph program in North Carolina—showed less than a 1% chance that Doe was lying about any of his answers, which included unequivocal denials that the had ever engaged in sexual activity without consent with Roe 4. Both Special Agent Walker's credentials and his report were submitted to EOC shortly after the exam.

### i.     Evaluation and Notice – Roe 1

In this case, the EOC issued written notice stating that Doe was alleged to have engaged in non-consensual sexual intercourse with Roe 1 on November 19, 2020, at the Kappa Sigma fraternity house. ██████████████████████████ ████████████████████████████████████████████████████ The EOC's Formal Complaint and Notice of Investigation, dated June 29, 2021, also identified November 19, 2020, as the relevant date. At no point did the EOC issue an amended notice or complaint to include an allegation pertaining to November 12.

No amended written notice was ever issued to reflect a shift in the date of the alleged conduct. For nine months, Doe and his legal and investigative team gathered evidence specifically to dispute the allegation concerning November 19. This included documentation establishing that no sexual contact occurred between Doe and Roe 1 on that date. The EOC had access to this information and shared it with Roe 1.

### ii.     Investigation – Roe 1

As with Roe 1's case, EOC Investigator Jeremy Enlow employed different interview techniques for complainants and respondents. Interviews with Roe 1 and other complainants involved leading questions and uncritical acceptance of statements. Indeed, in the hearing for Roe 3's case, the hearing panel criticized Enlow for his use of leading questions by investigators. By contrast, Doe's interview included repeated questions, probing for inconsistencies, and unsupported implications in the report that Doe withheld evidence.

Enlow used the same method for collecting evidence from the Roes and witnesses in Roe 1's case as he did in Roe 4's. ████████████████████████ ████████████████████████████████████████████████████ Enlow did not request key materials, such as photographs and messages that were referenced during the

investigation. There is also no evidence that Enlow ever notified the complainant or supporting witnesses of the importance of such evidence if they hoped there would be a finding against Doe. Again, the hearing panel in Roe 3's case noted the lack of expected evidence from the complainant and supporting witnesses in finding insufficient evidence to support the allegations in that case.

Meanwhile, Enlow made multiple targeted evidence requests of Doe and treated the absence from Doe of evidence as a sign of noncooperation.

The investigation report also emphasized evidence supporting Roe 1's account while minimizing or excluding contradictory information. The report also included references to other unrelated allegations, based on a letter from Doe's attorney in an unrelated matter, despite prior assurances that such information would be excluded.

As noted above, drafts of the investigation reports also show efforts to shape a narrative that would be harmful to Doe. ███████████████████████████ █████████████████████████████████████████████████████ ████████████████████████ Similar comments are also elsewhere in the report drafts.

After all hearings had concluded, the EOC disclosed materials suggesting that potentially exculpatory evidence had not been included in the investigation file. That evidence, which may have supported Doe's defense, was not made available during the adjudication process.

███████████████████████████████████████████████████ █████████████████████████████████████████████████████ ███████████████████████████████████████████████ The references were not part of the formal notice issued to Doe, nor were they consolidated with his consent.

Throughout the process, Doe requested that the four cases be handled separately to ensure that each would be adjudicated on its own merits. Early in the investigation, the Title IX Coordinator acknowledged that under Title IX, the university could not consolidate the cases without Doe's consent. Doe declined, and his legal counsel consistently emphasized this position in communications with EOC.

This separation was maintained procedurally until the EOC released its investigative reports and accompanying witness interview transcripts. Although some redactions were made, many references to the other complaints remained. For example, one witness—Roe 2's boyfriend and Doe's former roommate—who had no

direct knowledge of the incident at issue, was quoted as saying he had heard that "multiple women… accused [Doe] of multiple sexual violence allegations." Other materials included anonymous third-party statements that Doe "has committed sexual misconduct against several women" and had been "kicked out of his fraternity" as a result. One unredacted document referred to supposed "written statements" from other complainants and alleged that "many other girls" had experienced similar conduct but were afraid to come forward.

Despite the earlier agreement, Enlow included material in the investigation report, appendices, and interview transcripts referencing other complainants' cases. These included internal findings from other EOC matters and summaries of prior allegations. For example, the investigation report included a discussion of the investigator's recommended sanction, expulsion, which stated it was based on the investigator's finding Doe was responsible for nonconsensual vaginal intercourse with Roe 3. But Roe 3's hearing had not yet occurred at the time of Roe 1's hearing, and when it was heard, Doe was unanimously acquitted of all of Roe 3's allegations. Nevertheless, the statement was in the investigation report transmitted to the hearing panel before the Roe 1 hearing began.

As discussed above, Enlow justified this inclusion by citing a letter written by Doe's attorney to Dean Jonathan Sauls in the context of the EEAC proceedings. That letter, dated October 5, 2021, discussed broader due process concerns in a different forum. The EEOC process had consolidated the complainants, whereas the Title IX process did not, pursuant to both policy and Doe's lack of consent.

In light of the number and nature of the references in the report, Doe's attorney requested a meeting with the Title IX Coordinator, which occurred on December 26, 2021. During that meeting, the Coordinator stated that the hearing panel would not be presented with references to allegations outside the specific case being heard. She indicated that if a finding of responsibility were made in one case, that outcome could be considered during sanctioning after all four hearings had concluded. Based on that understanding, Doe's attorney submitted a 19-page letter identifying references in the investigation file that they believed should be redacted.

Shortly before the hearings, however, the Title IX Coordinator informed Doe's attorney that the full, unredacted investigation file had been submitted to the hearing panel. In a January 21, 2022 email—the day after the final pre-hearing conference—she also notified the parties that the complainants and their legal counsel would be permitted to reference any of the other allegations during the hearings, despite the parties' earlier understanding to the contrary.

This was not the only issue with bias that occurred prior to the hearing. Counsel for Doe objected to two of the hearing panelists, Maxine Eichner and Margaret F. Henderson, based on backgrounds suggesting disqualifying bias toward female complainants in Title IX sexual misconduct cases. Those requests were denied based on general references to the Title IX regulations.

After all of Doe's hearings concluded, the EOC allegedly disclosed materials suggesting that exculpatory evidence had not been included in the original investigative report or shared with the parties. The nature of this evidence, as described, could have been relevant to Doe's defense, and its omission raises questions regarding the completeness and fairness of the investigative file.

### iii.    Hearing – Roe 1



The hearing ultimately proceeded based on the revised date of November 12, despite the absence of the required written notice under 34 C.F.R. § 106.45(b)(2)(ii). There was no explanation of the consequences in a Title IX case, where the decision-maker would typically be required to send the case back to the investigation process unless he obtained informed consent from both parties to continue. No such informed consent happened.

Because Doe had not received prior written notice of any allegation relating to November 12–13, he was not afforded an opportunity to gather and submit relevant evidence related to those dates before the hearing. The only information he was able to collect during a short lunch break was a series of text messages suggesting that he was engaged in other activities at the alleged times when he was asleep.

The hearing that led to Doe's expulsion also did not include an opportunity for cross-examination of his accuser.



Those references presented a cumulative portrayal of Doe as having engaged in a pattern of sexual violence and suggested that Roe 1's claims were part of that broader pattern.

First, the Panel found Roe 1 credible in part because she admitted during the hearing that she had previously lied about what occurred with Doe on November 1, 2020. She originally said that he had tried to force her into sexual activity but that she got uncomfortable and left. At the hearing, she admitted that she had consensual sexual activity with Doe on November 1, 2020. According to the decision, this admission supported her credibility. However, that admission occurred only after she was confronted with contrary evidence during cross-examination. Instead, her admission came only during cross-examination at the hearing. She also left the hearing before any further cross-examination could continue on the issue.

Second, the Panel found that Roe 1 was unconscious during the alleged sexual assault. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

Third, the panel found that during that time, Doe engaged in "rough sexual intercourse." Roe 1 testified that she had no memory of any sexual activity occurring while she was asleep. ██████████████████████████████████████████

█████████████████████████████████████████████████████████████

Fourth, the panel found that Roe 1 woke at 3 a.m. from pain "consistent with rough sexual intercourse." ████████████████████████████████████████

████████████████████████████████████████████████████████████

Fifth, the panel found that there was bruising was consistent with being restrained while unconscious. No photos, messages, or medical records were presented to show bruising on Roe 1's wrists, chest, or neck. The only witness to mention bruising, Kate Joe , could not associate it with a specific date or incident. Kate Joe also stated that Roe 1 had engaged in rough sexual activity with others in the past and that marks on her neck were not unusual. She did not recall them being specific to Doe or to this date. ████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████



Seventh, the panel found a photo posted by Roe 2 shows Roe 1 at Kappa Sigma at 9:48 a.m. on November 13. There is a photo, but no video, showing Roe 1 in the common area of the fraternity house at 9:48 a.m.

Eighth, the panel found that Roe 2 saw Roe 1 exiting the hallway that led to Doe's room on the morning of November 13.

, not Roe 2. The hearing panel did not address the inconsistency in their report.

Ninth, the panel found Roe 2 was credible because she contradicted Roe 1 when she "could have been untruthful."

Finally, the panel claimed inconsistency in Doe's account. The Panel concluded that Doe was less credible because of an inconsistency in his testimony about breath play. It cited a contradiction between Doe's testimony that he first learned of breath

play online and that Roe 1 introduced it during their initial encounter. However, the record shows that Doe consistently testified that Roe 1 initiated breath play during their first encounter and that his prior familiarity was theoretical.

### iv.    Appeal – Roe 1

At the time the hearing panel adjudicated Roe 1's allegations, allegations of non-consensual sexual intercourse made by Roe 2, Roe 3, and Roe 4 against Doe had not yet been resolved. However, those accusations were available to the panel through the investigative record.

Following the adjudication of Roe 1's case, two of the other matters—specifically, the allegations made by Roe 2 and Roe 3—were adjudicated to final determinations by independent hearing panels. In both cases, the panels found Doe not responsible for all allegations. The panel in Roe 3's case also found Doe not responsible for multiple allegations of retaliation asserted by the EOC. However, Doe's appeal was denied on the basis of this new evidence not reasonably available at the time of the hearing decision.

The appeal was also denied despite email communications from late July and August 2021 between EOC personnel and several complainants, including Roe 2, were not disclosed to Doe until after all hearings concluded. Those communications contained claims that Doe was allegedly present on campus, entering buildings unlawfully, threatening witnesses, and in possession of a firearm—all during a time he was documented to be in New Hampshire. The unverified and false claims were communicated by the EOC to the university's Emergency Evaluation and Action Committee (EEAC) without Doe's knowledge, and the information was not disclosed to him during the adjudication process, so he could not rely on the information to challenge Roe 2's credibility during Roe 1's hearing. Roe 2 was the only witness who supported Roe 1's allegation concerning the alleged conduct on or around November 13, and the panel found her testimony credible.

Finally, the appeal was denied despite email records indicating that Roe 2 and Roe 3 withdrew from the EOC process that were not disclosed to Doe until after the

panel issued its decision. Roe 2's withdrawal occurred shortly after she was asked to confirm her allegation in writing—an event that closely followed Roe 1's submission of a similar confirmation—and after the complainants were informed of Doe's removal from campus and suspension.



Finally, Doe was told to raise objections on appeal, including when Roe 1 left mid-hearing. Yet that appeal basis appeal was rejected on grounds that he had failed to raise objections during the hearing itself. The Title IX office submitted arguments opposing Doe's appeals, and prior communication between appeals officers and EOC staff further undermined the appearance of neutrality.

As a result of the Roe 1 and Roe 4 proceedings, Doe was permanently expelled from the UNC system and lost his Morehead-Cain scholarship. He has been publicly labeled as responsible for sexual assault, with a permanent disciplinary record that will follow him in future educational and professional settings.

## V.    Opinions

Reasonable administrators understand that external pressures can distort institutional responses to sexual misconduct allegations, especially in the Title IX context. Courts have been reminding us for years that intense public scrutiny and pressure to demonstrate responsiveness to female complainants can, when coupled with procedural deficiencies, support an inference of gender bias. In my opinion, based on my education, experience, and knowledge, UNC operated in such a climate in this case. Both the UNC-specific environment and the experiences of key players Hall and Enlow appear to have contributed to strong institutional incentives to appear aggressive in its response to sexual misconduct complaints against a male respondent, even if it meant ignoring or illogically justifying away significant evidence to the contrary. The external forces appear to have permeated every stage of the process in the four cases brought against Doe.

The four cases included two Title IX matters—Roe 1 and Roe 2, which allegedly occurred on campus and within a UNC program or activity—and two non-Title IX cases—Roe 3 and Roe 4, involving alleged off-campus conduct outside the university's educational program or activity. My opinion focuses primarily on the two matters in

which findings of responsibility were made: Roe 1 (Title IX) and Roe 4 (non-Title IX). However, the mishandling of all four cases is relevant, as the evidence of extensive procedural failures and bias in the Roe 2 and Roe 3 cases support my opinions in the Roe 1 and Roe 4 cases. Also, because the university allowed references to all of the cases to be made, as if they had all led to findings against Doe, at several stages of the process, and used four cases to improperly sanction him before he was found responsible in any case, all of the cases matter.

At the reporting and evaluation stage, UNC's decisions to remove Doe from campus, revoke his prestigious scholarship, and sign formal complaints in two cases where the complainants withdrew their reports did not comport with anything close to the standard of care.

First, UNC's emergency removal of Doe from campus and revocation of his prestigious scholarship were not supported by an individualized safety and risk analysis that could meet the standards required under 34 C.F.R. § 106.44(c) for Title IX cases. That standard requires that there be an imminent threat to the physical health or safety of a member of the campus community. The only unique factors of this case are that there were "multiple charges" against the Respondent. But there is no evidence of outsized power or authority by the Respondent, allegations of extreme violence, or other factors that a reasonable administrator would generally look for to establish that there was an imminent threat to physical health or safety. Title IX requires institutions to conduct a genuine, individualized threat assessment that links the respondent's continued presence to a concrete risk. Here, and there was no evidence that Doe posed *any* physical threat. The mere fact that *some violence* was alleged to be used certainly cannot be the deciding factor, where violence is an inherent part of rape and educational institutions refuse to sign complaints under Title IX for rape cases all the time. In the absence of such a finding, removing a student and revoking a merit-based scholarship not only subverts the presumption of non-responsibility but also constitutes a punitive action masquerading as a supportive measure. In my opinion, these actions do not meet the standard of care under for either Title IX or non-Title IX cases, based on principles of fundamental fairness and due process.

██████████████████████████████████████████████ In both instances, however, the university signed or initiated formal complaints and proceeded with full investigations and adjudications. This is a significant departure from accepted practices. While the Title IX Coordinator has discretion to proceed even when a complainant declines, that

discretion must be exercised in a manner that reflects the same types of serious risk factors that would justify an emergency removal. Here, there is no indication that the decision to move forward was grounded in a fair, balanced, or necessity-driven assessment. Instead, it appears to have been driven by institutional self-interest or external pressure. Proceeding with investigations after complainants withdrew in this case rather than complying with the expectations of the 2020 Title IX regulations to respect the autonomy of the complainants is not what a reasonable administrator would typically do.

Third, these early decisions set the tone for the procedural irregularities that followed and cast doubt on the neutrality of the university's approach from the outset. Instead of beginning with a fair and impartial evaluation of risk and evidence, UNC took aggressive, public-facing action against a single respondent across multiple cases, seemingly to signal institutional toughness rather than to protect against any real risk of harm. These premature and unsupported actions also likely tainted the subsequent proceedings by signaling to investigators, panelists, and administrators that the university had already deemed Doe culpable. In civil rights investigations—particularly those involving potential sexual assault—starting from a place of neutrality and evenhanded evaluation is essential. When an institution begins instead with disciplinary actions and overrides complainant agency, it risks undermining the legitimacy of the entire process.

The investigatory phase also exhibited pervasive procedural defects across all four cases, but particularly in the Title IX case involving Roe 1, where legal standards under 34 C.F.R. § 106.45 applied in full. Most significantly, UNC failed to comply with Title IX's strict written notice requirements. Those requirement are not just a formality; it has become widely accepted in the field how important it is to provide specific details like dates, times, and locations of alleged incidents to Respondents before speaking to them about a case even for the first time. Yet here, Doe was not provided the details he should have been. He was formally notified—both in the Notice of Allegations (NOA) and throughout the investigative process—that the alleged non-consensual intercourse with Roe 1 occurred on November 19, 2020. He was not notified that she was allegedly sexually assaulted while unconscious. Any reasonable administrator would know that those failures would negatively impact the Respondent's ability to gather evidence, seek witnesses, and prepare a defense.

████████████████████████████████████████████████████
████████████████████████████████████████████, UNC did not send the case back to investigation as I would expect to occur if such a major change were

raised for the first time during a hearing. UNC never amended the NOA or even paused to allow Doe a reasonable amount of time to collect information related to the new allegation. This was more than just a technical violation of 34 C.F.R. § 106.45(b)(2)(i)(B), which requires revising the NOA in such situations. It also, in my opinion, denied Doe a meaningful opportunity to be heard. The fact that he was able to scramble over lunch and pull some evidence together to dispute the new date should not be the basis for finding the actions of the EOC reasonable in this case. He got lucky that he had legal counsel and has lawyers for parents; most Respondent's do not, and the rules are created for people like them. That is particularly the case where the hearing panel relied so heavily on the fact that this evidence *was not good enough* in reaching its decision on the merits.

The investigation into both Roe 1 and Roe 4 also demonstrated troubling confirmation bias and procedural negligence. Investigators failed to collect key exculpatory evidence from witnesses, declined to request relevant records, and distorted the content of interviews—often reporting that witnesses corroborated complainant narratives when transcripts revealed the opposite. They allowed irrelevant and prejudicial information from other cases to bleed into the records of Roe 1 and Roe 4, refusing to redact references to other accusations from the hearing panel despite acknowledging that they did not have the authority to consolidate the cases.

During the hearing phase, both cases were marred by procedural misconduct and bias. As an initial matter, despite Doe's counsel objecting to the inclusion of two hearing panelists—Maxine Eichner and Margaret F. Henderson—based on their public and professional backgrounds, which strongly suggested predispositions favoring female complainants in Title IX sexual misconduct cases, those requests were denied. Rather than substantively evaluating whether those panelists could serve as impartial adjudicators in these specific matters, the university dismissed the objections with only generalized references to Title IX regulations. In my professional opinion, the failure to meaningfully assess and respond to those valid bias concerns reflects a serious departure from the standard of care expected in Title IX adjudications. A reasonable institution would go to great lengths to avoid not just actual bias but even the appearance of bias, particularly in highly sensitive and high-stakes cases such as this. Ignoring well-supported bias challenges without individualized analysis undermines confidence in the neutrality of the process and increases the likelihood of an erroneous outcome.



In both Roe 1 and Roe 4, Doe was also denied the right to cross-examine his accusers—despite credibility being central to both matters. In Roe 1, the complainant left mid-hearing after being confronted with inconsistencies in her prior statements. Although the panel allowed her attorney to answer questions on her behalf (a process I have never heard of in my 20-year career and would never allow), there is no question that the hearing panel and Doe were never able to test her credibility, despite major issues with it being raised.

Although current Title IX regulations no longer require the exclusion of statements from witnesses who refuse to appear or answer questions, and institutions cannot compel participation in a hearing, any reasonable administrator would still understand that credibility cannot be meaningfully assessed without live testimony. That is particularly true where the complainant's credibility is directly disputed and is central to the outcome—as it was in both Roe 1 and Roe 4's cases. The fact that the panel in these cases proceeded to find Doe responsible, despite lacking testimony from the very individuals whose credibility was determinative, reflects a fundamental breakdown in reasonable evidentiary standards. Under any reasonable standard of care, the absence of such testimony should have led to a conclusion that there was insufficient evidence to support a finding of responsibility. The panel's decision to rely instead on untested written statements was not only procedurally irregular but also patently unfair.

The hearings were further distorted by UNC's introduction of "pattern" evidence and unrelated accusations. Despite earlier assurances that only the case at hand would be considered, the university introduced extensive references to complaints from Roes other than the Roe whose allegations were being adjudicated. The prejudicial references were woven into hearing records, investigative reports, and hearing testimony. In both Roe 1 and Roe 4, panelists relied on a finding of a pattern to bolster findings, even where the evidence specific to the collateral allegations was weak, conflicting, or absent.

Perhaps the most egregious action by the hearing panel in these cases was the hearing chair's barring Doe from introducing credibility evidence about Roe 4. When pressed, the chair did not even have a policy to support his claim, and once he found one after the hearing, it was not even applicable to the hearing process.

What makes this decision especially indefensible is that, at the same time the hearing panel barred Doe from presenting credibility evidence about Roe 4, they freely allowed credibility evidence to be used against him—including references to unadjudicated and disproven allegations by other Roes. These references, which had no direct bearing on the allegations in Roe 4's case, were permitted to support an implied narrative that Doe had a pattern of misconduct. In contrast, when Doe sought to introduce credibility-related evidence—such as prior inconsistent statements or indications of motive—the panel refused to consider it. This asymmetrical treatment of credibility evidence reflects a clear bias and violates any reasonable standard of fairness. It is a basic tenet of institutional adjudications that credibility evidence must be evaluated consistently and without regard to which party it favors. The panel's willingness to consider unsupported accusations to undermine Doe's credibility while refusing to admit evidence that could have cast doubt on his accuser's is a textbook example of an unbalanced and procedurally unsound process.

The appeal process in both cases was likewise flawed. Doe was told to raise concerns—such as a complainant fleeing the hearing—on appeal. Yet his appeal was then denied for purportedly not objecting to her leaving during the hearing. Worse, the Title IX office that conducted the investigations submitted arguments against Doe's appeals (again, something I have never seen and would never recommend), calling into serious question the impartiality of EOC during the process (to the extent that there was any belief that there was impartiality left after the investigator's actions during the investigation). Appeals are meant to be independent reviews—not rubber-stamps of the original process defended by its own architects.

Compounding these failures, UNC withheld exculpatory evidence until after the hearings and refused to grant appeals to address the failure. This included emails disproving false claims, polygraph results administered by a retired FBI examiner, and notices that some complainants had withdrawn their complaints. These materials were critical to credibility determinations and the defense—but Doe had no chance to use them at the hearings.

The hearing panel's selective treatment of expert and non-expert testimony further highlights the inequity of the process. In Roe 1's case, the panel permitted the complainant—a layperson with no medical training—to offer speculative testimony

that she developed a urinary tract infection because of rough, non-consensual sex, without any corroborating medical records or expert input. Yet when Doe attempted to introduce expert psychological testimony to explain how cognitive dissonance and memory distortion might affect a complainant's perception or reporting of events, the panel refused to allow it. That exclusion directly contradicts both the Title IX regulations, which expressly permit parties to present expert witnesses, and case law recognizing that psychological testimony can be highly relevant in credibility-based determinations. Courts have held that such testimony may be critical to interpreting conflicting narratives in sexual misconduct cases, especially where no third-party witnesses or physical evidence exist. The panel's willingness to accept speculative medical claims from a non-expert while rejecting scientifically grounded psychological evidence from a qualified expert offering relevant information exemplifies the imbalanced, outcome-driven nature of the proceedings and further undermines their legitimacy.

Taken together, the procedural violations in Roe 1 and Roe 4—the two cases that led to Doe's expulsion—reveal a system that failed at every stage. Doe was denied timely notice, subjected to biased investigations, deprived of cross-examination, confronted with irrelevant and prejudicial character evidence, and judged based on shifting theories never formally charged. The university's reliance on unsubstantiated allegations from outside the scope of the relevant allegations further tainted the proceedings.

These were not isolated or technical errors. Any reasonable administrator would recognize that they were systemic, pervasive, and legally significant. In my opinion, Doe 's expulsion from UNC and the entire University of North Carolina system was not the result of a fair or reliable adjudicatory process—under either Title IX or general institutional procedures. Under any reasonable standard of care, these proceedings do not satisfy the obligations of due process, regulatory compliance, or institutional integrity. They serve instead as a cautionary example of what happens when an institution loses sight of fairness in pursuit of a particular outcome.

Respectfully Signed,

*J.F. Wernz*

Jacqueline Farideh Wernz

ECR Solutions PLLC