UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
DOCKET NO. 1:23-CV-0041

| | |
|---|---|
| JACOB DOE,<br><br>          Plaintiff,<br><br>v.<br><br>THE UNIVERSITY OF NORTH<br>CAROLINA SYSTEM, et al.,<br><br>          Defendants. | **MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND REQUEST FOR INJUNCTIVE RELIEF** |

NOW COMES THE PLAINTIFF, tendering to the Court its Memorandum in support of Motion for Partial Summary Judgment.

## INTRODUCTION

This case involves the expulsion of Jacob Doe, a Morehead-Cain Scholar, from the University of North Carolina following disciplinary proceedings riddled with procedural defects and gender bias.

## PROCEDURAL BACKGROUND

Jacob Doe filed this action on February 15, 2023, asserting claims for denial of due process, an erroneous Title IX outcome, breach of contract, negligent and intentional infliction of emotional distress, tortious interference with contract, and violation of the North Carolina Constitution. [Doc. 1]. On May 8, 2023, Defendants moved to dismiss, invoking Eleventh Amendment immunity and other defenses. [Doc. 34]. On March 4, 2024, this Court dismissed some claims but sustained Doe's

due process and Title IX claims. [Doc. 65]. Defendants appealed. The Fourth Circuit dismissed the §1983 claims of due process for damages but allowed Doe's due process claims for prospective relief and declined jurisdiction over Doe's Title IX claims. [Doc. 98, p.23]. Summary judgment is now warranted because the undisputed record demonstrates pervasive procedural violations and gender bias in Doe's disciplinary proceedings.

## SUMMARY JUDGMENT LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed Rules Civ Proc R 56. *See Barrett v. Pae Gov't Servs., Inc.,* 975 F.3d 416, 428 (4th Cir. 2020) (quoting, *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). There have been Title IX cases where summary judgment was appropriately granted for the plaintiff.[1]

---

[1] *See B.P.J. by Jackson v. W. Virginia State Bd. of Educ.,* 98 F.4th 542, 565 (4th Cir.) *cert. denied sub nom*. *W. Virginia Secondary Sch. Activities Comm'n v. B.P. J. Next Friend Jackson,* 145 S. Ct. 568, 220 L. Ed. 2d 216 (2024), and *cert. granted sub nom. W. Virginia v. B. P. J. by Jackson*, No. 24-43, (Case below) 98 F.4th 542 (U.S. July 3, 2025) ____.Ct. ___, 2025 WL 1829164. (Summary judgment for defendants reversed, and summary judgment entered for plaintiff); *Also see A.H. v. Minersville Area Sch. Dist*., 408 F. Supp. 3d 536, 577 (M.D. Pa. 2019) (Court found partial summary judgment for plaintiff and entered an injunction against defendants from restricting transgender child's choice of bathroom on trips).

# FACTUAL SUMMARY

Jacob Doe was an honor student and recipient of the Morehead-Cain Scholarship at UNC. In March 2021, the University received an anonymous email from four women, (Roes 1-4)[2] making allegations of sexual misconduct against Jacob Doe [Appx. 1, p.1]. At all relevant times, Elizabeth Hall was the Interim Title IX Coordinator. Rebecca Gibson was the Report and Response Coordinator. Jeremy Enlow and Beth Froehling were the investigators assigned to investigate the complaints against Doe.

When the anonymous full complaints were first received, on April 1, 2021, Rebecca Gibson of EOC (Office of Equal Opportunity and Compliance) reduced the full complaints into much shorter statements before sending them to the Emergency Evaluation and Action Committee (EEAC), which served, in effect, to remove all context and other issues of import. [Appx. 2].

Without detailed notice of the charges, Doe was immediately suspended (and his scholarship revoked.) [Appx. 3, pp. 1-2]. Rebecca Gibson and investigators Jeremy Enlow and Beth Froehling pursued the cases under UNC's Title IX policy[3] (Roe 1 and Roe 2) and its Policy on Prohibited Discrimination, Harassment, and

---

[2] Although confusing, Account 1 in the anonymous email is Roe 1, and Account 3 is Roe 2. Account 2 is Roe 3, and Account 4 is Roe 4.
[3] For alleged misconduct "on campus."

Related Misconduct (PPDHRM)[4] (Roe 3 and Roe 4).

## ROE 1

In her anonymous email (Account 1), Roe 1 admitted to a sexual relationship with Doe but alleged he had "completely manipulated and lied" to her. Enlow and Froehling interviewed Roe 1 on May 7 and May 14, 2021. [Appx. 4, pp. 1-2]. Although no specific dates of any alleged misconduct appeared in her anonymous account, Roe 1 subsequently told investigators that on <u>November 19th, 2020</u>, she attended a Christmas decorating party at the Kappa Sigma Fraternity house and became very intoxicated. [Appx. 4, p.1]. She claimed that she went to Doe's room in the fraternity, climbed into Doe's lofted bed, and fell asleep. [Appx. 4]. Sometime around 3:00 or 4:00 in the morning, she woke up with "pain down there" and assumed she was having her menstrual period. [Appx. 4]. When she discovered she was not, she assumed that Doe had nonconsensual intercourse with her while she was asleep. [Appx. 4]. According to the Investigatory Summary, Roe 1 said that she "really did not know what happened." [Appx. 4, p. 2].

Under Title IX, a formal complaint must be filed for the matter to proceed. [Appx. 5, p. 2]. Even though there is a presumption of non-responsibility required by Title IX and even though UNC bore the burden of proof, Investigators Jeremy

---

[4] Applies to alleged "off-campus" conduct which could negatively impact on-campus education or activities.

Enlow and Elizabeth Froehling drafted a formal complaint for Roe 1 to send to Elizabeth Hall at the EOC. [Appx. 6, pp. 2-3, Enlow depo. pp. 128-129]. The complaint was emailed on June 9, 2021, and contained Roe 1's electronic signature. [Appx. 7]. In the formal complaint, the date of the alleged occurrence was November 19, 2020.

Six days later, Roe 1 sent an email to Elizabeth Hall, Gibson, and Enlow, stating that "I've decided not to go forward. . ." [Appx. 8]. Ignoring Roe 1's desire, Hall signed a formal complaint against Doe, alleging sexual misconduct occurring on November 19, 2020. [Appx. 9]. Doe was sent a Notice of Investigation (NOI) stating that the alleged incident occurred on November 19, 2020. [Appx. 10].

The Roe 1 hearing was conducted on January 27 and 28, 2022. The hearing panel consisted of a hearing officer (Jacklyn Feeney) and three female hearing panelists.[5,6] (Investigator Enlow admitted that a reversed gender scenario (all-male panel judging a female accused) could raise concerns.) [Appx. 12, pp. 1-2, Enlow depo. pp. 183-184].

---

[5] One of the panelists was Maxine Eichner, a law professor of law UNC, to whom Doe objected because, in part, of her public filings in the nomination of Justice Kavanaugh, supporting his female accuser. With little to no explanation (except that she disagreed), Interim Head of the EOC, Elizabeth Hall, rejected the objection to Ms. Eichner. [Appx.11].

[6] All of the decision makers in the case, from the Morehead Cain Foundation to the Reporting and Response Coordinator, to the EOC to all three panel members, and one of the investigators were all women.

Prior to the hearing, Elizabeth Hall asked Robert Ekstrand, Doe's attorney, if he would consent to a consolidation of all four of the Roe accounts. [Appx. 13]. Mr. Ekstrand declined. [Appx. 14, pp. 2-3]. Hall agreed to exclude reference to the other women's allegations. [Appx. 15, pp. 2-3, Ekstrand depo. pp. 60-61]. But, within the first few moments of his opening statement, Roe 1's attorney, Andy Fitzgerald, made reference to the other allegations. [Appx. 16, pp. 11-13, Roe 1 Hearing Tr., pp. 11-13].[7]

When the hearing opened, Ms. Feeney confirmed the date of the alleged offense was <u>November 19, 2020</u>. [Appx. 16, pp. 5,19]. Fitzgerald then announced that the alleged incident DID NOT occur on <u>November 19, 2020</u>, but allegedly on November 12. [Appx. 16, pp. 17,85,90]. Fitzgerald conceded that if the hearing was about November 19, there was no violation. [Appx. 16, p. 18]. Ekstrand testified that he and Doe had spent ten months preparing a defense for that date and no other. [Appx. 18, pp, 2-5, Ekstrand depo., pp. 213-216]. The Panel determined that the case could proceed without giving Ekstrand time to prepare for the new date.[8] In his

---

[7] Enlow admitted the risk of prejudice if there is a cross-referencing of other complainants. [Appx. 17, pp. 1-3, Enlow depo. pp. 61-63].

[8] Defense witnesses have contended that the words "on or about November 19th, 2020," were sufficient notice of the allegation. Title IX requires the date and location to be contained in the notice, and it does not contain words such as "on or about." "Sufficient information available at the time to allow the parties to respond to the allegations. Sufficient information includes the identities of the parties involved in the incident(s), the conduct alleged to constitute sex discrimination under Title IX or this part, and the date(s) and location(s) of the alleged incident(s), to the

deposition, Ekstrand explained the prejudice of changing the date:

> A: But I can't really articulate how hamstrung we were by that. … We had no time to find witnesses to interview them about what happened on the 12th. . . . I think -- and that just prejudiced us completely. … You know we were going completely on the basis that it was the 19th. Because that's exactly what the notice said and that's exactly what Roe 1 repeatedly said. [Appx. 18, pp. 213-216].

With the sudden change of the critical date, Doe and his counsel were unable to prepare the defense that would have vindicated Doe from the accusations.

Doe testified extensively at the hearing and provided documentary evidence in support of his innocence. [Appx. 16, pp. 78-84]. The testimony of a defense psychology expert was disallowed. [Appx. 16, pp. 213-224 (or hearing day 2 Tr., pp 21-32)].

After a break, Roe 1 left the hearing before a meaningful cross-examination could occur, and astoundingly, the Panel allowed her attorney to testify instead. [Appx. 16, p. 68]. Mr. Ekstrand indicated that he had only asked about one-fourth of the questions he had prepared for Roe 1, including:

- The level of Roe 1's actual intoxication and how she could have awakened naturally at 3 a.m. but slept through "rough sex" only an hour earlier.
- Her lie to investigators about not having sex with Doe the very first time they met.[9]

_____

extent that information is available to the recipient." 34 C.F.R. § 106.45(c)(ii).

[9] Roe 1 told investigators that she was uncomfortable on her first date with Doe and called her roommate to pick her up. She recanted that testimony when she was shown the receipt were Doe had purchased Plan B, ("day after" contraception). [Appx. 16, Roe 1 Hearing Tr., pp. 60-61].

- Why did she continue to date  Doe for two months after November 19, 2020?
- Her desire not to proceed with the complaint.
- How her original anonymous account was created, and by whom.
- Why she had not produced any of the documentation she had promised to the investigators to support her allegations.

[Appx. 19, pp, 1-5, Ekstrand depo. pp. 172-173, 216-218].

When Mr. Fitzgerald, who had no personal knowledge of the alleged events, testified in place of his client, he violated Rule 3.7 of the North Carolina Rules of Professional Conduct. "Rule 3.7 Lawyer as Witness, (a) A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness.…" Said another way, UNC adopted a policy that included an ethical violation.[10]

The lack of notice and the lack of meaningful cross-examination deprived Doe of his ability to defend the claim against him, which procedurally benefited the female complainant.

Doe submitted to four polygraph examinations regarding all of the allegations of Roe 1-4, and his denial of misconduct showed no deception. [Appx. 20, pp. 7-18]. The Department of Education specifically refers to allowing consideration of polygraph tests. "[A] recipient may not adopt rules excluding certain types of relevant evidence (e.g., lie detector test results, or rape kits) …" [Appx. 21, p. 6]. It

---

[10] Any suggestion that the attorney was permitted to violate Rule 3.7 because of N.C. Gen. Stat. § 116-40.11, which permits an attorney to participate in a disciplinary hearing, is disingenuous.

is evident that the Panel gave no or minimal weight to this exculpatory evidence.

It was discovered that when Roe 1 read texts from her phone to the investigators, she omitted key exculpatory parts of the texts, as proven when Doe produced those contemporaneous texts to the EOC. [Appx. 22, Ekstrand depo. at 216]. In essence, UNC wrongfully placed the burden of proving his innocence on Doe, rather than UNC assuming the burden of proof as required by Title IX.

Despite the procedural violations and the exculpatory evidence submitted by Doe, the Hearing Panel found Doe responsible for the sexual misconduct alleged by Roe 1. [Appx. 23, p. 7]. This resulted, (in combination with the Roe 4 panel's findings), in Doe's permanent expulsion from all North Carolina University System affiliated schools.

When Doe appealed the Panel's decision to the UNC trustees under Title IX, the review was to be based on the record. However, UNC filed a seventeen-page brief, much like a prosecutor, attempting to validate their reasoning. [Appx. 24].[11]

## ROE 2[12]

Roe 2 alleged that she had four incidents of non-consensual sex with Jacob Doe in the course of one night and early morning. [Appx. 1, Account 3]. Unlike Roe 1, who actually filed a formal complaint (drafted by Enlow), Roe 2 never did. In

---

[11] A similar brief was filed in opposition to Doe's appeal of the Roe 4 decision.
[12] Roe 2 is Account 3 of the four full and combined anonymous complaints.

fact, Roe 2 sent an email to Elizabeth Hall, indicating that she did not want to proceed with a complaint against Doe. [Appx. 25]. Notwithstanding Roe 2's request, Elizabeth Hall, the Interim Title IX Coordinator, filed a formal complaint against Doe. [Appx. 26]. During the course of the investigation and the hearing, it was learned that Roe 2 had crawled through Doe's fraternity bedroom window to have sex with Doe. [Appx. 27]. The outcome of the Roe 2 hearing, with a different hearing panel and with full cross-examination, was that the complaint was dismissed. [Appx. 28, p.6]. This outcome highlights the consequences of the absence of due process, such as cross-examination, as exposed in the Roe 1 (and Roe 4) matters.

### ROE 3[13]

Roe 3 alleged that Doe had invited her to go on a skiing trip in the North Carolina mountains. On the way, they spent one night at Doe's home before joining Doe's high school friends at Beech Mountain. Roe 3 alleged that Doe had non-consensual sex with her. [Appx. 1, Account 2]. The case was investigated under the PPDHRM. Unlike Title IX, investigators determine responsibility and sanctions. In addition to the accusations lodged at Doe by Roe 3, the Investigators added a charge of retaliation against Doe. [Appx. 29, Roe 3 Investigation Report, p. 1].[14]

---

[13] Roe 3 is account 2 in the four full and combined anonymous complaints
[14] During Doe's efforts to reveal the truth, Doe's attorney, Robert Ekstrand, engaged a private investigator, Jan Barefoot, to interview Roe 3. The interview was consensual, non-confrontational and occurred in Roe 3's home with her mother present.

Enlow and Froehling found Doe responsible for both non-consensual sex and retaliation and recommended Doe's permanent expulsion from the University. [Appx. 29, pp. 49-50]. Under the PPDHRM,[15] Doe appealed the Investigators' decision and sanction to a hearing panel, similar to that of Title IX. The appeal was de novo. Roe 3 did not appear at the hearing. After hearing from Doe, and reviewing the evidence, the Hearing Panel unanimously dismissed the allegations against Doe. [Appx. 30]. Notably, in its decision, the Panel noted the bias of the investigators in favor of the complainants by the investigators' use of leading questions. [Appx. 30, p.2].[16]

## ROE 4[17]

Of all the Roes, Roe 4 shows perhaps the most serious procedural misconduct. Although adjudicated under the PPDHRM rather than UNC's Title IX process, the flawed investigation and hearing exhibit gender bias. There was ample evidence of the untruthfulness of Roe 4. To the extent that evidence of credibility was excluded from the hearing, such exclusion violated Title IX because it demonstrated gender bias towards Doe.

Roe 4 did not file a formal complaint, but was Account 4 in the anonymous

---

[15] *See generally*, Appx. 33.

[16] "[T]he Hearing Panel opined many questions asked by the Investigators to the Reporting Party were leading, and thus lent less weight to the Reporting Party's responses."

[17] Roe 4 was decided under the guidelines and procedures of the PPDHRM.

complaints. [Appx. 1]. In the anonymous account she emailed to the Morehead-Cain Foundation and EOC, she alleged two separate events of sexual misconduct by Doe. [Appx. 1].

The first alleged incident occurred during the spring break of 2021, when Doe, Roe 4, and other friends visited Gulf Shores in Alabama. According to Roe 4, one evening, Doe came up behind her and gave her a hug. Roe 4 claimed that Doe had touched her vagina during the embrace. [Appx. 31, Investigation Report, p. 2]. She also stated that a friend of Doe's, John Evans, saw it occur, pulled Doe away, and took him upstairs. [Appx. 31, Investigation Report, p. 2].

The second alleged misconduct occurred several months later when Roe 4 and Doe were alone in Doe's home. According to Roe 4, Doe touched her breasts and pressed his penis against her back. [Appx. 32].

In neither allegation was the date of the alleged offenses specified. [Appx. 33, Roe 4 NOI]. In the first allegation, it was said to have occurred sometime during spring break in 2021. [Appx. 33]. The second alleged incident was described as occurring "in or about June 2021." [Appx. 33].

The wrongful outcome in Roe 4 begins with the fact that there was a want of jurisdiction. For UNC to have jurisdiction over off-campus activities under the PPDHRM, there must be a finding that the "off-campus activity had continuing

adverse effects in … activity of the University."[18] [Appx. 34]. Nowhere in the NOI did it allege that the off-campus misconduct would have "continuing adverse effects" on the University, a prerequisite for jurisdiction.[19] [Appx. 33].

The Investigation Report[20] submitted by Enlow and Froehling[21] contained this language:

> The Investigator considered the need to maintain a safe and respectful environment conducive to learning, as well as the impact or implications of the conduct on the community or the University and the protection of the University community.

[Appx. 35, p 45]. There are three glaring fatal errors in this apparent effort at jurisdiction. First, by the very terms of the PPDHRM, only the Director of Equal Opportunity and Compliance or the Title IX Coordinator can determine if there is jurisdiction – Enlow was neither. Secondly, there was no explanation of how the conduct alleged by Roe 4 could prospectively have continuing adverse effects on the University. Third, the language Enlow used to allege jurisdiction was not the same terminology referenced in the jurisdictional statement of the PPDHRM.[22]

---

[18] Section IIB of the PPDHRM.

[19] The PPDHRM requires an "assessment of risk" to the campus.

[20] Although the word "DRAFT" appears on the title page, it is apparently the final version.

[21] That fact alone raises many questions about the objectivity of the investigation, since Enlow and Froehling investigated all four anonymous complaints.

[22] In determining whether the University has jurisdiction over off-campus conduct that is not part of an educational program or activity of the University, the Director of Equal Opportunity and Compliance or the Title IX Coordinator will assess whether the alleged conduct has or is reasonably likely to have continuing

Furthermore, when the Hearing Panel in Roe 4 made its decision, it made no findings or determination of jurisdiction, a prerequisite to hearing and deciding the case. [Appx. 36]. The Investigators found Doe responsible for all of the allegations. They recommended permanent expulsion of Doe, who once again made a de novo appeal to a hearing panel. The matter was heard on April 8, 2022.

The three previous hearing panels were chaired by Hearing Officer Jacklyn Feeney. However, in Roe 4, the EOC engaged David Elrod to serve as the hearing officer/coordinator.[23] Elrod admitted to Robert Ekstrand that he was not familiar with UNC's PPDHRM procedures. [Appx. 37, pp. 1-4, Ekstrand depo. pp. 133-136].

When he was previously employed at Appalachian State University, the school and Elrod were sued for his mishandling of a Title IX investigation. *See Gulyas v. Appalachian State Univ.*, No. 516CV00225RLVDCK, 2017 WL 3710083, at *6 (W.D.N.C. Aug. 28, 2017). In addressing the defendants' motion to dismiss, Judge Richard Voorhees noted that if the allegations in the complaint were true, "[I]t is hard to imagine how a reasonable government official in Elrod's position could believe that such [conduct by Elrod] comported with the requirements of due process." *Id*.[24]

---

adverse effects or to create a hostile environment. . . Section IIB.

[23] Elrod was part of the Title IX program at N.C. State University, but was recruited by UNC to be in charge of the Roe 4 hearing. [Appx. 38, Elrod depo. p. 10]

[24] Soon after, Elrod was terminated at Appalachian as the Director of Student Conduct, and several months later was hired by N.C. State as an "assistant equal

Elrod testified that it was his job to rule on the admissibility of evidence [Appx. 39, pp. 2-4 Elrod depo. p, 27, 36-37)] and to author the decision of the Panel. Tellingly, at his deposition, Elrod appeared not to understand what hearsay was or why it is considered unreliable in the legal world. [Appx. 40, pp. 1-11, Elrod depo. pp. 90-100]. Elrod also said he could not recall having a pre-hearing discussion with Ekstrand regarding the admissibility of credibility evidence and denied instructing the panel not to consider statements or evidence pertaining to the credibility of Roe 4. [Appx. 41, pp. 1-4, Elrod depo. pp. 42-45].

However, Ekstrand recorded his telephone conversation with Elrod. [Appx. 42].[25] (Note: Man 1 is Elrod, Man 2 is Ekstrand). This recording refutes Elrod's testimony. For example, Roe 4 had requested a continuance from the first hearing due to a medical emergency. Doe had evidence that Roe 4's "medical emergency" was a black eye and bruises from a "drunken fist fight." Elrod disallowed this evidence to attack Roe 4's credibility. [Appx. 42, p.2][26]. Elrod went on to say that his ruling was based on "the procedures for UNC." [Appx. 42, p.3].

But Ekstrand testified that Elrod was relying on the wrong procedures:

A: [I]t became clear that the rule he was establishing was that there would be no evidence of credibility . . . unless it related directly to the actions of the parties in connection with the allegations. . . And he

opportunity officer." [Appx. 38, Elrod depo. p. 10].
[25] The transcription of the recording was outsourced to a third party.
[26] Doe did testify that Roe 4 posted on TikTok about having a black eye. (Appx. 44, p. 103, Roe 4 Transcript).

pointed to a policy . . . given to him by the EOC, and it refers to investigators, . . . . It is not about hearings. But he was reading that as a prohibition on any of our credibility evidence in that case, which was probably the most substantial amount of credibility evidence that any of the four complainants had. [Appx. 43, pp. 1-4, Ekstrand depo. pp. 133-136].

At the hearing, Enlow testified[27] that he found Roe 4's account credible. [Appx. 44, Roe 4 Hearing Tr., p. 15]. As an objective investigator, both inculpatory and exculpatory evidence should be brought to the hearing panel. In regard to what occurred in Gulf Shores, Enlow's and Froehling's <u>Report</u> stated the following:

… <u>The Reporting Party added that the incident was short because Mr. [Moe] was "pretty quick with coming over" and Mr. Evans "grabbed" the Reporting Party.</u> … The Reporting Party stated that <u>Mr. Evans then took the Responding Party upstairs to his bedroom</u> and that was the last time she saw him that evening. (underlining added). [Appx. 31, Roe 4 Investigation Report, p. 2].

Contrast what J[ohn] Evans actually told the Investigators as found in the Investigation <u>Transcript</u>:

INVESTIGATOR 1: Um-hum. So do you -- like, after he comes up and hugs her, do you pull him aside, or do you go up -- do you have a conversation with him or anything like that?
WITNESS : No. [Appx. 45].

This exculpatory evidence was omitted from the Investigation Report presented to the hearing panel. The Investigators also completely discounted John Evan's description of Roe 4, when he said, "[Roe 4] is probably the most unreliable

---

[27] Curiously, testimony at the hearing is not given under oath.

narrator that I've ever met, in terms of just, like, twisting the truth towards her favor … "[Appx. 46].

However, the most serious example of investigatory misconduct was that information further impugning Roe 4's credibility was never given to Doe or his attorney until after the conclusion of the hearing. Such evidence unequivocally established Roe 4's propensity for hyperbole and fabrication. On July 30, 2021, Roe 4 sent an email to Rebecca Gibson. [Appx. 47, p. 2]. In the email, Roe 4 impliedly accused Doe of fraternity house break-ins and gun possession, which was demonstrably false because the fraternity house had been vacated six months earlier and Doe was in New Hampshire at the time. [Appx. 48, pp. 1-2] [Appx. 49, Ekstrand depo. pp. 199-200]. This email was withheld until after the hearing, thus preventing Doe from using the email to attack Roe 4's credibility.[28] [Appx. 49, pp. 1-4, Ekstrand depo. pp. 198-201].

No one appeared live for the rescheduled hearing except Doe and the Investigators. Doe was found responsible based entirely on hearsay. The subsequent sanction was the educational death penalty – permanent expulsion from all UNC universities and affiliated community colleges across the state.

These PPDHRM violations and the selective exclusion/withholding of

---

[28] When Enlow was asked if he knew about the "gun" email, he said, "That sounds somewhat vaguely familiar." Enlow depo. at 199.

exculpatory material form an integrated theory: (1) the procedural defects materially prejudiced Doe; (2) they reflect investigation and decision-making that favored complainants. One is left with the inescapable inference that gender bias motivated the adverse outcome.

## DISCUSSION OF TITLE IX AND GENDER BIAS

"Title IX proscribes gender discrimination in education programs or other activities receiving federal financial assistance." *Pederson v. La. State Univ.*, 213 F.3d 858, 877 (5th Cir. 2000). "The University, as a recipient of federal funding, can be held liable for intentional discrimination on the basis of sex or for deliberate indifference to discrimination against or harassment of a student on the basis of sex." *Plummer v. Univ. of Hous.*, 860 F.3d 767, 777 (5th Cir. 2017), *as revised* (June 26, 2017).

In reversing the trial court's dismissal of a Title IX claim the Court in *Schiebel v. Schoharie School District,* 120 F.4th 1082 (2nd Cir. 2024), referencing the Title IX regulations wrote that a grievance process "lacking principles of due process risks bias that in the context of sexual harassment allegations is likely to involve bias based on stereotypes and generalizations on the basis of sex." *Id.* at 1099 (*Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30026, 30101 (May 19, 2020).

Consider the case of *Doe v. University of Denver*, 1 F.4th 822 (10th Cir. 2021).

A male student filed a suit under Title IX claiming sex discrimination arising from the University's investigation of sexual assault and its decision to expel him. In reversing summary judgment in favor of the defendants, the Court referenced *Yusuf v. Vassar Coll.*, 35 F.3d 709, 714-715 (2d Cir. 1994) when stating that Title IX "bars the imposition of university discipline where [sex][sic] is a motivating factor in the decision to discipline." *Denver* at 829.

Federal courts have developed several approaches to analyze whether a university's response to alleged sexual misconduct was free of gender bias. The Second Circuit adopted the erroneous-outcome theory. Under this framework, a plaintiff must point to particular facts "sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding" and to "particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding." *Yusuf* at 714-715). The First and Fifth Circuit[29] and other circuits apply *Yusuf*'s two-part test as the baseline for erroneous-outcome claims.

Also, in *Schiebel,* the Second Circuit stated that "a grievance process lacking principles of due process risks bias." *Id* at *1099.* And that a process "so deficient as to constitute a sham" supports Title IX liability. *Id.* at 1089. These departures demonstrate an outcome-oriented rather than truth-seeking proceeding.

---

[29] *See Haidak v. University of Mass.-Amherst*, 933 F.3d 56,73-74 (1st Cir. 2019); *Klocke v. Univ. of Texas at Arlington*, 938 F.3d 204, 210 (5th Cir. 2019).

The Seventh Circuit takes a different approach to Title IX cases, asking more simply, "[D]o the alleged facts, if true, raise a plausible inference that the university discriminated against [the student] on the basis of sex?" *Doe v. Purdue Univ.*, 928 F.3d 652,667-68 (7th Cir. 2019).[30]

In *Sheppard v. Visitors of Virginia State University*, 993 F.3d 230 (4th Cir. 2021), while reviewing a motion to dismiss, the Fourth Circuit acknowledged that the circuits are split on how to approach Title IX claims. *Id.* at 235. The Fourth Circuit more closely aligned its approach to Title IX claims with the Seventh Circuit, but added

> We agree with the Seventh's Circuit's approach and see no need to deviate from the text of Title IX. In adopting this approach, however, we find no inherent problems with the erroneous outcome and selective enforcement theories identified in *Yusuf*. In fact, either theory, with sufficient facts, may suffice to state a plausible claim. We merely emphasize that the text of Title IX prohibits all discrimination on the basis of sex. *See* 20 U.S.C. § 1681(a).

*Sheppard* at 236. The *Sheppard* case also emphasized the importance of establishing causation. "While admittedly not yet addressed in the context of a Title IX school disciplinary proceeding, the Supreme Court and our Circuit have held that the same or similar language requires 'but-for' causation. *See Bostock v. Clayton Cnty., Ga.*, ___U.S.___, 140 S. Ct. 1731, 1739, 207 L.Ed.2d 218 (2020)." *Sheppard*

---

[30] This approach was also adopted by the Ninth Circuit. *See Schwake v. Ariz. Bd. Of Regents*, 967 F.3d 940,947 (9th Cir. 2020).

at 236.

Applying the Fourth Circuit's reasoning to rely on the language of Title IX, the facts in the present case establish the "but for" causation referenced in *Sheppard*. By way of background, the leading erroneous-outcome and sham-process decisions discussed above were decided before the Department of Education's ("DOE") May 19, 2020, Title IX Final Rule (the "DeVos regulations"), 85 Fed. Reg. 30026 (May 19, 2020), and therefore do not interpret or apply that Rule. The Final Rule required schools receiving federal funds to "Establish procedural due process protections that must be incorporated into a recipient's grievance process to ensure a fair and reliable factual determination when a recipient investigates and adjudicates a formal complaint of sexual harassment."[31] The Final Rule was promulgated to provide a uniform, enforceable federal baseline for campus adjudications and to reduce factual error and inconsistent campus practices that had produced widely divergent and unreliable outcomes. (85 Fed. Reg. 30026, 30030–30040). The regulation imposed mandatory procedural protections that directly guard against exactly the kind of manipulation the EOC engaged in here. (*see generally*, 34 C.F.R. 106.45 (*et. seq*.) (eff. July 1, 2020)[Appx. 50].[32]. An application of Plaintiff's facts to the

---

[31] *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 FR 30026-01.

[32] The regulations were recently amended, effective August 1, 2024. The revised regulations contain the same or similar requirements, although the code subsection

requirements of Title IX provides the causal nexus sought by the Fourth Circuit in

*Sheppard*.

> **(1) notice rules are meant to put a respondent on actual notice of the substance of the complaint so he can identify witnesses, gather exculpatory evidence, and prepare a defense (34 C.F.R. § 106.45(b)(2)**); (See discussion in Roe 1 of the changing of the date of the alleged offense, and in the complete lack of actual notice in the Roe 4 complaints. *See discussion,* pp. 6-7.

> **(2) the presumption of non-responsibility. (34 C.F.R. § 106.45(b)(1)(iv), (b)(1)(i))**; (The Investigators drafted the complaint for Roe 1, and EOC coordinator, Elizabeth Hall drafted the formal complaint. *See discussion,* pp. 4-5.

> **(3) investigators and decision-makers must apply neutral, evidence-based standards. (34 C.F.R. § 106.45(b)(1)(iii))**; (The polygraph results were discounted, unrelated allegations were disclosed in Roe 1; the objection to panelist in Roe 1 was denied, in the Roe 4 hearing, exculpatory evidence was excluded in the Investigator's report and the hearing was based entirely on hearsay.) *See discussion* pp. 5-6, 8, 16-18.

> **(4) the live-hearing requirements and, in particular, the cross-examination framework so credibility assessments rest on tested statements, not editorialized summaries (34 C.F.R. §106.45(b)(6)(i)–(ii))**; (Roe 1 left during cross-examination and her attorney was permitted to testify in her stead.), *See discussion,* pp. 7-*8* and

> **(5) the written-decision and recordkeeping obligations are meant to preserve the exact record and the rationale for outcomes was fair.** (34 C.F.R. § 106.45(b)(7)). (In Roe 4, there was no statement of jurisdiction under the PPDHRM regulations, and UNC filed "appellate" briefs on Doe's appeal of the hearing decisions). *See discussion,* pp. 9, 13-14, 22.

 In 2013, several complaints were filed against UNC with the Office of Civil

Rights, where UNC was widely criticized for its poor handling of sexual abuse cases

citations may be different.

on campus. [Appx. 51].[33] UNC was also criticized for not reporting the incidence of criminal activity as required by the Clery Act. [Appx. 52, Article on Clery violation (formatting modified)]. Under mounting public pressure and following the imposition of new Title IX safeguards by Secretary of Education Betsy DeVos in 2020, UNC developed its own Title IX policies for on-campus misconduct and procedures for investigating off-campus misconduct that could impact on-campus activities. (PPDHRM).[34, 35]

"[E]xternal pressure alone is not enough to state a claim that the university acted with bias in this particular case. Rather, it provides a backdrop that, when combined with other circumstantial evidence of bias in [a student's] specific proceeding, gives rise to a plausible claim.". *Doe v. Univ. of Denver*, 1 F.4th 822, 831 (10th Cir. 2021). "External pressure on a university to demonstrate that it acted vigorously in response to complaints by female students may support an inference that a university is biased based on sex.…" *Doe v. Univ. of Arkansas - Fayetteville, 974* F.3d 858, 865–66 (8th Cir. 2020). "It is precisely because procedural irregularity alone already suggests bias that even minimal evidence of sex-based pressure on the

---

[33] This is the Resolution of the complaints.
[34] For the University to have jurisdiction over off-campus activities, there must be a finding that the off-campus conduct has continuing adverse effects on the University community.
[35] The PPDHRM is also part of the EOC and managed by the Title IX Coordinator, Elizabeth Hall.

university is sufficient to establish bias on account of sex." *Menaker v. Hofstra Univ.*, 935 F.3d 20, fn. 48 (2d Cir. 2019) (*see discussion Id.* at p.30); *Also see Doe v. Univ. of Denver*, 1 F.4th 822, 831 (10th Cir. 2021) (external pressure combined with other circumstantial evidence gives rise to a plausible claim).

A reasonable inference is that the University's one-sided investigation establishes a prima facie case of sex discrimination. In *Doe v. Columbia University, in* reversing the lower court's dismissal of the Title IX claim brought by a wrongfully accused male student, the Court wrote:

> [T]he Complaint alleges that during the period preceding the disciplinary hearing, there was substantial criticism of the University, . . . accusing the University of not taking seriously complaints of female students alleging sexual assault by male students.… [I]t is entirely plausible that the University's decision-makers and its investigator were motivated to favor the accusing female over the accused male. . . .

831 F.3rd 46, 57 (2nd Cir. 2016).

The external pressure on UNC, coupled with the identified Title IX violations, establishes liability as a matter of law.

While certainly not determinative standing alone, this Court has already indicated that "the Plaintiff's evidence is sufficient to show a likelihood of success on the merits of at least a portion of his Title IX claim." [Doc. 64, p.13]. "When coupled with the procedural irregularities, these allegations cast significant doubt on the accuracy of UNC-CH's determination that Plaintiff is responsible for sexual

misconduct. [Doc 65, p. 22].

Lastly, in its opinion in this case, the Fourth Circuit specifically held that Doe alleged a liberty interest sufficient to trigger procedural due process protections. *Doe v. Univ. N.C. Sys.*, 133 F.4th 305 (4th Cir. 2025). It further held that "an erroneous university record of a student's permanent expulsion for sexual misconduct inflicts an ongoing injury for which the student can seek equitable relief." *Id*. at 319. Under *Ex parte Young*, federal courts may grant prospective relief against state officials to address ongoing violations of federal law. 209 U.S. 123 (1908).

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court: (1) Grant summary judgment on liability; (2) order expungement of Doe's disciplinary record, allowing him to re-enroll at the University; and (3) allow the matter to proceed on damages and the remaining claims.

Respectfully, this is the 17th day of December, 2025.

/s/ Fred W. DeVore, III
Fred W. DeVore, III
DAS Law Group, PA
438 Queens Road
Charlotte, NC 28207
(704) 377-5242
(704) 332-2825 *facsimile*
NC State Bar #10308
*Attorney for Plaintiff*
*fdevore@daslawgroup.com*

/s/ Raboteau T. Wilder, Jr.
Raboteau T. Wilder, Jr.
Wilder Law, PLLC
3501 Monroe Road
Charlotte, NC 28205
(704) 342-2243 telephone
NC State Bar #5891
*Attorney for Plaintiff*
*rob@wilderlawgroup.com*

<u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the foregoing pleading was served upon all other parties to this action or their attorneys of record by using the ECF filing system and/or email and addressed as follows:

Dixie Thomas Wells Dixie.wells@elliswinters.com
Alex John Hagan Alex.hagan@elliswinters.com
Kimberly D. Potter kpotter@ncdoj.gov
Jeremy David Lindsley jlindsley@ncdoj.gov
Lindsey Vance Smith lsmith@ncdoj.gov
Marla Spector Bowman marla_bowman@unc.edu

Respectfully, this is the 17th day of December, 2025.

/s/ Fred W. DeVore, III
Fred W. DeVore, III
DAS Law Group, PA
438 Queens Road
Charlotte, NC 28207
(704) 377-5242
(704) 332-2825 *facsimile*
NC State Bar #10308
*Attorney for Plaintiff*
*fdevore@daslawgroup.com*

/s/ Raboteau T. Wilder, Jr.
Raboteau T. Wilder, Jr.
Wilder Law, PLLC
3501 Monroe Road
Charlotte, NC 28205
(704) 342-2243 telephone
NC State Bar #5891
*Attorney for Plaintiff*
*rob@wilderlawgroup.com*

## <u>CERTIFICATION REGARDING AI PLATFORMS</u>

1. No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexis, FastCase, and Bloomberg;

2. Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction ( or the party making the filing if acting pro se) as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

Respectfully, this the 17th day of December, 2025.

<u>/s/ Fred W. DeVore, III</u>
Fred W. DeVore, III
DAS Law Group, PA
438 Queens Road
Charlotte, NC 28207
(704) 377-5242
(704) 332-2825 *facsimile*
NC State Bar #10308
*Attorney for Plaintiff*
fdevore@daslawgroup.com