# EXHIBIT 7

# REBUTTAL EXPERT REPORT

Jacob Doe v. The University of North Carolina System, *et al.*

Civil Case No. 1:23-cv-00041-MR

**June 16, 2025**

**Prepared By:**

Jackie Gharapour Wernz

Civil Rights Attorney & Consultant

ECR Solutions PLLC

jackie@educationcivilrights.com

**Rebuttal Expert Report of Jackie Gharapour Wernz**

*Jacob Doe v. The University of North Carolina System, et al.*

*Civil Case No. 1:23-cv-00041-MR*

I submit this rebuttal expert report on behalf of Plaintiff Jacob Doe under Rule 26(a)(2)(D) of the Federal Rules of Civil Procedure. It responds to and addresses the opinions Courtney H. Bullard, Esq., set forth in her May 15, 2025, expert report on behalf of the Defendants, the University of North Carolina System, *et al*.

In compliance with Rule 26, this rebuttal report solely contradicts or rebuts evidence presented in the opposing expert's report. This rebuttal report does not introduce new subject areas or offer affirmative opinions beyond what is necessary to respond to the opinions, assumptions, or methodology advanced by the Defendants' expert. However, this rebuttal report draws on the facts and opinions set forth in my initial report and is written with the expectation that the reader is familiar with my initial report.

My opinions in this rebuttal report, like those in my initial report, are based on my education, experience, and knowledge, as described in my initial report, and my review of the facts of the case, which are detailed in my initial report and supplemented below. Because discovery in this matter is still ongoing, I reserve the right to supplement my initial report and this rebuttal report if additional relevant facts are uncovered or clarified through subsequent discovery.

## INTRODUCTION

Several limitations undermine the reliability of the opinions expressed in the Defendants' expert report. The analysis frequently adopts a narrow view of compliance, focusing on superficial adherence to a limited subset of legal, regulatory, and procedural requirements while failing to engage meaningfully with the broader professional standards that inform how a reasonable administrator would effectuate those requirements in practice. In some instances, the report mischaracterizes key factual elements underlying its opinions. In others, it offers conclusory determinations about whether the Defendants' actions met industry standards without sufficient contextual analysis of the facts. As a result, the report ignores significant failures by the Defendants to meet the widely recognized expectations of a prompt, thorough, fair, and impartial response to reports of sexual misconduct in a higher education setting.

## I. Policies and Procedures

The Defendants' expert offers the opinion that UNC's Title IX and non-Title IX policies complied with industry standards, but her report does not provide a reliable foundation for that conclusion.

As an initial matter, the Defendants' expert contends that UNC's Title IX policies aligned with industry standards essentially because they incorporated a short list of procedural requirements from the 2020 Title IX regulations[1] and, in some respects, went beyond those minimum requirements—for example, by not only permitting an advisor for cross-examination but permitting extensive advisor participation throughout, and by not only offering the appeal required by Title IX but by offering a second level of appeal.[2] She similarly claims that UNC's non-Title IX sexual misconduct policy complied with industry standards because it included features required by the Violence Against Women Act and bare-bones due process components, like providing clear guidance, outlining rights and responsibilities, and describing timelines and appeal options.[3]

While she invokes "industry standards" when discussing UNC's policies and procedures, the Defendants' expert does not identify any meaningful benchmark against which she evaluated those documents beyond those identified in the previous paragraph.[4] The analysis overlooks numerous principles from federal case law and knowledge and experience in the field that a reasonable administrator would be expected to be aware of, such as the requirement of fundamental accuracy in decision-making. As experienced administrators understand, legal and regulatory standards may inform but do not alone determine the standard of care.

The limitations of the Defendants' expert's analysis become apparent when one considers the implications of her reasoning. Her report appears to suggest that if an institution's policies and procedures include certain baseline elements derived from

---

[1] Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30026 et seq. (May 19, 2020) (effective August 14, 2020).

[2] *See* Bullard Expert Opinion Report at 41–42.

[3] *See id.* at 42–43.

[4] *See id.* at 42–43. Defendants' expert does reference guidelines from several higher education administrator organizations, *id.* at 43 n.400, but does not identify what specific sources from those organizations she relied on or why she believes any part of those sources are so well-accepted that they have become part of industry standards.

federal regulations or minimal due process standards, those documents automatically meet industry standards. That view implies that the mere inclusion of such features is sufficient, regardless of how the policies are structured, what additional provisions they contain, or how they are applied in practice. In my professional opinion, this reasoning is inconsistent with both established professional norms and sound judgment. An institution may fully incorporate the procedural elements referenced by the Defendants' expert yet fall short of the applicable standard of care due to deficient implementation. Conversely, an institution might omit certain elements from its written documents yet still meet industry standards if, in practice, its processes incorporate all required components and reflect broader professional norms. Reducing complex professional standards to a checklist of minimum formalities oversimplifies the responsibilities of administrators and misrepresents what is reasonably expected in the field.

For example, as the Defendants' expert acknowledges, both UNC's Title IX and non-Title IX procedures include language allowing an advocate to "fully participate in the proceeding to the same extent afforded to the party the Advocate represents." She cites those provisions as evidence that UNC's policies and procedures align with industry standards.[5] In my professional opinion, however, that language—particularly as interpreted and applied by UNC—highlights a significant departure from accepted practice. Specifically, UNC interpreted the provision to permit advisors to testify on behalf of their parties during both Title IX and non-Title IX hearings. That practice, in my view, is exceedingly inconsistent with the standard of care. No reasonable administrator would consider it appropriate for an advisor to testify at a hearing in place of a party. That is particularly true in Title IX proceedings, where both federal regulations and UNC's own policies make clear that parties must be permitted to pose questions, through their advisors, to *other parties and witnesses*, not to those parties' or witnesses' *advocates or representatives*.[6]

Most importantly, the Defendants' expert report's hyperfocus on the written content of UNC's policies overlooks a fundamental principle well recognized by professionals in the field and of extreme importance in this case. The existence of a policy or procedure does not, by itself, demonstrate compliance with industry norms. As noted above, an institution may adopt governing documents that reflect industry standards yet still fall short of meeting those standards in practice if the documents

---

[5] Bullard Expert Opinion Report at 42.

[6] *See* 34 C.F.R. § 106.45(b)(6)(i).

are poorly implemented, inconsistently applied, or fail to support a process that is prompt, thorough, and—especially relevant here—impartial. In my professional opinion, that is precisely what occurred in this case.

Finally, the expert's emphasis on compliant policy and procedure language also overlooks the need for a detailed, fact-specific analysis of whether the implementation of those documents met the expectations of a reasonable administrator. As I explained in my initial report, and as further supported by the responses to the opinions of the Defendants' expert, below, a thorough review of the facts demonstrates that UNC's actions not only failed to meet the applicable standard of care, but did so in a manner that reflects a profound breakdown in fairness—one that, in my professional opinion, is best understood as the result of gender-based bias that permeated UNC's handling of Doe's case.

## II. Initial Responses to Reports

Despite the frequent use of emphatic language to describe UNC's response to the reports of misconduct involving Doe, the report of Defendants' expert offers little factual support for her conclusory opinions that UNC's initial actions in the Doe cases complied with industry standards. In some instances, it mischaracterizes the key facts underlying those opinions.

### A. Formal Complaint Delays

For example, the Defendants' expert claims the lengthy delay between receipt of the reports and issuance of the notices of allegations in the four cases was reasonable because the EOC was diligently working to identify the anonymous complainants after receiving the initial report. That conclusion rests on her conclusory statement that the EOC was actively engaged in identifying the complainants over the "weeks and months" following the report.[7]

Yet I see nothing in the record to support the need for such efforts. In fact, it shows that as early as March 29, 2021—two days before the EOC received the initial reports—Roe 2 had spoken by phone with Mallory Findlay, one of the reporting parties and Doe's advisor in the Morehead-Cain scholarship program. Ms. Findlay clearly knew the identity of at least one Complainant from the outset, yet there is no indication that the EOC took any steps to follow up with this readily available, non-

---

[7] Bullard Expert Opinion Report at 43.

student, affiliated individual to try to obtain the Complainants' names.[8] Moreover, the investigation report for the matter involving Roe 1 recounts that on April 9, 2021, Roe 1 submitted "a signed complaint" to the EOC, which, under Title IX and UNC's related policies, requires the Complainant to provide her name to the EOC. The expert's suggestion that the EOC had to conduct extensive "work" over "weeks and months" to identify the Complainants cannot be taken seriously.

Even if a three-month delay would be justified in theory if an institution did not have the complainants' names and was diligently working toward identifying them, as I pointed out in my initial report, I did not see any efforts by the EOC to do *anything*, let alone identify or engage the complainants, during the three months between the report and the notices. In addition to the failure to follow up with Ms. Findlay about Roe 2's identity, there is no documentation showing that the EOC clarified to either Ms. Findlay or Ruby Kinder—the student who initially reported the alleged conduct to Ms. Findlay and reported separately to the EOC on the same day as Ms. Findlay—how vital it was for EOC to meet with the Complainants to offer supportive measures, discuss available processes, or assess any broader risk to the University community. This is something a reasonable administrator would do when they receive an anonymous complaint.

The initial delay between the reports and the notices is not the only delay that the Defendants' expert opines was appropriate without adequate justification. After UNC finally issued notices and no contact orders in late April and early May, there appears to have been no action by EOC for almost a month, until June, without any valid justification.

Those opinions are particularly questionable when considering that the Title IX regulations explicitly required UNC to notify Doe of Roe 1's April 9, 2021, formal complaint "upon receipt."[9] The regulations also required UNC to promptly notify Doe of any dismissal of that complaint. But the EOC did not provide notice of

---

[8] I reserve the right to update this information and my related opinion opinion if discovery discloses further information about Ms. Findlay's relationship with the University.

[9] *See* 34 C.F.R. § 106.45(b)(2). Although the preamble to the regulations recognizes some flexibility in the timing of the notice, they also recognize the importance of promptness throughout the Title IX process. 85 Fed. Reg. 30283. A reasonable administrator would know that the notice should be made promptly and without unnecessary delay, which in my experience is usually within 10 calendar days of receipt of the formal complaint.

either the formal complaint or the dismissal until June 30, 2021.[10] No reasonable administrator would consider a nearly three-month delay in providing notice to be consistent with the standard of care—especially where the university relied on the underlying allegations to impose interim disciplinary sanctions and revoke Doe's scholarship.

One final example of the flawed reasoning in the Defendants' expert report relates to the highly prejudicial and discriminatory delay by EOC regarding timing concerns surrounding Roe 3's retaliation allegations. The Defendants' expert suggests that the delay, which conveniently ensured that Doe remained unaware of the retaliation allegations during processes related to the no-contact order and the EEAC's second hearing, was in line with industry standards because it was the institution's "standard practice" to obtain a complainant's confirmation of the accuracy of the allegations before issuing notice.[11] But just because something is one institution's standard practice does not mean it is what a reasonable administrator would do in the field.

Based on my experience, training, and work in the field, it is my professional opinion that no reasonable administrator would conclude that the conduct reported by Roe 3—even if substantiated—would constitute a violation of university policy by Doe. [12] However, even assuming the conduct could be interpreted as a policy violation, there is no reasonable explanation in the record for the nearly month-long delay in

---

[10] UNC_0002042. Notably, that notice does not include the date of the initial formal complaint, which would have allowed the Respondent to readily understand the extent of the delay.

[11] Bullard Expert Opinion Report at 23.

[12] In addition to the fact that UNC's own policy permits a party to be charged with retaliation only for their own actions or those of someone acting on their behalf—a standard clearly not met by the private investigator in this case—there was not a no-contact order between Roe 3 and Doe at the time of the incident, so there was nothing improper about Doe or anyone else contacting Roe 3 about the case. Indeed, even if there had been a no-contact order in place between Roe 3 and Doe at the time of the investigator's interview, the interaction would still not be sufficient to support a retaliation charge. A reasonable administrator would recognize that broadly prohibiting or characterizing as retaliatory all off-campus, third-party contact—such as communication through attorneys or private investigators undertaken in support of a party's defense—without narrowly tailoring the restriction to address a specific, articulable risk of actual or reasonably anticipated harassment or disruption, raises serious constitutional and fairness concerns. The Defendants' expert fails to acknowledge or address any of these considerations in her seemingly unequivocal endorsement of UNC's actions regarding the no-contact directive and the subsequent retaliation allegation involving Roe 3.

drafting and issuing a notice of allegations, particularly when the university knew all the relevant alleged facts on the day the report was made. While delays in issuing notices may sometimes be justified, there is no evidence here that the EOC was actively working during that time to obtain Roe 3's consent to move forward. One would expect to see multiple documented attempts to secure approval of the allegations, including follow-up emails and a clear deadline within days of the report, if consent was indeed the limiting factor.

When considering these facts, the only apparent explanation for the delay is that the EOC was using the time to stretch the bounds of its own policies to support a retaliation charge against Doe based on the actions of a third party over whom he had no control, while simultaneously trying to prevent Doe from becoming aware of the allegations while engaging in other processes with the university relating to his case. In my professional opinion, this type of procedural maneuvering falls well outside the bounds of what a reasonable administrator would consider fair or appropriate, and it further illustrates the pattern of gender bias that Doe encountered in his interactions with the EOC.

While delays are often unavoidable in both Title IX and non-Title IX sexual misconduct matters, any reasonable administrator knows they must be supported by good cause. The expert's characterization of UNC's delays as "reasonable" and its process as "prompt" without engaging with the many concerns identified about those delays lacks reliability.

### B. Signing of Complaints

The Defendants' expert opines that the ECO's decisions to sign formal complaints in the cases against Doe were reasonable, but her report simply adds to my concerns about UNC's departure from industry standards on this issue.

Specifically, the Defendants' expert fails to address the numerous irregularities surrounding the decision to sign the formal complaints—irregularities that, in my professional opinion, strongly suggest the influence of gender bias. By overlooking the timing, selective enforcement, and inconsistent application of policy related to the signing of formal complaints, the expert's analysis omits critical context that is necessary to evaluate whether UNC's actions were aligned with the expectations of a reasonable and impartial administrator.

For example, Roe 1 filed a formal complaint on June 9, 2021. Only portions of it were determined to be subject to dismissal when she requested to withdraw her complaint. Nevertheless, the EOC signed a new formal complaint related to the one

allegation it decided should proceed despite Roe 1's request to withdraw. Under the 2020 Title IX regulations, a reasonable administrator would have denied the withdrawal request regarding that allegation and allowed the matter to proceed under the original complaint.

Beyond the procedural concerns, there are also substantive concerns with the decision to sign the formal complaint that the Defendants' expert does not adequately consider. According to the Defendants' expert, signing a formal complaint in this case comported with the standard of care because the EOC "carefully assessed whether [Roe 1's] non-participation would materially hinder their ability to investigate" and determined that it would not for the alleged sexual assault on November 19, 2020.[13] The Defendants' expert also cites the fact that "UNC was faced with multiple allegations against the same Respondent."[14] With respect to Roe 2, the Defendants' expert cites only two factors: the existence of several reports against Doe and Roe 2's willingness to participate in a hearing.[15]

However, the Defendants' expert opinion is based on a flawed understanding of the regulations she cites in support of it. It is true that the 2020 Title IX regulations permit an educational institution to dismiss a formal complaint, or specific allegations within it, if the complainant submits a written request to withdraw and it would not be clearly unreasonable in light of the known circumstances to grant the dismissal.[16] However, in the preamble to the 2020 rule, the Department of Education emphasized that, in all but the most exceptional circumstances, complainants should retain autonomy over whether to pursue or withdraw a formal complaint of sexual harassment. Only in limited, appropriate cases does an institution have the right to proceed with an investigation despite receipt of a written request for withdrawal.[17]

The example the Department provided of when an institution might exercise that discretion was "for example, where the recipient has gathered evidence apart from the complainant's statements and desires to reach a determination regarding the respondent's responsibility."[18]

---

13 Bullard Expert Opinion Report at 46.

14 *Id.*

15 *Id.*

16 34 CFR 106.45(d)(1)(iii).

17 85 Fed. Reg. 30289–90.

18 85 Fed. Reg. 30290.

But that example does not apply in this case. At the time that Roe 1 requested to withdraw her formal complaint, the institution had not initiated *any* investigation and so had not collected *any* evidence, let alone evidence apart from Roe 1's statements. The investigation of Roe 2's complaint had also not begun when the analysis of whether to sign a formal complaint occurred. Any suggestion otherwise would evidence an inappropriate blurring of the lines between the intake and investigation processes, which should not be done, especially under Title IX, where the investigation cannot begin until after a notice of allegations has been shared with both parties.

The preamble to the 2020 Title IX regulations also identifies several other factors that institutions can consider when deciding whether to proceed despite a complainant's request to withdraw, such as the presence of allegations of threats, serial predation, violence, or weapons.[19] But it makes clear that these are baseline considerations, none of which independently justify overriding a complainant's autonomy to withdraw or not file a formal complaint.

In fact, the Department of Education's proposed regulations in November 2018 included a provision that would have required a Title IX Coordinator to file a formal complaint upon receiving multiple reports against the same individual, *but that provision was intentionally removed in the final rule*.[20] As explained in the preamble, one purpose of removing the provision was to "reduce the likelihood that a complainant's desire not to file a formal complaint will be overridden by a Title IX Coordinator's decision to sign a formal complaint."[21]

The Department also expressly declined to adopt a rule requiring formal complaints to be filed whenever allegations involving threats, violence, or weapons were raised, reaffirming its commitment to a discretionary, case-by-case approach grounded in the specific facts and circumstances.[22]

---

19 85 Fed. Reg. 30217–18.

20 *See* 85 Fed. Reg. 30123 n.549.

21 *See* 85 Fed. Reg. 30286 (emphasis in original).

22 85 Fed. Reg. 30217. For this reason, as explained in my initial report, the EOC's own documented rationale for signing formal complaints in these cases—which the Defendants' expert does not address—fails to support the reasonableness of the decision. According to the worksheets completed by the EOC team at the time, the decision was based solely on the number of complaints

Taken together, these considerations call into serious question the opinion of the Defendants' expert that UNC's decision to override Roe 1's and Roe 2's autonomy simply because there were multiple allegations against Doe involving some force or violence was consistent with the standard of care.

The expert's opinion is especially difficult to reconcile with the timing of UNC's actions. By early April, the university undisputably knew of reports by four students who had reported being sexually assaulted by Doe. Although their stories changed markedly between their initial reports to Doe, their initial reports to the scholarship foundation, and their initial reports made to the EOC in April, by early April, the Complainants, working with EOC, had conceived the allegations of "violence" and "force" that the EOC relied on to sign the complaints in late June and knew who at least some of the Complainants were. Although the Complainants increasingly embellished their allegations throughout the lengthy evaluation process, they provided only vague claims without the specific details (who, what, when, where, etc.) that would allow a reasonable administrator to infer that misconduct occurred. That is why the final allegations were limited to a few instances, all of which were known to the EOC by early April.

If, as the Defendants' expert suggests, the risk to the campus community from the allegations was so significant that it justified proceeding without the Complainants' consent, there is no good reason for the university to have waited until June 30 to sign the complaints. While it is both appropriate and common for administrators to allow complainants time to consider whether to move forward and to review allegations, a delay of nearly three months between the report and the filing of a formal complaint falls well outside the range of what a reasonable administrator would view as acceptable under the circumstances. At a minimum, I would expect to

---

and the fact that the allegations involved sexual violence and force. As discussed above, relying on the number of complaints against a single respondent, without more, is an inadequate basis for initiating formal action. Moreover, "violence" and "force" are elements commonly present in sexual assault allegations and cannot, standing alone, justify overriding a complainant's clear request to withdraw or not participate in the formal complaint process. If the Department of Education had intended to require Title IX Coordinators to sign formal complaints whenever multiple allegations of sexual assault are made against the same respondent, it could have included such a mandate in the final rule—but it did not. Instead, the regulations call for an individualized assessment based on the specific facts and circumstances of each case. A reasonable administrator would understand that this assessment must be grounded in a documented, well-reasoned justification. Even taking the EOC's own worksheets at face value—something the Defendants' expert fails to do—UNC's actions fall short of the standard of care expected in this context.

see numerous communications between the EOC and the Complainants during that time, attempting to discern whether the Complainants were going to file complaints and notifying them that if they did not do so, the office would proceed with considering whether to sign a complaint. It does not appear that any of that happened, calling into question the reliability of the Defendant's expert's opinion, which fails even to consider the issue.

### C. Off-Campus Conduct

The Defendants' expert also defends UNC's decision to proceed with Roe 3's and Roe 4's complaints arising from alleged off-campus misconduct, asserting that factors such as "continuing trauma," "proximity concerns," and "avoidance behaviors on campus" "clearly met the threshold" for applying long-arm jurisdiction.[23] While some institutions do assert broad jurisdiction over off-campus conduct in non-Title IX cases through non-Title IX policies, the Defendants' expert acknowledges that UNC's non-Title IX policy limits such jurisdiction to cases where the off-campus conduct creates a "hostile environment" on campus. Courts that have addressed the issue of when a hostile environment is considered to be created on campus after a sexual assault off campus have consistently held that so-called "downstream effects," like those described by Defendants' expert, are not sufficient to constitute sexual harassment themselves. Reasonable administrators understand this.[24] Accordingly, under the scope of UNC's own policy, as cited by its own expert, the university's decision to pursue Roe 3's and Roe 4's complaints was not justified. I would not expect a reasonable administrator to make such a decision.

Like the Defendants' expert, the EOC failed to consider these critical issues. It issued what the Defendants' expert—somewhat perplexingly—describes as a "clear, well-reasoned, and policy-grounded justification for proceeding with the formal

---

[23] Bullard Expert Opinion Report at 47.

[24] *See, e.g.,* Greta Anderson, "Ruling Narrows Title IX Obligations," *Inside Higher Ed*, (December 12, 2019), *at* https://www.insidehighered.com/news/2019/12/13/federal-court-decision-favors-limited-application-title-ix#:~:text=%E2%80%9CIn%20some%20views,most%20liberal%20courts.%E2%80%9D (""In some views, the mere contact on campus is enough to cause action against the school," Dolce said. 'Courts across the country have said that the mere presence of the perpetrator on campus does not qualify [as hostile environment sexual harassment]… If the standard was otherwise, anytime a student sexually assaulted someone, you would have to expel them.'").

investigations," but that "justification" was simply a policy conclusion. To quote the entirety of the "justification," cited in full in the expert's report:

> The alleged conduct had or was reasonably likely to have continuing adverse effects or to create a hostile environment . . . [and posed] a significant risk of harm due to both the alleged conduct and other alleged misconduct by the Responding Party.

These statements do not reflect transparent, reasoned decision-making grounded in policy. Rather, they rely on conclusory references to generalized policy language offered without meaningful factual context or analytical support. They do not explain how the relevant jurisdictional standard was met or why the circumstances justified extending UNC's authority to off-campus conduct under its own policies. This absence of substantive engagement with the legal and factual complexities of the situation reflects a serious deficiency—one that appears not only in the Defendants' expert report but also in the underlying administrative record. In my professional opinion, this falls well short of what any recognized industry standards would require and further illustrates a concerning pattern in which the EOC appeared willing to stretch procedural and jurisdictional boundaries to ensure that the institution would be able to show how strongly it responds to reports by female students against males on its campus.

### D. Punitive Interim Actions

The Defendants' expert also asserts that the decision to impose and keep in place severe interim sanctions on Doe—which resulted in the loss of his prestigious scholarship and, ultimately, his suspension from the university during the lengthy resolution process—was reasonable.[25] However, the EEAC decision that Doe was a "danger to campus"[26] appears to have been based on the same flawed reasoning that led the EOC to sign formal complaints in the Roe 1 and Roe 2 cases. As addressed in

---

[25] *See* Bullard Expert Opinion Report at 44–45.

[26] Notably, this is not the standard for an emergency removal, such as an interim suspension, under Title IX. Under 34 C.F.R. § 106.44(c), the applicable standard is whether "an individualized safety and risk analysis … determines that an imminent and serious threat to the health or safety of a complainant or any students, employees, or other persons arising from the allegations of sex discrimination justifies removal." Most of the factors considered by the EEAC appear to be based on *mental* threats to health and safety; in my expert opintion, the record in this case would not suggest to a reasonable administrators that Doe posed an *imminent* and *serious* threat to anyone's *physical* health or safety, especially here the alleged misconduct was so differing in nature between the complainants.

my initial report and further discussed above, a reasonable administrator would not believe that the mere existence of multiple allegations referencing "force" or "violence," even against a single respondent, without more, would justify the significant and punitive interim measures implemented in this case.

The Defendants' expert praises the EEAC for its decision-making process, yet fails to acknowledge several critical deficiencies that undermine the integrity of that process. For example, the expert does not address the EOC's troubling decision to redraft and edit the complaints of the female Complainants before submitting them to the EEAC, making the allegations against the male Respondent appear more severe than what was originally reported. She also fails to address the fact that Doe was denied access to essential information during the EEAC proceedings, such as the identities of the complainants and the nature of the additional allegations they were making against him, some of which were demonstrably false and called their credibility into serious question. A reasonable administrator would understand that withholding such critical information in a high-stakes disciplinary context compromises the fundamental principles of notice and opportunity to be heard.

The expert also mischaracterizes key facts related to the no-contact order issued by the EEAC. She claims that, as of May 3, 2021—the day before the EEAC issued the order—Doe "no longer resided or planned to reside" in his apartment (which she refers to as "Coe's apartment").[27] In reality, Doe stated in an email to his roommate that he was planning to go by the apartment on May 3 to retrieve his belongings. That is a significant difference, and the expert's framing appears designed to deflect from the broader concerns raised by the no-contact order that were raised in my initial report.

Those concerns are substantial. The EEAC's order barred all communication between Doe and the complainants, including off-campus contact—an overbroad restriction that deviated from recognized industry standards, raised serious First Amendment concerns, and had the effect of forcing Doe to move out of his off-campus apartment. The orders were inconsistent with what a reasonable and neutral administrator would impose under similar circumstances. By overlooking those issues, the Defendants' expert sidesteps the core flaws inherent in UNC's handling of the matter.

---

[27] Bullard Expert Opinion Report at 15.

The Defendants' expert also describes the EEAC's "decision to maintain the interim measures" in its second hearing as "reasonable and well-supported." However, even a cursory review of the communication Doe received regarding that decision reveals that the EEAC offered no substantive analysis of the issues raised. In its August 25, 2021, letter, the EEAC stated only that "based on the presently available information, the EEAC did not find there was a material change in circumstances" and therefore "the summary suspension remains in place." This conclusory statement fails to engage with any of the arguments Doe presented. The attempt by the Defendants' expert to offer post hoc justifications for the EEAC's decision so she can characterize it as reasonable and well-supported does not cure the deficiency. Holding a hearing and issuing a letter may satisfy procedural formalities, but as any reasonable administrator understands, those steps must be accompanied by a meaningful analysis of the concerns raised and precise documentation of not only the decision but also the basis for it. Simply going through the motions is not enough.

In evaluating the brief and unsupported nature of the EEAC's decision, it is particularly troubling that the Defendants' expert asserts there was "no credible evidence" that the false statements made by Roes 2 and 4 in late July 2021 were considered by the EEAC.[28] There is no dispute that the EOC shared those allegations, including false claims about Doe having a gun, trying to break into the frat house, and causing fear amongst his frat brothers, among other things, with the EEAC prior to its decision. If, as the Defendants' expert now claims, the "unverified remarks" were so irrelevant to the EEAC's process that they were not even taken into account, it raises the question of why they were provided to the EEAC at all. Either the EEAC considered them, in which case their relevance must be addressed, or they were shared unnecessarily, casting doubt on the neutrality of the process. In either scenario, I see no support for the expert's claim that this episode—or the EEAC's broader handling of the matter—reflects the "objectivity and integrity" of the process.

This is one of several instances where the Defendants' expert engages in a recurring and concerning strategy that was used throughout UNC's adjudication process —namely, the improper shifting of the burden onto Doe to prove deficiencies that the university itself has the duty to refute. To the extent there is no affirmative evidence showing that the EEAC considered information that even the Defendants' expert appears to agree would have been inappropriate, that absence stems from the EEAC's failure to document its decision-making in a manner consistent with

[28] Bullard Expert Opinion Report at 45.

expectations for a case of this nature. It is not Doe's burden to produce evidence disproving the propriety of the EEAC's process. As any reasonable administrator understands, it is the institution's responsibility to ensure that its decisions are transparent, well-reasoned, and capable of withstanding future scrutiny. UNC's repeated failure to meet that standard—and the consistent efforts by both the university and its expert to deflect accountability by improperly shifting the burden onto a student—underscore a pattern of conduct that, in my professional opinion, constitutes significant evidence of gender bias.

## III. Investigations

Once again, the report of the Defendants' expert emphasizes procedural form over substantive sufficiency. The report's analysis primarily focuses on whether procedural steps were completed without adequately addressing whether those steps were carried out in a manner consistent with sound investigative practices. Instead of engaging with the core deficiencies that undermined the integrity of the investigation process, the report offers general praise that overlooks or sidesteps the serious procedural flaws documented in the record and detailed in my initial report.[29]

The Defendants' expert also appears to defend the investigations team's actions because of what she calls the "challenging situation" the investigators faced—a case involving four complaints against a single respondent and two different policies.[30] While I acknowledge that coordinating multiple complaints under both Title IX and non-Title IX frameworks can be complex, in my professional experience, such complexity is common in higher education civil rights investigations and does not distinguish this case from many others. In fact, the allegations here primarily involved "he said, she said" accounts, which, though sensitive, can be procedurally straightforward. That is particularly true in cases like this, where the investigation team made minimal efforts to gather information beyond party and witness statements, resulting in a relatively modest evidentiary record. The investigative reports in the cases also consist largely of procedural recitations, evidence lists, and unelaborated interview summaries, with only minimal substantive analysis that fails to address many of the arguments raised by Doe throughout the process. On those facts, it is difficult to see how this case could be characterized as a particularly extensive or demanding one.

---

29 Bullard Expert Opinion Report at 47–48.

30 *Id.* at 47.

Rather than addressing the serious concerns about the disparate treatment the male Respondent received from investigators in comparison to the female Complainants, the Defendants' expert sidesteps the issue by mischaracterizing the facts[31] and then claiming, *ipse dixit*, that the investigators "offered each party the opportunity to provide supporting documentation," "requested such materials diligently," and "fulfilled its duty to make reasonable efforts to obtain all relevant information per industry standards."

However, it seems that, contrary to the expert report's claims, the investigators failed to share all evidence directly related to the allegations with the parties. For example, the investigation team did not disclose to Doe information about certain complainants withdrawing their reports or falsely reporting that Doe was on campus with a gun, trying to break into his old fraternity house. That information was clearly not just "directly related" to the matters at hand but *relevant* to the credibility of the complainants. A reasonable administrator would know that failing to provide that information would deprive the respondent of a full opportunity to prepare and respond to the allegations and would fall below the standard of care for investigations in higher education settings.

It also seems that the investigators did not meet their obligation to make reasonable efforts to obtain all relevant information, as the Defendants' expert claims.[32] Those shortcomings are addressed in my initial report, but are most evident in the case involving Roe 1.

---

[31] For example, the Defendants' expert claims that when Roe 1 made her report to the EOC, she "reported she woke up at approximately 3:00AM or 4:00AM [sic] experiencing vaginal pain that she associated with either the onset of menstruation, or with rough sex." Bullard Expert Opinion Report at 12. However, the document she cites clearly states that Roe 1 reported waking up with vaginal pain that made her think "she may have started her period"—with no mention of rough sex. Even when Roe 1's statement later describes waking up again at home much later in the morning, she still did not suggest that the pain was associated with rough sex.

This is a critical factual point, and yet the Defendants' expert glosses over it—just as the investigators, decision-makers, and appellate officers at UNC did. The consistent failure to engage with or reconcile the contradictions in the Complainants' accounts is a stark example of how far UNC's handling of this matter deviated from accepted standards in the field. Any reasonable administrator would recognize that such discrepancies demand careful scrutiny, and UNC's failure to do so leads inescapably to my expert opinion that its actions were tainted by gender bias.

[32] *Id.* at 48.

There is no dispute that the Roe 1 matter proceeded to a hearing even though the Notice of Allegations included both an incorrect date and an incomplete and inaccurate description of the alleged conduct. Throughout the investigation, the allegation was consistently framed as non-consensual sexual intercourse occurring on November 19, despite the Defendants' expert's assertion that the investigation was thorough and adequate. Yet, once the hearing began, the complainant introduced a significantly different factual theory for the first time, alleging that the incident occurred on a different night and that she had been so incapacitated by alcohol that she was unaware the respondent was engaging in rough sex with her while she was unconscious.

Despite this substantial shift in the nature and timing of the allegation, the Notice of Allegations was never updated to reflect the critical changes. In fact, it appears that Beth Froehling edited the original notice *to remove* the phrase "while incapacitated," rendering the allegations less descriptive—something I would never expect to see in a process purporting to ensure adequate notice. The omission is especially troubling, given that the correct date could have been easily determined during the investigation had the investigators simply asked the complainant a few probing questions instead of apparently acting more like their counsel.

The failure to provide accurate and complete notice of the specific allegations violated the clear requirements of the 2020 Title IX regulations, which mandate that the notice include "sufficient details," including the "conduct allegedly constituting sexual harassment" and the "date… of the alleged incident."[33] The regulations also place the burden of collecting sufficient evidence on the institution, not on the parties.[34] Yet the Defendants' expert neither acknowledges nor addresses the failure to update the details of the sexual assault in the notice to match what the EOC knew were the alleged facts of the nature of the sexual assault, let alone why it would remove such information from the notice at the outset.[35]

The Defendants' expert does attempt to justify the inaccuracy regarding the date in the notice by pointing to the phrase "on or around," suggesting it was sufficient to alert Doe that the incident could have occurred earlier. She further claims that such language is appropriate because complainants may not always recall precise

---

[33] 34 C.F.R. § 106.45(b)(2)(ii).

[34] 34 C.F.R. § 106.45(b)(5)(i).

[35] She also fails to address this and other examples of clear gender based bias when opining that the impartiality of the process met industry standards.

dates.[36] While that may be true in some cases, it is not true in this case. Within moments of hearing Doe's opening statement, which clearly explained why the conduct could not have occurred on November 19, Doe provided an alternate date. Had the investigators done what I would have expected, they would have gone back to the Complainant to ask probing questions about the date she provided when they realized, from Doe, that it was impossible the incident occurred on the provided date. A reasonable administrator would not accept vague language as satisfying the requirement for "sufficient details" when the actual date was clearly not in hand and was readily ascertainable.

Instead of pursuing clarification as I would expect, the investigators appear to have treated the complainants' and their supporting witnesses' statements as presumptively accurate, without requiring corroboration or applying appropriate scrutiny. As detailed in my initial report, they asked leading rather than probing questions, seemingly aimed at reinforcing the Complainants' narratives rather than testing their reliability—an approach not mirrored in their treatment of the male Respondent.

Even if one were to accept the argument that "on or around" provides technical compliance with notice requirements, that would not excuse the investigators' failure to resolve such a fundamental factual discrepancy prior to the hearing. Nor would it justify the Defendants' expert's failure to confront what that discrepancy reveals about the overall adequacy of the investigation. Rather than recognizing any investigative shortcomings, the expert shifts responsibility to Doe, suggesting that he should have pieced together the correct date based on a passing reference in the record to a Christmas decorating party.

This reasoning is deeply flawed. The investigative record shows that Doe was never asked about the party, nor was he provided with sufficient context to infer its relevance. The idea that a 20-year-old student, under significant stress and facing serious allegations, should have been expected to identify and correct a mistake that trained investigators overlooked undermines basic principles of fairness and due process.

It is the investigator's responsibility, not the respondent's, to ask the necessary questions and clarify key facts. Allowing the case to proceed to a hearing without addressing such a material issue reflects a serious lapse in investigative diligence. In

---

[36] Bullard Expert Opinion Report at 48–49.

my professional opinion, the most plausible explanation for why such a critical error was allowed to persist was that the purpose of the investigation was not to obtain all relevant facts but rather to present a case to prosecute the male Respondent. Had such a mistake occurred under my supervision, I would not only view it as a failure that jeopardizes the integrity of the investigation; it would, quite frankly, be an embarrassment.

## IV. Hearings and Appeals

The Defendants' expert opines—without meaningful support—that the hearing and appeals processes were in line with industry norms. However, her report fails to engage with the numerous deficiencies I identified in my initial report.

For example, the Defendants' expert attempts, as she did with the investigation, to shift blame to Doe for the hearing board's failings. For example, regarding the hearing board's failure to return the case to investigation once it became clear at the outset of the hearing that the allegations were inadequately developed[37]—a clearly inappropriate position for the reasons discussed in the previous section—she blames Doe for supposedly not raising the issue at the right time in the process. Of course, the institution has the responsibility to ensure a procedurally sound process, not the student. A reasonable administrator would have returned the case to the investigative phase under the circumstances without any prodding from the party. At a minimum, they would not proceed in such a case without the on-the-record agreement of both parties that it was appropriate to do so. Neither of those things happened here, but instead of engaging with those facts, the Defendants' expert suggests that Doe should somehow have known that raising the issue at the time he was directed to (on appeal) was not actually the appropriate time to do so.[38]

Equally unconvincing is the expert's assertion that allowing an advisor to testify on behalf of the complainant somehow *enhanced* the institution's compliance with the applicable standard of care.[39] UNC could have provided Doe with countless procedural steps, but if those procedures were implemented in a manner that reveals

---

[37] Bullard Expert Opinion Report at 48–50.

[38] Where university administrative proceedings are not courts of law, most reasonable administrators recognize the inappropriateness of denying appeals based on procedural waiver or forfeiture.

[39] Bullard Expert Opinion Report at 49.

substantive flaws, particularly those indicative of gender bias, the process still fails to meet the applicable standard of care.

The Defendants' expert suggests that the findings against Doe in the Roe 1 and Roe 4 cases were appropriate, despite those witnesses not testifying at the hearing,[40] but her understanding of the provisions of the Title IX rule she relies on for that opinion is flawed. It is true that the 2020 Title IX rule provided that "[i]f a party or witness does not submit to cross-examination at [a] live hearing, the decision-maker(s) must not rely on any statement of that party or witness in reaching a determination regarding responsibility…."[41] It is also true that the "exclusionary rule," as it was commonly referred to in the field, was deemed arbitrary and capricious by a court and is no longer used by the U.S. Department of Education.

However, the removal of the exclusionary rule from the Title IX regulations does not mean that institutions *must* consider such evidence; rather, it means that they may exercise *discretion* to do so *as appropriate*. Moreover, any reasonable administrator knows that even if you accept and consider certain evidence, you must also determine what weight to give it based on its characteristics of reliability.

For that reason, in a case where credibility is as essential as it was in the Doe cases, I would not expect a reasonable administrator to unquestioningly accept the out-of-hearing statements of the Complainants, particularly when Doe raised so many reasonable issues about their credibility that the hearing boards in Roe 1's and Roe 4's cases did not even reasonably evaluate. Instead, they applied a double standard with respect to credibility as applied to the male Respondent and the female Complainants to reach their decisions without adequately showing their work to consider credibility.

Similarly, the Defendants' expert's reliance on 34 C.F.R. § 106.45(b)(6)(i) of the Title IX regulations—which prohibits decision-makers from drawing an inference regarding responsibility based solely on a party's failure to appear or submit to cross-examination—misstates the standard by omitting the critical importance of the term "solely." The regulation does not bar decision-makers from considering a party's refusal to appear or answer cross-examination questions as a factor in assessing credibility. To the contrary, such behavior may appropriately be one of several factors

40 *Id.*

41 34 C.F.R. § 106.45(b)(6)(i).

weighed—potentially even a dispositive one—so long as it is not the exclusive basis for the credibility determination.

In this case, Doe raised several substantive challenges to the credibility of Roe 1 and Roe 4 during the investigation process beyond their refusal to appear or fully respond to cross-examination. Contrary to the assertion of Defenedant's expert,[42] it appears that Doe was limited in addressing Roe 4's credibility. And to the extent that Doe did raise credibility concerns with the Roes and witnesses during the hearings, in both matters, the hearing panels inexplicably failed to adequately analyze or explain their incomprehensible findings that Doe, who appeared and subjected himself to cross-examination, was less credible than Complainants and witnesses who failed to participate in the hearing process at all and whose recollections of the case were riddled with inconsistencies, evidence of bias and collusion, and, in some cases, outright lies.

This is particularly troubling in Roe 4's case, where, as the Defendants' expert acknowledges,[43] neither the complainant nor any supporting witnesses appeared at the hearing. In my professional experience, such an outcome is extraordinary. It would only be justifiable under circumstances where the respondent had made clear admissions of misconduct or where credibility was otherwise not a significant issue. That was not the case here, so the lack of a reasoned explanation for the panel's determinations is highly inconsistent with industry standards.

The expert also suggests that because two hearing panels ultimately found Doe not responsible, this somehow proves the fairness of the overall UNC process. She offers no analysis to support this conclusion, merely asserting that the different outcomes stemmed from factual differences rather than procedural inconsistencies.[44] As I explained in my initial report, however, there were significant concerns—such as the leading nature of the investigators' questions and the failure of key witnesses to appear and be cross-examined—appropriately acknowledged by some hearing boards and wholly ignored by others. Such inconsistency is not indicative of a sound process but instead suggests that some decision-makers were appropriately applying the relevant standards while others were not, and that the EOC was not guiding them to apply policies consistently as I would expect them to do.

---

42 Bullard Expert Opinion Report at 33.

43 *Id.* at 32.

44 *Id.* at 50.

While the expert claims that the respondents received separate hearings, it appears the investigators blurred the lines, introducing prejudicial and irrelevant information into the proceedings. This likely influenced certain panels and the appellate decision-maker in a manner inconsistent with the standard of care, especially where the investigators and hearing officers appeared to cherry-pick which credibility evidence would and would not be allowed, rather than allowing all relevant evidence to be presented.

Finally, the appeals themselves were cursory, each consisting of approximately ten pages, despite the Defendants' expert characterizing the underlying cases as exceedingly complex.[45] The expert cites the existence of an appeal process as evidence of fairness; however, in my expert opinion, the brief decisions lacking significant analysis of the issues raised reflect a superficial review that more closely resembles a rubber stamp than a meaningful reconsideration.

For example, the expert defends the handling of Doe's concern about Roe 1's early departure from the hearing—before his advisor had an opportunity to ask all of his questions challenging her credibility—by asserting that Doe failed to raise the issue at a particular moment during the proceeding.[46] This justification, which was also relied on in the appeal decision, ignores Doe's report that his advisor had been expressly instructed to raise such concerns on appeal. The expert does not substantively address that claim, let alone grapple with the fundamental unfairness of penalizing a party for following the institution's own guidance. Procedural formality does not equate to fairness when the process is undermined by bias and flawed execution. In such circumstances, a process that purports to offer due process, but does not deliver it in substance, fails to meet the standard of care and, in my opinion considering the totality of the evidence in this case, shows gender bias.

## V. Conclusion

Nowhere does Doe argue—and I have never opined—that UNC was required to follow best practices or reach a result that satisfied Doe.[47] Those claims by the Defendants' expert are red herrings. The Defendants' expert report is rife with such logical fallacies as well as conclusory assertions, exaggerations, and factual distortions offered in support of a predetermined narrative.

---

45 *Id.* at 47.

46 *Id.* at 31.

47 *Id.* at 50.

Jacob Doe was consistently treated less favorably than his female accusers in ways that any reasonable administrator would recognize as suggesting gender bias, not just procedural error. As discussed above and in my initial report, whereas Doe was faulted for lack of corroborating evidence, the Roes were not discredited—even when they lied, failed to produce promised medical records or what should have been easy-to-produce text messages, or refused to appear for cross-examination. The EOC redrafted the Roes complaints and investigation reports to remove language undermining the Roes' claims, but never altered Doe's statements to present him in a more favorable light. In Doe's case, mere rumors (e.g., about weapons or breaking into a frat house) were passed to disciplinary panels without his knowledge and treated as proof of "danger," while similar or worse behavior by accusers—such as reports of patently untrue claims against Doe—was ignored. When Doe declined to consolidate hearings, the EOC consolidated them anyway through backdoor cross-referencing, allowing each Roe to bolster the others' claims, but Doe was regularly shut down when he tried to present or provide necessary context to credibility evidence, even against the Complainant in a case. In Roe 1's hearing, after she was caught in a lie and exited the proceeding, her lawyer was allowed to speak for her—violating clear standards of cross-examination rules, particularly in Title IX cases—while Doe's polygraph and sworn statements were dismissed. Even when Roe 1 and Roe 4 repeatedly changed their stories, failed to appear, or were directly contradicted by neutral witnesses, the investigators and decision-makers still recommended Doe's expulsion based primarily on minor inconsistencies in his statements that they deemed to be evidence that he was not credible.[48]

The consistent, repeated, and serious differential treatment Doe received is stark and, in my view, appears to be due to his status as a male respondent accused of sexual misconduct by a group of women, members of a demographic whose activism had recently drawn intense public scrutiny and federal attention to UNC. I do not see anything in the record to support the expert's claim that UNC's revised policies and practices after those embarrassing incidents improved fairness for any parties; indeed, the record suggests that they decreased fairness for respondents.

---

[48] For example, the Defendants' expert highlights that the hearing panel found uncredible in Roe 1's case that Doe said women were not allowed int eh fraternity house after the Christmas decorationg party, which is a relatively minor issue. Similarly, she refers to Doe saying that he first learned about "breath play" on YouTube but that he did not initiate it with Doe 1 until she raised the suggestion as a contradiction, even though those statements do not appar contradictory in the slightest. Bullard Expert Opinion Report at 33.

A central failing in this case is UNC's refusal to engage meaningfully with the concerns raised by Doe throughout the process. He raised numerous legitimate issues, as was his right. Had the university responded by demonstrating its reasoning, documenting its conclusions transparently, and clearly explaining both process and outcomes, I might not be offering this critique. But UNC did not do those things. Its conduct fell so short of the standards I would expect to see in this field—particularly at an institution of UNC's stature and with the significant resources at its disposal—that it would lead any reasonable administrator to be concerned that the university's actions in the case were tainted by gender bias.

Respectfully Signed,



Jacqueline Farideh Wernz

ECR Solutions PLLC